1  MICHAEL R. FARRELL (BAR NO. 173831)
   MATTHEW D. PHAM (BAR NO. 287704)
2  ALLEN MATKINS LECK GAMBLE
     MALLORY & NATSIS LLP
3  865 South Figueroa Street, Suite 2800
   Los Angeles, California 90017-2543
4  Phone: (213) 622-5555
   Fax: (213) 620-8816
5  E-Mail: mfarrell@allenmatkins.com
           mpham@allenmatkins.com
6
   Attorneys for Plaintiff
7  AMERICAN EQUITY INVESTMENT LIFE
   INSURANCE COMPANY
8

9              UNITED STATES DISTRICT COURT

10            EASTERN DISTRICT OF CALIFORNIA

11                  FRESNO DIVISION

12  AMERICAN EQUITY INVESTMENT          Case No.
    LIFE INSURANCE COMPANY,
13                                       **COMPLAINT FOR SPECIFIC**
                 Plaintiff,              **PERFORMANCE AND**
14                                       **APPOINTMENT OF RECEIVER**
          vs.
15
    MARICOPA ORCHARDS, LLC; 104
16  INVESTMENTS, LLC; ACAP FARMS,
    LLC; C & A FARMS, LLC; CANTUA
17  ORCHARDS, LLC; COPPER AVENUE
    INVESTMENTS, LLC; FFGT FARMS,
18  LLC; GRADON FARMS, LLC;
    GRANTOR REAL ESTATE
19  INVESTMENTS, LLC; LINCOLN
    GRANTOR FARMS, LLC; LOCANS
20  INVESTMENTS, LLC; and WILLOW
    AVENUE INVESTMENTS, LLC,
21
                 Defendants.
22

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Plaintiff AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY, an Iowa corporation ("American Equity" or "Plaintiff"), hereby brings this complaint (the "Complaint") against the following defendants (collectively, "Defendants," and individually, "Defendant"): (1) MARICOPA ORCHARDS, LLC, a California limited liability company; (2) 104 INVESTMENTS, LLC, a California limited liability company; (3) ACAP FARMS, LLC, a California limited liability company; (4) C & A FARMS, LLC, a California limited liability company; (5) CANTUA ORCHARDS, LLC, a California limited liability company; (6) COPPER AVENUE INVESTMENTS, LLC, a California limited liability company; (7) FFGT FARMS, LLC, a California limited liability company; (8) GRADON FARMS, LLC, a California limited liability company; (9) GRANTOR REAL ESTATE INVESTMENTS, LLC, a California limited liability company; (10) LINCOLN GRANTOR FARMS, LLC, a California limited liability company; (11) LOCANS INVESTMENTS, LLC, a California limited liability company; and (12) WILLOW AVENUE INVESTMENTS, LLC, a California limited liability company.  In support of the Complaint, Plaintiff alleges as follows:

# I.  **PARTIES**

1.  Plaintiff AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY is, and at all times mentioned herein was, an Iowa corporation organized and existing under and by virtue of the laws of the State of Iowa and authorized to do business in the State of California, with its principal place of business located in West Des Moines, Iowa.

2.  On information and belief, defendant MARICOPA ORCHARDS, LLC ("Maricopa Orchards") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

3.      On information and belief, defendant 104 INVESTMENTS, LLC ("104 Investments") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

4.      On information and belief, defendant ACAP FARMS, LLC ("ACAP Farms") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

5.      On information and belief, defendant C & A FARMS, LLC ("C & A Farms") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

6.      On information and belief, defendant CANTUA ORCHARDS, LLC ("Cantua Orchards") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

7.      On information and belief, defendant COPPER AVENUE INVESTMENTS, LLC ("Copper Avenue") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

8.      On information and belief, defendant FFGT FARMS, LLC ("FFGT Farms") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

9.      On information and belief, defendant GRADON FARMS, LLC ("Gradon Farms") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

10. On information and belief, defendant GRANTOR REAL ESTATE INVESTMENTS, LLC ("Grantor Real Estate") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

11. On information and belief, defendant LINCOLN GRANTOR FARMS, LLC ("Lincoln Grantor Farms") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

12. On information and belief, defendant LOCANS INVESTMENTS, LLC ("Locans Investments") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

13. On information and belief, defendant WILLOW AVENUE INVESTMENTS, LLC ("Willow Avenue") is, and at all times mentioned herein was, a California limited liability company licensed to do business in the State of California, with its principal place of business located in the State of California.

## II.   JURISDICTION AND VENUE

14. The United States District Court for the Eastern District of California (the "Court") has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because (a) the action is civil in nature, (b) diversity of citizenship exists between Plaintiff and each Defendant, and (c) the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. Venue in the Eastern District of California is proper because one or more Defendants reside in this district, and all Defendants are residents of the State of California. *See* 28 U.S.C. § 1391(b)(1). Venue is also proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district and because a substantial portion of the property at issue in this action is situated in this district. *See id.* § 1391(b)(2).

III.   **GENERAL ALLEGATIONS**

    A.    **Loans made to Defendants.**

    16.    Beginning in July 2020, Conterra Agricultural Capital, LLC ("Conterra") began making a number of loans to Defendants (collectively, the "Loans," and individually, a "Loan"), as discussed below.  The Loans had been funded by American Equity, and contemporaneously with the closing of each Loan, Conterra would transfer its interest in the Loan to American Equity.  Thereafter, Conterra would continue to service the Loan as agent for American Equity.

            1.    **Loan #AG1021 and Loan #AG1024.**

    17.    On or about July 23, 2020, Conterra, as lender, made a loan to Maricopa Orchards and Willow Avenue, as borrowers, in the original principal amount of $5,550,000, identified as Loan #AG1021 (the "1021 Loan").

    18.    Maricopa Orchards and Willow Avenue's obligation to repay the 1021 Loan is memorialized in that certain promissory note titled *Note* and dated July 23, 2020 (the "1021 Note"), under which they promised to repay $5,550,000 in principal, with interest (originally set at the nondefault rate of 3.75% per annum), to Conterra.  The 1021 Note requires semiannual payments of principal and interest to be made (the first in the amount of $94,400.66 plus all then accrued interest, and the following nineteen in the amount of $198,463.16 each) and has a ten-year term, maturing on July 23, 2030, at which time all remaining amounts owed thereunder become due and payable.  A true and correct copy of the 1021 Note is attached hereto as **Exhibit 1**.

    19.    The 1021 Note was originally secured by that certain *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated July 23, 2020, which was recorded in the official records of the Kern County Recorder on July 23, 2020, as Document No. 220096750 (the "1021-Kern Deed of Trust").

    20.    On or about July 23, 2020, Conterra, as lender, also extended a revolving line of credit loan to Maricopa Orchards and Willow Avenue, as

borrowers, with advances not to exceed $4,696,367, which loan is identified as Loan #AG1024 (the "1024 Loan").  Funds in the amount of $1,310,840 were initially advanced to Maricopa Orchards and Willow Avenue under the 1024 Loan, and on or about July 1, 2021, additional funds in the amount of $303,957 were advanced to Maricopa Orchards and Willow Avenue under the 1024 Loan.

21.     Maricopa Orchards and Willow Avenue's obligation to repay the 1024 Loan was originally memorialized in that certain promissory note titled *Note* and dated July 23, 2020 (the "1024 Note"), under which they promised to repay the amount advanced on the 1024 Loan, with interest (at a variable rate), to Conterra. The 1024 Note required semiannual interest-only payments to be made and has a seven-year term, maturing on July 23, 2027, at which time all remaining amounts owed thereunder become due and payable.  A true and correct copy of the 1024 Note is attached hereto as **Exhibit 2**.

22.     The 1024 Note was originally secured by that certain *Open-End Deed of Trust (with Future Advance Clause)[,] Security Agreement, Assignment of Rents and Fixture Filing* dated July 23, 2020, which was recorded in the official records of the Kern County Recorder on July 23, 2020, as Document No. 220096752 (the "1024-Kern Deed of Trust").

23.     In addition, a UCC financing statement, corresponding to both the 1021-Kern Deed of Trust and 1024-Kern Deed of Trust (together, the "1021/1024-Kern Deeds of Trust"), was also (a) filed with the California Secretary of State on October 12, 2020, as File No. U200029038629 (the "Filed 1021/1024 UCC-1"), and (b) recorded in the official records of the Kern County Recorder on October 23, 2020, as Document No. 220156769 (the "Recorded 1021/1024-Kern UCC-1").  The Filed 1021/1024 UCC-1 was subsequently amended (to address the omission of an exhibit) by a UCC financing statement amendment filed with the California Secretary of State on April 7, 2021, as File No. U210036237933 (the "1st Filed

1  1021/1024 UCC-3").  True and correct copies of the Filed 1021/1024 UCC-1 and

2  1st Filed 1021/1024 UCC-3 are attached hereto as **Exhibits 3 and 4**, respectively.

3      24.     Under each of the 1021/1024-Kern Deeds of Trust, Willow Avenue

4  originally granted Conterra a security interest in certain real property (generally

5  described as approximately 473 acres located in Kern County, California); all

6  buildings, improvements, equipment, fixtures, and permanent plantings affixed to,

7  attached to, or incorporated in the real property (including all rents, issues, profits,

8  income, and proceeds therefrom); all water rights appurtenant to the real property;

9  and other property as described in the 1021/1024-Kern Deeds of Trust (collectively,

10  the "Original 1021/1024 Collateral").  Specifically excluded from the Original

11  1021/1024 Collateral, as set forth in the 1021/1024-Kern Deeds of Trust, are any

12  "growing crop" and any "rolling stock" affixed or attached to the real property, as

13  well as any "crop receivables."  The 1021/1024-Kern Deeds of Trust also include an

14  assignment-of-rents provision, under which Willow Avenue absolutely and

15  unconditionally assigns all rents and revenues of the Original 1021/1024 Collateral

16  to Conterra.

17      25.     Conterra assigned to American Equity all of its interests relating the

18  1021 Loan, including in the 1021 Note and 1021-Kern Deed of Trust, as evidenced

19  by, among other things, (a) that certain *Allonge to Promissory Note* relating to the

20  1021 Note (the "1021 Allonge") and (b) that certain *Assignment of Deed of Trust*,

21  which was recorded in the official records of the Kern County Recorder on July 23,

22  2020, as Document No. 220096751 (the "1021-Kern DOT Assignment").

23  Nevertheless, Conterra continues to act as American Equity's agent and loan

24  servicer for the 1021 Loan.  A true and correct copy of the 1021 Allonge is attached

25  hereto as **Exhibit 5**.

26      26.     Conterra also assigned to American Equity all of its interests relating to

27  the 1024 Loan, including in the 1024 Note and 1024-Kern Deed of Trust, as

28  evidenced by, among other things, (a) that certain *Allonge to Promissory Note*

relating to the 1024 Note (the "1024 Allonge"), and (b) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Kern County Recorder on July 23, 2020, as Document No. 220096753 (the "1024-Kern DOT Assignment"). Nevertheless, Conterra continues to act as American Equity's agent and loan servicer for the 1024 Loan. A true and correct copy of the 1024 Allonge is attached hereto as **Exhibit 6**.

27. On or about December 16, 2021, American Equity, on the one hand, and Maricopa Orchards and Willow Avenue, on the other hand, entered into that certain *Collateral Substitution Agreement* dated December 16, 2021 (the "1021/1024 Collateral Substitution Agreement"), under which Maricopa Orchards and Willow Avenue agreed to substitute the Original 1021/1024 Collateral with other collateral in connection with the 1021 Loan and 1024 Loan. A true and correct copy of the 1021/1024 Collateral Substitution Agreement is attached hereto as **Exhibit 7**.

28. On or about December 16, 2021, Maricopa Orchards and Willow Avenue also exercised an option to convert the 1024 Loan, which was, at that time, a revolving line of credit loan, into a term loan to repay the amount of funds advanced to date under the 1024 Loan. Accordingly, on or about December 16, 2021, American Equity, on the one hand, and Maricopa Orchards and Willow Avenue, on the other hand, entered into that certain *Agreement to Convert and Amended and Restated Note* dated December 16, 2021 (the "1024 Amended Note"), under which the terms of the 1024 Note were amended and Maricopa Orchards and Willow Avenue were now promising to repay $1,614,797 in principal, with interest (originally set at the nondefault rate of 3.75% per annum), to American Equity. The 1024 Amended Note requires semiannual payments of principal and interest to be made (the first in the amount of all then accrued interest, and the following seventeen in the amount of $59,796.99 each) and matures on July 23, 2030, at which

1  time all remaining amounts owed thereunder become due and payable.  A true and
2  correct copy of the 1024 Amended Note is attached hereto as **Exhibit 8**.

3       29.     In accordance with the 1021/1024 Collateral Substitution Agreement,
4  the 1021 Note became secured by that certain *Deed of Trust[,] Security Agreement,*
5  *Assignment of Rents and Fixture Filing* dated December 16, 2021, which was
6  recorded in the official records of the Fresno County Recorder on December 17,
7  2021, as Document No. 2021-0206984 (the "1021-Fresno Deed of Trust").  A true
8  and correct copy of the 1021-Fresno Deed of Trust is attached hereto as **Exhibit 9**.

9       30.     In accordance with the 1021/1024 Collateral Substitution Agreement,
10  the 1024 Amended Note became secured by that certain *Deed of Trust[,] Security*
11  *Agreement, Assignment of Rents and Fixture Filing* dated December 16, 2021,
12  which was recorded in the official records of the Fresno County Recorder on
13  December 17, 2021, as Document No. 2021-0206985 (the "1024-Fresno Deed of
14  Trust").  A true and correct copy of the 1024-Fresno Deed of Trust is attached
15  hereto as **Exhibit 10**.

16       31.     In addition, (a) a UCC financing statement, corresponding to both the
17  1021-Fresno Deed of Trust and 1024-Fresno Deed of Trust (together, the
18  "1021/1024-Fresno Deeds of Trust"), was recorded in the official records of the
19  Fresno County Recorder on December 17, 2021, as Document No. 2021-0206986
20  (the "Recorded 1021/1024-Fresno UCC-1"), and (b) two UCC financing statement
21  amendments, further amending the Filed 1021/1024 UCC-1 and corresponding to
22  the 1021/1024-Fresno Deeds of Trust, were filed with the California Secretary of
23  State on December 19, 2021, as File No. U210111410316 (the "2nd Filed
24  1021/1024 UCC-3") and File No. U210111411217 (the "3rd Filed 1021/1024
25  UCC-3").  True and correct copies of the Recorded 1021/1024-Fresno UCC-1, 2nd
26  Filed 1021/1024 UCC-3, and 3rd Filed 1021/1024 UCC-3 are attached hereto as
27  **Exhibits 11, 12, and 13**, respectively.

28

32.     Under each of the 1021/1024-Fresno Deeds of Trust, Willow Avenue originally granted American Equity a security interest in certain real property (generally described as approximately 1,614.18 acres located in Fresno County, California); all buildings, improvements, equipment, fixtures, and permanent plantings affixed to, attached to, or incorporated in the real property (including all rents, issues, profits, income, and proceeds therefrom); all water rights appurtenant to the real property; and other property as described in the 1021/1024-Fresno Deeds of Trust (collectively, the "Substituted 1021/1024 Collateral").  Specifically excluded from the Substituted 1021/1024 Collateral, as set forth in the 1021/1024-Fresno Deeds of Trust, are any "growing crop" and any "rolling stock" affixed or attached to the real property, as well as any "crop receivables."  The 1021/1024-Fresno Deeds of Trust also include an assignment-of-rents provision, under which Willow Avenue absolutely and unconditionally assigns all rents and revenues of the Substituted 1021/1024 Collateral to Conterra.

### 2.     Loan #AG1022.

33.     On or about July 23, 2020, Conterra, as lender, made a loan to Maricopa Orchards and Lincoln Grantor Farms, as borrowers, in the original principal amount of $288,000, identified as Loan #AG1022 (the "1022 Loan").

34.     Maricopa Orchards and Lincoln Grantor Farms' obligation to repay the 1022 Loan is memorialized in that certain promissory note titled *Note* and dated July 23, 2020 (the "1022 Note"), under which they promised to repay $288,000 in principal, with interest (originally set at the nondefault rate of 3.75% per annum), to Conterra.  The 1022 Note requires semiannual payments of principal and interest to be made (the first in the amount of $4,898.63 plus all then accrued interest, and the following nineteen in the amount of $10,298.63 each) and has a ten-year term, maturing on July 23, 2030, at which time all remaining amounts owed thereunder become due and payable.  A true and correct copy of the 1022 Note is attached hereto as **Exhibit 14**.

35.     The 1022 Note is secured by that certain *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated July 23, 2020, which was recorded in the official records of the Kern County Recorder on July 23, 2020, as Document No. 220096754 (the "1022 Deed of Trust").  A corresponding UCC financing statement was also (a) filed with the California Secretary of State on October 12, 2020, as File No. U200024956631 (the "Filed 1022 UCC-1"), and (b) recorded in the official records of the Kern County Recorder on October 13, 2020, as Document No. 220148455 (the "Recorded 1022 UCC-1").  True and correct copies of the 1022 Deed of Trust, Filed 1022 UCC-1, and Recorded 1022 UCC-1 are attached hereto as **Exhibits 15, 16, and 17**, respectively.

36.     Under the 1022 Deed of Trust, Lincoln Grantor Farms originally granted Conterra a security interest in certain real property (generally described as approximately 20 acres located in Kern County, California); all buildings, improvements, equipment, fixtures, and permanent plantings affixed to, attached to, or incorporated in the real property (including all rents, issues, profits, income, and proceeds therefrom); all water rights appurtenant to the real property; and other property as described in the 1022 Deed of Trust (collectively, the "1022 Collateral").  Specifically excluded from the 1022 Collateral, as set forth in the 1022 Deed of Trust, are any "growing crop" and any "rolling stock" affixed or attached to the real property, as well as any "crop receivables."  The 1022 Deed of Trust also includes an assignment-of-rents provision, under which Lincoln Grantor Farms absolutely and unconditionally assigns all rents and revenues of the 1022 Collateral to Conterra.

37.     Conterra assigned to American Equity all of its interests relating to the 1022 Loan, including in the 1022 Note and 1022 Deed of Trust, as evidenced by, among other things, (a) that certain *Allonge to Promissory Note* relating to the 1022 Note (the "1022 Allonge") and (b) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Kern County Recorder on July 23,

2020, as Document No. 220096755 (the "1022 DOT Assignment").  Nevertheless, Conterra continues to act as American Equity's agent and loan servicer for the 1022 Loan.  True and correct copies of the 1022 Allonge and 1022 DOT Assignment are attached hereto as **Exhibits 18 and 19**, respectively.

### 3.   Loan #AG1023.

38.    On or about July 23, 2020, Conterra, as lender, made a loan to Maricopa Orchards and Grantor Real Estate, as borrowers, in the original principal amount of $3,312,000, identified as Loan #AG1023 (the "1023 Loan").

39.    Maricopa Orchards and Grantor Real Estate's obligation to repay the 1023 Loan is memorialized in that certain promissory note titled *Note* and dated July 23, 2020 (the "1023 Note"), under which they promised to repay $3,312,000 in principal, with interest (originally set at the nondefault rate of 3.75% per annum), to Conterra.  The 1023 Note requires semiannual payments of principal and interest to be made (the first in the amount of $56,334.23 plus all then accrued interest, and the following nineteen in the amount of $118,434.23 each) and has a ten-year term, maturing on July 23, 2030, at which time all remaining amounts owed thereunder become due and payable.  A true and correct copy of the 1023 Note is attached hereto as **Exhibit 20**.

40.    The 1023 Note is secured by that certain *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated July 23, 2020, which was recorded in the official records of the Kern County Recorder on July 23, 2020, as Document No. 220096746 (the "1023 Deed of Trust").  A corresponding UCC financing statement was also (a) filed with the California Secretary of State on October 12, 2020, as File No. U200025028422 (the "Filed 1023 UCC-1"), and (b) recorded in the official records of the Kern County Recorder on October 23, 2020, as Document No. 220156768 (the "Recorded 1023 UCC-1").  True and correct copies of the 1023 Deed of Trust, Filed 1023 UCC-1, and Recorded 1023 UCC-1 are attached hereto as **Exhibits 21, 22, and 23**, respectively.

41.     Under the 1023 Deed of Trust, Grantor Real Estate originally granted Conterra a security interest in certain real property (generally described as approximately 273 acres located in Kern County, California); all buildings, improvements, equipment, fixtures, and permanent plantings affixed to, attached to, or incorporated in the real property (including all rents, issues, profits, income, and proceeds therefrom); all water rights appurtenant to the real property; and other property as described in the 1023 Deed of Trust (collectively, the "1023 Collateral").  Specifically excluded from the 1023 Collateral, as set forth in the 1022 Deed of Trust, are any "growing crop" and any "rolling stock" affixed or attached to the real property, as well as any "crop receivables."  The 1023 Deed of Trust also includes an assignment-of-rents provision, under which Grantor Real Estate absolutely and unconditionally assigns all rents and revenues of the 1023 Collateral to Conterra.

42.     Conterra assigned to American Equity all of its interests relating to the 1023 Loan, including in the 1023 Note and 1023 Deed of Trust, as evidenced by, among other things, (a) that certain *Allonge to Promissory Note* relating to the 1023 Note (the "1023 Allonge") and (b) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Kern County Recorder on July 23, 2020, as Document No. 220096747 (the "1023 DOT Assignment").  Nevertheless, Conterra continues to act as American Equity's agent and loan servicer for the 1023 Loan.  True and correct copies of the 1023 Allonge and 1023 DOT Assignment are attached hereto as **Exhibits 24 and 25**, respectively.

### 4.     Loan #AG1069.

43.     On or about October 15, 2021, Conterra, as lender, made a loan to Maricopa Orchards and Gradon Farms, as borrowers, in the original principal amount of $3,852,300, identified as Loan #AG1069 (the "1069 Loan").

44.     Maricopa Orchards and Gradon Farms' obligation to repay the 1069 Loan is memorialized in that certain promissory note titled *Note* and dated

October 15, 2021 (the "1069 Note"), under which they promised to repay $3,852,300 in principal, with interest (originally set at the nondefault rate of 3.5% per annum), to Conterra.  The 1069 Note requires semiannual payments of principal and interest to be made (the first in the amount of $67,307.74 plus all then accrued interest, and the following nineteen in the amount of $134,722.99 each) and has a ten-year term, maturing on October 15, 2031, at which time all remaining amounts owed thereunder become due and payable.  A true and correct copy of the 1069 Note is attached hereto as **Exhibit 26**.

45.   The 1069 Note is secured by that certain *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated October 15, 2021, which was recorded in the official records of the Fresno County Recorder on October 15, 2021, as Document No. 2021-0172474 (the "1069 Deed of Trust").  A corresponding UCC financing statement was also filed with the California Secretary of State on October 20, 2021, as File No. U210094921531 (the "Filed 1069 UCC-1").  True and correct copies of the 1069 Deed of Trust and Filed 1069 UCC-1 are attached hereto as **Exhibits 27 and 28**, respectively.

46.   Under the 1069 Deed of Trust, Gradon Farms originally granted Conterra a security interest in certain real property (generally described as approximately 642 acres located in Fresno County, California); all buildings, improvements, equipment, fixtures, and permanent plantings affixed to, attached to, or incorporated in the real property (including all rents, issues, profits, income, and proceeds therefrom); all water rights appurtenant to the real property; and other property as described in the 1069 Deed of Trust (collectively, the "1069 Collateral").  Specifically excluded from the 1069 Collateral, as set forth in the 1069 Deed of Trust, are any "growing crop" and any "rolling stock" affixed or attached to the real property, as well as any "crop receivables."  The 1069 Deed of Trust also includes an assignment-of-rents provision, under which Gradon Farms

1    absolutely and unconditionally assigns all rents and revenues of the 1069 Collateral

2    to Conterra.

3         47.    Conterra assigned to American Equity all of its interests relating to the

4    1069 Loan, including in the 1069 Note and 1069 Deed of Trust, as evidenced by,

5    among other things, (a) that certain *Allonge to Promissory Note* relating to the

6    1069 Note (the "1069 Allonge") and (b) that certain *Assignment of Deed of Trust*,

7    which was recorded in the official records of the Fresno County Recorder on

8    October 15, 2021, as Document No. 2021-0172475 (the "1069 DOT Assignment").

9    Nevertheless, Conterra continues to act as American Equity's agent and loan

10   servicer for the 1069 Loan.  True and correct copies of the 1069 Allonge and

11   1069 DOT Assignment are attached hereto as **Exhibits 29 and 30**, respectively.

12        **5.    Loan #AG1078.**

13        48.    On or about December 10, 2021, Conterra, as lender, made a loan to

14   Maricopa Orchards and Lincoln Grantor Farms, as borrowers, in the original

15   principal amount of $3,530,910, identified as Loan #AG1078 (the "1078 Loan").

16        49.    Maricopa Orchards and Lincoln Grantor Farms' obligation to repay the

17   1078 Loan is memorialized in that certain promissory note titled *Note* and dated

18   December 10, 2021 (the "1078 Note"), under which they promised to repay

19   $3,530,910 in principal, with interest (originally set at the nondefault rate of 3.5%

20   per annum), to Conterra.  The 1078 Note requires semiannual payments of principal

21   and interest to be made (the first in the amount of $61,692.39 plus all then accrued

22   interest, and the following eighteen in the amount of $123,483.31 each) and has a

23   ten-year term, maturing on December 10, 2031, at which time all remaining

24   amounts owed thereunder become due and payable.  A true and correct copy of the

25   1078 Note is attached hereto as **Exhibit 31**.

26        50.    The 1078 Note is secured by that certain *Deed of Trust[,] Security*

27   *Agreement, Assignment of Rents and Fixture Filing* dated December 10, 2021,

28   which was recorded in the official records of the Fresno County Recorder on

December 10, 2021, as Document No. 2021-0202493 (the "1078 Deed of Trust"). A corresponding UCC financing statement was also filed with the California Secretary of State on December 14, 2021, as File No. U210110126717 (the "Filed 1078 UCC-1"). True and correct copies of the 1078 Deed of Trust and Filed 1078 UCC-1 are attached hereto as **Exhibits 32 and 33**, respectively.

51. Under the 1078 Deed of Trust, Lincoln Grantor Farms originally granted Conterra a security interest in certain real property (generally described as approximately 527 acres located in Fresno County, California); all buildings, improvements, equipment, fixtures, and permanent plantings affixed to, attached to, or incorporated in the real property (including all rents, issues, profits, income, and proceeds therefrom); all water rights appurtenant to the real property; and other property as described in the 1078 Deed of Trust (collectively, the "1078 Collateral"). Specifically excluded from the 1078 Collateral, as set forth in the 1078 Deed of Trust, are any "growing crop" and any "rolling stock" affixed or attached to the real property, as well as any "crop receivables." The 1078 Deed of Trust also includes an assignment-of-rents provision, under which Lincoln Grantor Farms absolutely and unconditionally assigns all rents and revenues of the 1078 Collateral to Conterra.

52. Conterra assigned to American Equity all of its interests relating to the 1078 Loan, including in the 1078 Note and 1078 Deed of Trust, as evidenced by, among other things, (a) that certain *Allonge to Promissory Note* relating to the 1078 Note (the "1078 Allonge"), and (b) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Fresno County Recorder on December 10, 2021, as Document No. 2021-0202494 (the "1078 DOT Assignment"). Nevertheless, Conterra continues to act as American Equity's agent and loan servicer for the 1078 Loan. True and correct copies of the 1078 Allonge and 1078 DOT Assignment are attached hereto as **Exhibits 34 and 35**, respectively.

## 6. Loan #AG1077.

53.     On or about December 17, 2021, Conterra, as lender, made a loan to Maricopa Orchards and FFGT Farms, as borrowers, in the original principal amount of $13,500,000, identified as Loan #AG1077 (the "1077 Loan").

54.     Maricopa Orchards and FFGT Farms' obligation to repay the 1077 Loan is memorialized in that certain promissory note titled *Note* and dated December 17, 2021 (the "1077 Note"), under which they promised to repay $13,500,000 in principal, with interest (originally set at the nondefault rate of 3.5% per annum), to Conterra.  The 1077 Note requires semiannual payments of principal and interest to be made (the first in the amount of $235,873.23 plus all then accrued interest, and the following eighteen in the amount of $472,123.23 each) and has a ten-year term, maturing on December 17, 2031, at which time all remaining amounts owed thereunder become due and payable.  A true and correct copy of the 1077 Note is attached hereto as **Exhibit 36**.

55.     The 1077 Note is secured by that certain *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated December 17, 2021, which was recorded in the official records of the Fresno County Recorder on December 21, 2021, as Document No. 2021-0208172 (the "1077 Deed of Trust"). A corresponding UCC financing statement was also filed with the California Secretary of State on January 5, 2022, as File No. U220115881934 (the "Filed 1077 UCC-1").  True and correct copies of the 1077 Deed of Trust and Filed 1077 UCC-1 are attached hereto as **Exhibits 37 and 38**, respectively.

56.     Under the 1077 Deed of Trust, FFGT Farms originally granted Conterra a security interest in certain real property (generally described as approximately 630 acres located in Fresno County, California); all buildings, improvements, equipment, fixtures, and permanent plantings affixed to, attached to, or incorporated in the real property (including all rents, issues, profits, income, and proceeds therefrom); all water rights appurtenant to the real property; and other

property as described in the 1077 Deed of Trust (collectively, the "1077 Collateral"). Specifically excluded from the 1077 Collateral, as set forth in the 1077 Deed of Trust, are any "growing crop" and any "rolling stock" affixed or attached to the real property, as well as any "crop receivables." The 1077 Deed of Trust also includes an assignment-of-rents provision, under which FFGT Farms absolutely and unconditionally assigns all rents and revenues of the 1077 Collateral to Conterra.

57.     Conterra assigned to American Equity all of its interests relating to the 1077 Loan, including in the 1077 Note and 1077 Deed of Trust, as evidenced by, among other things, (a) that certain *Allonge to Promissory Note* relating to the 1077 Note (the "1077 Allonge"), and (b) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Fresno County Recorder on December 21, 2021, as Document No. 2021-0208173 (the "1077 DOT Assignment"). Nevertheless, Conterra continues to act as American Equity's agent and loan servicer for the 1077 Loan. True and correct copies of the 1077 Allonge and 1077 DOT Assignment are attached hereto as **Exhibits 39 and 40**, respectively.

### 7.     Loan #AG1076.

58.     On or about March 10, 2022, Conterra, as lender, made a loan to Maricopa Orchards and FFGT Farms, as borrowers, in the original principal amount of $10,098,930, identified as Loan #AG1076 (the "1076 Loan").

59.     Maricopa Orchards and FFGT Farms' obligation to repay the 1076 Loan is memorialized in that certain promissory note titled *Note* and dated March 10, 2022 (the "1076 Note"), under which they promised to repay $10,098,930 in principal, with interest (originally set at the nondefault rate of 4.0% per annum), to Conterra. The 1076 Note requires semiannual payments of principal and interest to be made (the first in the amount of $167,195.34 plus all then accrued interest, and the following nineteen in the amount of $369,173.94 each) and has a ten-year term, maturing on March 10, 2032, at which time all remaining amounts

owed thereunder become due and payable.  A true and correct copy of the 1076 Note is attached hereto as **Exhibit 41**.

60.     The 1076 Note is secured by (a) that certain *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated March 10, 2022, which was recorded in the official records of the Fresno County Recorder on March 24, 2022, as Document No. 2022-0038476 (the "1076-Fresno Deed of Trust"), and (b) that certain *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated March 10, 2022, which was recorded in the official records of the Kings County Recorder on March 24, 2022, as Document No. 2205594 (the "1076-Kings Deed of Trust") (together, the "1076 Deeds of Trust").  True and correct copies of the 1076-Fresno Deed of Trust and 1076-Kings Deed of Trust are attached hereto as **Exhibits 42 and 43**, respectively.

61.     Under the 1076 Deeds of Trust, FFGT Farms originally granted Conterra a security interest in certain real property (generally described as approximately 785 acres located in Fresno and Kings Counties, California); all buildings, improvements, equipment, fixtures, and permanent plantings affixed to, attached to, or incorporated in the real property (including all rents, issues, profits, income, and proceeds therefrom); all water rights appurtenant to the real property; and other property as described in the 1076 Deeds of Trust (collectively, the "1076 Collateral").  Specifically excluded from the 1076 Collateral, as set forth in the 1076 Deeds of Trust, are any "growing crop" and any "rolling stock" affixed or attached to the real property, as well as any "crop receivables."  The 1076 Deeds of Trust also include an assignment-of-rents provision, under which FFGT Farms absolutely and unconditionally assigns all rents and revenues of the 1076 Collateral to Conterra.

62.     Conterra assigned to American Equity all of its interests relating to the 1076 Loan, including in the 1076 Note and 1076 Deeds of Trust, as evidenced by, among other things, (a) that certain *Allonge to Promissory Note* relating to the

1076 Note (the "1076 Allonge"), (b) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Fresno County Recorder on March 24, 2022, as Document No. 2022-0038477 (the "1076-Fresno DOT Assignment"), and (c) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Kings County Recorder on March 24, 2022, as Document No. 2205595 (the "1076-Kings DOT Assignment").  Nevertheless, Conterra continues to act as American Equity's agent and loan servicer for the 1076 Loan. True and correct copies of the 1076 Allonge, 1076-Fresno DOT Assignment, and 1076-Kings DOT Assignment are attached hereto as **Exhibits 44, 45, and 46**, respectively.

### 8.      Loan #AG1115 and Loan #AG1116.

63.     On or about February 3, 2023, Conterra, as lender, made a loan to Maricopa Orchards, Copper Avenue, C & A Farms, ACAP Farms, Willow Avenue, 104 Investments, Lincoln Grantor Farms, Grantor Real Estate, Gradon Farms, FFGT Farms, Cantua Orchards, and Locans Investments, as borrowers (collectively, "1115/1116 Borrowers"), in the original principal amount of $11,300,000, identified as Loan #AG1115 (the "1115 Loan").

64.     On or about February 3, 2023, Conterra, as lender, also extended a revolving line of credit loan to the 1115/1116 Borrowers, with advances not to exceed $11,300,000, which loan is identified as Loan #AG1116 (the "1116 Loan"). Funds in the amount of $11,300,000 were initially advanced to the 1115/1116 Borrowers under the 1116 Loan.

65.     The 1115/1116 Borrowers' obligation to repay the 1115 Loan is memorialized in that certain promissory note titled *Note* and dated February 3, 2023 (the "1115 Note"), under which they promised to repay $11,300,000 in principal, with interest (at a variable rate), to Conterra.  The 1115 Note requires semiannual interest-only payments to be made and has a five-year term, maturing on February 3,

2028, at which time all remaining amounts owed thereunder become due and payable.  A true and correct copy of the 1115 Note is attached hereto as **Exhibit 47**.

66.     The 1115/1116 Borrowers' obligation to repay the 1116 Loan is memorialized in that certain promissory note titled *Note* and dated February 3, 2023 (the "1116 Note"), under which they promised to repay the amount advanced on the 1116 Loan, with interest (at a variable rate), to Conterra.  The 1116 Note requires semiannual interest-only payments to be made and has a five-year term, maturing on February 3, 2028, at which time all remaining amounts owed thereunder become due and payable.  A true and correct copy of the 1116 Note is attached hereto as **Exhibit 48**.

67.     The 1115 Note and 1116 Note are secured by (a) that certain *Open-End Deed of Trust (with Future Advance Clause)[,] Security Agreement, Assignment of Rents and Fixture Filing* dated February 3, 2023, which was recorded in the official records of the Fresno County Recorder on February 9, 2023, as Document No. 2023-0011566 (the "1115/1116-Fresno Deed of Trust"), (b) that certain *Open-End Deed of Trust (with Future Advance Clause)[,] Security Agreement, Assignment of Rents and Fixture Filing* dated February 3, 2023, which was recorded in the official records of the Kern County Recorder on February 9, 2023, as Document No. 223015311 (the "1115/1116-Kern Deed of Trust"), and (c) that certain *Open-End Deed of Trust (with Future Advance Clause)[,] Security Agreement, Assignment of Rents and Fixture Filing* dated February 3, 2023, which was recorded in the official records of the Kings County Recorder on February 9, 2023, as Document No. 2301976 (the "1115/1116-Kings Deed of Trust") (collectively, the "1115/1116 Deeds of Trust").  True and correct copies of the 1115/1116-Fresno Deed of Trust, 1115/1116-Kern Deed of Trust, and 1115/1116-Kings Deed of Trust are attached hereto as **Exhibits 49, 50, and 51**, respectively.

68.     Collectively, (a) Lincoln Grantor Farms, Gradon Farms, FFGT Farms, 104 Investments, Locans Investments, Cantua Orchards, C & A Farms, and Willow

Avenue, under the 1115/1116-Fresno Deed of Trust, (b) C & A Farms, Lincoln Grantor Farms, Maricopa Orchards, Willow Avenue, and Grantor Real Estate, under the 1115/1116-Kern Deed of Trust, and (c) Copper Avenue, Lincoln Grantor Farms, ACAP Farms, FFGT Farms, and Willow Avenue, under the 1115/1116-Kings Deed of Trust, originally granted Conterra a security interest in certain real property located in Fresno, Kern, and Kings Counties; all buildings, improvements, equipment, fixtures, and permanent plantings affixed to, attached to, or incorporated in the real property (including all rents, issues, profits, income, and proceeds therefrom); all water rights appurtenant to the real property; and other property as described in the 1115/1116 Deeds of Trust (collectively, the "1115/1116 Collateral").  Specifically excluded from the 1115/1116 Collateral, as set forth in the 1115/1116 Deeds of Trust, are any "growing crop" and any "rolling stock" affixed or attached to the real property, as well as any "crop receivables." The 1115/1116 Deeds of Trust also include an assignment-of-rents provision, under which the applicable 1115/1116 Borrowers absolutely and unconditionally assign all rents and revenues of the 1115/1116 Collateral to Conterra.

69.     Conterra assigned to American Equity all of its interests relating to the 1115 Loan and 1116 Loan, including in the 1115 Note, 1116 Note, and 1115/1116 Deeds of Trust, as evidenced by, among other things, (a) that certain *Allonge to Promissory Note* relating to the 1115 Note (the "1115 Allonge"), (b) that certain *Allonge to Promissory Note* relating to the 1116 Note (the "1116 Allonge"), (c) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Fresno County Recorder on March 14, 2023, as Document No. 2023-0023044 (the "1115/1116-Fresno DOT Assignment"), (d) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Kern County Recorder on March 14, 2023, as Document No. 223029410 (the "1115/1116-Kern DOT Assignment"), and (e) that certain *Assignment of Deed of Trust*, which was recorded in the official records of the Kings County Recorder on March 23, 2023, as

Document No. 2304389 (the "1115/1116-Kings DOT Assignment").  Nevertheless, Conterra continues to act as American Equity's agent and loan servicer for the 1115 Loan and 1116 Loan.  True and correct copies of the 1115 Allonge, 1116 Allonge, 1115/1116-Fresno DOT Assignment, 1115/1116-Kern DOT Assignment, and 1115/1116-Kings DOT Assignment are attached hereto as **Exhibits 52, 53, 54, 55, and 56**, respectively.

> ### B.  Relevant common provisions in the loan documents.

70.  The promissory notes relating to the Loans (i.e., the 1021 Note, 1024 Amended Note, 1022 Note, 1023 Note, 1069 Note, 1078 Note, 1077 Note, 1076 Note, 1115 Note, and 1116 Note) (collectively, the "Notes") include common provisions relating to defaults thereunder.

71.  The deeds of trust securing the Notes (i.e., the 1021-Fresno Deed of Trust, 1024-Fresno Deed of Trust, 1022 Deed of Trust, 1023 Deed of Trust, 1069 Deed of Trust, 1078 Deed of Trust, 1077 Deed of Trust, 1076-Fresno Deed of Trust, 1076-Kings Deed of Trust, 1115/1116-Fresno Deed of Trust, 1115/1116-Kern Deed of Trust, and 1115/1116-Kings Deed of Trust) (collectively, the "Deeds of Trust") also include common provisions relating to defaults thereunder.

72.  Each of the Notes provides, "The occurrence of any one or more of the following shall constitute an 'Event of Default' under this Note, the Security Instrument [i.e., the deed of trust], and any related loan documents, as such term is used herein … (1) If Borrowers fail to repay any interest or Principal under the Note when due …."

73.  Each Deed of Trust similarly sets forth the borrowers' obligation to make timely payments under the applicable Note: "Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note."  In addition, the Deeds of Trust also include a cross-default provision, providing that "Borrower's or Borrower Parties' default or breach

under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument."

74.     Under each Deed of Trust, "[f]ollowing Borrower's breach of any covenant or agreement in this Security Instrument … and prior to acceleration or Lender's exercise of any remedy," American Equity is required to "give at least sixty (60) days written notice to Borrower prior to exercising any remedy, *unless otherwise provided under this Deed of Trust*."  One such exception is in seeking the appointment of a receiver, where each Deed of Trust provides, "If Lender gives notices of default to Borrower … (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security."

**C.     Defendants' defaults on the Loans.**

75.     Beginning in July 2024, Defendants began breaching or defaulting on its obligations under the loan documents relating to each of the Loans, primarily by failing to make the payments due thereon.

**1.     Default on the 1021 Loan.**

76.     Maricopa Orchards and Willow Avenue failed to pay the semiannual payment of $198,463.16 due on July 1, 2024, under the 1021 Note.  Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on Maricopa Orchards and Willow Avenue by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1021 Loan due to nonpayment.

77.     As of September 26, 2024, the unpaid principal balance of the 1021 Note was approximately $3,397,915.77 (exclusive of interest, costs, and other charges).

### 2.     Default on the 1024 Loan.

78.     Maricopa Orchards and Willow Avenue failed to pay the semiannual payment of $59,796.99 due on July 1, 2024, under the 1024 Amended Note. Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on Maricopa Orchards and Willow Avenue by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1024 Loan due to nonpayment.

79.     As of September 26, 2024, the unpaid principal balance of the 1024 Amended Note was approximately $1,493,356.15 (exclusive of interest, costs, and other charges).

### 3.     Default on the 1022 Loan.

80.     Maricopa Orchards and Lincoln Grantor Farms failed to pay the semiannual payment of $10,298.63 due on July 1, 2024, under the 1022 Note. Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on Maricopa Orchards and Lincoln Grantor Farms by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1022 Loan due to nonpayment.

81.     As of September 26, 2024, the unpaid principal balance of the 1022 Note was approximately $251,719.34 (exclusive of interest, costs, and other charges).

### 4.     Default on the 1023 Loan.

82.     Maricopa Orchards and Grantor Real Estate failed to pay the semiannual payment of $118,434.23 due on July 1, 2024, under the 1023 Note. Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on Maricopa Orchards and Grantor Real Estate by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1023 Loan due to nonpayment.

83.     As of September 26, 2024, the unpaid principal balance of the 1023 Note was approximately $2,894,772.46 (exclusive of interest, costs, and other charges).

### 5.     Default on the 1069 Loan.

84.     Maricopa Orchards and Gradon Farms failed to pay the semiannual payment of $134,722.99 due on July 1, 2024, under the 1069 Note.  Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on Maricopa Orchards and Gradon Farms by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1069 Loan due to nonpayment.

85.     As of September 26, 2024, the unpaid principal balance of the 1069 Note was approximately $3,503,744.50 (exclusive of interest, costs, and other charges).

### 6.     Default on the 1078 Loan.

86.     Maricopa Orchards and Lincoln Grantor Farms failed to pay the semiannual payment of $123,483.31 due on July 1, 2024, under the 1078 Note.  Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on Maricopa Orchards and Lincoln Grantor Farms by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1078 Loan due to nonpayment.

87.     As of September 26, 2024, the unpaid principal balance of the 1078 Note was approximately $1,441,978.13 (exclusive of interest, costs, and other charges).

### 7.     Default on the 1077 Loan.

88.     Maricopa Orchards and FFGT Farms failed to pay the semiannual payment of $472,123.23 due on July 1, 2024, under the 1077 Note.  Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on Maricopa Orchards and FFGT Farms by mail,

indicating that the borrowers were in default of their obligations under the loan documents relating to the 1077 Loan due to nonpayment.

89.     As of September 26, 2024, the unpaid principal balance of the 1077 Note was approximately $12,531,450.19 (exclusive of interest, costs, and other charges).

### 8.     Default on the 1076 Loan.

90.     Maricopa Orchards and FFGT Farms failed to pay the semiannual payment of $369,173.94 due on July 1, 2024, under the 1076 Note.  Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on Maricopa Orchards and FFGT Farms by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1076 Loan due to nonpayment.

91.     As of September 26, 2024, the unpaid principal balance of the 1076 Note was approximately $9,409,816.35 (exclusive of interest, costs, and other charges).

### 9.     Default on the 1115 Loan.

92.     The 1115/1116 Borrowers failed to pay the semiannual payment of $363,774.10 due on July 1, 2024, under the 1115 Note.  Accordingly, on or about September 26, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on the 1115/1116 Borrowers by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1115 Loan due to nonpayment.

93.     As of September 26, 2024, the unpaid principal balance of the 1115 Note was approximately $8,212,151.19 (exclusive of interest, costs, and other charges).

### 10.     Default on the 1116 Loan.

94.     The 1115/1116 Borrowers failed to pay the installment payments of (a) $73,766.88 due on July 1, 2024, (b) $73,861.73 due on August 1, 2024, and

(c) $73,856.87 due on September 1, 2024, under the 1116 Note.  Accordingly, on or about September 30, 2024, Conterra, as agent and loan servicer for American Equity, served a notice of default on the 1115/1116 Borrowers by mail, indicating that the borrowers were in default of their obligations under the loan documents relating to the 1116 Loan due to nonpayment.

95.     As of September 24, 2024, the unpaid principal balance of the 1116 Note was approximately $8,212,151.19 (exclusive of interest, costs, and other charges).

**D.     The need for the appointment of a receiver.**

96.     Given Defendants' breach or default under each of the Loans, Plaintiff is entitled to the appointment of a receiver to protect and manage the property constituting Plaintiff's collateral for the Loans (i.e., the Substituted 1021/1024 Collateral, 1022 Collateral, 1023 Collateral, 1069 Collateral, 1078 Collateral, 1077 Collateral, 1076 Collateral, and 1115/1116 Collateral) (collectively, the "Collateral").

97.     Unless a receiver is appointed to, among other things, protect and manage the Collateral, there is a real danger that the Collateral will suffer waste or other harm, resulting in irreparable injury to Plaintiff's rights thereto.

98.     Specifically, the Collateral consists of, among other things, thousands of acres of farm land, with a significant number of those acres containing pistachio or almond trees.  Those trees (but not any crops thereon) represent a significant portion of the value of Plaintiff's Collateral.  This farm land requires regular care, without which the trees thereon may be damaged or may die.

99.     Defendants have informed Plaintiff that, due to cash flow and liquidity issues, Defendants no longer have the ability to pay their operating expenses, maintain their operations, or otherwise care for Plaintiff's Collateral.  As a result, there is manifest and immediate danger of loss, deterioration, and diminution of the Collateral, which will likely be the primary source for repayment of the Loans, and

Plaintiff, as an interested and secured party, is threatened with material losses and injuries for which it has no adequate remedy at law against Defendants.

100.    Under California and federal law and as provided in the Deeds of Trust, Plaintiff has the right to the appointment of a receiver.  Plaintiff is contractually and equitably entitled to the immediate appointment of a receiver to take possession of and hold, subject to the discretion of this Court, the Collateral pledged as security for the Loans.

101.    Plaintiff intends to provide additional funding to the appointed receiver to allow them to maintain and manage the Collateral.

## IV.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(For Specific Performance and Appointment of Receiver)**

**(Against All Defendants)**

102.    Plaintiff incorporates herein by reference, as though fully set forth herein, the allegations contained in paragraphs 1 through 101, inclusive.

103.    Plaintiff is the lawful holder of the Notes, the lawful beneficiary under the Deeds of Trust, and the lawful owner of the other loan documents relating to the Loans (collectively, the "Loan Documents").

104.    Plaintiff has performed all of its obligations to Defendants under the terms of the Loan Documents.

105.    As set forth above, the Loan Documents, among other things, require that the applicable Defendants make certain installment payments to Plaintiff that come due under the Notes, and those Defendants breached the Loan Documents by failing to make those payments.

106.    Plaintiff has notified the applicable Defendants of their default under each Loan in writing, and, to date, the applicable Defendants have not cured their default.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

4859-5411-5573.4

107.   Having given written notice of default to Defendants with respect to the Loans, Plaintiff is entitled pursuant to the express terms of the Deeds of Trust to have a receiver appointed to take possession of and manage the Collateral and to collect the rents and profits from the Collateral, if any, without the need to make any showing as to the inadequacy of the Collateral as security.

108.   Due to Defendants' defaults, as well as their cash flow and liquidity issues, there is a real danger that the Collateral will suffer waste resulting in irreparable harm to Plaintiff if a receiver is not appointed to manage and protect the Collateral.

109.   It is impractical and impossible for Plaintiff to enjoy the rights granted to it or enforce the obligations of Defendants under the Loan Documents without the appointment of a receiver who has the power and authority to take possession of and manage the Collateral and collect the rents and profits derived therefrom, if any.

110.   Plaintiff has no plain, speedy, or adequate remedy at law to enforce the provisions of the Deeds of Trust as set forth herein and will suffer irreparable harm unless equitable relief is granted and a receiver is appointed to manage, operate, and control the Collateral.

111.   A receiver should be appointed and granted the general powers and duties of a court-appointed receiver, including the power to take and keep possession of the Collateral and to do such acts respecting the collateral as the Court may authorize pending Plaintiff's forthcoming exercise of its remedies under the Loan Documents.

## V.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, and in favor of Plaintiff as follows:

**On the First Claim for Relief:**

1.      For specific performance of the provisions of the Deeds of Trust, and the assignment referred to therein, relating to the right of Plaintiff, pending a

1  foreclosure and/or trial on the issues herein, to have a receiver appointed to take

2  possession of and care for and operate the Collateral, and to collect rents, issues,

3  profits, income, and proceeds therefrom during the pendency of this action;

4      2.    For the entry of an order appointing a receiver, and that, pursuant to

5  that order, the receiver be authorized to (a) take possession and control of the

6  Collateral; (b) conserve, maintain, and manage the Collateral, including entering

7  into any appropriate lease(s) or license(s) associated with the management of the

8  Collateral or retaining a third party to manage the Collateral; (c) collect any and all

9  rents, issues, profits, income, and proceeds from the Collateral, if any; and

10  (d) perform all other acts consistent with the terms of the order entered by the Court;

11      3.    For the entry of an order directing Defendants and any other third party

12  in possession of the Collateral to deliver possession of the same to the receiver and

13  perform certain acts or refrain from other acts as deemed appropriate by the Court;

14      4.    For the entry of a preliminary injunction and permanent injunction

15  enjoining Defendants and their agents, partners, property managers, employees,

16  officers, directors, affiliates, assignees, successors, and representatives, and all

17  persons acting under, in concert with, or for them, from (a) committing or permitting

18  any waste on the Collateral, or suffering, committing, or permitting any act on the

19  Collateral, or any part thereof, in violation of applicable law, or removing or

20  otherwise disposing of any of the Collateral, including any improvements,

21  equipment, fixtures, and permanent plantings; (b) directly or indirectly interfering in

22  any manner with the discharge of the receiver's duties or the receiver's possession

23  of and operation or management of the Collateral; and (c) doing any act which will,

24  or which will tend to, impair, defeat, divert, prevent, or prejudice the preservation of

25  the Collateral; and

26  / / /

27  / / /

28  / / /

1    5.    For the granting of such other and further relief as the Court deems

2  appropriate under the circumstances.

3

4  Dated:  November 15, 2024            ALLEN MATKINS LECK GAMBLE
                                         MALLORY & NATSIS LLP
5                                       MICHAEL R. FARRELL
                                        MATTHEW D. PHAM
6

7                                       By:_____/s/ Michael R. Farrell_____
                                           MICHAEL R. FARRELL
8                                          Attorneys for Plaintiff
                                           AMERICAN EQUITY
9                                          INVESTMENT LIFE INSURANCE
                                           COMPANY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT INDEX**

| No. | Capitalized Term | Title or Description |
|---|---|---|
| 1 | 1021 Note | *Note* dated July 23, 2020 (relating to Loan #AG1021) |
| 2 | 1024 Note | *Note* dated July 23, 2020 (relating to Loan #AG1024) |
| 3 | Filed 1021/1024 UCC-1 | *UCC Financing Statement* (relating to Loan #AG1021 and Loan #AG1024) (filed in California) |
| 4 | 1st Filed 1021/1024 UCC-3 | *UCC Financing Statement Amendment* (relating to Loan #AG1021 and Loan #AG1024) (filed in California) |
| 5 | 1021 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1021) |
| 6 | 1024 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1024) |
| 7 | 1021/1024 Collateral Substitution Agreement | *Collateral Substitution Agreement* dated December 16, 2021 (relating to Loan #AG1021 and Loan #AG1024) |
| 8 | 1024 Amended Note | *Agreement to Convert and Amended and Restated Note* dated December 16, 2021 (relating to Loan #AG1024) |
| 9 | 1021-Fresno Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated December 16, 2021 (relating to Loan #AG1021) (recorded in Fresno County) |
| 10 | 1024-Fresno Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated December 16, 2021 (relating to Loan #AG1024) (recorded in Fresno County) |
| 11 | Recorded 1021/1024-Fresno UCC-1 | *UCC Financing Statement* (relating to Loan #AG1021 and Loan #AG1024) (recorded in Fresno County) |
| 12 | 2nd Filed 1021/1024 UCC-3 | *UCC Financing Statement Amendment* (relating to Loan #AG1021 and Loan #AG1024) (filed in California) |
| 13 | 3rd Filed 1021/1024 UCC-3 | *UCC Financing Statement Amendment* (relating to Loan #AG1021 and Loan #AG1024) (filed in California) |
| 14 | 1022 Note | *Note* dated July 23, 2020 (relating to Loan #AG1022) |
| 15 | 1022 Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated July 23, 2020 (relating to Loan #AG1022) (recorded in Kern County) |
| 16 | Filed 1022 UCC-1 | *UCC Financing Statement* (relating to Loan #AG1022) (filed in California) |
| 17 | Recorded 1022 UCC-1 | *UCC Financing Statement* (relating to Loan #AG1022) (recorded in Kern County) |
| 18 | 1022 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1022) |
| 19 | 1022 DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1022) (recorded in Kern County) |
| 20 | 1023 Note | *Note* dated July 23, 2020 (relating to Loan #AG1023) |
| 21 | 1023 Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated July 23, 2020 (relating to Loan #AG1023) (recorded in Kern County) |

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

4859-5411-5573.4

| 22 | Filed 1023 UCC-1 | *UCC Financing Statement* (relating to Loan #AG1023) (filed in California) |
| 23 | Recorded 1023 UCC-1 | *UCC Financing Statement* (relating to Loan #AG1023) (recorded in Kern County) |
| 24 | 1023 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1023) |
| 25 | 1023 DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1023) (recorded in Kern County) |
| 26 | 1069 Note | *Note* dated October 15, 2021 (relating to Loan #AG1069) |
| 27 | 1069 Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated October 15, 2021 (relating to Loan #AG1069) (recorded in Fresno County) |
| 28 | Filed 1069 UCC-1 | *UCC Financing Statement* (relating to Loan #AG1069) (filed in California) |
| 29 | 1069 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1069) |
| 30 | 1069 DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1069) (recorded in Fresno County) |
| 31 | 1078 Note | *Note* dated December 10, 2021 (relating to Loan #AG1078) |
| 32 | 1078 Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated December 10, 2021 (relating to Loan #AG1078) (recorded in Fresno County) |
| 33 | Filed 1078 UCC-1 | *UCC Financing Statement* (relating to Loan #AG1078) (filed in California) |
| 34 | 1078 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1078) |
| 35 | 1078 DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1078) (recorded in Fresno County) |
| 36 | 1077 Note | *Note* dated December 17, 2021 (relating to Loan #AG1077) |
| 37 | 1077 Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated December 17, 2021 (relating to Loan #AG1077) (recorded in Fresno County) |
| 38 | Filed 1077 UCC-1 | *UCC Financing Statement* (relating to Loan #AG1077) (filed in California) |
| 39 | 1077 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1077) |
| 40 | 1077 DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1077) (recorded in Fresno County) |
| 41 | 1076 Note | *Note* dated March 10, 2022 (relating to Loan #AG1076) |
| 42 | 1076-Fresno Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated March 10, 2022 (relating to Loan #AG1076) (recorded in Fresno County) |
| 43 | 1076-Kings Deed of Trust | *Deed of Trust[,] Security Agreement, Assignment of Rents and Fixture Filing* dated March 10, 2022 (relating to Loan #AG1076) (recorded in Kings County) |
| 44 | 1076 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1076) |
| 45 | 1076-Fresno DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1076) (recorded in Fresno County) |

| 46 | 1076-Kings DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1076) (recorded in Kings County) |
| 47 | 1115 Note | *Note* dated February 3, 2023 (relating to Loan #AG1115) |
| 48 | 1116 Note | *Note* dated February 3, 2023 (relating to Loan #AG1116) |
| 49 | 1115/1116-Fresno Deed of Trust | *Open-End Deed of Trust (with Future Advance Clause)[,] Security Agreement, Assignment of Rents and Fixture Filing* dated February 3, 2023 (relating to Loan #AG1115 and Loan #AG1116) (recorded in Fresno County) |
| 50 | 1115/1116-Kern Deed of Trust | *Open-End Deed of Trust (with Future Advance Clause)[,] Security Agreement, Assignment of Rents and Fixture Filing* dated February 3, 2023 (relating to Loan #AG1115 and Loan #AG1116) (recorded in Kern County) |
| 51 | 1115/1116-Kings Deed of Trust | *Open-End Deed of Trust (with Future Advance Clause)[,] Security Agreement, Assignment of Rents and Fixture Filing* dated February 3, 2023 (relating to Loan #AG1115 and Loan #AG1116) (recorded in Kings County) |
| 52 | 1115 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1115) |
| 53 | 1116 Allonge | *Allonge to Promissory Note* (relating to Loan #AG1116) |
| 54 | 1115/1116-Fresno DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1115 and Loan #AG1116) (recorded in Fresno County) |
| 55 | 1115/1116-Kern DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1115 and Loan #AG1116) (recorded in Kern County) |
| 56 | 1115/1116-Kings DOT Assignment | *Assignment of Deed of Trust* (relating to Loan #AG1115 and Loan #AG1116) (recorded in Kings County) |

# EXHIBIT 1

**Exhibit 1**
**Page 36**

# NOTE

**Loan #AG1021**

**July 23, 2020**              **Fresno**              **CA**
[Date]                        [City]                  [State]

**473 +/- Acres**
**Kern County, California**
[Property Address]

**1.      BORROWERS' PROMISE TO PAY**

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Willow Avenue Investments, LLC**, a California limited liability company (Maricopa Orchards, LLC and Willow Avenue Investments, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$5,550,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company.** Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

**2.      INTEREST**

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **3.750%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

**3.      SCHEDULED PAYMENTS**

    **(A)   Time and Amount of Payments**

**1 payment on January 1, 2021, in the Principal amount of $94,400.66 plus all accrued interest, with interest calculated from the date of closing on the unpaid Principal balance at 3.750%% per annum; 19 consecutive semi-annual Principal and interest payments of $198,463.16 each, beginning July 1, 2021 with the final payment of all remaining Principal and interest, plus any costs and expenses, due on July 23, 2030, which is called the "Maturity Date."**

    **(B)   Place of Payments**

Borrowers will make payments at 7755 Office Plaza Drive North, Suite 195, West Des Moines, IA 50266 or at a different place if required by Lender

**4.      INTEREST CALCULATION**

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to Principal, and finally to late charges.

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**Exhibit 1**
**Page 37**

**5.    PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.    INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.    ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.    DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

2

**Exhibit 1**
**Page 38**

("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.      LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.     WAIVERS**

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

**Exhibit 1**
**Page 39**

**13.     USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**14.     DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

      **(A)     Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

            **(1)**     If Borrowers fail to repay any interest or Principal under the Note when due;

            **(2)**     If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

            **(3)**     If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

            **(4)**     If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

            **(5)**     If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

            **(6)**     If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

            **(7)**     If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

      **(B)     Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

      **(C)     Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

      **(D)     No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

**Exhibit 1**
**Page 40**

immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(E)   Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

5

**Exhibit 1**
**Page 41**

# EXHIBIT 2

Exhibit 2
Page 42

# NOTE

Loan # AG1024
Kern County, CA

**July 23, 2020**

## 1.    BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC,** a California limited liability company, and **Willow Avenue Investments, LLC,** a California limited liability company (Maricopa Orchards, LLC and Willow Avenue Investments, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$4,696,367.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company.**  Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

## 2.    MULTIPLE ADVANCE LINE OF CREDIT

Prior to the expiration of the Draw Period ("Draw Period") as calculated in accordance with this paragraph "2", this Promissory Note ("Note") evidences a multiple advance line of credit loan ("Loan") under which Loan advances may from time to time be extended to Borrowers in accordance with the terms hereof.  Advances are subject to the amounts available to Borrowers pursuant to Section 3 of this Note, and shall be in the minimum amount of $50,000.00 and shall be in amounts which are multiples of $100.00.  Upon receipt of a verified funds request by Borrowers to a telephone number provided from time to time by Lender, **or by such other funds request method as the Lender may establish,** and provided all conditions for an advance have been met, Lender shall promptly deliver the requested funds directly to Borrowers' account at Borrowers' bank ("Bank Account") as designated in the original Loan application or by separate written notice on forms to be provided by Lender.  In most cases, if a valid funds request is received by Lender at its designated telephone number at or before 12:00 noon (all times in this paragraph refer to the time in Des Moines, Iowa (Central Standard Time CST), the requested funds will be delivered two (2) business days following receipt of the funds request (e.g., if the funds request is received at 11:00 a.m. on Monday, the funds will usually be delivered on Wednesday; if the funds request is received at 2:00 p.m. on Tuesday, the funds will usually be delivered on Friday).  A valid funds request shall be verified by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note in a manner to be designated by the Lender.  A valid designation of the Bank Account to which funds are to be advanced shall be signed by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note.  Lender shall be entitled to rely on the statements in any (i) verified funds request and/or (ii) signed designation of Bank Account, to the effect that the person who signed such instrument was fully authorized to do so by all of the persons obligated to pay this Note and all persons who are obligated to pay this Note hereby release any and all claims against Lender based on Lender's reliance on such statements.

Advances may be made without payment of a transaction fee.

The Draw Period referenced above shall terminate and expire upon the earlier of the date set forth in paragraph 9(A)(7) or at such date as determined by the Lender, in its sole discretion.

## 3.    DRAW FEATURE

During the Draw Period, Borrowers may borrow under this Note at any time, subject to the terms and conditions of this Note (the "Draw Provisions"), provided that no Event of Default exists under this Note or the Security Instrument, as defined below, and subject to the following Advance Schedule: (a) monthly draws shall be permitted in accordance with an annual development budget approved by Lender; (b) advances shall be based on the approved annual budget with an advance rate of 60% of development costs, as supported by evidence of the development costs.  The unpaid principal balance owing on this Note at any time during the Draw Period will be evidenced by Lender's internal records and the amount advanced and outstanding may not exceed at any one time the face amount of this Note.  Lender shall not be obligated to make any Loan advance to Borrowers following occurrence

1

**Exhibit 2**
**Page 43**

of an Event of Default.

**4.    PAYMENTS**

During the Draw Period of the Note, Borrowers will be billed in arrears twice a year for interest accrued. Notwithstanding any provision in this Note to the contrary and subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the principal balance of this Note. Any prepayment over 10% of the principal balance of this Note made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of the principal balance of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the Security Instrument.

Notwithstanding the foregoing, all amounts other than interest accruing over the period from the last date through which interest was last billed due under the terms of this Note, including but not limited to principal and all other interest, shall be due and payable in full upon the Maturity Date, unless otherwise permitted to be earlier pursuant to the terms of this Note. Interest accruing over the period from the last date through which interest was billed until the later of (a) the actual date of payment of all other amounts or (b) the Maturity Date shall be billed promptly after all such other amounts have been received by Lender.

**5.    APPLICATION OF PAYMENTS**

A.    During the Draw Period

Notwithstanding any provision in this Note to the contrary, all payments during the Draw Period, other than a regularly scheduled payment of interest, will be applied first to:

(1)    All other amounts owed other than late charges; and then to
(2)    Late charges; and then to
(3)    Accrued interest; and then to
(4)    Principal.

B.    After the Draw Period

All payments received after termination of the Draw Period will be applied first to:
(1)    All other amounts owed other than late charges; and then to

2

**Exhibit 2**
**Page 44**

       (2)     Late charges; and then to

       (3)     Accrued interest; and then to

       (4)     Principal.

The term "late charges" is intended to include both flat fees associated with late payments, if any, and any incremental increase in interest rate as a result of maturity or default.

## 6.   EARLY TERMINATION

During the Draw Period, Borrowers may terminate the multiple advance line of credit Loan represented by this Note by (i) providing written notice to Lender of the intent to do so, (ii) paying the outstanding principal balance in full, plus any applicable Yield Maintenance Premium, and by (iii) agreeing to pay accrued but unbilled interest promptly upon being billed. Borrowers will be billed for the amount of accrued interest and all other amounts owed, if any, other than interest within fifteen (15) days after the later of Lender's receipt of the notice terminating the Loan and the payment in full of the principal. The collateral securing this Note will then be released of record upon receipt of the final payment of all amounts owed under this Note. Amounts that might be owed other than interest include, but are not limited to, late charges, standby fees, taxes and other amounts advanced by Lender and attorney fees and costs. So long as Borrowers are not in default, the Loan will not terminate simply because the outstanding principal balance may be zero at any given time.

## 7.   GENERAL PROVISIONS

A.     Notwithstanding any provision of this Note to the contrary, interest on this Note is computed on a 30/360 simple interest basis; monthly interest is calculated by applying the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days.

B.     Upon the occurrence and during the continuance of an Event of Default, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum or, if less, the maximum rate allowed by applicable state law. In addition, upon the occurrence and during the continuance of an Event of Default, the Lender may add any unpaid interest to principal then due under this Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).

C.     Neither the imposition nor payment of any additional interest, compounded interest or the late fee hereunder shall be deemed a waiver of any Event of Default.

D.     Borrowers will make payments at **7755 Office Plaza Dr. North, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender.

## 8.   MULTIPLE ADVANCE LINE OF CREDIT VARIABLE RATE PROVISIONS

    A.     **Payment of Principal and Interest.**

       (1)     Interest shall accrue on the unpaid balance of this Note until the Loan is repaid in full.

       (2)     The Initial Variable Rate is as stated in Section 9(A)(7) below. Thereafter, the Variable Rate shall change according to the Rate Change Date at a rate equal to the sum of (i) the Current Index (defined below) and (ii) the Margin (defined below) (the "Variable Rate").

       (3)     A payment of interest calculated at the Variable Rate on the outstanding principal balance represented under this Note from the date of the first advance hereunder shall be due on the First Interest Payment Date. Thereafter, consecutive semi-annual installments of interest, each in the amount required to pay the unpaid interest accruing through the applicable period, shall be due on each January 1 and July 1 at the Variable Rate until the Maturity Date (as defined below) or the Conversion Date (as defined below) as the case may be. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date (as defined below).

       (4)     If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any interest payment (whether because of a miscalculation of the Variable Rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the interest payment (and the corrected Variable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have

3

**Exhibit 2**
**Page 45**

otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrowers are not otherwise in breach or default under any of the terms and provisions of this Note, the Security Instrument or any other loan document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

(5)       Borrowers may make payments of principal in any amount on any business day of Lender during such time as the principal is accruing interest at the Variable Rate.

(6)       the Multiple Advance Line of Credit Provisions will expire on **July 23, 2027**.

(7)       The following definitions shall apply to this Note:

**Current Index:** The Index that is published in <u>The Wall Street Journal</u> on the applicable Rate Change Date.

**Index.** Beginning with the initial Rate Change Date, the variable rate will be based on an Index. The "Index" is the U.S. 7-Year Treasury Note, subject to a floor of 3.75%. The variable interest rate shall change to a rate that shall be determined 2 business days prior to the applicable Rate Change Date.  If the Index is no longer available, the Note Holder will choose a new Index that is based on comparable information.

**Margin: 3.220%**

**First Interest Payment Date: January 1, 2021**

**Draw Provisions Termination Date: July 23, 2027**.

**First Principal Payment Date: July 23, 2027**

**Maturity Date: July 23, 2027**

**Rate Change Date:  8/1/2020 and on the 1st of every month thereafter**

**Initial Variable Rate: 3.750%**

**Variable Rate Floor: 3.750%**

**9.       GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.
Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**10.      WAIVERS**
Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due.  "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

4

**Exhibit 2
Page 46**

**11.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note.  That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note.  Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**12.     USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**13.     DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

(A)     **Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

(1)   If Borrowers fail to repay any interest or Principal under the Note when due;

(2)   If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

(3)   If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

(4)   If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

(5)   If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

(6)   If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

(7)   If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

5

**Exhibit 2**
**Page 47**

**(B)**     **Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

**(A)**     **Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

**(B)**     **No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(C)**     **Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

6

**Exhibit 2**
**Page 48**

# EXHIBIT 3

**Exhibit 3**
**Page 49**

B0339-4712 10/12/2020 5:00 PM Received by California Secretary of State

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U200029038629 |
| Date Filed: 10/12/2020 |

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   32548 - CONTERRA

Lien Solutions    77133829
P.O. Box 29071
Glendale, CA 91209-9071    CALI

File with: Secretary of State, CA          THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| Willow Avenue Investments, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1396 W Herndon Ave Suite 101 | Fresno | CA | 93711 | | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| | | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| | | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 6000 Westown Parkway | West Des Moines | IA | 50266 | | USA |

4. COLLATERAL: This financing statement covers the following collateral:
See Rider A to UCC and Exhibit A legal description attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
77133829     AG1021 & AG1024

Maricopa Orchards, LLC

**Exhibit 3**
**Page 50**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

B0339-4713 10/12/2020 5:00 PM Received by California Secretary of State

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME

Willow Avenue Investments, LLC

OR

18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

22. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☒ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

CONTERRA AGRICULTURAL CAPITAL, LLC

| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 22c. MAILING ADDRESS 7755 Office Plaza Dr N, Suite 195 | CITY West Des Moines | STATE IA / POSTAL CODE 50266 | COUNTRY USA |

23. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

24. MISCELLANEOUS: 77133829-CA-0   32548 - CONTERRA ASSET MANAG    CONTERRA AGRICULTURAL    File with: Secretary of State, CA    AG1021 & AG1024   Maricopa Orchards, LLC

**Exhibit 3**
**Page 51**

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# EXHIBIT 4

Exhibit 4
Page 52





**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| :---: |
| **-FILED-** |
| File #: U210036237933 |
| Date Filed: 4/7/2021 |

| Submitter Information: | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

| Amendment Action Information: | |
| --- | --- |
| Initial Financing Statement File Number | U200029038629 |
| Date Filed | 10/12/2020 |
| Amendment Action | Collateral Amendment |
| Collateral Change | Add Collateral |

| Indicate how documentation of Collateral is provided: | Attached in a File |
| --- | --- |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY |
| --- | --- |

Optional Filer Reference Information:
79836016

**Exhibit 4**
**Page 53**

See Rider A to UCC and Exhibit A legal description attached hereto and made a part hereof.

B0381-5521 04/07/2021 8:55 AM Received by California Secretary of State

**Exhibit 4**
**Page 54**

This page and any following pages include and merge any text received for the collateral description with any attachments.

Page 2 of 6

B0381-5522 04/07/2021 8:55 AM Received by California Secretary of State

# RIDER A TO UCC

Debtor:                          **Willow Avenue Investments, LLC**

Secured Party:                   **American Equity Investment Life Insurance Company**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

---

**RIDER A TO UCC**

1

**Exhibit 4**
**Page 55**

Page 3 of 6

B0381-5523 04/07/2021 8:55 AM Received by California Secretary of State

ORDER NO. : 1411018744C

# EXHIBIT A

The land referred to is situated in the County of Kern, City of Bakersfield, State of California, and is described as follows:

PARCEL 1:

Lots 1, 2 and 3 and the North half of the Northeast Quarter of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas, hydrocarbon substances and other minerals contained within the property hereinabove referred to, whether now known to exist or hereafter discovered, all oil, gas, hydrocarbon substances and other mineral rights belonging to or appertaining to said property, the exclusive right to prospect for, drill for, produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals upon and from said property, the exclusive right to drill upon, to drill through and otherwise to use said property to produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals from adjacent or neighboring lands, and the exclusive right to inject in, store under and thereafter withdraw from said property oil, gas, hydrocarbon substances and other minerals and products thereof, whether produced from said property or elsewhere, together with the right to drill and operate whatever wells, construct, install, operate, maintain and remove whatever other facilities and do whatever else may be reasonably necessary on and in said property for the full enjoyment and exercise of the rights to excepted and reserved, and the unrestricted right of ingress and egress to and from said property for all such purposes; but grantor and its successors and assigns shall compensate grantee and its successors and assigns upon demand for any and all damage they cause to improvements and growing crops upon said property by the enjoyment or exercise of the rights so excepted and reserved by Tenneco West, Inc., a Delaware corporation in Deed recorded December 28, 1971 in Book 4614, Page 672 of Official Records.

APN: 295-070-04 and 295-070-06

PARCEL 2:

Lots 1 and 2 in the Northeast Quarter of Section 3, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas, hydrocarbon substances and other minerals contained within the property hereinabove referred to, whether now known to exist or hereafter discovered, all oil, gas, hydrocarbon substances and other mineral rights belonging to or appertaining to said property, the exclusive right to prospect for, drill for, produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals upon and from said property, the exclusive right to drill upon, to drill through and otherwise to use said property to produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals from

**Exhibit 4
Page 56**

Page 4 of 6

B0381-5524 04/07/2021 8:55 AM Received by California Secretary of State

adjacent or neighboring lands, and the exclusive right to inject in, store under and thereafter withdraw from said property oil, gas, hydrocarbon substances and other minerals and products thereof, whether produced from said property or elsewhere, together with the right to drill and operate whatever wells, construct, install, operate, maintain and remove whatever other facilities and do whatever else may be reasonably necessary on and in said property for the full enjoyment and exercise of the rights to excepted and reserved, and the unrestricted right of ingress and egress to and from said property for all such purposes; but grantor and its successors and assigns shall compensate grantee and its successors and assigns upon demand for any and all damage they cause to improvements and growing crops upon said property by the enjoyment or exercise of the rights so excepted and reserved by Tenneco West, Inc., a Delaware corporation in Deed recorded December 28, 1971 in Book 4614, Page 672 of Official Records.

APN: 295-070-23

PARCEL 3:

Lots 4, 5 and 6 of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM an undivided 1/6th interest in and to the oil, gas and other hydrocarbon substances and all other minerals and mineral rights conveyed to Ernest L. Antongiovanni, an unmarried man, as to an undivided one-third (1/3) interest, Claudia Lee Heinle, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest and Martha Jean Ball, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest, by Deed recorded November 16, 1984 in Book 5711, Page 487 of Official Records.

ALSO EXCEPTING THEREFROM all minerals including all gas and other hydrocarbons within or underlying said property, owned by Lucy Antongiovanni, a widow and Ernest Antongiovanni, as Trustee, as Trustee of the Testamentary Trust of the Ugo Antongiovanni Trust (Ernest Antongiovanni, aka Ernest L. Antongiovanni, aka Ernst L. Antongiovanni and Lucy Antongiovanni, aka Lucy Angela Antongiovanni, aka Lucille Angela Antongiovanni), as reserved in Deed recorded September 1, 1988 in Book 6159, Page 78 of Official Records.

By an Agreement for surface entry waiver and for drill sites dated May 26, 1988 executed by and between David Antongiovanni; Helen Antongiovanni individually and on behalf of the Estate of Eugene Antongiovanni, deceased; Lucy A. Antongiovanni, and Ernest L. Antongiovanni as Trustee of The Ugo Antongiovanni, Trust recorded September 1, 1988 in Book 6159, Page 146 of Official Records, it was agreed that none of the surface thereof to a depth of 500 feet below the surface thereof, ever shall be used for the purpose of drilling for, producing, extracting, or taking the oil, gas or other hydrocarbon substances and the other minerals, therein or thereunder, EXCEPTING THEREFROM a drill site together with unrestricted rights for ingress and egress to and from the drill site, and for pipelines to and from the drill site, the location of the drill site, roadway and pipeline easements being described as a portion of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, and as Section is shown on County Surveyor's Map 7-1, filed in Book 7 at Page 22 of Filed Maps, in the Office of the County Surveyor of said County and described as:

Exhibit 4
Page 57

Page 5 of 6

The Easterly 300 feet of the Northerly 300 feet of the Southerly 815 feet of the Northwest Quarter of said Section 2, together with the right of access across the Northerly 15 feet of the Northeast Quarter and also across the Easterly 15 feet of the Northerly 1805 feet of the Northwest Quarter of last named Section 2.

APN: 295-070-03

PARCEL 4:

Lots 5 and 7 of Section 3, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM an undivided 1/6th interest in and to the oil, gas and other hydrocarbon substances and all other minerals and mineral rights conveyed to Ernest L. Antongiovanni, an unmarried man, as to an undivided one-third (1/3) interest, Claudia Lee Heinle, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest and Martha Jean Ball, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest, by Deed recorded November 16, 1984 in Book 5711, Page 487 of Official Records.

ALSO EXCEPTING THEREFROM all minerals including all gas and other hydrocarbons within or underlying said property, owned by Lucy Antongiovanni, a widow and Ernest Antongiovanni, as Trustee, as Trustee of the Testamentary Trust of the Ugo Antongiovanni Trust (Ernest Antongiovanni, aka Ernest L. Antongiovanni, aka Ernst L. Antongiovanni and Lucy Antongiovanni, aka Lucy Angela Antongiovanni, aka Lucille Angela Antongiovanni) as reserved in Deed recorded September 1, 1988 in Book 6159, Page 78 of Official Records.

By an Agreement for surface entry waiver and for drill sites dated May 26, 1988 executed by and between David Antongiovanni; Helen Antongiovanni individually and on behalf of the Estate of Eugene Antongiovanni, deceased; Lucy A. Antongiovanni, and Ernest L. Antongiovanni as Trustee of The Ugo Antongiovanni, Trust recorded September 1, 1988 in Book 6159, Page 146 of Official Records, it was agreed that none of the surface thereof to a depth of 500 feet below the surface thereof, ever shall be used for the purpose of drilling for, producing, extracting, or taking the oil, gas or other hydrocarbon substances and the other minerals, therein or thereunder, EXCEPTING THEREFROM therefrom a drill site together with unrestricted rights for ingress and egress to and from the drill site, and for pipelines to and from the drill site, the location of the drill site, roadway and pipeline easements being described as a portion of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, and as Section is shown on County Surveyor's Map 7-1, filed in Book 7 at page 22 of Filed Maps, in the Office of the County Surveyor of said County and described as:

The Easterly 300 feet of the Northerly 300 feet of the Southerly 960 feet of the Northeast Quarter of said Section 3, together with the right of access across the Northerly 15 feet of Section 2 of said township and range, and also across the Easterly 15 feet of the Northerly 1635 feet of said Section 3.

APN: 295-070-02

**Exhibit 4**
**Page 58**

B0381-5525 04/07/2021 8:55 AM Received by California Secretary of State

# EXHIBIT 5

**Exhibit 5**
**Page 59**

# Allonge to Promissory Note

**Loan # AG1021**

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **July 23, 2020**

Original Amount: **$5,550,000.00**

Borrower Name(s): **Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

Property Address: **473 +/- Acres, Kern County, California**

PAY TO THE ORDER OF

**American Equity Investment Life Insurance Company**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature
**Mark A. Smith, COO & General Counsel**

Allonge to Promissory Note

**Exhibit 5
Page 60**

# EXHIBIT 6

**Exhibit 6**
**Page 61**

# Allonge to Promissory Note

**Loan # AG1024**

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **July 23, 2020**

Original Amount: **$4,696,367.00**

Borrower Name(s): **Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

Property Address: **473 +/- Acres, Kern County, California**

PAY TO THE ORDER OF

**American Equity Investment Life Insurance Company**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature

**Mark A. Smith, COO & General Counsel**

---

Allonge to Promissory Note

1

**Exhibit 6**
**Page 62**

# EXHIBIT 7

Exhibit 7
Page 63

## COLLATERAL SUBSTITUTION AGREEMENT

<div align="right">

**AG1021**
**AG1024**

</div>

THIS COLLATERAL SUBSTITUTION AGREEMENT (this "Agreement") is dated as of December 16, 2021, and is made by and between **Maricopa Orchards, LLC**, a California limited liability company, and **Willow Avenue Investments, LLC, a California limited liability company** (collectively, the "Borrowers"), and **American Equity Investment Life Insurance Company** (the "Lender").

### Recitals

A.      On or around July 23, 2020, Conterra Agricultural Capital, LLC, an Iowa limited liability company ("**Originator**"), made a loan to Borrowers in the original principal amount of $5,550,000.00 (the "AG1021 Loan"), which is evidenced by Borrowers' promissory note dated July 23, 2020 (as amended or otherwise modified from time to time, the "**AG1021 Note**"), payable to Originator in the amount of the Loan plus interest, and subsequently endorsed by Originator to Lender.

B.      The AG1021 Note was secured by, among other documents, a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated July 23, 2020 (as amended or otherwise modified from time to time, the "**AG 1021 Security Instrument**"), granted by Willow Avenue Investments, LLC, as trustor, for the benefit of Originator, encumbering the real property described therein (the "**Kern Properties**"), and recorded in the Official Records of Kern County, California, on July 23, 2020, as Document No. 220096750. The Security Instrument was subsequently assigned by Originator to Lender pursuant to an Assignment of Deed of Trust dated July 23, 2020, and recorded in the Official Records of Kern County, California.

C.      On or around July 23, 2020, Originator made a second loan to Borrowers in the original principal amount up to $4,696,367.00 (the "**AG1024 Loan**"), which is evidenced by Borrowers' promissory note dated July 23, 2020 (as amended or otherwise modified from time to time, the "**AG1024 Note**"), payable to Originator in the amount of the Loan plus interest, and subsequently endorsed by Originator to Lender.

D.      The AG1024 Note was secured by, among other documents, an Open-End Deed of Trust (With Future Advance Clause), Security Agreement, Assignment of Rents and Fixture Filing dated July 23, 2020 (as amended or otherwise modified from time to time, the "AG 1024 Security Instrument"), granted by Willow Avenue Investments, LLC, as trustor, for the benefit of Originator, also encumbering the Kern Properties, and recorded in the Official Records of Kern County, California, on July 23, 2020, as Document No. 220096752. The Security Instrument was subsequently assigned by Originator to Lender pursuant to an Assignment of Deed of Trust dated July 23, 2020, and recorded in the Official Records of Kern County, California.

E.      The Kern Properties are also referred to herein as the "Release Properties."

F.      Lender and Borrowers desire to set forth certain agreements between them concerning the release of the Release Properties from the liens of the AG1021 Security Instrument and the AG1024 Security Instrument (collectively, the "Lien Instruments"), and the simultaneous pledge by Borrowers of certain replacement real property located in Fresno County (the "Fresno Properties" or "Replacement Properties") and more particularly described in **Exhibit A** hereto.

<div align="right">

**Exhibit 7**
**Page 64**

</div>

NOW, THEREFORE, in consideration of the premises, mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrowers and Lender agree as follows:

<div align="center">

**Agreement**

</div>

1.      Collateral Substitution. Provided that no Event of Default, as defined in the AG1021 Note and AG1024 Note has occurred and is continuing, Borrowers shall be permitted to substitute (referred herein as the "Substitution") the Replacement Properties for the Release Properties, upon satisfaction of the following conditions:

(a)     Lender's Approval. The proposed Substitution shall be, in all respects, acceptable to Lender in its reasonable discretion.

(b)     No Defaults. At the time of the Substitution, there shall be no Events of Default under either the AG1021 Loan or the AG1024 Loan.

(c)     Title to Replacement Properties. Borrowers shall have or obtain, at or before the time of the Substitution, good, marketable and indefeasible fee title to the Replacement Properties.

(d)     Collateral Substitution Fee. Borrowers shall pay to Lender a collateral substitution fee equal to $1,500.00 at the time of Substitution.

(e)     Security Instruments. Borrowers shall have executed, acknowledged and delivered to Lender (i) one or more security instruments and UCC financing statements with respect to the Replacement Properties as may be necessary or desirable in Lender's determination with respect to any applicable jurisdiction so as to effectively create upon such recording and filing a valid and enforceable first priority lien upon the Replacement Properties in favor of Lender, (ii) amendments to all of the documents evidencing and/or executed in connection with the Loan (the "Loan Documents"), whereby the Loan Documents shall be modified to address those issues raised by the terms of the Substitution, and (iii) such other documents as Lender may reasonably require in connection with the Substitution. The security instruments and UCC financing statements shall be substantially the same in form and substance as the counterparts of such documents executed and delivered with respect to the Release Properties, subject to modifications reflecting the Replacement Properties as the property that is the subject of such replacement documents. The security instruments encumbering the Replacement Properties shall secure all amounts evidenced by the AG1021 Note or AG1024 Note, as applicable.

(f)     Title Insurance. Lender shall have received an ALTA extended coverage mortgagee's title insurance policy issued by an approved title insurance company and meeting Lender's requirements for title insurance policies and otherwise acceptable to Lender (a "Qualified Title Policy") insuring the lien of the security instruments encumbering the Replacement Properties and dated as of the date of the Substitution. The Qualified Title Policy issued with respect to the Replacement Properties shall (1) provide coverage to Lender in the amount of the Loans affected by the substitution, (2) insure Lender that such security instrument(s) creates a valid first lien on the Replacement Properties encumbered thereby, free and clear of all exceptions from coverage other than those exceptions acceptable to Lender, and (3) contain such endorsements and affirmative coverages as are contained in the Qualified Title Policies insuring the liens of the existing AG1021 Security Instrument and AG1024 Security Instrument (to the extent such endorsements and affirmative coverages are applicable and available in the jurisdiction in which the Replacement Properties is located) and such other endorsements and affirmative coverages as Lender may reasonably require.

**Exhibit 7**
**Page 65**

(g) Payment of Costs. Borrowers shall have paid or reimbursed Lender for all costs and expenses incurred by Lender (including, without limitation, all disbursements and reasonable attorneys' fees) in connection with the Substitution, whether or not such Substitution in fact occurs, and Borrowers shall have paid all title premiums, escrow charges, recording charges, filing fees, taxes or other expenses (including, without limitation, mortgage and intangibles taxes and documentary stamp taxes) payable in connection with the Substitution. If Borrowers fail to pay any such amount within ten (10) days after demand from Lender, such failure shall constitute an Event of Default under the security instruments encumbering the Replacement Properties, or under the existing AG1021 Security Instrument and AG1024 Security Instrument if the Substitution does not occur, and the amount due shall bear interest at the Default Rate (as defined in the AG1021 Note and AG1024 Note) from the date such amounts are incurred by Lender until paid.

2.     Release of Lien. Upon the satisfaction of the conditions precedent set forth in **Section 1** hereof, Lender will release (i) the liens of the existing AG1021 Security Instrument and AG1024 Security Instrument from the Release Properties.

3.     Request for Collateral Substitution. Any request by Borrowers for the Substitution shall be accompanied by all documentation necessary for Lender to determine whether the conditions set forth in **Section 1** hereof have been or will be satisfied.

4.     Payment of Fees and Expenses. Borrowers shall pay upon demand all fees and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender in performing its obligations under this Agreement or in responding to any request or notice received from Borrowers pursuant to this Agreement. If Borrowers fail to pay any such amount within ten (10) days after demand from Lender, such failure shall constitute an Event of Default under the security instruments encumbering the Replacement Properties, or under the existing AG1021 Security Instrument and AG1024 Security Instrument if the Substitution does not occur, and the amount due shall bear interest at the Default Rate (as defined in the AG1021 Note and AG1024 Note) from the date such amounts are incurred by Lender until paid.

5.     Notices. All notices or instructions required or permitted to be given under this Agreement shall be in writing and shall be delivered to Borrowers and Lender in accordance with the provisions of the security instruments.

6.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

7.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute the same agreement.

*[remainder of page intentionally left blank – signature page follows]*

**Exhibit 7**
**Page 66**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**BORROWERS:**

**WILLOW AVENUE INVESTMENTS, LLC**
a California limited liability company

By: _____
Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC**
a California limited liability company

By: _____
Farshid Assemi
Its: General Manager

**LENDER:**

**AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY**

By: Conterra Holdings, LLC, an Iowa limited liability company d/b/a Conterra Ag Capital
Its: Attorney-in-Fact under Limited Power of Attorney dated June 29, 2020

By: _____
Mark A. Smith
Its: COO & General Counsel

Exhibit 7
Page 67

## EXHIBIT A

### Legal Description

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN:  027-171-15-S

PARCEL 3:

B-1

Exhibit 7
Page 68

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN: 027-171-84-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

B-1

Exhibit 7
Page 69

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

Exhibit 7
Page 70

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

Exhibit 7
Page 71

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

B-1

Exhibit 7
Page 72

# EXHIBIT 8

**Exhibit 8**
**Page 73**

**AGREEMENT TO CONVERT**
**AND**
**AMENDED AND RESTATED NOTE**

**Loan # AG1024**

This Agreement to Convert and Amended and Restated Note (this "Agreement") is made effective this 16th day of December, 2021 (the "Effective Date"), by and among **American Equity Investment Life Insurance Company** (the "Lender") and **Maricopa Orchards, LLC,** a California limited liability company, and **Willow Avenue Investments, LLC,** a California limited liability company (collectively, the "Borrowers"), and modifies and amends certain terms of Borrower's indebtedness evidenced by a Promissory Note (the "Note") to Lender dated July 23, 2020, which is secured by a Deed of Trust Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date and covering the property described in the Security Instrument (the "Property").

In consideration of Borrower's exercise of Borrower's option to convert Borrower's variable interest rate multiple advance line of credit loan to another interest rate loan, pursuant to the provisions of the Note and the Security Instrument, the Note is hereby modified, amended, and restated as follows:

I.    The provisions of the Note are deleted in full and amended and restated with the following:

**1.   BORROWER'S PROMISE TO PAY**
In return for a loan that Maricopa Orchards, LLC, a California limited liability company and Willow Avenue Investments, LLC, a California limited liability company ("Borrowers") has received, Borrower promises to pay U.S. **$1,614,797.00,** (this amount is called "Principal"), plus interest, to the order of American Equity Investment Life Insurance Company ("Lender").  Borrower will make all payments under this Note in the form of cash, check or money order.
Borrower understands that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

**2.   INTEREST**
So long as no Event of Default exists, interest will be charged on unpaid principal until the full amount of Principal has been paid.  Borrower will pay interest at a yearly rate of **3.75%.**
After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 7 of this Note.

**3.   SCHEDULED PAYMENTS**
 **(A) Time and Amount of Payments**
**Borrower will make one interest only payment on January 1, 2022, with interest calculated from the Effective Date at 3.75% per annum; 17 consecutive semi-annual Principal and interest payments of $59,796.99 beginning July 1, 2022, with interest calculated at 3.75% per annum, and the final payment of all outstanding Principal and accrued interest, plus any incurred costs and expenses, on July 23, 2030, which is called the "Maturity Date."**
 **(B) Place of Payments**
Borrower will make payments at **5465 Mills Civic Pkwy, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender

**4.   INTEREST CALCULATION**
Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days.  The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for

1

**Exhibit 8**
**Page 74**

the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to Principal, and finally to late charges.

**5.   PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.   INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.   ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.   DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis

2

**Exhibit 8**
**Page 75**

and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

## 9.  LENDER ADVANCES

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

## 10.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at 1306 W Herndon Ave #101, Fresno, CA 93711, or at a different address if Borrowers give Lender a notice of Borrowers' different address. Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

## 11.  WAIVERS

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

## 12.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

## 13.  USURY

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

## 14.  DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED

(A) Event of Default

3

**Exhibit 8**
**Page 76**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

      **(1)**     If Borrower fails to repay any interest or Principal under the Note when due;

      **(2)**     If Borrower defaults in any material respect in the performance of any of the other covenants, agreements and obligations of any of the Borrower or any other obligated party under the Security Instrument or any related loan documents involving the payment of money and fails to cure such default within ten (10) days;

      **(3)**     If Borrower defaults in any material respect in the performance of any of such Borrower's non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan documents and fails to cure such default within thirty (30) days after written notice thereof from Lender;

      **(4)**     If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

      **(5)**     If any bankruptcy or insolvency petition is filed by or against Borrower under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

      **(6)**     If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

      **(7)**     If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**(B)**    **Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

**(C)**    **Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

**(D)**    **No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(E)**    **Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

*[remainder of page intentionally left blank – signature page follows]*

4

**Exhibit 8**
**Page 77**

**BORROWERS:**

**WILLOW AVENUE INVESTMENTS, LLC**
a California limited liability company

By: _____
Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC**
a California limited liability company

By: _____
Farshid Assemi
Its: General Manager

**LENDER:**

**AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY**

By: Conterra Holdings, LLC, an Iowa limited liability company d/b/a Conterra Ag Capital
Its: Attorney-in-Fact under Limited Power of Attorney dated June 29, 2020

By: _____
Mark A. Smith
Its: COO & General Counsel

5

**Exhibit 8
Page 78**

# EXHIBIT 9

Fresno County Recorder
Paul Dictos, CPA

# 2021-0206984

RECORDING REQUESTED BY
**OLD REPUBLIC TITLE COMPANY**

Escrow No.:   1411012312-DB
APN:   See Exhibit A attached

.

WHEN RECORDED MAIL TO

Conterra Ag Capital
5465 Mills Civic Pkwy Suite 201
West Des Moines, IA 50266

Loan# AG1021

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/17/2021 04:07 25
Titles: 3      Pages: 23
Fees: $99.00
CA SB2 Fees:$0.00
Taxes: $0.00
Total: $99.00

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

## Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing

| | | |
|---|---|---|
| 1 | ☒ | Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax |
| 2 | ☐ | Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier |
| 3 | ☐ | Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier |
| 4 | ☐ | Exempt from fee per GC 27388.1(a)(1); fee cap of $225 reached |

-------------------------------------------- For Use in Select Counties --------------------------------------------

| | | |
|---|---|---|
| 5 | ☐ | Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax |
| 6 | ☐ | Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____(date) as document number _____ |
| 7 | ☐ | Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ _____ (date) as document number(s)_____ |
| 8 | ☐ | Exempt from fee per GC27388.1(a)(1); maximum fees having been paid on documents in the transaction(s) recorded previously on _____ (date) as document _____ number(s) |
| 9 | ☐ | Exempt from fee under GC27388.1 for the following reasons: _____ |
| 10 | ☐ | Exempt from fee per GC 27388.1(a)(1); not related to real property |
| 11 | ☐ | Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state |
| 12 | ☐ | Exempt from fee per GC 27388.1(a)(1); document is executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) Part 4 of the Code of Civil Procedure). |

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 1 of 23
Order: a Comment:

Recorded at Request of
Old Republic Title Company

 141012312-DD5

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Shelby Peters**

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1021**

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **December 16, 2021**, together with all Riders to this document.

**(B) "Lender"** is **American Equity Investment Life Insurance Company.** Lender's address is **6000 Westown Parkway, West Des Moines, Iowa 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrower"** is **Willow Avenue Investments, LLC, a California limited liability company**. Borrower is the trustor under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company**. Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711**.

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Note"** means the promissory note signed by Borrower Parties and dated **July 23, 2020.** The **"Note"** states that Borrower Parties owe Lender **Five Million Five Hundred Fifty Thousand and No/100 ($5,550,000.00)**, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 23, 2030.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether recorded or not recorded. The following Riders are to be executed by Borrower and/or Borrower Parties:

CALIFORNIA--UNIFORM INSTRUMENT

1

☐  Irrigation Equipment Rider ☐  Water Rights Rider

☒  Financial Information and Covenants Rider ☐  Permitted Prior Encumbrance Rider

☐  Mortgage Insurance Rider ☐  Adjustable Rate Rider

☐  Other(s):

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note. For this purpose, Borrower irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

**Please see Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

**1,614.18 +/- Acres
Fresno County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made

**CALIFORNIA--UNIFORM INSTRUMENT**

2

**Exibit 9
Page 82**

thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Fresno County, California,** described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider

CALIFORNIA--UNIFORM INSTRUMENT

3

*Description: CA Fresno Document - Year.DocID 2021.0206984 Page 4 of 23*
*Order: a Comment:*

is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require

CALIFORNIA–UNIFORM INSTRUMENT

4

**Exibit 9**
**Page 84**

Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any

CALIFORNIA–UNIFORM INSTRUMENT

5

refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due

CALIFORNIA--UNIFORM INSTRUMENT

6

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 7 of 23
Order: a Comment:

and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights

CALIFORNIA—UNIFORM INSTRUMENT

7

under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this

CALIFORNIA–UNIFORM INSTRUMENT

8

**Exhibit 9**
**Page 88**

Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably

CALIFORNIA--UNIFORM INSTRUMENT

9

*Description: CA Fresno Document - Year.DocID 2021.0206984 Page 10 of 23*
*Order: a Comment:*

require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and

**CALIFORNIA—UNIFORM INSTRUMENT**

10

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 11 of 23
Order: a Comment:

expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower

CALIFORNIA--UNIFORM INSTRUMENT

11

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 12 of 23
Order: a Comment:

agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies.** Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay.  Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay.  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law.  Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or

CALIFORNIA--UNIFORM INSTRUMENT

12

any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)     In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

---

CALIFORNIA--UNIFORM INSTRUMENT

13

Exibit 9
Page 93

(d)     Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

*[remainder of page intentionally left blank – signature page follows]*

---

**CALIFORNIA—UNIFORM INSTRUMENT**

14

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 15 of 23
Order: a Comment:

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**"BORROWER"**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Darius Assemi
Its: Manager

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF CALIFORNIA
COUNTY OF _____ FRESNO _____

On ___Dec. 15, 2021___ before me, ___L. Diaz, Notary Public___, personally appeared **Darius Assemi,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: ___L. Diaz___
My commission expires: ___April 20, 2022___

L. DIAZ
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

---

**CALIFORNIA–UNIFORM INSTRUMENT**

15

**Exibit 9**
**Page 95**

## EXHIBIT A

### Legal Description

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN: 027-171-15-S

PARCEL 3:

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN:  027-171-84-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

B-1

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 18 of 23
Order: a Comment:

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

Exibit 9
Page 98

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 20 of 23
Order: a Comment:

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**Exibit 9
Page 100**

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 21 of 23
Order: a Comment:

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1021**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this **16ᵗʰ day of December, 2021**, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by Willow Avenue Investments, LLC (the "Borrower") to secure a promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to Conterra Agricultural Capital dated July 23, 2020, and subsequently assigned to **American Equity Investment Life Insurance Company** (the "Lender") and covering the property described in the Security Instrument and located at:

**1,614.18 +/- Acres**
**Fresno County, California**

**FINANCIAL COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument by Borrower, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain Borrower Parties' financial records using consistently applied generally accepted accounting principles then in effect.  Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

[X]        **Frequency.** Annually, Borrower Parties will provide to Lender Borrower Parties' internally prepared financial statements and tax returns within **150** days after the close of each fiscal year.

[X]        **Water Sources**. At all times, the property must have sufficient water sources, producing enough water to sustain normal production.

[X]        **Current Ratio.** Borrower Parties shall always maintain a current ratio, as determined in Lender's sole discretion, of not less than 1.25:1, when measured with the December 31 cost basis financial statements for The Assemi Group, as defined below, annually thereafter during the term of the Loan. Current ratio is computed, as of any date of determination, by dividing current assets by current liabilities.

[X]        **Debt Service Coverage Ratio.** Borrower Parties shall maintain at all times a debt service coverage ratio, as determined in Lender's sole discretion, great than or equal to 1.25:1 when measured with the December 31 financial statements for The Assemi Group, as defined below, annually thereafter during the term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income minus withdrawals, plus depreciation (except for livestock related depreciation), plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

[X]        **Transfer of Ownership.** Borrower Parties shall not, without Lender's prior written consent, convey, transfer, or pledge any ownership to other third-parties, excepting transfers to entities within The Assemi Group, as defined

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 22 of 23
Order: a Comment:

below.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means all entities identified and consolidated within the annual accountant-audited financial statements title "The Assemi Group".

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

**BORROWER PARTIES:**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Darius Assemi
Its: Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

*[Sign Originals Only]*

**Exibit 9**
**Page 102**

# EXHIBIT 10

**Exhibit 10**
**Page 103**

Fresno County Recorder
Paul Dictos, CPA

# 2021-0206985

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/17/2021 04:07 25
Titles: 3     Pages: 23
Fees: $99.00
CA SB2 Fees:$0.00
Taxes: $0.00
Total: $99.00

RECORDING REQUESTED BY
**OLD REPUBLIC TITLE COMPANY**

Escrow No.:  1411012312-DB
APN:   See Exhibit A attached

WHEN RECORDED MAIL TO

Conterra Ag Capital
5465 Mills Civic Pkwy Suite 201
West Des Moines, IA 50266

LN # A61024

_SPACE ABOVE THIS LINE FOR RECORDER'S USE_

## Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing

1 ☒ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2 ☐ Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4 ☐ Exempt from fee per GC 27388.1(a)(1); fee cap of $225 reached

-------------------------------------------------- For Use in Select Counties --------------------------------------------------

5 ☐ Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

6 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____(date) as document number _____

7 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ _____ (date) as document number(s)_____

8 ☐ Exempt from fee per GC27388.1(a)(1); maximum fees having been paid on documents in the transaction(s) recorded previously on _____ (date) as document _____ number(s)

9 ☐ Exempt from fee under GC27388.1 for the following reasons:
_____

10 ☐ Exempt from fee per GC 27388.1(a)(1); not related to real property

11 ☐ Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12 ☐ Exempt from fee per GC 27388.1(a)(1); document is executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) Part 4 of the Code of Civil Procedure).

Exhibit 10
Page 104

Description: CA Fresno Document - Year.DocID 2021.206985 Page 1 of 23
Order: a Comment:

Recorded at Request of
Old Republic Title Company

1411012312-08

(3) Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Shelby Peters**

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1024**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **December 16, 2021**, together with all Riders to this document.

**(B) "Lender"** is **American Equity Investment Life Insurance Company.** Lender's address is **6000 Westown Parkway, West Des Moines, Iowa 50266.** Lender is the beneficiary under this Security Instrument.

**(C) "Borrower"** is **Willow Avenue Investments, LLC, a California limited liability company.** Borrower is the trustor under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company.** Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Note"** means the promissory note signed by Borrower Parties and dated **July 23, 2020**, as amended and restated pursuant to an Agreement to Convert and Amended and Restated Note signed by Borrower Parties dated December 15, 2021. The **"Note"** states that Borrower Parties owe Lender **One Million Six Hundred Fourteen Thousand Seven Hundred Ninety Seven and No/100 ($1,614,797.00,),** plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 23, 2030.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether
**CALIFORNIA--UNIFORM INSTRUMENT**

1

**Exhibit 10**
**Page 105**

recorded or not recorded.  The following Riders are to be executed by Borrower and/or Borrower Parties:

| | | |
|---|---|---|
| ☐ Irrigation Equipment Rider | | ☐ Water Rights Rider |
| ☒ Financial Information and Covenants Rider | | ☐ Permitted Prior Encumbrance Rider |
| ☐ Mortgage Insurance Rider | | ☐ Adjustable Rate Rider |
| ☐ Other(s): | | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Borrower irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

**Please see Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

<div align="center">

**1,614.18 +/- Acres**
**Fresno County, California**
("Property Address"):

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

    **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed,

---

CALIFORNIA–UNIFORM INSTRUMENT

**Exhibit 10**
**Page 106**

attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the  real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and

**CALIFORNIA--UNIFORM INSTRUMENT**

3

specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in

CALIFORNIA--UNIFORM INSTRUMENT

4

**Exhibit 10**
**Page 108**

accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts

CALIFORNIA--UNIFORM INSTRUMENT

5

unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable

CALIFORNIA--UNIFORM INSTRUMENT

6

**Exhibit 10**
**Page 110**

costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's

**CALIFORNIA--UNIFORM INSTRUMENT**

7

**Exhibit 10**
**Page 111**

judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by

---

CALIFORNIA—UNIFORM INSTRUMENT

Exhibit 10
Page 112

federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's

**CALIFORNIA--UNIFORM INSTRUMENT**

**Exhibit 10**
**Page 113**

interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless

CALIFORNIA–UNIFORM INSTRUMENT

10

Exhibit 10
Page 114

Description: CA Fresno Document - Year.DocID 2021.206985 Page 11 of 23
Order: a Comment:

from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the

CALIFORNIA--UNIFORM INSTRUMENT

**Exhibit 10**
**Page 115**

Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the**

CALIFORNIA--UNIFORM INSTRUMENT

**Exhibit 10**
**Page 116**

notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

26. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

27. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

28. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

29. **Other California State Specific Provisions.**

(a)      In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)      Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)      Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)      at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)      the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

CALIFORNIA–UNIFORM INSTRUMENT

13

**Exhibit 10**
**Page 117**

(d)      Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the **"Environmental Provisions"**), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA--UNIFORM INSTRUMENT**

14

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**"BORROWER"**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Darius Assemi
Its: Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _____FRESNO_____

On _Dec. 15, 2021_____ before me, _L. Diaz, Notary Public___, personally appeared **Darius Assemi,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC · CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp April 20, 2022

**CALIFORNIA--UNIFORM INSTRUMENT**

15

**Exhibit 10
Page 119**

Description: CA Fresno Document - Year.DocID 2021.206985 Page 16 of 23
Order: a Comment:

## EXHIBIT A

### Legal Description

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN: 027-171-15-S

PARCEL 3:

B-1

**Exhibit 10**
**Page 120**

Description: CA Fresno Document - Year.DocID 2021.206985 Page 17 of 23
Order: a Comment:

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN: 027-171-84-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

B-1

Exhibit 10
Page 121

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

B-1

Exhibit 10
Page 122

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

B-1

Exhibit 10
Page 123

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**Exhibit 10**
**Page 124**

Description: CA Fresno Document - Year.DocID 2021.206985 Page 21 of 23
Order: a Comment:

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1024**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this **16th day of December, 2021,** and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by Willow Avenue Investments, LLC (the "Borrower") to secure a promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to Conterra Agricultural Capital, LLC dated July 23, 2020, and subsequently assigned to **American Equity Investment Life Insurance Company** (the "Lender"), and as amended and restated on December 15, 2021, and covering the property described in the Security Instrument and located at:

**1,614.18 +/- Acres**
**Fresno County, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument by Borrower, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain Borrower Parties' financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

☒ **Frequency.** Annually, Borrower Parties will provide to Lender Borrower Parties' internally prepared financial statements and tax returns within **150** days after the close of each fiscal year.

☒ **Water Sources.** At all times, the property must have sufficient water sources, producing enough water to sustain normal production.

☒ **Current Ratio.** Borrower Parties shall always maintain a current ratio, as determined in Lender's sole discretion, of not less than 1.25:1, when measured with the December 31 cost basis financial statements for The Assemi Group, as defined below, annually thereafter during the term of the Loan. Current ratio is computed, as of any date of determination, by dividing current assets by current liabilities.

☒ **Debt Service Coverage Ratio.** Borrower Parties shall maintain at all times a debt service coverage ratio, as determined in Lender's sole discretion, great than or equal to 1.25:1 when measured with the December 31 financial statements for The Assemi Group, as defined below, annually thereafter during the term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income minus withdrawals, plus depreciation (except for livestock related depreciation), plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

☒ **Transfer of Ownership.** Borrower Parties shall not, without Lender's prior written consent, convey, transfer, or pledge any ownership to other third-parties, excepting transfers to entities within The Assemi Group, as defined

**Exhibit 10**
**Page 125**

Description: CA Fresno Document - Year.DocID 2021.206985 Page 22 of 23
Order: a Comment:

below.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means all entities identified and consolidated within the annual accountant-audited financial statements title "The Assemi Group".

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

**BORROWER PARTIES:**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Darius Assemi
Its:  Manager


**Maricopa Orchards, LLC**,
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

**Exhibit 10**
**Page 126**

Description: CA Fresno Document - Year.DocID 2021.206985 Page 23 of 23
Order: a Comment:

# EXHIBIT 11

**Exhibit 11**
**Page 127**

Fresno County Recorder
Paul Dictos, CPA

## 2021-0206986

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/17/2021 04:07 25
Titles: 1  Pages: 9
Fees: $35.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $35.00

RECORDING REQUESTED BY
**OLD REPUBLIC TITLE COMPANY**

Escrow No.:  1411012312-DB
APN:  See Exhibit A attached.

WHEN RECORDED MAIL TO

Conterra Ag Capital
5465 Mills Civic Pkwy Suite 201
West Des Moines, IA 50266

Attn: Shelby Peters

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

## UCC Financing Statement

1. ☒ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax
2. ☐ Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier
3. ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier
4. ☐ Exempt from fee per GC 27388.1(a)(1); fee cap of $225 reached

-------------------------------------------------- For Use in Select Counties --------------------------------------------------

5. ☐ Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax
6. ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____(date) as document number _____
7. ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ _____ (date) as document number(s)_____
8. ☐ Exempt from fee per GC27388.1(a)(1); maximum fees having been paid on documents in the transaction(s) recorded previously on _____ (date) as document                                                                 number(s)
9. ☐ Exempt from fee under GC27388.1 for the following reasons:

_____

10. ☐ Exempt from fee per GC 27388.1(a)(1); not related to real property
11. ☐ Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state
12. ☐ Exempt from fee per GC 27388.1(a)(1); document is executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) Part 4 of the Code of Civil Procedure).

**Exhibit 11**
**Page 128**

Description: CA Fresno Document - Year.DocID 2021.206986 Page 1 of 9
Order: a Comment:

Recorded at Request of
Old Republic Title Company

|41|012312-DB

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Shelby Peters 515.348.6409

**B. E-MAIL CONTACT AT FILER (optional)**
shelby.peters@ConterraAg.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Attn: Shelby Peters
Conterra Ag Capital
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Willow Avenue Investments, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1396 W Herndon Ave Suite 101 | Fresno | CA | 93711 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| American Equity Investment Life Insurance Company | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6000 Westown Parkway | West Des Moines | IA | 50266 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A legal description attached hereto and made a part hereof.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box: **6b.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility ☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
AG1021 & AG1024

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

Exhibit 11
Page 129

Description: CA Fresno Document - Year.DocID 2021.206986 Page 2 of 9
Order: a Comment:

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR:  Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
**Willow Avenue Investments, LLC**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                          SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                                      SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME
**Conterra Agricultural Capital, LLC**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **5465 Mills Civic Pkwy, Ste. 201** | **West Des Moines** | **IA** | **50266** | **USA** |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the
REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16
(if Debtor does not have a record interest):

16. Description of real estate:
**See Exhibit A attached hereto and made a part hereof.**

17. MISCELLANEOUS:

Description: CA Fresno Document - Year.DocID 2021.206986 Page 3 of 9
Order: a Comment:

# RIDER A TO UCC

Debtor:                          **Willow Avenue Investments, LLC**

Secured Party:                   **American Equity Investment Life Insurance Company**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

---

RIDER A TO UCC

1

**Exhibit 11**
**Page 131**

Description: CA Fresno Document - Year.DocID 2021.206986 Page 4 of 9
Order: a Comment:

## EXHIBIT A

### Legal Description

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN: 027-171-15-S

PARCEL 3:

B-1

Exhibit 11
Page 132

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN:  027-171-84-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

B-1

Exhibit 11
Page 133

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

B-1

Exhibit 11
Page 134

Description: CA Fresno Document - Year.DocID 2021.206986 Page 7 of 9
Order: a Comment:

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

B-1

Exhibit 11
Page 135

Description: CA Fresno Document - Year.DocID 2021.206986 Page 8 of 9
Order: a Comment:

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

Exhibit 11
Page 136

Description: CA Fresno Document - Year.DocID 2021.206986 Page 9 of 9
Order: a Comment:

# EXHIBIT 12

**Exhibit 12**
**Page 137**




B0456-1691 12/19/2021 2:15 PM Received by California Secretary of State



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File #: U210111410316

Date Filed: 12/19/2021

| Submitter Information: | |
|---|---|
| Contact Name | Kirk Stanfield |
| Organization Name | SOS Corporate & Court Services |
| Phone Number | (916) 442-4901 |
| Email Address | order@sosccs.com |
| Address | 520 9TH STREET #103 SACRAMENTO, CA 95814 |

| Amendment Action Information: | |
|---|---|
| Initial Financing Statement File Number | U200029038629 |
| Date Filed | 10/12/2020 |
| Amendment Action | Collateral Amendment |
| Collateral Change | Delete Collateral |

| Indicate how documentation of Collateral is provided: | Attached in a File |
|---|---|

Upload PDF as Collateral:
1421001288 1 of 4.pdf

☐ Check this box to see additional UCC Collateral options.

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

Authorizing Secured Party Name   AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY

Optional Filer Reference Information:
AG1021 & AG1024

Miscellaneous Information:
COLLATERAL CHANGE DELETE: SEE EXHIBIT A

**Exhibit 12**
**Page 138**

B0456-1692  12/19/2021  2:15 PM  Received by California Secretary of State

██████████
██████████
██████████
██████████

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER** (optional) | |
| Shelby Peters 515-348-6409 | |
| **B. E-MAIL CONTACT AT FILER** (optional) | |
| Shelby.peters@conterraag.com | |
| **C. SEND ACKNOWLEDGMENT TO:**  (Name and Address) | |

Attn: Shelby Peters
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☑ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| U200029038629 | Filer: **attach** Amendment Addendum (Form UCC3Ad) **and** provide Debtor's name in Item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, **and** address of Assignee in item 7c **and** name of Assignor in item 9
For partial assignment, complete items 7 and 9 **and** also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:          **AND** Check **one** of these three boxes to:

This Change affects ☐ Debtor **or** ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; **and** item 7a or 7b **and** item 7c     ☐ ADD name: Complete item 7a or 7b, **and** item 7c     ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only **one** name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| |

OR

| 7b. INDIVIDUAL'S SURNAME |
|---|
| |

| INDIVIDUAL'S FIRST PERSONAL NAME |
|---|
| |

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|
| | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☑ **COLLATERAL CHANGE:** Also check **one** of these four boxes:   ☐ ADD collateral   ☑ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral

Indicate collateral:

See attached Exhibit A

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| American Equity Investment Life Insurance Company | | | |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA:
AG1021 & AG1024

UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**Exhibit 12**
**Page 139**

B0456-1693 12/19/2021 2:15 PM Received by California Secretary of State

## UCC FINANCING STATEMENT AMENDMENT ADDENDUM
FOLLOW INSTRUCTIONS

**11. INITIAL FINANCING STATEMENT FILE NUMBER:** Same as Item 1a on Amendment form
U200029038629

**12. NAME OF PARTY AUTHORIZING THIS AMENDMENT:** Same as Item 9 on Amendment form

12a. ORGANIZATION'S NAME
American Equity Investment Life Insurance Company

OR

12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**13. Name of DEBTOR on related financing statement** (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction Item 13): Provide only **one** Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME
Willow Avenue Investments, LLC

OR

13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):**

**15. This FINANCING STATEMENT AMENDMENT:**
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**16. Name and address of a RECORD OWNER of real estate described in Item 17**
(if Debtor does not have a record interest):

**17. Description of real estate:**
See Attached Exhibit A

**18. MISCELLANEOUS:**

UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

**Exhibit 12**
**Page 140**

B0456-1694 12/19/2021 2:15 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the County of Kern, City of Bakersfield, State of California, and is described as follows:

PARCEL 1:

Lots 1, 2 and 3 and the North half of the Northeast Quarter of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas, hydrocarbon substances and other minerals contained within the property hereinabove referred to, whether now known to exist or hereafter discovered, all oil, gas, hydrocarbon substances and other mineral rights belonging to or appertaining to said property, the exclusive right to prospect for, drill for, produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals upon and from said property, the exclusive right to drill upon, to drill through and otherwise to use said property to produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals from adjacent or neighboring lands, and the exclusive right to inject in, store under and thereafter withdraw from said property oil, gas, hydrocarbon substances and other minerals and products thereof, whether produced from said property or elsewhere, together with the right to drill and operate whatever wells, construct, install, operate, maintain and remove whatever other facilities and do whatever else may be reasonably necessary on and in said property for the full enjoyment and exercise of the rights to excepted and reserved, and the unrestricted right of ingress and egress to and from said property for all such purposes; but grantor and its successors and assigns shall compensate grantee and its successors and assigns upon demand for any and all damage they cause to improvements and growing crops upon said property by the enjoyment or exercise of the rights so excepted and reserved by Tenneco West, Inc., a Delaware corporation in Deed recorded December 28, 1971 in Book 4614, Page 672 of Official Records.

APN: 295-070-04 and 295-070-06

PARCEL 2:

Lots 1 and 2 in the Northeast Quarter of Section 3, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas, hydrocarbon substances and other minerals contained within the property hereinabove referred to, whether now known to exist or hereafter discovered, all oil, gas, hydrocarbon substances and other mineral rights belonging to or appertaining to said property, the exclusive right to prospect for, drill for, produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals upon and from said property, the exclusive right to drill upon, to drill through and otherwise to use said property to produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals from

Exhibit 12
Page 141

Page 4 of 6

B0456-1695 12/19/2021 2:15 PM Received by California Secretary of State

adjacent or neighboring lands, and the exclusive right to inject in, store under and thereafter withdraw from said property oil, gas, hydrocarbon substances and other minerals and products thereof, whether produced from said property or elsewhere, together with the right to drill and operate whatever wells, construct, install, operate, maintain and remove whatever other facilities and do whatever else may be reasonably necessary on and in said property for the full enjoyment and exercise of the rights to excepted and reserved, and the unrestricted right of ingress and egress to and from said property for all such purposes; but grantor and its successors and assigns shall compensate grantee and its successors and assigns upon demand for any and all damage they cause to improvements and growing crops upon said property by the enjoyment or exercise of the rights so excepted and reserved by Tenneco West, Inc., a Delaware corporation in Deed recorded December 28, 1971 in Book 4614, Page 672 of Official Records.

APN: 295-070-23

PARCEL 3:

Lots 4, 5 and 6 of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM an undivided 1/6th interest in and to the oil, gas and other hydrocarbon substances and all other minerals and mineral rights conveyed to Ernest L. Antongiovanni, an unmarried man, as to an undivided one-third (1/3) interest, Claudia Lee Heinle, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest and Martha Jean Ball, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest, by Deed recorded November 16, 1984 in Book 5711, Page 487 of Official Records.

ALSO EXCEPTING THEREFROM all minerals including all gas and other hydrocarbons within or underlying said property, owned by Lucy Antongiovanni, a widow and Ernest Antongiovanni, as Trustee, as Trustee of the Testamentary Trust of the Ugo Antongiovanni Trust (Ernest Antongiovanni, aka Ernest L. Antongiovanni, aka Ernst L. Antongiovanni and Lucy Antongiovanni, aka Lucy Angela Antongiovanni, aka Lucille Angela Antongiovanni), as reserved in Deed recorded September 1, 1988 in Book 6159, Page 78 of Official Records.

By an Agreement for surface entry waiver and for drill sites dated May 26, 1988 executed by and between David Antongiovanni; Helen Antongiovanni individually and on behalf of the Estate of Eugene Antongiovanni, deceased; Lucy A. Antongiovanni, and Ernest L. Antongiovanni as Trustee of The Ugo Antongiovanni, Trust recorded September 1, 1988 in Book 6159, Page 146 of Official Records, it was agreed that none of the surface thereof to a depth of 500 feet below the surface thereof, ever shall be used for the purpose of drilling for, producing, extracting, or taking the oil, gas or other hydrocarbon substances and the other minerals, therein or thereunder, EXCEPTING THEREFROM a drill site together with unrestricted rights for ingress and egress to and from the drill site, and for pipelines to and from the drill site, the location of the drill site, roadway and pipeline easements being described as a portion of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, and as Section is shown on County Surveyor's Map 7-1, filed in Book 7 at Page 22 of Filed Maps, in the Office of the County Surveyor of said County and described as:

Exhibit 12
Page 142

Page 5 of 6

B0456-1696 12/19/2021 2:15 PM Received by California Secretary of State

The Easterly 300 feet of the Northerly 300 feet of the Southerly 815 feet of the Northwest Quarter of said Section 2, together with the right of access across the Northerly 15 feet of the Northeast Quarter and also across the Easterly 15 feet of the Northerly 1805 feet of the Northwest Quarter of last named Section 2.

APN: 295-070-03

PARCEL 4:

Lots 5 and 7 of Section 3, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM an undivided 1/6th interest in and to the oil, gas and other hydrocarbon substances and all other minerals and mineral rights conveyed to Ernest L. Antongiovanni, an unmarried man, as to an undivided one-third (1/3) interest, Claudia Lee Heinle, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest and Martha Jean Ball, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest, by Deed recorded November 16, 1984 in Book 5711, Page 487 of Official Records.

ALSO EXCEPTING THEREFROM all minerals including all gas and other hydrocarbons within or underlying said property, owned by Lucy Antongiovanni, a widow and Ernest Antongiovanni, as Trustee, as Trustee of the Testamentary Trust of the Ugo Antongiovanni Trust (Ernest Antongiovanni, aka Ernest L. Antongiovanni, aka Ernst L. Antongiovanni and Lucy Antongiovanni, aka Lucy Angela Antongiovanni, aka Lucille Angela Antongiovanni) as reserved in Deed recorded September 1, 1988 in Book 6159, Page 78 of Official Records.

By an Agreement for surface entry waiver and for drill sites dated May 26, 1988 executed by and between David Antongiovanni; Helen Antongiovanni individually and on behalf of the Estate of Eugene Antongiovanni, deceased; Lucy A. Antongiovanni, and Ernest L. Antongiovanni as Trustee of The Ugo Antongiovanni, Trust recorded September 1, 1988 in Book 6159, Page 146 of Official Records, it was agreed that none of the surface thereof to a depth of 500 feet below the surface thereof, ever shall be used for the purpose of drilling for, producing, extracting, or taking the oil, gas or other hydrocarbon substances and the other minerals, therein or thereunder, EXCEPTING THEREFROM therefrom a drill site together with unrestricted rights for ingress and egress to and from the drill site, and for pipelines to and from the drill site, the location of the drill site, roadway and pipeline easements being described as a portion of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, and as Section is shown on County Surveyor's Map 7-1, filed in Book 7 at page 22 of Filed Maps, in the Office of the County Surveyor of said County and described as:

The Easterly 300 feet of the Northerly 300 feet of the Southerly 960 feet of the Northeast Quarter of said Section 3, together with the right of access across the Northerly 15 feet of Section 2 of said township and range, and also across the Easterly 15 feet of the Northerly 1635 feet of said Section 3.

APN: 295-070-02

Exhibit 12
Page 143

Page 6 of 6

# EXHIBIT 13

**Exhibit 13**
**Page 144**

 



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210111411217 |
| Date Filed: 12/19/2021 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | Kirk Stanfield |
| Organization Name | SOS Corporate & Court Services |
| Phone Number | (916) 442-4901 |
| Email Address | order@soscss.com |
| Address | 520 9TH STREET #103 SACRAMENTO, CA 95814 |

Amendment Action Information:

| | |
| --- | --- |
| Initial Financing Statement File Number | U200029038629 |
| Date Filed | 10/12/2020 |
| Amendment Action | Collateral Amendment |
| Collateral Change | Add Collateral |

| Indicate how documentation of Collateral is provided: | Attached in a File |
| --- | --- |

Upload PDF as Collateral:
1421001228 2 of 4.pdf

☐ Check this box to see additional UCC Collateral options.

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY |
| --- | --- |

Optional Filer Reference Information:
AG1021 & AG1024

Miscellaneous Information:
COLLATERAL CHANGE ADD: SEE ATTACHED EXHIBIT A

**Exhibit 13**
**Page 145**
Page 1 of 9

B0456-1705  12/19/2021  2:22 PM  Received by California Secretary of State

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Shelby Peters 515-348-6409

**B. E-MAIL CONTACT AT FILER (optional)**
Shelby.peters@conterraag.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Attn: Shelby Peters
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| U200029038629 | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:     **AND** Check **one** of these three boxes to:

This Change affects ☐ Debtor **or** ☐ Secured Party of record | ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c | ☐ ADD name: Complete item 7a or 7b, and item 7c | ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only **one** name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| OR  7b. INDIVIDUAL'S SURNAME |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                    SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☑ **COLLATERAL CHANGE:** Also check **one** of these four boxes: ☑ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:
See attached Exhibit A

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| American Equity Investment Life Insurance Company | | | |
| OR  9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
AG1021 & AG1024

UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**Exhibit 13**
**Page 146**

B0456-1706  12/19/2021  2:22  PM  Received by California Secretary of State

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

**11. INITIAL FINANCING STATEMENT FILE NUMBER:** Same as Item 1a on Amendment form

U200029038629

**12. NAME OF PARTY AUTHORIZING THIS AMENDMENT:** Same as Item 9 on Amendment form

**12a. ORGANIZATION'S NAME**

American Equity Investment Life Insurance Company

OR

**12b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)**            **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**13.** Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction Item 13); Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

**13a. ORGANIZATION'S NAME**

Willow Avenue Investments, LLC

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):**

**15. This FINANCING STATEMENT AMENDMENT:**
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**16.** Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):

**17.** Description of real estate:

See Attached Exhibit A

**18. MISCELLANEOUS:**

UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

**Exhibit 13**
**Page 147**

Page 3 of 9

B0456-1707 12/19/2021 2:22 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN:  027-171-15-S

PARCEL 3:

**Exhibit 13**
**Page 148**

Page 4 of 9

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN:  027-171-84-S

B0456-1708 12/19/2021 2:22 PM Received by California Secretary of State

Exhibit 13
Page 149

Page 5 of 9

B0456-1709 12/19/2021 2:22 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Exhibit 13
Page 150

Page 6 of 9

B0456-1710  12/19/2021  2:22 PM Received by California Secretary of State

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

Exhibit 13
Page 151

Page 7 of 9

B0456-1711 12/19/2021 2:22 PM Received by California Secretary of State

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

Exhibit 13
Page 152

Page 8 of 9

B0456-1712 12/19/2021 2:22 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**Exhibit 13**
**Page 153**

Page 9 of 9

# EXHIBIT 14

**Exhibit 14**
**Page 154**

# NOTE

Loan #AG1022

| July 23, 2020 | Fresno | CA |
|---|---|---|
| [Date] | [City] | [State] |

**20 +/- Acres**
**Kern County, California**
[Property Address]

### 1.      BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Lincoln Grantor Farms, LLC**, a California limited liability company (Maricopa Orchards, LLC and Willow Avenue Investments, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$288,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company**.  Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

### 2.      INTEREST

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Borrowers will pay interest at a yearly rate of **3.750%**.

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

### 3.      SCHEDULED PAYMENTS

**(A)   Time and Amount of Payments**

**1 payment on January 1, 2021, in the Principal amount of $4,898.63 plus all accrued interest, with interest calculated from the date of closing on the unpaid Principal balance at 3.750%% per annum; 19 consecutive semi-annual Principal and interest payments of $10,298.63 each, beginning July 1, 2021 with the final payment of all remaining Principal and interest, plus any costs and expenses, due on July 23, 2030, which is called the "Maturity Date."**

**(B)   Place of Payments**

Borrowers will make payments at 7755 Office Plaza Drive North, Suite 195, West Des Moines, IA 50266 or at a different place if required by Lender

### 4.      INTEREST CALCULATION

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days.  The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to Principal, and finally to late charges.

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

1

**Exhibit 14**
**Page 155**

**5.     PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.     INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.     ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.     DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**Exhibit 14**
**Page 156**

("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

9.      **LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

10.     **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

11.     **WAIVERS**

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

12.     **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**Exhibit 14**
**Page 157**

**13.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**14.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

**(A)    Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

**(1)**    If Borrowers fail to repay any interest or Principal under the Note when due;

**(2)**    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

**(3)**    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

**(4)**    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

**(5)**    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

**(6)**    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

**(7)**    If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**(B)    Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

**(C)    Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

**(D)    No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

4

**Exhibit 14**
**Page 158**

immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

(E)     **Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Lincoln Grantor Farms, LLC**
a California limited liability company

_____
By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

_____
By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

5

**Exhibit 14**
**Page 159**

# EXHIBIT 15

**Exhibit 15**
**Page 160**

Recorded at Request of
Old Republic Title Company

*141108745*

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**7755 Office Plaza Dr. North, Suite 195**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

Jon Lifquist, Assessor-Recorder
Kern County Official Records

LB
7/23/2020
11:57 AM

Recorded Electronically by:
451  Old Republic Title Company

DOC #:  **220096754**



220096754

| | |
|---|---|
| Stat Types:  3 | Pages:  16 |
| FEES | 111.00 |
| TAXES | .00 |
| OTHER | 225.00 |
| PAID | 336.00 |

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
# Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1022**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document.  Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)  "Security Instrument"** means this document, which is dated **July 23, 2020,** together with all Riders to this document.

**(B)  "Lender"** is **Conterra Agricultural Capital, LLC.**  Lender is a **limited liability company** organized and existing under the laws of **Iowa.**  Lender's address is **7755 Office Plaza Dr. North, Suite 195 West Des Moines, IA 50266.**  Lender is the beneficiary under this Security Instrument.

**(C)  "Borrower"** is **Lincoln Grantor Farms, LLC, a California limited liability company.**  Borrower is the trustor under this Security Instrument.  **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company.**  Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

**(D)  "Trustee"** is Old Republic Title Company.

**(E)  "Note"** means the promissory note signed by Borrower Parties and dated **July 23, 2020.** The **"Note"** states that Borrower Parties owe Lender **Two Hundred Eighty-Eight Thousand and No/100 Dollars ($288,000.00),** plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 23, 2030.**

**(F)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)  "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)  "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether
CALIFORNIA–UNIFORM INSTRUMENT

1

**Exhibit 15**
**Page 161**

recorded or not recorded.  The following Riders are to be executed by Borrower and/or Borrower Parties:

☐  Irrigation Equipment Rider        ☐  Water Rights Rider

☐  Financial Information and Covenants Rider        ☐  Permitted Prior Encumbrance Rider

☐  Mortgage Insurance Rider        ☐  Adjustable Rate Rider

☐  Other(s):

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)  "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Borrower irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kern, California**:

**Please see Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

<div align="center">

**20 +/- Acres**
**Kern County, California**
("Property Address"):

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

      **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed,

**CALIFORNIA--UNIFORM INSTRUMENT**

<div align="center">2</div>

**Exhibit 15**
**Page 162**

attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Kern, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and

**CALIFORNIA—UNIFORM INSTRUMENT**

**Exhibit 15**
**Page 163**

specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in

**CALIFORNIA--UNIFORM INSTRUMENT**

**Exhibit 15**
**Page 164**

accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts

CALIFORNIA—UNIFORM INSTRUMENT

5

**Exhibit 15**
**Page 165**

unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    **5.  Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

    Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    **6.  Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

    **7.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7.  Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable

**CALIFORNIA--UNIFORM INSTRUMENT**

<div align="center">6</div>

**Exhibit 15**
**Page 166**

costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's

**CALIFORNIA--UNIFORM INSTRUMENT**

7

**Exhibit 15
Page 167**

judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by

CALIFORNIA--UNIFORM INSTRUMENT

**Exhibit 15**
**Page 168**

federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.**  Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel").  No more than three (3) Requests shall be made per calendar year.  The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing,  upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing").  Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's

CALIFORNIA–UNIFORM INSTRUMENT

9

**Exhibit 15
Page 169**

interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless

**CALIFORNIA–UNIFORM INSTRUMENT**

**Exhibit 15**
**Page 170**

from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the

---

CALIFORNIA—UNIFORM INSTRUMENT

11

**Exhibit 15**
**Page 171**

Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies.** Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the

CALIFORNIA--UNIFORM INSTRUMENT

**Exhibit 15**
**Page 172**

notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.  Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26.  Reconveyance.**  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.**  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28.  Statement of Obligation Fee.**  Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29.  Other California State Specific Provisions.**

(a)	In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)	Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)	Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)	at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)	the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

CALIFORNIA–UNIFORM INSTRUMENT

13

**Exhibit 15
Page 173**

(d)     Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

*[remainder of page intentionally left blank – signature page follows]*

\

**CALIFORNIA--UNIFORM INSTRUMENT**

14

**Exhibit 15**
**Page 174**

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**"BORROWER"**

**Lincoln Grantor Farms, LLC**
a California limited liability company

By: Neema Assemi
Its: Manager

Lincoln Grantor Farms, LLC

a California limited liability company

Neema Assemi

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF CALIFORNIA
COUNTY OF _Fresno_

On _July 20, 2020_ before me, _L. Diaz, Notary Public_, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

---

**CALIFORNIA--UNIFORM INSTRUMENT**

15

**Exhibit 15**
**Page 175**

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

# EXHIBIT 16

**Exhibit 16**
**Page 177**

 



**STATE OF CALIFORNIA**
*Office of the Secretary of State, Alex Padilla*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| :---: |
| **-FILED-** |
| File #: U200024956631 |
| Date Filed: 10/12/2020 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| LINCOLN GRANTOR FARMS, LLC | 1306 W. HERNDON AVE. STE 101 FRESNO, CA 93711 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 6000 WESTOWN PARKWAY WEST DES MOINES, IA 50266 |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 7755 OFFICE PLAZA DR N SUITE 195 WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Attached in a File

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
77141935

**Exhibit 16**
**Page 178**

See Rider A to UCC and Exhibit A legal description, attached hereto and made a part hereof.

B0335-8995 10/12/2020 7:12 AM Received by California Secretary of State

**Exhibit 16**

**Page 179**

This page and any following pages include and merge any text received for the collateral description with the attachments.

B0035-8996 10/12/2020 7:12 AM Received by California Secretary of State

# RIDER A TO UCC

| | |
|---|---|
| Debtor: | **Lincoln Grantor Farms, LLC** |
| Secured Party: | **American Equity Investment Life Insurance Company** |
| Assignor Secured Party: | **Conterra Agricultural Capital, LLC** |

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

**Exhibit 16**
**Page 180**

Page 3 of 4

B0335-8997 10/12/2020 7:12 AM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

# EXHIBIT 17

**Exhibit 17**
**Page 182**

**Jon Lifquist, Assessor—Recorder**
Kern County Official Records

Recorded at the request of
**Public**

DUARTED
10/13/2020
10:32 AM

Recording Requested By:

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

Return To:

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

DOC#:   **220148455**



| Stat Types: 1 | Pages:   **5** |
|---|---|
| Fees | 30.00 |
| Taxes | 0.00 |
| Others | 75.00 |
| PAID | $105.00 |

THIS SPACE IS FOR RECORDER'S USE ONLY

DOCUMENT TITLE(S)

UCC FINANCING STATEMENT  Original(UCC-1) Filing

THIS   Original(UCC-1) Filing      FIXTURE FILING IS BEING RECORDED WITH   KERN                COUNTY

Order No: 77141732

**Exhibit 17**
**Page 183**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   49931 - Conterra Ag -

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

77141732

CALI
FIXTURE

File with: Kern, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name): if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Lincoln Grantor Farms, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1306 W. Herndon Ave. Ste 101 | Fresno | CA | 93711 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name): if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6000 Westown Parkway | West Des Moines | IA | 50266 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A legal description, attached hereto and made a part hereof.

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
77141732          AG1022                    Maricopa Orchards, LLC

**Exhibit 17**
**Page 184**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| Lincoln Grantor Farms, LLC |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only _one_ additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME   _or_   ☒ ASSIGNOR SECURED PARTY'S NAME:  Provide only _one_ name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CONTERRA AGRICULTURAL CAPITAL, LLC | | | |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7755 Office Plaza Dr N, Suite 195 | West Des Moines | IA | 50266 | USA |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| 13. ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☒ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate:<br><br>See Exhibit A attached hereto and made a part hereof. |

| 17. MISCELLANEOUS: 77141732-CA-29   49931 - Conterra Ag - County | CONTERRA AGRICULTURAL | File with: Kern, CA | AG1022   Maricopa Orchards, LLC |
|---|---|---|---|

**Exhibit 17**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, Glendale, CA 91209-9071 Tel (800) 331-3282

# RIDER A TO UCC

Debtor:                        **Lincoln Grantor Farms, LLC**

Secured Party:                 **American Equity Investment Life Insurance Company**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

---

**RIDER A TO UCC**

1

**Exhibit 17**
**Page 186**

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

**Exhibit 17**
**Page 187**

# EXHIBIT 18

**Exhibit 18**
**Page 188**

# Allonge to Promissory Note

**Loan # AG1022**

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **July 23, 2020**

Original Amount: **$288,000.00**

Borrower Name(s): **Maricopa Orchards, LLC and Lincoln Grantor Farms, LLC**

Property Address: **20 +/- Acres, Kern County, California**

PAY TO THE ORDER OF

**American Equity Investment Life Insurance Company**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature

**Mark A. Smith, COO & General Counsel**

**Exhibit 18
Page 189**

# EXHIBIT 19

**Exhibit 19**
**Page 190**

RECORDING REQUESTED BY

OLD REPUBLIC TITLE COMPANY

Escrow No.:  1411018745
APN:  see legal

WHEN RECORDED MAIL TO

Conterra Agricultural Capital, LLC
Taylor Petersen
7755 Office Plaza Drive North, Suite 195,
West Des Moines, IA 50266

Jon Lifquist, Assessor-Recorder
Kern County Official Records

LB
7/23/2020
11:57 AM

Recorded Electronically by:
451  Old Republic Title Company

DOC #:  220096755



220096755

| Stat Types: 1 | Pages: 4 |
|---|---|
| FEES | 33.00 |
| TAXES | .00 |
| OTHER | .00 |
| PAID | 33.00 |

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

## Assignment of Deed of Trust

1  ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2  ☐ Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3  ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4  ☒ Exempt from fee per GC27388.1(a)(1); fee cap of $225 reached

5  ☐ Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

6  ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____ (date) as document number _____

7  ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ (date) as document number(s) _____

8  ☐ Exempt from fee per GC27388.1(a)(1); maximum fees have been paid on documents in the transaction(s) recorded previously on _____ (date) as document number(s) _____

11 ☐ Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12 ☐ Exempt from fee per GC27388.1(a)(2); executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) of Part 4 of the Code of Civil Procedure)

DB/db

**Exhibit 19
Page 191**

Recorded at Request of
Old Republic Title Company

*1411018745*

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**7755 Office Plaza Drive North, Suite 195, Suite 195**
**West Des Moines, IA 50266**

-------------------------------------------------------- [Space Above This Line For Recording] --------------------------------------------------------

# ASSIGNMENT OF DEED OF TRUST

**Loan # AG1022**

For Value Received, Conterra Agricultural Capital, LLC, an Iowa limited liability company ("Assignor") whose address is **7755 Office Plaza Drive North, Suite 195, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company, whose address is 6000 Westown Parkway, West Des Moines, Iowa 50266** ("Assignee") all beneficial interest under a certain Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filings date July 23, 2020 (collectively, the "Deed of Trust" made and executed by **Lincoln Grantor Farms, LLC, a California limited liability company**, as Trustor to Old Republic Title Company, as Trustee, upon the following described property situated in **Kern County**, State of **California**:

**See Exhibit "A" attached hereto and made a part hereof.**

such Deed of Trust having been given to secure payment of **$288,000.00** , which Deed of Trust
**is recording concurrently herewith.** (Original Amount of Principal)
is of record in Book /////// Page /////  in the Real Property Records of **Kern** County, State of **California**, together with the note(s) and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever without recourse, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Deed of Trust on
July 23 , 2020 .

---

**California Deed of Trust Assignment - Single Family**                                                              **11/02**

1

200909410425 [Doc Id 8457 M10032017]

**Exhibit 19**
**Page 192**

**Conterra Agricultural Capital, LLC**

_(signature)_                          7-23-2020
Signature                                   Date

Mark A. Smith, COO & General Counsel

_(signature)_
Witness


STATE OF IOWA

COUNTY OF ___Dallas___

Before me, the undersigned authority, on this day personally appeared

___Mark A. Smith, COO General Counsel___

, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 23rd day of July , 2020 .

_(signature)_
Notary, State of Iowa
Printed Name: Taylor Petersen
My Commission Expires: 11-9-2021

```
            TAYLOR PETERSEN
            Commission Number 813700
            My Commission Expires
                11-9-2021
```

**This Instrument Prepared By:**
**PeirsonPatterson, LLP**

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

**Exhibit 19
Page 194**

# EXHIBIT 20

Exhibit 20
Page 195

# NOTE

Loan #AG1023

**July 23, 2020**
[Date]

**Fresno**
[City]

**CA**
[State]

**273 +/- Acres**
**Kern County, California**
[Property Address]

**1.      BORROWERS' PROMISE TO PAY**

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Grantor Real Estate Investments, LLC**, a California limited liability company (Maricopa Orchards, LLC and Grantor Real Estate Investments, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$3,312,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company**.  Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

**2.      INTEREST**

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Borrowers will pay interest at a yearly rate of **3.750%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

**3.      SCHEDULED PAYMENTS**

**(A)   Time and Amount of Payments**

**1 payment on January 1, 2021, in the Principal amount of $56,334.23 plus all accrued interest, with interest calculated from the date of closing on the unpaid Principal balance at 3.750%% per annum; 19 consecutive semi-annual principal and interest payments of $118,434.23 each beginning July 1, 2021, with the final payment of all remaining Principal and interest, plus any costs and expenses, due on July 23, 2030, which is called the "Maturity Date."**

**(B)   Place of Payments**

Borrowers will make payments at **7755 Office Plaza Drive North, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender

**4.      INTEREST CALCULATION**

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days.  The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to Principal, and finally to late charges.

---

**MULTISTATE FIXED RATE NOTE**

1

**Exhibit 20**
**Page 196**

**5.    PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.    INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.    ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.    DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities

---

MULTISTATE FIXED RATE NOTE

2

**Exhibit 20**
**Page 197**

("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

9.      **LENDER ADVANCES**
Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

10.     **GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.
Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

11.     **WAIVERS**
Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

12.     **UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

---

MULTISTATE FIXED RATE NOTE

3

Exhibit 20
Page 198

**13.   USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**14.   DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

**(A)   Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

**(1)**   If Borrowers fail to repay any interest or Principal under the Note when due;

**(2)**   If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

**(3)**   If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

**(4)**   If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

**(5)**   If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

**(6)**   If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

**(7)**   If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**(B)   Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

**(C)   Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

**(D)   No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay

---

MULTISTATE FIXED RATE NOTE

4

**Exhibit 20**
**Page 199**

immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(E)    Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Grantor Real Estate Investments, LLC**
a California limited liability company

_____
By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

_____
By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

MULTISTATE FIXED RATE NOTE

5

**Exhibit 20**
**Page 200**

# EXHIBIT 21

Exhibit 21
Page 201

Jon Lifquist, Assessor-Recorder
Kern County Official Records

DD
7/23/2020
11:55 AM

Recorded at Request of
Old Republic Title Company

*1411018746*

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**7755 Office Plaza Dr. North, Suite 195**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

Recorded Electronically by:
451  Old Republic Title Company

**DOC #:** 220096746



220096746

| Stat Types: 3 | Pages: 15 |
|---|---|
| FEES | 108.00 |
| TAXES | .00 |
| OTHER | 225.00 |
| PAID | 333.00 |



_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1023**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)** **"Security Instrument"** means this document, which is dated **July 23, 2020,** together with all Riders to this document.

**(B)** **"Lender"** is **Conterra Agricultural Capital, LLC.** Lender is a **limited liability company** organized and existing under the laws of **Iowa.** Lender's address is **7755 Office Plaza Dr. North, Suite 195 West Des Moines, IA 50266.** Lender is the beneficiary under this Security Instrument.

**(C)** **"Borrower"** is **Grantor Real Estate Investments, LLC, a California limited liability company.** Borrower is the trustor under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company.** Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

**(D)** **"Trustee"** is Old Republic Title Company.

**(E)** **"Note"** means the promissory note signed by Borrower Parties and dated **July 23, 2020.** The **"Note"** states that Borrower Parties owe Lender **Three Million Three Hundred Twelve Thousand and No/100 ($3,312,000.00),** plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 23, 2030.**

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties,

**CALIFORNIA–UNIFORM INSTRUMENT**

1

**Exhibit 21**
**Page 202**

recorded or not recorded.  The following Riders are to be executed by Borrower and/or Borrower Parties:

☐ Irrigation Equipment Rider      ☐ Water Rights Rider

☐ Financial Information and Covenants Rider      ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider      ☐ Adjustable Rate Rider

☐ Other(s):

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)  "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note. For this purpose, Borrower irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kern, California:**

**PARCEL 1:**
**The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.**
**APN: 521-160-06**

**PARCEL 2:**
**The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.**
**APN: 521-160-07**

**PARCEL 3:**
**The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section 4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.**
**APN: 060-050-15**

---

**CALIFORNIA--UNIFORM INSTRUMENT**

**Exhibit 21**
**Page 203**

which currently has the address of:

<div align="center">

**273 +/- Acres of Agricultural Land**
**Kern County, California**
("Property Address"):

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Kern, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

---

**CALIFORNIA–UNIFORM INSTRUMENT**

<div align="center">3</div>

**Exhibit 21**
**Page 204**

TOGETHER WITH any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:
**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so

CALIFORNIA--UNIFORM INSTRUMENT

4

Exhibit 21
Page 205

long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties.

**CALIFORNIA--UNIFORM INSTRUMENT**

**Exhibit 21**
**Page 206**

If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.**  Borrower shall be in default if, during the loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate

CALIFORNIA—UNIFORM INSTRUMENT

6

**Exhibit 21**
**Page 207**

building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument,

**CALIFORNIA–UNIFORM INSTRUMENT**

**Exhibit 21**
**Page 208**

whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless

CALIFORNIA--UNIFORM INSTRUMENT

8

**Exhibit 21**
**Page 209**

Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing

**CALIFORNIA--UNIFORM INSTRUMENT**

**Exhibit 21**
**Page 210**

this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

     **17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

     Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

     **18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

     Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

     Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that

CALIFORNIA--UNIFORM INSTRUMENT

**Exhibit 21**
**Page 211**

any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.  Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property.  Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19.  Additional Property Subject To The Security Instrument.**  This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC").  In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of  Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument.  All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20.  Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21.  Use of Property; Compliance With Law.**  Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change.  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22.  Assignment of Leases.**  Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property.  Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23.  Assignment of Rents; Appointment of Receiver; Lender In Possession.**  Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable.  Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents.  However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent.  This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

**CALIFORNIA--UNIFORM INSTRUMENT**

11

**Exhibit 21**
**Page 212**

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the**

CALIFORNIA--UNIFORM INSTRUMENT

**Exhibit 21**
**Page 213**

Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)     In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

**CALIFORNIA--UNIFORM INSTRUMENT**

13

Exhibit 21
Page 214

(d)      Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA–UNIFORM INSTRUMENT**

**Exhibit 21**
**Page 215**

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower.

**"BORROWER"**

Grantor Real Estate

**Grantor Real Estate Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager                    Assemi

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF CALIFORNIA
COUNTY OF _FRESNO_

On _July 20, 2020_ before me, _L. Diaz, Notary Public_, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name:_ L. Diaz _
My commission expires:_ April 20, 2022 _

```
L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022
```

**CALIFORNIA--UNIFORM INSTRUMENT**

15

**Exhibit 21**
**Page 216**

# EXHIBIT 22

**Exhibit 22**
**Page 217**





**STATE OF CALIFORNIA**
*Office of the Secretary of State, Alex Padilla*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U200025028422 |
| Date Filed: 10/12/2020 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 <br> GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| GRANTOR REAL ESTATE INVESTMENTS, LLC | 1306 W HERNDON AVE. STE 101 <br> FRESNO, CA 93711 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 6000 WESTOWN PARKWAY <br> WEST DES MOINES, IA 50266 |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 7755 OFFICE PLAZA DR N <br> SUITE 195 <br> WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Attached in a File

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
77152200

**Exhibit 22**
**Page 218**

See Rider A to UCC and Exhibit A legal description, attached hereto and made a part hereof.

B0335-9682 10/12/2020 2:15 PM Received by California Secretary of State

**Exhibit 22**
**Page 219**

This page and any following pages include and merge any text received for the collateral description with the attachments.

# RIDER A TO UCC

Debtor:                          **Grantor Real Estate Investments, LLC**

Secured Party:                   **American Equity Investment Life Insurance Company**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

B0035-9683 10/12/2020 2:15 PM Received by California Secretary of State

**Exhibit 22**
**Page 220**

Page 3 of 4

B0335-9684 10/12/2020 2:15 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

PARCEL 1:

The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN:  521-160-06

PARCEL 2:

The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN:  521-160-07

PARCEL 3:

The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section 4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.

APN:  060-050-15

**Exhibit 22**
**Page 221**

Page 4 of 4

# EXHIBIT 23

**Exhibit 23**
**Page 222**

**Jon Lifquist, Assessor – Recorder**
Kern County Official Records

DUARTED
10/23/2020
12:19 PM

Recorded at the request of
**Public**

Recording Requested By:

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

Return To:

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

DOC#: **220156768**



| Stat Types: 1 | Pages: 5 |
|---|---|
| Fees | 30.00 |
| Taxes | 0.00 |
| Others | 225.00 |
| PAID | $255.00 |

THIS SPACE IS FOR RECORDER'S USE ONLY

**DOCUMENT TITLE(S)**

**UCC FINANCING STATEMENT  Original(UCC-1) Filing**

THIS   Original(UCC-1) Filing      FIXTURE FILING IS BEING RECORDED WITH      KERN          COUNTY

Order No: 77151394

Exhibit 23
Page 223

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| |
|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141 |
| B. E-MAIL CONTACT AT FILER (optional)<br>uccfilingreturn@wolterskluwer.com |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address)   49931 - Conterra Ag -<br><br>Lien Solutions       77151394<br>P.O. Box 29071<br>Glendale, CA 91209-9071    CALI<br>FIXTURE<br><br>File with: Kern, CA |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Grantor Real Estate Investments, LLC | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave. Ste 101 | | Fresno | CA | 93711 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 6000 Westown Parkway | | West Des Moines | IA | 50266 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A legal description, attached hereto and made a part hereof.

| | |
|---|---|
| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |

| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien  ☐ Non-UCC Filing | |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
77151394          AG1023          Maricopa Orchards

Exhibit 23<br>Page 224

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| Grantor Real Estate Investments, LLC | |

OR

| | | |
|---|---|---|
| 9b. INDIVIDUAL'S SURNAME | | |
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☒ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| 11a. ORGANIZATION'S NAME | | | | |
| CONTERRA AGRICULTURAL CAPITAL, LLC | | | | |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7755 Office Plaza Dr N, Suite 195 | West Des Moines | IA | 50266 | USA |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| | |
|---|---|
| 13. ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☒ is filed as a fixture filing |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate:  See Exhibit A attached hereto and made a part hereof. |

17. MISCELLANEOUS: 77151394-CA-29  49931 - Conterra Ag - County    CONTERRA AGRICULTURAL    File with: Kern, CA    AG1023  Maricopa Orchards, LLC

**Exhibit 23**
**Page 225**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# RIDER A TO UCC

Debtor: **Grantor Real Estate Investments, LLC**

Secured Party: **American Equity Investment Life Insurance Company**

Assignor Secured Party: **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

RIDER A TO UCC

1

**Exhibit 23**
**Page 226**

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

PARCEL 1:

The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN: 521-160-06

PARCEL 2:

The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN: 521-160-07

PARCEL 3:

The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section 4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.

APN: 060-050-15

Exhibit 23
Page 227

# EXHIBIT 24

**Exhibit 24**
**Page 228**

# Allonge to Promissory Note

**Loan # AG1023**

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **July 23, 2020**

Original Amount: **$3,312,000.00**

Borrower Name(s): **Maricopa Orchards, LLC and Grantor Real Estate Investments, LLC**

Property Address: **273 +/- Acres, Kern County, California**

PAY TO THE ORDER OF

**American Equity Investment Life Insurance Company**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

_____
Signature

**Mark A. Smith, COO & General Counsel**

---

Allonge to Promissory Note

1

**Exhibit 24
Page 229**

# EXHIBIT 25

Exhibit 25
Page 230

Jon Lifquist, Assessor-Recorder
Kern County Official Records

DD
7/23/2020
11:55 AM

RECORDING REQUESTED BY

OLD REPUBLIC TITLE COMPANY

Escrow No.: 1411018746
APN:    see legal

Recorded Electronically by:
451  Old Republic Title Company

DOC #: 220096747



220096747

| Stat Types: 1 | Pages: 3 |
|---|---|
| FEES | 30.00 |
| TAXES | .00 |
| OTHER | .00 |
| PAID | 30.00 |

WHEN RECORDED MAIL TO

Conterra Agricultural Capital, LLC
Taylor Petersen
7755 Ofice Plaza Drive North, Suite 195,
West Des Moines, IA 50266

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## Assignment of Deed of Trust

1 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2 ☐ Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4 ☒ Exempt from fee per GC27388.1(a)(1); fee cap of $225 reached

5 ☐ Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

6 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____ (date) as document number _____

7 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ (date) as document number(s) _____

8 ☐ Exempt from fee per GC27388.1(a)(1); maximum fees have been paid on documents in the transaction(s) recorded previously on _____ (date) as document number(s) _____

11 ☐ Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12 ☐ Exempt from fee per GC27388.1(a)(2); executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) of Part 4 of the Code of Civil Procedure)

DB/db

**Exhibit 25
Page 231**

Recorded at Request of
Old Republic Title Company

1411018746

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**7755 Office Plaza Drive North, Suite 195, Suite 195**
**West Des Moines, IA 50266**

-------------------------------------------------------- [Space Above This Line For Recording] --------------------------------------------------------

# ASSIGNMENT OF DEED OF TRUST

**Loan # AG1023**

For Value Received, Conterra Agricultural Capital, LLC, an Iowa limited liability company ("Assignor") whose address is **7755 Office Plaza Drive North, Suite 195, West Des Moines, IA  50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company, whose address is 6000 Westown Parkway, West Des Moines, Iowa 50266 ("Assignee")** all beneficial interest under a certain Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filings dated July 23, 2020, (collectively, the "Deed of Trust" made and executed by **Grantor Real Estate Investments, LLC, a California limited liability company**, as Trustor, to Old Republic Title Company, as Trustee, upon the following described property situated in **Kern** County, State of **California**:

PARCEL 1:
**The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B.**
**& M., in the County of Kern, State of California.**
**APN: 521-160-06**

PARCEL 2:
**The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. &**
**M., in the County of Kern, State of California.**
**APN: 521-160-07**

PARCEL 3:
**The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of**
**Section**
**4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.**
**APN: 060-050-15**

such Deed of Trust having been given to secure payment of <u>**$3,312,000.00**</u>              , which Deed of Trust
**is recorded concurrently herewith.**          (Original Amount of Principal)
i̶s̶ ̶o̶f̶ ̶r̶e̶c̶o̶r̶d̶ ̶i̶n̶ ̶B̶o̶o̶k̶ ̶/̶/̶/̶/̶/̶/̶ ̶P̶a̶g̶e̶ ̶/̶/̶/̶/̶/̶  in the Real Property Records of **Kern** County, State of **California**, together with the note(s) and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

---

California Deed of Trust Assignment - Single Family                                          11/02

1

200909410425 [Doc Id 8457 M10032017]

**Exhibit 25**
**Page 232**

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever without recourse, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Deed of Trust on JULY 23, 2020.

Conterra Agricultural Capital, LLC

_____   7-23-2020
Signature                          Date
Mark A. Smith, COO & General Counsel

_____
Witness

STATE OF IOWA
COUNTY OF _____ Dallas _____

Before me, the undersigned authority, on this day personally appeared
_____ Mark A. Smith, COO & General counsel _____

, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 23rd day of July, 20 20.

_____
Notary, State of Iowa
Printed Name: Taylor Petersen
My Commission Expires: 11-9-2021

TAYLOR PETERSEN
Commission Number 813700
My Commission Expires
11-9-2021

This Instrument Prepared By:
PeirsonPatterson, LLP

California Deed of Trust Assignment - Single Family                                   11/02

2

200909410425 [Doc Id 8457 M10032017]

**Exhibit 25**
**Page 233**

# EXHIBIT 26

**Exhibit 26**
**Page 234**

# NOTE

Loan #AG1069

**October 15, 2021**
[Date]

**Fresno,**
[City]

**CA**
[State]

**642 +/- Acres**
**Fresno County, California**
[Property Address]

**1.     BORROWERS' PROMISE TO PAY**

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Gradon Farms, LLC**, a California limited liability company (Maricopa Orchards, LLC and Gradon Farms, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$3,852,300.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC**, an Iowa limited liability company.  Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

**2.     INTEREST**

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Borrowers will pay interest at a yearly rate of **3.500%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

**3.     SCHEDULED PAYMENTS**

**(A)  Time and Amount of Payments**
**Borrower will make (i) 1 principal payment in the amount of $67,307.74 on January 1, 2022, accompanied with interest calculated from the date of closing on the unpaid principal balance at 3.500% per annum; (ii) 19 consecutive semi-annual Principal and interest payments of $134,722.99 each, due and payable on the first day of each July and January, beginning July 1, 2022, and (iii) the final payment of all remaining Principal and interest, plus any costs and expenses incurred, due on October 15, 2031, which is called the "Maturity Date."**

**(B)  Place of Payments**
Borrowers will make payments at **5465 Mills Civic Parkway, Suite 195, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender.

**4.     INTEREST CALCULATION**

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days.   The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

MULTISTATE FIXED RATE NOTE

1

**Exhibit 26**
**Page 235**

**5.   PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.   INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.   ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.   DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any

MULTISTATE FIXED RATE NOTE

2

**Exhibit 26**
**Page 236**

guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

## 9.   LENDER ADVANCES

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

## 10.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

## 11.   WAIVERS

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due.  "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

## 12.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note.  That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note.  Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

## 13.   USURY

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or

MULTISTATE FIXED RATE NOTE

3

Exhibit 26
Page 237

criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

## 14.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED

### (A)    Event of Default

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

        **(1)**    If Borrowers fail to repay any interest or Principal under the Note when due;

        **(2)**    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

        **(3)**    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

        **(4)**    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

        **(5)**    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

        **(6)**    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

        **(7)**    If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

### (B)    Late Charge for Overdue Payments

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

### (C)    Notice of Default

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

### (D)    No Waiver By Lender

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

### (E)    Payment of Lender's Costs and Expenses

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those

MULTISTATE FIXED RATE NOTE

4

Exhibit 26
Page 238

expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Gradon Farms, LLC**
a California limited liability company

By: Neema Assemi
Its: Manager

**Maricopa Orchards, LLC**,
a California limited liability company

By: Farshid Assemi
Its: General Manager

*[Sign Originals Only]*

MULTISTATE FIXED RATE NOTE

**Exhibit 26
Page 239**

# EXHIBIT 27

**Exhibit 27**
**Page 240**

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2021-0172474

Recorded at the request of:
ERECORDING PARTNERS NETWORK

10/15/2021 11:49 19
Titles: 3      Pages: 18
Fees: $84.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $84.00

Recorded at Request of
Old Republic Title Company

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

[Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1069**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **October 15, 2021**, together with all Riders to this document.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrower"** is **Gradon Farms, LLC, a California limited liability company**. Grantor is the trustor under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liability company**. Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711**.

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Note"** means the promissory note signed by Borrower Parties and dated **October 15, 2021**. The Note states that Borrower Parties owe Lender **Three Million Eight Hundred Fifty Two Thousand Three Hundred and 00/100 ($3,852,300.00)**, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **October 15, 2031.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Notes, plus interest, any prepayment charges and late charges due under the Notes, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether

CALIFORNIA–UNIFORM INSTRUMENT

1

**Exhibit 27**
**Page 241**

recorded or whether unrecorded.  The following Riders are to be executed by Borrower or Borrower Parties:

☐  Irrigation Equipment Rider      ☐  Water Rights Rider

☒  Financial Information and Covenants Rider      ☐  Permitted Prior Encumbrance Rider

☐  Mortgage Insurance Rider      ☐  Adjustable Rate Rider

☐  Other(s): Cross Default Rider; Cross Collateralization Rider

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)  "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

**See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

**642 +/- Acres of Agricultural Land**
**Fresno County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made

**CALIFORNIA--UNIFORM INSTRUMENT**

2

**Exhibit 27**
**Page 242**

thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the  real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument.  Borrower warrants and will defend generally the title to the Property against all

**CALIFORNIA--UNIFORM INSTRUMENT**

3

**Exhibit 27**
**Page 243**

claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS.  Borrower covenants and agrees as follows:
**1.  Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12.  Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.**  Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Charges; Liens.**  Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**CALIFORNIA--UNIFORM INSTRUMENT**

4

Exhibit 27
Page 244

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then

CALIFORNIA—UNIFORM INSTRUMENT

5

**Exhibit 27**
**Page 245**

due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date

CALIFORNIA—UNIFORM INSTRUMENT

6

Exhibit 27
Page 246

of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or

CALIFORNIA–UNIFORM INSTRUMENT

7

**Exhibit 27**
**Page 247**

modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

      **10.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

      **11.  Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

      If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

      **12.  Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

      **13.  Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

      As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding

**CALIFORNIA--UNIFORM INSTRUMENT**

**Exhibit 27**
**Page 248**

neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of

**CALIFORNIA–UNIFORM INSTRUMENT**

9

**Exhibit 27**
**Page 249**

acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.  Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property.  Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC").  In addition to the Property described in the Security Instrument, the following items now or hereafter attached

CALIFORNIA--UNIFORM INSTRUMENT

Exhibit 27
Page 250

to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

CALIFORNIA–UNIFORM INSTRUMENT

11

**Exhibit 27**
**Page 251**

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies.** Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons

**CALIFORNIA--UNIFORM INSTRUMENT**

**Exhibit 27**
**Page 252**

legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

    **27. Substitute Trustee.**  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.  Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

    **28. Statement of Obligation Fee.**  Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

    **29. Other California State Specific Provisions.**

    (a)    In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

    (b)    Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

    (c)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

    (1)    at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

    (2)    the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

    (d)    Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the **"Environmental Provisions"**), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

---

**CALIFORNIA--UNIFORM INSTRUMENT**

13

Exhibit 27
Page 253

DOC #2021-0172474  Page 14 of 18

**"BORROWER"**

**Gradon Farms LLC**
a California limited liability company

_____
By: Neema Assemi
Its:  Manager

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate
> is attached, and not the truthfulness, accuracy, or
> validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___FRESNO_____

On _October 14, 2021_ before me, _L. Diaz, Notary Public_, personally appeared
**Neema Assemi,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____
Notary Public
Printed Name:__ L. Diaz _____
My commission expires: _April 20, 2022_

> L. DIAZ
> NOTARY PUBLIC   CALIFORNIA
> COMMISSION # 2235602
> FRESNO COUNTY
> My Comm  Exp. April 20, 2022

**CALIFORNIA–UNIFORM INSTRUMENT**

14

**Exhibit 27**
**Page 254**

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1069**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this **15th day of October, 2021**, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by Gradon Farms, LLC (the "Borrower") to secure promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**642 +/- Acres**
**Fresno County, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

☒    **Financials.** Annually, Lender will be provided Borrower Parties' internally prepared financial statements and tax returns within **150** days after the close of each fiscal year. Financial statements provided to Lender must include market value balance sheets and an entity-by-entity breakdown of any and all related party accounts/notes, both payable and receivable.

☒    **Debt Service Coverage Ratio.** Annually, the Assemi Group, as defined below, shall maintain at all times a debt service coverage ratio greater than or equal to 1.25:1 when measured with the December 31 financial statements.

Debt Service Coverage Ratio shall be as determined in Lender's sole discretion and based on the December 31 financial statements for The Assemi Group, as defined below, during the applicable term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income minus withdrawals, plus depreciation (except for livestock related depreciation), plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

☒    **Total Liabilities/Total Assets.** Annually, Borrower Parties and all guarantors of the Notes on a consolidated

**MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER**

1

**Exhibit 27**
**Page 255**

basis shall maintain Total Liabilities to Total Assets of no more than 60%, as measured as of December 31 each year using market basis financial statements.

☒ **Transfer of Ownership.** Borrower Parties shall not, without Lender's prior written consent, convey, transfer, or pledge any ownership of the membership interests in the entities to other third-parties, excepting transfers to entities within The Assemi Group, as defined below.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means all entities identified and consolidated within the annual accountant-audited financial statements title "The Assemi Group".

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

DATED effective this ⎣5⎦ day of October, 2021.

**"BORROWER PARTIES"**

**Gradon Farms, LLC**
a California limited liability company

By: Farshid Assemi  Neema Assemi
Its: Manager

**Maricopa Orchards, LLC**
a California limited liability company

By: Farshid Assemi
Its: General Manager

*[Sign Originals Only]*

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

2

**Exhibit 27
Page 256**

**ORDER NO. :** 1421000876

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Northeast Quarter of Section 16, Township 18 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Together with the Easterly 660.03 feet of the Northwest Quarter of said Section 16.

Excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Section 16, said Northeast corner being at Coordinates Y=380, 340.97 feet and X=1,606, 371.10 feet; thence (1) along the East line of said Section 16, South 1° 26' 28" West, a distance of 13.28 feet to the Northeasterly boundary of the existing State Highway, Road 06-FRE-33; thence (2)along said Northeasterly boundary North 43° 44' 00" West, a distance of 18.60 feet to the North line of said Section 16; thence (3), along said North line South 89° 16' 39" East, a distance of 13.19 feet to the point of beginning.

Excepting therefrom 75% of all oil, gas, minerals and other hydrocarbons in, on or underlying said real property, with the right of ingress and egress to and from said real property for the purpose of exploring for, producing, removing and storing all oil, gas, hydrocarbons and other minerals and such other rights as may be necessary or convenient in the full and free exercise of the rights herein expressly reserved, as reserved in the Deed from Lyle J. Christie, an unmarried man, to Five Points Ranch, Inc., a corporation, dated July 8, 1965, recorded August 20, 1965, in Book 5207, Page 332 of Official Records, Document No. 67349.

APN: 058-080-23S and 058-080-30S

PARCEL 2:

The Southeast Quarter of Section 32, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Plats.

Excepting therefrom 75% all oil, gas and other hydrocarbon substances, as reserved in various Deeds of record.

APN: 050-100-09S

PARCEL 3:

The East-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

**Exhibit 27**
**Page 257**

Excepting therefrom that portion as conveyed to The United States of America  in that certain Grant Deed Recorded August 24, 1965 in Book 5208, Page 554 of Fresno County Official Records, described as follows:

Beginning at a point in the North boundary of said Section 7, distant therealong North 89° 40' West 1940.5 feet from the Northeast corner of said Section 7; thence along said North boundary South 89° 40' East 697.0 feet; thence leaving said North boundary South 27° 32' East 2491.6 feet; thence South 89° 22' East 67.9 feet to a point in the East boundary of said Section 7; thence along said East boundary the following courses and distances:

South 0° 28' West 442.1 feet to the East Quarter corner of said Section 7; thence continuing South 0° 38' West 744.5 feet; thence leaving said East boundary and running North 27° 32' West 3173.2 feet; thence North 33° 40' West 374.4 feet; thence North 39° 48' West 358.2 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document Nos. 104217 and 104218, Official Records.

APN: 060-020-38S and 060-020-39S

**Exhibit 27**
**Page 258**

# EXHIBIT 28

**Exhibit 28**
**Page 259**




**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516



| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210094921531 |
| Date Filed: 10/20/2021 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| GRADON FARMS, LLC | 1306 W. HERNDON AVE<br>STE 101<br>FRESNO, CA 93711 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 6000 WESTOWN PARKWAY<br>WEST DES MOINES, IA 50266 |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY<br>STE 201<br>WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Attached in a File

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
83035569

**Exhibit 28**
**Page 260**

See Rider A to UCC and Exhibit A Legal Description attached hereto and made a part hereof.

B0439-8381 10/20/2021 12:11 PM Received by California Secretary of State

This page and any following pages include and merge any text received for the collateral description with any attachments.

**Exhibit 28**
**Page 261**

Page 2 of 5

B0439-8382 10/20/2021 12:11 PM Received by California Secretary of State

# RIDER A TO UCC

| | |
|---|---|
| **Debtor:** | **Gradon Farms, LLC** |
| **Secured Party:** | **American Equity Investment Life Insurance Company** |
| **Assignors Secured Party:** | **Conterra Agricultural Capital, LLC** |

All building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property described on Exhibit A, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins;

All of Debtor's right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired: all irrigation equipment (including but not limited to center irrigation pivots, pumps, PVC pipe, sprinklers, motors, well equipment, pumps and power units situated on the Property);

And all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

RIDER A TO UCC

1

©PeirsonPatterson, LLP. 2021

211025000516 [Doc Id 9696 M10292018]

**Exhibit 28**
**Page 262**

Page 3 of 5

B0439-8383 10/20/2021 12:11 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Northeast Quarter of Section 16, Township 18 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Together with the Easterly 660.03 feet of the Northwest Quarter of said Section 16.

Excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Section 16, said Northeast corner being at Coordinates Y=380, 340.97 feet and X=1,606, 371.10 feet; thence (1) along the East line of said Section 16, South 1° 26' 28" West, a distance of 13.28 feet to the Northeasterly boundary of the existing State Highway, Road 06-FRE-33; thence (2) along said Northeasterly boundary North 43° 44' 00" West, a distance of 18.60 feet to the North line of said Section 16; thence (3), along said North line South 89° 16' 39" East, a distance of 13.19 feet to the point of beginning.

Excepting therefrom 75% of all oil, gas, minerals and other hydrocarbons in, on or underlying said real property, with the right of ingress and egress to and from said real property for the purpose of exploring for, producing, removing and storing all oil, gas, hydrocarbons and other minerals and such other rights as may be necessary or convenient in the full and free exercise of the rights herein expressly reserved, as reserved in the Deed from Lyle J. Christie, an unmarried man, to Five Points Ranch, Inc., a corporation, dated July 8, 1965, recorded August 20, 1965, in Book 5207, Page 332 of Official Records, Document No. 67349.

APN: 058-080-23S and 058-080-30S

PARCEL 2:

The Southeast Quarter of Section 32, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Plats.

Excepting therefrom all oil, gas and other hydrocarbon substances, as reserved in various Deeds of record.

APN: 050-100-09S

PARCEL 3:

The East-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

**Exhibit 28**
**Page 263**
Page 4 of 5

Excepting therefrom that portion as conveyed to The United States of America  in that certain Grant Deed Recorded August 24, 1965 in Book 5208, Page 554 of Fresno County Official Records, described as follows:

Beginning at a point in the North boundary of said Section 7, distant therealong North 89° 40' West 1940.5 feet from the Northeast corner of said Section 7; thence along said North boundary South 89° 40' East 697.0 feet; thence leaving said North boundary South 27° 32' East 2491.6 feet; thence South 89° 22' East 67.9 feet to a point in the East boundary of said Section 7; thence along said East boundary the following courses and distances:

South 0° 28' West 442.1 feet to the East Quarter corner of said Section 7; thence continuing South 0° 38' West 744.5 feet; thence leaving said East boundary and running North 27° 32' West 3173.2 feet; thence North 33° 40' West 374.4 feet; thence North 39° 48' West 358.2 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document Nos. 104217 and 104218, Official Records.

APN: 060-020-38S and 060-020-39S

B0439-8384 10/20/2021 12:11 PM Received by California Secretary of State

**Exhibit 28**
**Page 264**

# EXHIBIT 29

**Exhibit 29**
**Page 265**

**ALLONGE TO PROMISSORY NOTE**

   For purposes of endorsement of the promissory note dated October 15, 2021, executed by Maricopa Orchards, LLC, and Gradon Farms, LLC, in favor of Conterra Agricultural Capital, LLC, an Iowa limited liability company, in the original principal amount of $3,852,300.00 plus interest (the "**Note**"), this Allonge to Promissory Note is affixed and becomes a permanent part of the Note.

**PAY TO THE ORDER OF**
**American Equity Investment Life Insurance Company**
**WITHOUT RECOURSE**


Dated: October 15, 2021


         **CONTERRA AGRICULTURAL CAPITAL, LLC,**
         **an Iowa limited liability company**


By: _____
   Mark A. Smith
Its: COO & General Counsel

**Exhibit 29**
**Page 266**

# EXHIBIT 30

**Exhibit 30**
**Page 267**

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2021-0172475

Recorded at the request of:
ERECORDING PARTNERS NETWORK

10/15/2021 11:49 19
Titles: 1       Pages: 4
Fees: $20.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $20.00

· Recorded at Request of
Old Republic Title Company

l42l000874

This instrument prepared by:
**PeirsonPatterson, LLP.**
**2310 Interstate 20 West, Suite 100**
**Arlington, TX 76017-1668**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

## ASSIGNMENT OF DEED OF TRUST
## (Simultaneous)

Loan ## AG1069

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company**, whose address is **6000 Westown Parkway, West Des Moines, IA 50266**, all beneficial interest under a certain Deed of Trust dated **October 15, 2021**, made and executed by **Gradon Farms, LLC, a California limited liability company,** to **Old Republic Title Company,** Trustee, upon the following described property situated in **Fresno County**, State of ~~Texas:~~ California

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of a single-advance term loan in the original principal amount of **$3,852,300.00**, which Deed of Trust is being filed of record simultaneously in the official records of **Fresno County, State of California**, together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed and made to be effective this Assignment of Deed of Trust on _October 15_ , 2021_____ .

---

Multistate Deed of Trust Assignment (Simultaneous) - Single Family

1       .

211631000322 [Doc Id 8448 M11182020]

**Exhibit 30**
**Page 268**

DOC #2021-0172475  Page 2 of 4

**Conterra Agricultural Capital, LLC**

_(signature)_                    10/15/2021

Signature                              Date

**Mark A. Smith, COO & General Counsel**

_(signature)_   Keifer Brandt

Witness                    **Witness**

STATE OF IOWA

COUNTY OF ___Polk___          Notary Public

Before me, the undersigned authority, on this day personally appeared
___Mark A. Smith, COO & General counsel___

, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this __15ᵗʰ__ day of __October__, 20 __21__ .

___Taylor Petersen___

Notary, State of ___Iowa___

Printed Name: _Taylor Petersen_
My Commission Expires: __11-9-2021__

> **TAYLOR PETERSEN**
> Commission Number 813700
> My Commission Expires
> 11-9-2021

---

Multistate Deed of Trust Assignment (Simultaneous) - Single Family

2

211631000322 [Doc Id 8448 M11182020]

**Exhibit 30**
**Page 269**

**ORDER NO. :** 1421000876

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Northeast Quarter of Section 16, Township 18 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Together with the Easterly 660.03 feet of the Northwest Quarter of said Section 16.

Excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Section 16, said Northeast corner being at Coordinates Y=380, 340.97 feet and X=1,606, 371.10 feet; thence (1) along the East line of said Section 16, South 1° 26' 28" West, a distance of 13.28 feet to the Northeasterly boundary of the existing State Highway, Road 06-FRE-33; thence (2)along said Northeasterly boundary North 43° 44' 00" West, a distance of 18.60 feet to the North line of said Section 16; thence (3), along said North line South 89° 16' 39" East, a distance of 13.19 feet to the point of beginning.

Excepting therefrom 75% of all oil, gas, minerals and other hydrocarbons in, on or underlying said real property, with the right of ingress and egress to and from said real property for the purpose of exploring for, producing, removing and storing all oil, gas, hydrocarbons and other minerals and such other rights as may be necessary or convenient in the full and free exercise of the rights herein expressly reserved, as reserved in the Deed from Lyle J. Christie, an unmarried man, to Five Points Ranch, Inc., a corporation, dated July 8, 1965, recorded August 20, 1965, in Book 5207, Page 332 of Official Records, Document No. 67349.

APN: 058-080-23S and 058-080-30S

PARCEL 2:

The Southeast Quarter of Section 32, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Plats.

Excepting therefrom 75% all oil, gas and other hydrocarbon substances, as reserved in various Deeds of record.

APN: 050-100-09S

PARCEL 3:

The East-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

**Exhibit 30
Page 270**

Excepting therefrom that portion as conveyed to The United States of America  in that certain Grant Deed Recorded August 24, 1965 in Book 5208, Page 554 of Fresno County Official Records, described as follows:

Beginning at a point in the North boundary of said Section 7, distant therealong North 89° 40' West 1940.5 feet from the Northeast corner of said Section 7; thence along said North boundary South 89° 40' East 697.0 feet; thence leaving said North boundary South 27° 32' East 2491.6 feet; thence South 89° 22' East 67.9 feet to a point in the East boundary of said Section 7; thence along said East boundary the following courses and distances:

South 0° 28' West 442.1 feet to the East Quarter corner of said Section 7; thence continuing South 0° 38' West 744.5 feet; thence leaving said East boundary and running North 27° 32' West 3173.2 feet; thence North 33° 40' West 374.4 feet; thence North 39° 48' West 358.2 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document Nos. 104217 and 104218, Official Records.

APN: 060-020-38S and 060-020-39S

**Exhibit 30**
**Page 271**

# EXHIBIT 31

**EXHIBIT 31**
**Page 272**

# NOTE

Loan #AG1078

| December 10, 2021 | Fresno, | CA |
|---|---|---|
| [Date] | [City] | [State] |

**527 +/- Acres**
**Fresno County, California**
[Property Address]

### 1. BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Lincoln Grantor Farms, LLC**, a California limited liability company (Maricopa Orchards, LLC and Lincoln Grantor Farms, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$3,530,910.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC**, an Iowa limited liability company. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

### 2. INTEREST

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **3.500%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

### 3. SCHEDULED PAYMENTS

**(A) Time and Amount of Payments**
**Borrower will make (i) 1 principal payment in the amount of $61,692.39 on July 1, 2022, accompanied with interest calculated from the date of closing on the unpaid principal balance at 3.500% per annum; (ii) 18 consecutive semi-annual Principal and interest payments of $123,483.31 each, due and payable on the first day of each January and July, beginning January 1, 2023 and (iii) the final payment of all remaining Principal and interest, plus any costs and expenses incurred, due on December 10, 2031, which is called the "Maturity Date."**

**(B) Place of Payments**
Borrowers will make payments at **5465 Mills Civic Parkway, Suite 195, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender.

### 4. INTEREST CALCULATION

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days. The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

---

**MULTISTATE FIXED RATE NOTE**

**EXHIBIT 31**
**Page 273**

**5.    PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note.  Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.    INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).  From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.    ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.  The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.    DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any

---

MULTISTATE FIXED RATE NOTE

2

EXHIBIT 31
Page 274

guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.     LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.    WAIVERS**

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**13.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or

**MULTISTATE FIXED RATE NOTE**

**EXHIBIT 31**
**Page 275**

criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

14. **DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**
   **(A)      Event of Default**
   The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:
             **(1)**      If Borrowers fail to repay any interest or Principal under the Note when due;
             **(2)**      If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;
             **(3)**      If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;
             **(4)**      If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;
             **(5)**      If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);
             **(6)**      If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;
             **(7)**      If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.
   **(B)      Late Charge for Overdue Payments**
   If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.
   **(C)      Notice of Default**
   Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.
   **(D)      No Waiver By Lender**
   Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.
   **(E)      Payment of Lender's Costs and Expenses**
   Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those

---

**MULTISTATE FIXED RATE NOTE**

4

EXHIBIT 31
Page 276

Case 1:24-cv-01406-KES-SAB   Document 1   Filed 11/15/24   Page 277 of 620

expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Lincoln Grantor Farms, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

---

MULTISTATE FIXED RATE NOTE

5

**EXHIBIT 31**
**Page 277**

# EXHIBIT 32

**EXHIBIT 32**
**Page 278**

**Fresno County Recorder**
**Paul Dictos, CPA**

RECORDING REQUESTED BY

OLD REPUBLIC TITLE COMPANY

Escrow No.:  1411012306-DB/JS
APN:  040-060-24s, 040-020-24s, 040-
020-25s, 027-171-81s

**2021-0202493**

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/10/2021 12:32 31
Titles: 3    Pages: 19
Fees: $87.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $87.00

WHEN RECORDED MAIL TO

Conterra Agricultural Capital, LLC
Attn: Taylor Petersen
5465 Mills Civic Pkwy, Ste 201
West Des Moines, IA 50266

_SPACE ABOVE THIS LINE FOR RECORDER'S USE_

## DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING

1  ☒  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2  ☐  Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4  ☐  Exempt from fee per GC27388.1(a)(1); fee cap of $225 reached

5  ☐  Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

11 ☐  Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12 ☐  Exempt from fee per GC27388.1(a)(2); executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) of Part 4 of the Code of Civil Procedure)

DB/js

**EXHIBIT 32**
**Page 279**

Recorded at Request of
Old Republic Title Company

*141012306 - D8/Js*

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
# Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1078**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document.  Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)  "Security Instrument"** means this document, which is dated **December 10, 2021**, together with all Riders to this document.

**(B)  "Lender"** is **Conterra Agricultural Capital, LLC**.  Lender is a **limited liability company** organized and existing under the laws of **Iowa**.  Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**.  Lender is the beneficiary under this Security Instrument.

**(C)  "Borrower"** is **Lincoln Grantor Farms, LLC, a California limited liability company**.  Grantor is the trustor under this Security Instrument.  **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company**.  Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711**.

**(D)  "Trustee"** is **Old Republic Title Company**.

**(E)  "Note"** means the promissory note signed by Borrower Parties and dated **December 10, 2021**. The **Note** states that Borrower Parties owe Lender **Three Million Five Hundred Thirty Thousand Nine Hundred Ten and 00/100 ($3,530,910.00)**, plus interest.  Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **December 10, 2031**.

**(F)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)  "Loan"** means the debt evidenced by the Notes, plus interest, any prepayment charges and late charges due under the Notes, and all sums due under this Security Instrument, plus interest.

**(H)  "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether

**CALIFORNIA--UNIFORM INSTRUMENT**

1

**EXHIBIT 32**
**Page 280**

recorded or whether unrecorded. The following Riders are to be executed by Borrower or Borrower Parties:

☐  Irrigation Equipment Rider                           ☐  Water Rights Rider

☒  Financial Information and Covenants Rider            ☐  Permitted Prior Encumbrance Rider

☐  Mortgage Insurance Rider                             ☐  Adjustable Rate Rider

☐  Other(s): Cross Default Rider; Cross Collateralization
Rider

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)  "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

> **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

<div align="center">

**527 +/- Acres of Agricultural Land**
**Fresno County, California**
("Property Address"):

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

   **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made

---

CALIFORNIA—UNIFORM INSTRUMENT

<div align="center">2</div>

**EXHIBIT 32**
**Page 281**

thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the  real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all

**CALIFORNIA–UNIFORM INSTRUMENT**

**EXHIBIT 32**
**Page 282**

claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS.  Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12.  Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.**  Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.**  Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**CALIFORNIA--UNIFORM INSTRUMENT**

4

**EXHIBIT 32**
**Page 283**

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then

**CALIFORNIA--UNIFORM INSTRUMENT**

5

**EXHIBIT 32**
**Page 284**

due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date

**CALIFORNIA--UNIFORM INSTRUMENT**

6

**EXHIBIT 32**
**Page 285**

of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or

---

CALIFORNIA–UNIFORM INSTRUMENT

EXHIBIT 32
Page 286

modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

      **10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

      **11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

      If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

      **12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

      **13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

      As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding

**CALIFORNIA--UNIFORM INSTRUMENT**

8

EXHIBIT 32
Page 287

neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of

**CALIFORNIA--UNIFORM INSTRUMENT**

9

**EXHIBIT 32**
**Page 288**

acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached

CALIFORNIA--UNIFORM INSTRUMENT

EXHIBIT 32
Page 289

to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of  Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument.  All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change.  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property.  Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion.  As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable.  Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents.  However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent.  This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

---

CALIFORNIA--UNIFORM INSTRUMENT

11

EXHIBIT 32
Page 290

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons

CALIFORNIA–UNIFORM INSTRUMENT

12

EXHIBIT 32
Page 291

legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)     In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(d)     Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

CALIFORNIA–UNIFORM INSTRUMENT

13

**EXHIBIT 32**
**Page 292**

**"BORROWER"**

**Lincoln Grantor Farms, LLC**
a California limited liability company

By: Neema Assemi
Its: Manager

---

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

---

STATE OF CALIFORNIA
COUNTY OF _FRESNO_

On _Dec. 7, 2021_ before me, _L. Diaz, Notary Public_, personally appeared
**Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

---

**CALIFORNIA–UNIFORM INSTRUMENT**

14

**EXHIBIT 32**
**Page 293**

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1078**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this Tenth day of December, 2021, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by Lincoln Grantor Farms, LLC (the "Borrower") to secure promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**527 +/- Acres
Fresno County, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

☒      **Financials.** Annually, Lender will be provided Borrower Parties' internally prepared financial statements and tax returns within **150** days after the close of each fiscal year. Financial statements provided to Lender must include market value balance sheets and an entity-by-entity breakdown of any and all related party accounts/notes, both payable and receivable.

☒      **Debt Service Coverage Ratio.** Annually, the Assemi Group, as defined below, shall maintain at all times a debt service coverage ratio greater than or equal to 1.25:1 when measured with the December 31 financial statements.

Debt Service Coverage Ratio shall be as determined in Lender's sole discretion and based on the December 31 financial statements for The Assemi Group, as defined below, during the applicable term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income minus withdrawals, plus depreciation (except for livestock related depreciation), plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

☒      **Total Liabilities/Total Assets.** Annually, Borrower Parties and all guarantors of the Notes on a consolidated

---

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

1

EXHIBIT 32
Page 294

basis shall maintain Total Liabilities to Total Assets of no more than 60%, as measured as of December 31 each year using market basis financial statements.

**X**   **Transfer of Ownership.** Borrower Parties shall not, without Lender's prior written consent, convey, transfer, or pledge any ownership of the membership interests in the entities to other third-parties, excepting transfers to entities within The Assemi Group, as defined below.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means all entities identified and consolidated within the annual accountant-audited financial statements title "The Assemi Group".

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

DATED effective this _____ day of December, 2021.

**"BORROWER PARTIES"**

**Lincoln Grantor Farms, LLC**
a California limited liability company


By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**
a California limited liability company


By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

2

**EXHIBIT 32**
**Page 295**

Exhibit A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL ONE:

The West half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to James L. Marshall, a married man as his separate property, dated May 30, 1974, recorded in June 25, 1974, as Document No. 47797.

APN:  040-020-24-S

PARCEL TWO:

The East half and the East half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to John Alan Silveira, a single man, dated May 30, 1974, recorded June 25, 1974, as Document No. 47797.

APN:  040-020-25-S

**EXHIBIT 32**
**Page 296**

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The Northeast quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in an unincorporated area of the County of Fresno, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided 50% interest in and to all oil, minerals and other hydrocarbon substances therein and thereunder, as reserved by A. J. Yates and Joyce E. Yates, husband and wife in Deed recorded May 3, 1985, Document No. 85043693, Official Records.

Also excepting therefrom an undivided 50% interest in and to all oil, gas and other hydrocarbons and minerals on, in or under said land, as reserved by Anderson, Clayton and Co., its successors and assigns, in Deed recorded September 28, 1971 in Book 5941 Page 200 of Official Records.

APN: 040-060-24-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian,

EXCEPTING THEREFROM the West 1811.4 feet;

ALSO EXCEPTING the East 1731.7 feet;

ALSO EXCEPTING that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721, Pages 929, 931 & 933, Official Records of Fresno County;

ALSO EXCEPTING THEREFROM that portion deeded to Westlands Water District recorded in Book 5681, Page 67, Official Records of Fresno County.

FURTHER EXCEPTING THEREFROM, all right, title and interest in and to oil, minerals and hydrocarbon substances within and underlying said property by Grant Deed recorded June 3, 1960 in Book 4396, Page 525 and by Grant Deed recorded June 3, 1960 in Book 4396, Page 527, both of Official Records.

Being the land pursuant to a Certificate of Compliance, recorded February 11, 1999 as Document 1999-0021855 of Official Records.

APN: 027-171-81-S

**EXHIBIT 32**
**Page 297**

# EXHIBIT 33

EXHIBIT 33
Page 298






**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210110126717 |
| Date Filed: 12/14/2021 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| LINCOLN GRANTOR FARMS, LLC | 1306 W HERNDON AVE STE 101 FRESNO, CA 93711 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 6000 WESTOWN PARKWAY WEST DES MOINES, IA 50266 |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY STE 201 WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Attached in a File

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
83914077

**EXHIBIT 33**
**Page 299**

See Rider A to UCC and Exhibit A legal description attached hereto and made a part hereof.

B0455-0771 12/14/2021 1:32 PM Received by California Secretary of State

This page and any following pages include and merge any text received for the collateral description with any attachments.

**EXHIBIT 33**
**Page 300**

B0455-0772 12/14/2021 1:32 PM Received by California Secretary of State

# RIDER A TO UCC

**Debtor:**                        **Lincoln Grantor Farms, LLC**

**Secured Party:**               **American Equity Investment Life Insurance Company**

**Assignors Secured Party:**       **Conterra Agricultural Capital, LLC**

      All building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property described on Exhibit A, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins;

      All of Debtor's right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired: all irrigation equipment (including but not limited to center irrigation pivots, pumps, PVC pipe, sprinklers, motors, well equipment, pumps and power units situated on the Property);

      And all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

---

RIDER A TO UCC

<div align="center">1</div>

©PeirsonPatterson, LLP. 2021

211025000516 [Doc Id 9696 M10292018]

**EXHIBIT 33**
**Page 301**

Page 3 of 5

B0455-0773 12/14/2021 1:32 PM Received by California Secretary of State

Exhibit A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL ONE:

The West half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to James L. Marshall, a married man as his separate property, dated May 30, 1974, recorded in June 25, 1974, as Document No. 47797.

APN: 040-020-24-S

PARCEL TWO:

The East half and the East half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to John Alan Silveira, a single man, dated May 30, 1974, recorded June 25, 1974, as Document No. 47797.

APN: 040-020-25-S

**EXHIBIT 33**
**Page 302**

Page 4 of 5

B0455-0774 12/14/2021 1:32 PM Received by California Secretary of State

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The Northeast quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in an unincorporated area of the County of Fresno, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided 50% interest in and to all oil, minerals and other hydrocarbon substances therein and thereunder, as reserved by A. J. Yates and Joyce E. Yates, husband and wife in Deed recorded May 3, 1985, Document No. 85043693, Official Records.

Also excepting therefrom an undivided 50% interest in and to all oil, gas and other hydrocarbons and minerals on, in or under said land, as reserved by Anderson, Clayton and Co., its successors and assigns, in Deed recorded September 28, 1971 in Book 5941 Page 200 of Official Records.

APN: 040-060-24-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian,

EXCEPTING THEREFROM the West 1811.4 feet;

ALSO EXCEPTING the East 1731.7 feet;

ALSO EXCEPTING that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721, Pages 929, 931 & 933, Official Records of Fresno County;

ALSO EXCEPTING THEREFROM that portion deeded to Westlands Water District recorded in Book 5681, Page 67, Official Records of Fresno County.

FURTHER EXCEPTING THEREFROM, all right, title and interest in and to oil, minerals and hydrocarbon substances within and underlying said property by Grant Deed recorded June 3, 1960 in Book 4396, Page 525 and by Grant Deed recorded June 3, 1960 in Book 4396, Page 527, both of Official Records.

Being the land pursuant to a Certificate of Compliance, recorded February 11, 1999 as Document 1999-0021855 of Official Records.

APN: 027-171-81-S

EXHIBIT 33
Page 303

Page 5 of 5

# EXHIBIT 34

**EXHIBIT 34**
**Page 304**

**ALLONGE TO PROMISSORY NOTE**

For purposes of endorsement of the promissory note dated December 10, 2021, executed by Maricopa Orchards, LLC, a California limited liability company, and Lincoln Grantor Farms, LLC, a California limited liability company, in favor of Conterra Agricultural Capital, LLC, an Iowa limited liability company, in the original principal amount of $3,530,910.00 plus interest (the "**Note**"), this Allonge to Promissory Note is affixed and becomes a permanent part of the Note.

**PAY TO THE ORDER OF**
**American Equity Investment Life Insurance Company**
**WITHOUT RECOURSE**

Dated December 10, 2021

**CONTERRA AGRICULTURAL CAPITAL, LLC**
**an Iowa limited liability company**

By: _____
Mark A. Smith
Its:  COO & General Counsel

**EXHIBIT 34**
**Page 305**

# EXHIBIT 35

**EXHIBIT 35**
**Page 306**

RECORDING REQUESTED BY

Old Republic Title Company

    Escrow No.:   1411012306
        APN:   040-060-24s

    .

WHEN RECORDED MAIL TO

    Conterra Agricultural Capital, LLC
    Attn Taylor Petersen
    5465 Mills Civic Parkway, Ste 201
    West Des Moines, IA 50266

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2021-0202494

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/10/2021 12:32 31
Titles: 1    Pages: 5
Fees: $23.00
CA SB2 Fees:$0.00
Taxes: $0.00
Total: $23.00

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

## ASSIGNMENT OF DEED OF TRUST

1 ☒ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2 ☐ Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4 ☐ Exempt from fee per GC27388.1(a)(1); fee cap of $225 reached

5 ☐ Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

11 ☐ Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12 ☐ Exempt from fee per GC27388.1(a)(2); executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) of Part 4 of the Code of Civil Procedure)

.

DB/js

**EXHIBIT 35**
**Page 307**

This instrument prepared by:
**PeirsonPatterson, LLP.**
**2310 Interstate 20 West, Suite 100**
**Arlington, TX 76017-1668**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

# ASSIGNMENT OF DEED OF TRUST
## (Simultaneous)

Loan ## **AG1078**

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company,** whose address is **6000 Westown Parkway, West Des Moines, IA 50266**, all beneficial interest under a certain Deed of Trust dated **December 10, 2021**, made and executed by **Lincoln Grantor Farms, a California limited liability company,** to **Old Republic Title Company,** Trustee, upon the following described property situated in **Fresno County,** State of **California:**

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of a single-advance term loan in the original principal amount of **$3,350,910.00,** which Deed of Trust is being filed of record simultaneously in the official records of **Fresno County, State of California,** together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed and made to be effective this Assignment of Deed of Trust on December 10         , 2021         .

---

Multistate Deed of Trust Assignment (Simultaneous) - Single Family

1

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT 35**
**Page 308**

**Conterra Agricultural Capital, LLC**

_[signature]_     12/10/2021
Signature               Date
**Mark A. Smith, COO & General Counsel**
_[signature]_
Witness

STATE OF IOWA
COUNTY OF _____ Polk _____

Before me, the undersigned authority, on this day personally appeared
_____ Mark A. Smith, COO & General counsel _____

, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 10th day of December , 20 21 .

_Taylor Petersen_
Notary, State of ___ Iowa ___

Printed Name: Taylor Petersen
My Commission Expires: 11-9-2024

> **TAYLOR PETERSEN**
> Commission Number 813700
> My Commission Expires
> _11-9-2024_
> IOWA

---

**Multistate Deed of Trust Assignment (Simultaneous) - Single Family**

2

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT 35**
**Page 309**

Exhibit A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL ONE:

The West half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to James L. Marshall, a married man as his separate property, dated May 30, 1974, recorded in June 25, 1974, as Document No. 47797.

APN:  040-020-24-S

PARCEL TWO:

The East half and the East half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to John Alan Silveira, a single man, dated May 30, 1974, recorded June 25, 1974, as Document No. 47797.

APN:  040-020-25-S

**EXHIBIT 35**
**Page 310**

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The Northeast quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in an unincorporated area of the County of Fresno, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided 50% interest in and to all oil, minerals and other hydrocarbon substances therein and thereunder, as reserved by A. J. Yates and Joyce E. Yates, husband and wife in Deed recorded May 3, 1985, Document No. 85043693, Official Records.

Also excepting therefrom an undivided 50% interest in and to all oil, gas and other hydrocarbons and minerals on, in or under said land, as reserved by Anderson, Clayton and Co., its successors and assigns, in Deed recorded September 28, 1971 in Book 5941 Page 200 of Official Records.

APN: 040-060-24-S


The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian,

EXCEPTING THEREFROM the West 1811.4 feet;

ALSO EXCEPTING the East 1731.7 feet;

ALSO EXCEPTING that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721, Pages 929, 931 & 933, Official Records of Fresno County;

ALSO EXCEPTING THEREFROM that portion deeded to Westlands Water District recorded in Book 5681, Page 67, Official Records of Fresno County.

FURTHER EXCEPTING THEREFROM, all right, title and interest in and to oil, minerals and hydrocarbon substances within and underlying said property by Grant Deed recorded June 3, 1960 in Book 4396, Page 525 and by Grant Deed recorded June 3, 1960 in Book 4396, Page 527, both of Official Records.

Being the land pursuant to a Certificate of Compliance, recorded February 11, 1999 as Document 1999-0021855 of Official Records.

APN: 027-171-81-S

**EXHIBIT 35**
**Page 311**

# EXHIBIT 36

EXHIBIT 36
Page 312

# NOTE

Loan #AG1077

December 17, 2021
[Date]

Fresno,
[City]

CA
[State]

**630 +/- Acres**
**Fresno County, California**
[Property Address]

## 1.    BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **FFGT Farms, LLC**, a California limited liability company (Maricopa Orchards, LLC and FFGT Farms, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$13,500,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC**, an Iowa limited liability company. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

## 2.    INTEREST

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **3.500%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

## 3.    SCHEDULED PAYMENTS

**(A)   Time and Amount of Payments**
Borrower will make (i) 1 principal payment in the amount of **$235,873.23 on July 1, 2022, accompanied with interest calculated from the date of closing on the unpaid principal balance at 3.500% per annum; (ii) 18 consecutive semi-annual Principal and interest payments of $472,123.23 each, due and payable on the first day of each January and July, beginning January 1, 2023 and (iii) the final payment of all remaining Principal and interest, plus any costs and expenses incurred, due on December 17, 2031, which is called the "Maturity Date."**

**(B)   Place of Payments**
Borrowers will make payments at **5465 Mills Civic Parkway, Suite 195, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender.

## 4.    INTEREST CALCULATION

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days.   The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

---

MULTISTATE FIXED RATE NOTE

1

EXHIBIT 36
Page 313

**5.    PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.    INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.    ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.    DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any

MULTISTATE FIXED RATE NOTE

**EXHIBIT 36**
**Page 314**

indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

## 9.   LENDER ADVANCES

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

## 10.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

## 11.   WAIVERS

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

## 12.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

## 13.   USURY

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by

MULTISTATE FIXED RATE NOTE

**EXHIBIT 36**
**Page 315**

the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

## 14.  DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED

### (A)  Event of Default

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

    **(1)**    If Borrowers fail to repay any interest or Principal under the Note when due;

    **(2)**    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

    **(3)**    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

    **(4)**    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

    **(5)**    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

    **(6)**    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

    **(7)**    If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

### (B)  Late Charge for Overdue Payments

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

### (C)  Notice of Default

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

### (D)  No Waiver By Lender

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

### (E)  Payment of Lender's Costs and Expenses

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

---

MULTISTATE FIXED RATE NOTE

**EXHIBIT 36**
**Page 316**

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**FFGT Farms, LLC**
a California limited liability company

By: Nader Assemi
Its:  Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

---

MULTISTATE FIXED RATE NOTE

**EXHIBIT 36**
**Page 317**

# EXHIBIT 37

**EXHIBIT 37**
**Page 318**

Recorded in Official Records of Fresno County
Old Republic Title Company

1421 0008?2

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

**Paul Dictos, CPA**

# 2021-0208172

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/21/2021 10:09 05
Titles: 3     Pages: 21
Fees: $93.00
CA SB2 Fees:$0.00
Taxes: $0.00
Total: $93.00

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST

## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1077**

#### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **December 17, 2021**, together with all Riders to this document.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrower"** is **FFGT Farms, LLC, a California limited liability company**. Grantor is the trustor under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company**. Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711**.

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Note"** means the promissory note signed by Borrower Parties and dated **December 17, 2021**. The Note states that Borrower Parties owe Lender **Thirteen Million Five Hundred Thousand and 00/100 ($13,500,000.00)**, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **December 17, 2031.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Notes, plus interest, any prepayment charges and late charges due under the Notes, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether
**CALIFORNIA--UNIFORM INSTRUMENT**

1

**EXHIBIT 37**
**Page 319**

recorded or whether unrecorded. The following Riders are to be executed by Borrower or Borrower Parties:

☐ Irrigation Equipment Rider ☐ Water Rights Rider

☒ Financial Information and Covenants Rider ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider ☐ Adjustable Rate Rider

☐ Other(s): Cross Default Rider; Cross Collateralization Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

**See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

**630 +/- Acres of Agricultural Land**
**Fresno County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made

---

**CALIFORNIA–UNIFORM INSTRUMENT**

2

**EXHIBIT 37**
**Page 320**

thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all

**CALIFORNIA--UNIFORM INSTRUMENT**

3

**EXHIBIT 37**
**Page 321**

claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**CALIFORNIA--UNIFORM INSTRUMENT**

4

**EXHIBIT 37**
**Page 322**

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then

**CALIFORNIA--UNIFORM INSTRUMENT**

5

**EXHIBIT 37**
**Page 323**

due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date

CALIFORNIA–UNIFORM INSTRUMENT

6

**EXHIBIT 37**
**Page 324**

of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or

**CALIFORNIA-UNIFORM INSTRUMENT**

7

**EXHIBIT 37**
**Page 325**

modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding

**CALIFORNIA--UNIFORM INSTRUMENT**

8

**EXHIBIT 37**
**Page 326**

neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of

CALIFORNIA--UNIFORM INSTRUMENT

9

**EXHIBIT 37**
**Page 327**

acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached

**CALIFORNIA–UNIFORM INSTRUMENT**

10

**EXHIBIT 37**
**Page 328**

to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

CALIFORNIA–UNIFORM INSTRUMENT

**EXHIBIT 37**
**Page 329**

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons

CALIFORNIA--UNIFORM INSTRUMENT

12

**EXHIBIT 37
Page 330**

legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)     In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(d)     Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the **"Environmental Provisions"**), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**CALIFORNIA--UNIFORM INSTRUMENT**

13

**EXHIBIT 37**
**Page 331**

**"BORROWER"**

**FFGT Farms, LLC**
a California limited liability company

_____
By: Nader Assemi
Its:  Manager

---

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

---

STATE OF CALIFORNIA
COUNTY OF  _FRESNO_

On _Dec. 15, 2021_ before me _L. Diaz, Notary Public_ , personally appeared
**Nader Assemi,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

---

**CALIFORNIA--UNIFORM INSTRUMENT**

14

**EXHIBIT 37**
**Page 332**

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1077**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this Seventeenth day of December, 2021, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by FFGT Farms, LLC (the "Borrower") to secure promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**630 +/- Acres
Fresno County, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

☒   **Financials.** Annually, Lender will be provided Borrower Parties' internally prepared financial statements and tax returns within **150** days after the close of each fiscal year. Financial statements provided to Lender must include market value balance sheets and an entity-by-entity breakdown of any and all related party accounts/notes, both payable and receivable.

☒   **Debt Service Coverage Ratio.** Annually, the Assemi Group, as defined below, shall maintain at all times a debt service coverage ratio greater than or equal to 1.25:1 when measured with the December 31 financial statements.

Debt Service Coverage Ratio shall be as determined in Lender's sole discretion and based on the December 31 financial statements for The Assemi Group, as defined below, during the applicable term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income minus withdrawals, plus depreciation (except for livestock related depreciation), plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

☒   **Total Liabilities/Total Assets.** Annually, Borrower Parties and all guarantors of the Notes on a consolidated

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

1

**EXHIBIT 37
Page 333**

basis shall maintain Total Liabilities to Total Assets of no more than 60%, as measured as of December 31 each year using market basis financial statements.

[X]    **Transfer of Ownership.** Borrower Parties shall not, without Lender's prior written consent, convey, transfer, or pledge any ownership of the membership interests in the entities to other third-parties, excepting transfers to entities within The Assemi Group, as defined below.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means all entities identified and consolidated within the annual accountant-audited financial statements title "The Assemi Group".

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

DATED effective this $\lfloor 7 \rfloor$ day of December, 2021.

**"BORROWER PARTIES"**

**FFGT Farms, LLC**
a California limited liability company

By: Nader Assemi
Its:  Manager

**Maricopa Orchards, LLC**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

_____

**MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER**

2

**EXHIBIT 37**
**Page 334**

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

That portion of the North Half of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Northerly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 2:

That portion of the West half of the Northwest quarter AND the West 30.00 feet of the East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

EXHIBIT 37
Page 335

APN: 068-130-47 (portion)

PARCEL 3:

The East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad.

Excepting therefrom the West 30.00 feet thereof.

Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 4:

The West half of the Northeast quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

EXHIBIT 37
Page 336

PARCEL 5:

The East half of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 6:

The Northwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 7:

The Southwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 8:

EXHIBIT 37
Page 337

The Northwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 9:

The Southwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 10:

The East half of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 11:

The Northwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

**EXHIBIT 37**
**Page 338**

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

Parcel 12:

The Southwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 Ease, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to th Official Plat thereof.

APN: 068-130-63

EXHIBIT 37
Page 339

# EXHIBIT 38

**EXHIBIT 38**
**Page 340**




B0460-4190 01/05/2022 2:06 PM Received by California Secretary of State



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U220115881934 |
| Date Filed: 1/5/2022 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| FFGT FARMS, LLC | 1306 W HERNDON AVE<br>STE 101<br>FRESNO, CA 93711 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 6000 WESTOWN PARKWAY<br>WEST DES MOINES, IA 50266 |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY<br>STE 201<br>WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Attached in a File

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
84236985

**EXHIBIT 38**
**Page 341**

See Rider A to UCC and Exhibit A legal description attached hereto and made a part hereof.

B0460-4191 01/05/2022 2:06 PM Received by California Secretary of State

This page and any following pages include and merge any text received for the collateral description with any attachments.

**EXHIBIT 38**
**Page 342**

B0460-4192 01/05/2022 2:06 PM Received by California Secretary of State

# RIDER A TO UCC

**Debtor:**                    **FFGT Farms, LLC**

**Secured Party:**             **American Equity Investment Life Insurance Company**

**Assignors Secured Party:**   **Conterra Agricultural Capital, LLC**

All building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property described on Exhibit A, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins;

All of Debtor's right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired: all irrigation equipment (including but not limited to center irrigation pivots, pumps, PVC pipe, sprinklers, motors, well equipment, pumps and power units situated on the Property);

And all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

RIDER A TO UCC

©PeirsonPatterson, LLP. 2021

211025000516 [Doc Id 9696 M10292018]

**EXHIBIT 38**
**Page 343**

Page 3 of 8

B0460-4193 01/05/2022 2:06 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

That portion of the North Half of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Northerly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 2:

That portion of the West half of the Northwest quarter AND the West 30.00 feet of the East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

**EXHIBIT 38**
**Page 344**

Page 4 of 8

B0460-4194  01/05/2022  2:06 PM  Received by California Secretary of State

APN: 068-130-47 (portion)

PARCEL 3:

The East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad.

Excepting therefrom the West 30.00 feet thereof.

Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 4:

The West half of the Northeast quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

**EXHIBIT 38**
**Page 345**

Page 5 of 8

B0460-4195 01/05/2022 2:06 PM Received by California Secretary of State

PARCEL 5:

The East half of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 6:

The Northwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 7:

The Southwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 8:

**EXHIBIT 38**
**Page 346**

Page 6 of 8

B0460-4196  01/05/2022  2:06 PM Received by California Secretary of State

The Northwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 9:

The Southwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 10:

The East half of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number  2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 11:

The Northwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

**EXHIBIT 38**
**Page 347**

B0460-4197 01/05/2022 2:06 PM Received by California Secretary of State

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

Parcel 12:

The Southwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 Ease, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to th Official Plat thereof.

APN: 068-130-63

**EXHIBIT 38**
**Page 348**
Page 8 of 8

# EXHIBIT 39

EXHIBIT 39
Page 349

**ALLONGE TO PROMISSORY NOTE**

For purposes of endorsement of the promissory note dated December 17, 2021, executed by Maricopa Orchards, LLC, a California limited liability company, and FFGT Farms, LLC, a California limited liability company, in favor of Conterra Agricultural Capital, LLC, an Iowa limited liability company, in the original principal amount of $13,500,000.00 plus interest (the "**Note**"), this Allonge to Promissory Note is affixed and becomes a permanent part of the Note.

**PAY TO THE ORDER OF**
**American Equity Investment Life Insurance Company**
**WITHOUT RECOURSE**

Dated December 17, 2021

> **CONTERRA AGRICULTURAL CAPITAL, LLC**
> **an Iowa limited liability company**
>
> By: _____
> Mark A. Smith
> Its:  COO & General Counsel

**EXHIBIT 39**
**Page 350**

# EXHIBIT 40

**EXHIBIT 40**
**Page 351**

Paul Dictos, CPA

# 2021-0208173

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/21/2021 10:09 05
Titles: 1        Pages: 7
Fees: $29.00
CA SB2 Fees:$0.00
Taxes: $0.00
Total: $29.00

Recorded at Request of
Old Republic Title Company

142100872

This instrument prepared by:
**PeirsonPatterson, LLP.**
**2310 Interstate 20 West, Suite 100**
**Arlington, TX 76017-1668**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

# ASSIGNMENT OF DEED OF TRUST
# (Simultaneous)

Loan ## **AG1077**

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company**, whose address is **6000 Westown Parkway, West Des Moines, IA 50266**, all beneficial interest under a certain Deed of Trust dated **December 17, 2021**, made and executed by **FFGT Farms, a California limited liability company,** to **Old Republic Title Company,** Trustee, upon the following described property situated in **Fresno County,** State of **California:**

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of a single-advance term loan in the original principal amount of **$13,500,000.00**, which Deed of Trust is being filed of record simultaneously in the official records of ✱✱ **Fresno County, State of California,** together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

✱✱ recording concurrently herewith
TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed and made to be effective this Assignment of Deed of Trust on Pecember 17 , 2021 .

.

**Multistate Deed of Trust Assignment (Simultaneous) - Single Family**

1

211631000322 [Doc Id 8448 MI1182020]

EXHIBIT 40
Page 352

**Conterra Agricultural Capital, LLC**

_____ 12/17/2021
Signature                        Date

**Mark A. Smith, COO & General Counsel**

_____
Witness

STATE OF IOWA
COUNTY OF _____ POIK

Before me, the undersigned authority, on this day personally appeared
_____ Mark A. Smith, COO & General Counsel _____

, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this __17th__ day of __December__, 20 21.

_____
Notary, State of ___ Iowa

Printed Name: __Taylor Petersen__
My Commission Expires: __11 - 9 - 2024__

TAYLOR PETERSEN
Commission Number 813700
My Commission Expires.
11 - 9 - 2024

---

**Multistate Deed of Trust Assignment (Simultaneous) - Single Family**

2

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT 40**
**Page 353**

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

That portion of the North Half of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Northerly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 2:

That portion of the West half of the Northwest quarter AND the West 30.00 feet of the East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

EXHIBIT 40
Page 354

APN: 068-130-47 (portion)

PARCEL 3:

The East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad.

Excepting therefrom the West 30.00 feet thereof.

Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 4:

The West half of the Northeast quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Sourtherly of the right of way of the Southern Pacific Railroad. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

**EXHIBIT 40**
**Page 355**

PARCEL 5:

The East half of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 6:

The Northwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 7:

The Southwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-47 (portion)

PARCEL 8:

EXHIBIT 40
Page 356

The Northwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 9:

The Southwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 10:

The East half of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

PARCEL 11:

The Northwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

**EXHIBIT 40**
**Page 357**

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-62 (portion)

Parcel 12:

The Southwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 Ease, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to th Official Plat thereof.

APN: 068-130-63

EXHIBIT 40
Page 358

# EXHIBIT 41

**EXHIBIT 41**
**Page 359**

# NOTE

Loan #AG1076

March 10, 2022                         Fresno,                          CA
[Date]                                [City]                          [State]

**785 +/- Acres**
**Fresno and Kings Counties, California**
[Property Address]

### 1.    BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **FFGT Farms, LLC**, a California limited liability company (Maricopa Orchards, LLC and FFGT Farms, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$10,098,930.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC**, an Iowa limited liability company.  Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

### 2.    INTEREST

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Borrowers will pay interest at a yearly rate of **4.000%**.

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

### 3.    SCHEDULED PAYMENTS
**(A)   Time and Amount of Payments**
**Borrowers will make (i) 1 Principal payment in the amount of $167,195.34 on July 1, 2022, accompanied with interest calculated from the date of closing on the unpaid Principal balance at 4.000% per annum; (ii) 19 consecutive semi-annual Principal and interest payments of $369,173.94 each, due and payable on the first day of each January and July, beginning January 1, 2023 and (iii) the final payment of all remaining Principal and interest, plus any costs and expenses incurred, due on March 10, 2032, which is called the "Maturity Date."**

**(B)   Place of Payments**
Borrowers will make payments at **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA  50266** or at a different place if required by Lender.

### 4.    INTEREST CALCULATION

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days.   The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

---

MULTISTATE FIXED RATE NOTE

1

**EXHIBIT 41**
**Page 360**

## 5.    PREPAYMENTS.

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note.  Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

## 6.    INTEREST AFTER DEFAULT

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).  From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

## 7.    ANNUAL FINANCIAL STATEMENTS

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.  The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

## 8.    DISSEMINATION OF INFORMATION

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any

MULTISTATE FIXED RATE NOTE

2

EXHIBIT 41
Page 361

indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.    LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.    WAIVERS**

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**13.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by

---

**MULTISTATE FIXED RATE NOTE**

3

EXHIBIT 41
Page 362

the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

## 14.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED

### (A)    Event of Default

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

(1)    If Borrowers fail to repay any interest or Principal under the Note when due;

(2)    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

(3)    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

(4)    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

(5)    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

(6)    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

(7)    If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

### (B)    Late Charge for Overdue Payments

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

### (C)    Notice of Default

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

### (D)    No Waiver By Lender

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

### (E)    Payment of Lender's Costs and Expenses

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

---

**MULTISTATE FIXED RATE NOTE**

EXHIBIT 41
Page 363

NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.

**BORROWERS:**

**FFGT Farms, LLC**
a California limited liability company

_____
By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC,**
a California limited liability company

_____
By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

---

MULTISTATE FIXED RATE NOTE

5

**EXHIBIT 41**
**Page 364**

# EXHIBIT 42

**EXHIBIT 42**
**Page 365**

Recorded at Request of
Old Republic Title Company

*1421000535-108*

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2022-0038476

Recorded at the request of:
ERECORDING PARTNERS NETWORK

03/24/2022 10:08 42
Titles: 3     Pages: 24
Fees: $102.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $102.00

[Space Above This Line For Recording Data] _____

## DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

\*This instrument is executed in duplicate for simultaneous recording in Kings County and in Fresno County.

**DEFINITIONS**

Loan #AG1076

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

(A)  **"Security Instrument"** means this document, which is dated **March 10, 2022**, together with all Riders to this document.

(B)  **"Lender"** is Conterra Agricultural Capital, LLC. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266.** Lender is the beneficiary under this Security Instrument.

(C)  **"Borrower"** is FFGT Farms, LLC, a California limited liability company. Grantor is the trustor under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liability company.** Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

(D)  **"Trustee"** is Old Republic Title Company.

(E)  **"Note"** means the promissory note signed by Borrower Parties and dated **March 10, 2022.** The **Note** states that Borrower Parties owe Lender **Ten Million Ninety-Eight Thousand Nine Hundred Thirty and 00/100 ($10,098,930.00),** plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 10, 2032.**

(F)  **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G)  **"Loan"** means the debt evidenced by the Notes, plus interest, any prepayment charges and late charges due under the Notes, and all sums due under this Security Instrument, plus interest.

(H)  **"Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether

CALIFORNIA–UNIFORM INSTRUMENT

1

recorded or whether unrecorded.  The following Riders are to be executed by Borrower or Borrower Parties:

☐ Irrigation Equipment Rider             ☐ Water Rights Rider
☒ Financial Information and Covenants Rider    ☐ Permitted Prior Encumbrance Rider
☐ Mortgage Insurance Rider                ☐ Adjustable Rate Rider
☐ Other(s):

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)  "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

     **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

     **785 +/- Acres of Agricultural Land**
     **Fresno and Kings Counties, California**
     ("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

     **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general

CALIFORNIA--UNIFORM INSTRUMENT

2

intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the  real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**CALIFORNIA—UNIFORM INSTRUMENT**

3

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS.  Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12.  Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.**  Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.**  Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the

CALIFORNIA--UNIFORM INSTRUMENT

4

Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**CALIFORNIA--UNIFORM INSTRUMENT**

5

**5.  Preservation, Maintenance and Protection of the Property; Inspections.**   Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6.  Loan Application.**   Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7.  Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage.  Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument.  These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties

CALIFORNIA–UNIFORM INSTRUMENT

6

requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any

CALIFORNIA--UNIFORM INSTRUMENT

7

Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11.  Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12.  Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13.  Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa;

**CALIFORNIA--UNIFORM INSTRUMENT**

8

and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

CALIFORNIA–UNIFORM INSTRUMENT

9

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property

CALIFORNIA--UNIFORM INSTRUMENT

10

covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property

CALIFORNIA--UNIFORM INSTRUMENT

11

and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies.** Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only

CALIFORNIA--UNIFORM INSTRUMENT

12

if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)      In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)      Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)      Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)      at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)      the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(d)      Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

**CALIFORNIA--UNIFORM INSTRUMENT**

13

**EXHIBIT 42**
**Page 378**

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**"BORROWER"**

**FFGT Farms, LLC**
a California limited liability company

_____

By: Neema Assemi
Its:  Manager

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _Fresno_____

On _March 5, 2022_____ before me, _L. Diaz, Notary Public_____, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

_____
Notary Public
Printed Name: _L. Diaz_____
My commission expires: _April 20, 2022_____

> L. DIAZ
> NOTARY PUBLIC · CALIFORNIA
> COMMISSION # 2235602
> FRESNO COUNTY
> My Comm. Exp. April 20, 2022

---

**CALIFORNIA--UNIFORM INSTRUMENT**

14

Branch :NPS    User :DIKU

ORDER NO. : 1421000535

**EXHIBIT A**

Legal Description for Fresno + Kings County,

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The South half of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting therefrom that portion of the North half of the Southeast Quarter lying west of Avenal Cutoff Road and West of the San Luis Canal and that portion of the Southwest Quarter of the Northeast Quarter lying West of the canal, all in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 2:

That portion of the North half of the Southeast Quarter lying West of Avenal Cutoff Road and West of the San Luis Canal in Section 18, Township 21 South, Range 18 South, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 feet; thence leaving said South boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 feet to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89°

Page 1 of 7

**EXHIBIT 42**
**Page 380**

FRESNO, CA  Document:DOT 2022.38476
Printed on:10/24/2024 5:45 PM

23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" ast 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances; South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 3:

The South 54 acres of the Northeast Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 fet1; thence leaving said South Boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 fet1 to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89° 23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances: South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for

Page 2 of 7

public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also except that portion described as follows:

Beginning at a point in the North boundary of the tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952 and recorded October 23, 1952, in Book 3224, Page 90 of Official Records, distant there along North 89° 23' 29" West 2277.72 feet from a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter of said Section 18; thence along said North boundary South 89° 23' 29" East 624.68 feet; thence leaving said North boundary South 43° 17' 09" East 1235.95 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 796.75 feet from the East Quarter corner of said Section 18; thence along said South boundary North 89° 23' 17" West 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 834.71 feet; thence North 33° 24' 22" West 348.78 feet to the point of beginning.

Also excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as excepted in the Deed from Barbara J. Meadows, et al, to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records, Document No. 55044.

APN: 078-090-26S (portion)

PARCEL 4:

A parcel of land in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, being a portion of that certain Parcel Two as described in the Deed from Vernon L. Thomas, Inc., a corporation to the United States of America, which was filed for record on September 14, 1965, in Book 5216, Page 283, Official Records of Fresno County, State of California, described as follows:

Beginning at a point in the South boundary of said Parcel Two (5216 OR 283) distant there along South 89° 23' 29" East 351.68 feet from the terminus of a course described as North 89° 23' 29" West 888.99 feet in said Parcel Two (5216 OR 283); thence from said point of beginning North 89° 23' 29" West 351.68 feet to a point in the West boundary of the Northeast Quarter of said Section 18; thence leaving said South boundary along said West boundary North 0° 33' 37" East 1560.00 feet; thence leaving said West boundary South 65° 49' 29" East, 76.36 feet; thence South 0° 08' 29" East 500.00 feet; thence South 7° 21' 29" East 469.85 feet; South 17° 13' 29" East 232.00 feet; thence South 21° 37' 22" East 370.92 feet to the point of beginning.

Excepting therefrom an undivided One-half interest in and to all oil, gas and other hydrocarbons and minerals in and under said land, as excepted by the Deed from B.E. Loomer, et al, to Alfred R. Brown, et ux, dated September 10, 1941, recorded October 6, 1941 as Document No. 33177, Official Records.

Page 3 of 7

Also excepting therefrom an undivided one-half interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling and mining operation thereon, as reserved in the Deed from A.R. Brown and Blanche G. Brown, husband and wife, to Carthyl Thomas and Gurtha Thomas, as tenants in common, dated January 7, 1948, recorded February 25, 1948, as Document No. 9403, Official Records.

Also excepting therefrom all of grantors interest in and to all oil gas or minerals in and under said land, without however the right to dig, drill or mine therefor through the surface of said land or within 100 feet of the surface, as reserved in the Deed from Vernon L. Thomas, Inc., a corporation, to the United States of America, recorded September 14, 1965, in Book 5216, Page 283 of Official Records, Document No. 73423.

APN: 078-090-27S

PARCEL 5:

The Southeast Quarter of the Northwest Quarter, and the North half of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof conveyed to Westlands Water District by Deed recorded December 7, 1973 in Book 6247, Page 483 of Official Records, Document No. 106071, being more particu1arly described as follows:

A parcel of land in the Northeast Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, described an follows:

Beginning at the North quarter corner of said Section 18; thence (1) along the East line of the Northwest Quarter of said Section 18, South 0° 33' 31" West, 180.00 feet; thence (2) North 89° 26' 29" West, 50.00 feet; thence (3) North 0° 33' 31" East, 105.00 feet; thence (4) North 75° 00' 35" West, 201.37 feet; thence (5) North 0° 36' 09" East, 25.00 feet to a point in the North line of said Section 18; thence (6) along said North line, South 89° 23' 51" East, 245.30 feet to the point of beginning.

ALSO EXCEPTING THEREFROM all oil, gas and minerals as heretofore reserved of record.

APN: 078-090-22S

PARCEL 6:

That portion of Fractional Section 7, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying Westerly of the Westerly boundary line of that certain tract or parcel of land described as Parcel 2 (Unit 178) as conveyed unto the United States of America in Deed recorded May 17, 1966 in Book 5314, Page 66 of Official Records, Document No. 37725.

Page 4 of 7

**EXHIBIT 42**
**Page 383**

Excepting therefrom that portion conveyed to Westlands Water District in Deed recorded February 18, 1977 in Book 6743, Page 213 of Official Records, Document No. 16643, described as follows:

Beginning at the South Quarter corner of said Section 7; thence (1) along the South line of the Southeast Quarter of said Section 7, South 89° 23' 49" East, 96.50 feet to the Southwest corner of the 59.13 acre parcel of land described as Parcel Two (Unit 178) in the Deed to the United States of America recorded May 17, 1966 in Book 5314, Page 66   as Document No. 37725, Fresno County Official Records; thence (2) along the West boundary of said 59.13 acre parcel of land, North 0° 52' 58" East, 120.00 feet; thence (3) South 52° 33' 14" West, 129.80 feet; thence (4) south 83° 00' 14" west, 242.00 feet; thence (5) South 0° 36' 09" West, 8.00 feet to a point on the South line of the Southwest Quarter of said Section 7; thence (6) along last said South line, South 89° 23' 51" East, 245.00 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965 in Book 5257, Page 25, Document No. 104217, Official Records.

This legal description is made pursuant to that certain Certificate of Waiver of Parcel Map No. 17-13, recorded October 23, 2018, as Instrument No. 2018-0128928 of Official Records.

APN: 078-080-57S

PARCEL 6A:

A non-exclusive easement for ingress and egress and incidental purposes over, across and through the Westerly 20 feet of the following described property:

The fractional Northeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; and

The Southeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; except that portion lying Easterly of the West boundary of land granted to the United States of America by Deed recorded November 1, 1965 in Book 5235, Page 243, Official Records, Document No. 88214; also excepting all oil, gas, minerals and other hydrocarbon substances an heretofore reserved of record.

PARCEL 7:

The Southwest Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Plat thereof.

Except all oil, gas and other minerals in, or under said premises.

APN: 078-090-02S

Page 5 of 7

PARCEL 8:

Intentionally Deleted

PARCEL 9:

Intentionally Deleted

Real property in the City of Avenal, County of Kings, State of California, described as follows:

PARCEL 10:

All that portion of the Northwest Quarter of Section 19, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying within the bounds of Fresno County, California.

Except all oil, gas and other minerals in, or under said premises.

Assessed under Kings County APN 036-170-038-000

PARCEL 11:

All that portion of Section 18, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded May 18, 1936 in Book 151 at Page 8 of Official Records, and Westerly of the California Aqueduct. Said property is situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Being described as Parcel 1, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-042-000

PARCEL 12:

All that portion of the Northwest one-quarter of Section 19, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded August 18, 1936 in Book 154, Page 153 as Document No. 4437 of Official Records. Situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Page 6 of 7

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinafter described property, as granted to Bravo Oil Company, a corporation, by Indenture recorded December 29, 1965 in Book 883, at Page 116 as Instrument No. 16704 of Official Records.

Being described as Parcel 3, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-037-000 and 036-170-039-000

PARCEL 13:

Intentially Deleted

**EXHIBIT 42**
**Page 386**

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1076**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this Tenth day of March, 2022, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by FFGT Farms, LLC (the "Borrower") to secure promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**785 +/- Acres**
**Fresno and Kings Counties, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

☒　　　**Financials.** Annually, Lender will be provided CPA reviewed consolidated and consolidating financial statements for The Assemi Group, as defined below, within **150** days after the close of each fiscal year. Financial statements provided to Lender shall include market value balance sheets for The Assemi Group and an entity-by-entity breakdown of any and all related-party accounts/notes, both payable and receivable.

☒　　　**Current Ratio.** The Assemi Group, as defined below, shall always maintain a current ratio, as determined in Lender's sole discretion, of not less than 1.50:1, when measured with the December 31 cost basis CPA reviewed financial statements and annually thereafter during the term of the Loan. Current ratio is computed, as of any date of determination, by dividing current assets by current liabilities.

☒　　　**Debt Service Coverage Ratio.** The Assemi Group, as defined below, shall maintain at all times a debt service coverage ratio as follows:

Fiscal Year End 2022 through Maturity required Debt Service Coverage Ratio: greater than or equal to 1.25:1

Debt Service Coverage Ratio shall be as determined in Lender's sole discretion and based on the December 31

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

1

financial statements for The Assemi Group, as defined below, during the applicable term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income, plus depreciation, plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

☒ **Total Liabilities/Total Assets.** The Assemi Group, as defined below, on a consolidated basis shall maintain Total Liabilities to Total Assets of no more than 60%, as measured as of December 31 each year using market basis financial statements.

☒ **Transfer of Ownership.** No equity interests of the Borrower Parties shall, without Lenders' prior written consent, be conveyed, transferred, or pledged to any other person, except for transfers to entities within the Assemi Group.

☒ **Covenant Compliance Certificates.** Annually, Borrower Parties shall provide covenant compliance certificates, in a form reasonably acceptable to Lender, within **150** days after the close of each fiscal year.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means the entities identified and consolidated within the annual accountant-audited financial statements titled "The Assemi Group".

*[remainder of page intentionally left blank – signature page follows]*

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

2

**EXHIBIT 42**
**Page 388**

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

DATED effective this ⟨9⟩ day of March, 2022.

**"BORROWER PARTIES"**

**FFGT Farms, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

---
MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

3

# EXHIBIT 43

**EXHIBIT 43**
**Page 390**

DOC NBR:  2205594     03/24/2022 09:44:53 AM
OFFICIAL RECORDS OF Kings County
Kristine Lee, Clerk-Recorder,
RECORDING FEE: $127.00
COUNTY TAX: $0.00
CITY TAX: $0.00

Recorded at Request of
Old Republic Title Company 

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**


ERECORDING PARTNERS NETWORK

TITLE: 3
DOC TYPE: 08
24 PGS
R048

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

[Space Above This Line For Recording Data]

# DEED OF TRUST

## Security Agreement, Assignment of Rents and Fixture Filing

\*This instrument is executed in duplicate for simultaneous recording in Kings County and in Fresno County.

Loan #AG1076

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **March 10, 2022**, together with all Riders to this document

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrower"** is **FFGT Farms, LLC, a California limited liability company**. Grantor is the trustor under this Security Instrument **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liability company**. Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711**.

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Note"** means the promissory note signed by Borrower Parties and dated **March 10, 2022**. The Note states that Borrower Parties owe Lender **Ten Million Ninety-Eight Thousand Nine Hundred Thirty and 00/100 ($10,098,930.00)**, plus interest Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 10, 2032**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Notes, plus interest, any prepayment charges and late charges due under the Notes, and all sums due under this Security Instrument, plus interest

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether

CALIFORNIA—UNIFORM INSTRUMENT

1

**EXHIBIT 43**
**Page 391**

recorded or whether unrecorded.  The following Riders are to be executed by Borrower or Borrower Parties:

☐ Irrigation Equipment Rider                    ☐ Water Rights Rider

☒ Financial Information and Covenants Rider      ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider                       ☐ Adjustable Rate Rider

☐ Other(s):

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Kings, California**:

> **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

<div align="center">

**785 +/- Acres of Agricultural Land**
**Fresno and Kings Counties, California**
("Property Address");

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general

CALIFORNIA--UNIFORM INSTRUMENT

2

**EXHIBIT 43**
**Page 392**

intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

TOGETHER WITH all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

TOGETHER WITH all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the  real property in **Kings County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

TOGETHER WITH all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

TOGETHER WITH all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

TOGETHER WITH all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

TOGETHER WITH all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

TOGETHER WITH any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**CALIFORNIA–UNIFORM INSTRUMENT**

3

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS.  Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12.  Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.**  Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.**  Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the

**CALIFORNIA--UNIFORM INSTRUMENT**

4

Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**CALIFORNIA--UNIFORM INSTRUMENT**

5

**EXHIBIT 43**
**Page 395**

5. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

6. **Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

7. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties

**CALIFORNIA–UNIFORM INSTRUMENT**

6

requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any

**CALIFORNIA−UNIFORM INSTRUMENT**

7

**EXHIBIT 43**
**Page 397**

Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa;

---

**CALIFORNIA--UNIFORM INSTRUMENT**

8

and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing,  upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**CALIFORNIA--UNIFORM INSTRUMENT**

9

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property

CALIFORNIA--UNIFORM INSTRUMENT

10

covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of  Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument.  All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change.  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property.  Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion.  As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable.  Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents.   However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent.  This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property

**CALIFORNIA--UNIFORM INSTRUMENT**

11

and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only

CALIFORNIA--UNIFORM INSTRUMENT

12

if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)　　　In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)　　　Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)　　　Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)　　　at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)　　　the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(d)　　　Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the **"Environmental Provisions"**), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

**CALIFORNIA--UNIFORM INSTRUMENT**

13

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**"BORROWER"**

**FFGT Farms, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

STATE OF CALIFORNIA
COUNTY OF _Fresno_

On _March 8, 2022_ before me, _L. Diaz, Notary Public_, personally appeared **Neema Assemi,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _L. Diaz_ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC · CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

**CALIFORNIA—UNIFORM INSTRUMENT**

14

Legal Description For Fresno + Kings County.

## EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The South half of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting therefrom that portion of the North half of the Southeast Quarter lying west of Avenal Cutoff Road and West of the San Luis Canal and that portion of the Southwest Quarter of the Northeast Quarter lying West of the canal, all in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 2:

That portion of the North half of the Southeast Quarter lying West of Avenal Cutoff Road and West of the San Luis Canal in Section 18, Township 21 South, Range 18 South, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 feet; thence leaving said South boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 feet to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89°

Page 1 of 7

EXHIBIT 43
Page 405
Page:15 of 24

23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18; thence along North 0° 34' 07" ast 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances; South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 3:

The South 54 acres of the Northeast Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 fet1; thence leaving said South Boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 fet1 to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89° 23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances: South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for

EXHIBIT 43
Page 406

public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also except that portion described as follows:

Beginning at a point in the North boundary of the tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952 and recorded October 23, 1952, in Book 3224, Page 90 of Official Records, distant there along North 89° 23' 29" West 2277.72 feet from a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter of said Section 18; thence along said North boundary South 89° 23' 29" East 624.68 feet; thence leaving said North boundary South 43° 17' 09" East 1235.95 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 796.75 feet from the East Quarter corner of said Section 18; thence along said South boundary North 89° 23' 17" West 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 834.71 feet; thence North 33° 24' 22" West 348.78 feet to the point of beginning.

Also excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as excepted in the Deed from Barbara J. Meadows, et al, to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records, Document No. 55044.

APN: 078-090-26S (portion)

PARCEL 4:

A parcel of land in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, being a portion of that certain Parcel Two as described in the Deed from Vernon L. Thomas, Inc., a corporation to the United States of America, which was filed for record on September 14, 1965, in Book 5216, Page 283, Official Records of Fresno County, State of California, described as follows:

Beginning at a point in the South boundary of said Parcel Two (5216 OR 283) distant there along South 89° 23' 29" East 351.68 feet from the terminus of a course described as North 89° 23' 29" West 888.99 feet in said Parcel Two (5216 OR 283); thence from said point of beginning North 89° 23' 29" West 351.68 feet to a point in the West boundary of the Northeast Quarter of said Section 18; thence leaving said South boundary along said West boundary North 0° 33' 37" East 1560.00 feet; thence leaving said West boundary South 65° 49' 29" East, 76.36 feet; thence South 0° 08' 29" East 500.00 feet; thence South 7° 21' 29" East 469.85 feet; South 17° 13' 29" East 232.00 feet; thence South 21° 37' 22" East 370.92 feet to the point of beginning.

Excepting therefrom an undivided One-half interest in and to all oil, gas and other hydrocarbons and minerals in and under said land, as excepted by the Deed from B.E. Loomer, et al, to Alfred R. Brown, et ux, dated September 10, 1941, recorded October 6, 1941 as Document No. 33177, Official Records.

EXHIBIT 43
Page 407
Page:17 of 24

Also excepting therefrom an undivided one-half interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling and mining operation thereon, as reserved in the Deed from A.R. Brown and Blanche G. Brown, husband and wife, to Carthyl Thomas and Gurtha Thomas, as tenants in common, dated January 7, 1948, recorded February 25, 1948, as Document No. 9403, Official Records.

Also excepting therefrom all of grantors interest in and to all oil gas or minerals in and under said land, without however the right to dig, drill or mine therefor through the surface of said land or within 100 feet of the surface, as reserved in the Deed from Vernon L. Thomas, Inc., a corporation, to the United States of America, recorded September 14, 1965, in Book 5216, Page 283 of Official Records, Document No. 73423.

APN: 078-090-27S

PARCEL 5:

The Southeast Quarter of the Northwest Quarter, and the North half of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof conveyed to Westlands Water District by Deed recorded December 7, 1973 in Book 6247, Page 483 of Official Records, Document No. 106071, being more particularly described as follows:

A parcel of land in the Northeast Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, described an follows:

Beginning at the North quarter corner of said Section 18; thence (1) along the East line of the Northwest Quarter of said Section 18, South 0° 33' 31" West, 180.00 feet; thence (2) North 89° 26' 29" West, 50.00 feet; thence (3) North 0° 33' 31" East, 105.00 feet; thence (4) North 75° 00' 35" West, 201.37 feet; thence (5) North 0° 36' 09" East, 25.00 feet to a point in the North line of said Section 18; thence (6) along said North line, South 89° 23' 51" East, 245.30 feet to the point of beginning.

ALSO EXCEPTING THEREFROM all oil, gas and minerals as heretofore reserved of record.

APN: 078-090-22S

PARCEL 6:

That portion of Fractional Section 7, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying Westerly of the Westerly boundary line of that certain tract or parcel of land described as Parcel 2 (Unit 178) as conveyed unto the United States of America in Deed recorded May 17, 1966 in Book 5314, Page 66 of Official Records, Document No. 37725.

Page 4 of 7

**EXHIBIT 43**
**Page 408**

Excepting therefrom that portion conveyed to Westlands Water District in Deed recorded February 18, 1977 in Book 6743, Page 213 of Official Records, Document No. 16643, described as follows:

Beginning at the South Quarter corner of said Section 7; thence (1) along the South line of the Southeast Quarter of said Section 7, South 89° 23' 49" East, 96.50 feet to the Southwest corner of the 59.13 acre parcel of land described as Parcel Two (Unit 178) in the Deed to the United States of America recorded May 17, 1966 in Book 5314, Page 66   as Document No. 37725, Fresno County Official Records; thence (2) along the West boundary of said 59.13 acre parcel of land, North 0° 52' 58" East, 120.00 feet; thence (3) South 52° 33' 14" West, 129.80 feet; thence (4) south 83° 00' 14" west, 242.00 feet; thence (5) South 0° 36' 09" West, 8.00 feet to a point on the South line of the Southwest Quarter of said Section 7; thence (6) along last said South line, South 89° 23' 51" East, 245.00 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965 in Book 5257, Page 25, Document No. 104217, Official Records.

This legal description is made pursuant to that certain Certificate of Waiver of Parcel Map No. 17-13, recorded October 23, 2018, as Instrument No. 2018-0128928 of Official Records.

APN: 078-080-57S

PARCEL 6A:

A non-exclusive easement for ingress and egress and incidental purposes over, across and through the Westerly 20 feet of the following described property:

The fractional Northeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; and

The Southeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; except that portion lying Easterly of the West boundary of land granted to the United States of America by Deed recorded November 1, 1965 in Book 5235, Page 243, Official Records, Document No. 88214; also excepting all oil, gas, minerals and other hydrocarbon substances an heretofore reserved of record.

PARCEL 7:

The Southwest Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Plat thereof.

Except all oil, gas and other minerals in, or under said premises.

APN: 078-090-02S

EXHIBIT 43
Page 409
Page:19 of 24

PARCEL 8:

Intentionally Deleted

PARCEL 9:

Intentionally Deleted

Real property in the City of Avenal, County of Kings, State of California, described as follows:

PARCEL 10:

All that portion of the Northwest Quarter of Section 19, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying within the bounds of Fresno County, California.

Except all oil, gas and other minerals in, or under said premises.

Assessed under Kings County APN 036-170-038-000

PARCEL 11:

All that portion of Section 18, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded May 18, 1936 in Book 151 at Page 8 of Official Records, and Westerly of the California Aqueduct. Said property is situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Being described as Parcel 1, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-042-000

PARCEL 12:

All that portion of the Northwest one-quarter of Section 19, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded August 18, 1936 in Book 154, Page 153 as Document No. 4437 of Official Records. Situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Page 6 of 7

EXHIBIT 43
Page 410
Page:20 of 24

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinafter described property, as granted to Bravo Oil Company, a corporation, by Indenture recorded December 29, 1965 in Book 883, at Page 116 as Instrument No. 16704 of Official Records.

Being described as Parcel 3, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-037-000 and 036-170-039-000

PARCEL 13:

Intentially Deleted

Page 7 of 7

EXHIBIT 43
Page 411

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1076**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this Tenth day of March, 2022, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by FFGT Farms, LLC (the "Borrower") to secure promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**785 +/- Acres**
**Fresno and Kings Counties, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

☒ **Financials.** Annually, Lender will be provided CPA reviewed consolidated and consolidating financial statements for The Assemi Group, as defined below, within **150** days after the close of each fiscal year. Financial statements provided to Lender shall include market value balance sheets for The Assemi Group and an entity-by-entity breakdown of any and all related-party accounts/notes, both payable and receivable.

☒ **Current Ratio.** The Assemi Group, as defined below, shall always maintain a current ratio, as determined in Lender's sole discretion, of not less than 1.50:1, when measured with the December 31 cost basis CPA reviewed financial statements and annually thereafter during the term of the Loan. Current ratio is computed, as of any date of determination, by dividing current assets by current liabilities.

☒ **Debt Service Coverage Ratio.** The Assemi Group, as defined below, shall maintain at all times a debt service coverage ratio as follows:

Fiscal Year End 2022 through Maturity required Debt Service Coverage Ratio: greater than or equal to 1.25:1

Debt Service Coverage Ratio shall be as determined in Lender's sole discretion and based on the December 31

---

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

1

financial statements for The Assemi Group, as defined below, during the applicable term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income, plus depreciation, plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

☒        **Total Liabilities/Total Assets.** The Assemi Group, as defined below, on a consolidated basis shall maintain Total Liabilities to Total Assets of no more than 60%, as measured as of December 31 each year using market basis financial statements.

☒        **Transfer of Ownership.** No equity interests of the Borrower Parties shall, without Lenders' prior written consent, be conveyed, transferred, or pledged to any other person, except for transfers to entities within the Assemi Group.

☒        **Covenant Compliance Certificates.** Annually, Borrower Parties shall provide covenant compliance certificates, in a form reasonably acceptable to Lender, within 150 days after the close of each fiscal year.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means the entities identified and consolidated within the annual accountant-audited financial statements titled "The Assemi Group".

*[remainder of page intentionally left blank – signature page follows]*

---

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

2

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

DATED effective this 9 day of March, 2022.

**"BORROWER PARTIES"**

**FFGT Farms, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

3

# EXHIBIT 44

**EXHIBIT 44**
**Page 415**

**ALLONGE TO PROMISSORY NOTE**

For purposes of endorsement of the promissory note dated March 10, 2022, executed by Maricopa Orchards, LLC, a California limited liability company, and FFGT Farms, LLC, a California limited liability company, in favor of Conterra Agricultural Capital, LLC, an Iowa limited liability company, in the original principal amount of $10,098,930.00 plus interest (the "**Note**"), this Allonge to Promissory Note is affixed and becomes a permanent part of the Note.

**PAY TO THE ORDER OF**
**American Equity Investment Life Insurance Company**
**WITHOUT RECOURSE**

Dated March 10, 2022

<div style="margin-left:40%">

**CONTERRA AGRICULTURAL CAPITAL, LLC**
**an Iowa limited liability company**

By: _____
      Mark A. Smith
Its:  COO & General Counsel

</div>

**EXHIBIT 44**
**Page 416**

# EXHIBIT 45

**EXHIBIT 45**
**Page 417**

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2022-0038477

Recorded at the request of:
ERECORDING PARTNERS NETWORK

03/24/2022 10:08 42
Titles: 1      Pages: 9
Fees: $35.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $35.00

Recorded at Request of
Old Republic Title Company

142100053S-DB

This instrument prepared by:
PeirsonPatterson, LLP.
2310 Interstate 20 West, Suite 100
Arlington, TX 76017-1668

Recording Requested By/Return To:
Conterra Agricultural Capital, LLC
Taylor Petersen
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

## ASSIGNMENT OF DEED OF TRUST
## (Simultaneous)

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

Loan ## AG1076

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is 5465 Mills Civic Parkway, **Suite 201, West Des Moines, IA   50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company**, whose address is 6000 Westown Parkway, West Des Moines, IA 50266, all beneficial interest under a certain Deed of Trust dated **March 10, 2022,** made and executed by **FFGT Farms, LLC, a California limited liability company**, to **Old Republic Title Company,** Trustee, upon the following described property situated in **Fresno County, State of California:**

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of a single-advance term loan in the original principal amount of **$10,098,930.00**, which Deed of Trust is being filed of record simultaneously in the official records of **Fresno County, State of California,** together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed and made to be effective this Assignment of Deed of Trust on _march 10_ , 2022_ .

Multistate Deed of Trust Assignment (Simultaneous) - Single Family

1

211631000322 [Doc Id 8448 M1 1182020]

**EXHIBIT 45**
**Page 418**

**Conterra Agricultural Capital, LLC**

_(signature)_      3-10-2022
Signature            Date

**Mark A. Smith, COO & General Counsel**

_Jenna Koppen_
Witness   Jenna Koppen

STATE OF IOWA
COUNTY OF _____POLK_____

Before me, the undersigned authority, on this day personally appeared
_____Mark A. Smith, COO & General counsel_____

, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 10TH day of _March_____, 20 22.

_Taylor Petersen_
Notary, State of _Iowa_____

Printed Name: _Taylor Petersen_____
My Commission Expires: _11-9-2024_____

> TAYLOR PETERSEN
> NOTARIAL SEAL
> IOWA
> Commission Number 813700
> My Commission Expires
> 11-9-2024

Multistate Deed of Trust Assignment (Simultaneous) - Single Family

2

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT 45**
**Page 419**

# EXHIBIT A



Legal Description for Fresno + Kings County

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The South half of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting therefrom that portion of the North half of the Southeast Quarter lying west of Avenal Cutoff Road and West of the San Luis Canal and that portion of the Southwest Quarter of the Northeast Quarter lying West of the canal, all in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 2:

That portion of the North half of the Southeast Quarter lying West of Avenal Cutoff Road and West of the San Luis Canal in Section 18, Township 21 South, Range 18 South, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 feet; thence leaving said South boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 feet to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89°

Page 1 of 7

**EXHIBIT 45**
**Page 420**

23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" ast 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances; South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 3:

The South 54 acres of the Northeast Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 fet1; thence leaving said South Boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 fet1 to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89° 23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances: South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for

EXHIBIT 45
Page 421

public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also except that portion described as follows:

Beginning at a point in the North boundary of the tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952 and recorded October 23, 1952, in Book 3224, Page 90 of Official Records, distant there along North 89° 23' 29" West 2277.72 feet from a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter of said Section 18; thence along said North boundary South 89° 23' 29" East 624.68 feet; thence leaving said North boundary South 43° 17' 09" East 1235.95 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 796.75 feet from the East Quarter corner of said Section 18; thence along said South boundary North 89° 23' 17" West 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 834.71 feet; thence North 33° 24' 22" West 348.78 feet to the point of beginning.

Also excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as excepted in the Deed from Barbara J. Meadows, et al, to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records, Document No. 55044.

APN: 078-090-26S (portion)

PARCEL 4:

A parcel of land in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, being a portion of that certain Parcel Two as described in the Deed from Vernon L. Thomas, Inc., a corporation to the United States of America, which was filed for record on September 14, 1965, in Book 5216, Page 283, Official Records of Fresno County, State of California, described as follows:

Beginning at a point in the South boundary of said Parcel Two (5216 OR 283) distant there along South 89° 23' 29" East 351.68 feet from the terminus of a course described as North 89° 23' 29" West 888.99 feet in said Parcel Two (5216 OR 283); thence from said point of beginning North 89° 23' 29" West 351.68 feet to a point in the West boundary of the Northeast Quarter of said Section 18; thence leaving said South boundary along said West boundary North 0° 33' 37" East 1560.00 feet; thence leaving said West boundary South 65° 49' 29" East, 76.36 feet; thence South 0° 08' 29" East 500.00 feet; thence South 7° 21' 29" East 469.85 feet; South 17° 13' 29" East 232.00 feet; thence South 21° 37' 22" East 370.92 feet to the point of beginning.

Excepting therefrom an undivided One-half interest in and to all oil, gas and other hydrocarbons and minerals in and under said land, as excepted by the Deed from B.E. Loomer, et al, to Alfred R. Brown, et ux, dated September 10, 1941, recorded October 6, 1941 as Document No. 33177, Official Records.

Page 3 of 7

Also excepting therefrom an undivided one-half interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling and mining operation thereon, as reserved in the Deed from A.R. Brown and Blanche G. Brown, husband and wife, to Carthyl Thomas and Gurtha Thomas, as tenants in common, dated January 7, 1948, recorded February 25, 1948, as Document No. 9403, Official Records.

Also excepting therefrom all of grantors interest in and to all oil gas or minerals in and under said land, without however the right to dig, drill or mine therefor through the surface of said land or within 100 feet of the surface, as reserved in the Deed from Vernon L. Thomas, Inc., a corporation, to the United States of America, recorded September 14, 1965, in Book 5216, Page 283 of Official Records, Document No. 73423.

APN: 078-090-27S

PARCEL 5:

The Southeast Quarter of the Northwest Quarter, and the North half of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof conveyed to Westlands Water District by Deed recorded December 7, 1973 in Book 6247, Page 483 of Official Records, Document No. 106071, being more particu1arly described as follows:

A parcel of land in the Northeast Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, described an follows:

Beginning at the North quarter corner of said Section 18; thence (1) along the East line of the Northwest Quarter of said Section 18, South 0° 33' 31" West, 180.00 feet; thence (2) North 89° 26' 29" West, 50.00 feet; thence (3) North 0° 33' 31" East, 105.00 feet; thence (4) North 75° 00' 35" West, 201.37 feet; thence (5) North 0° 36' 09" East, 25.00 feet to a point in the North line of said Section 18; thence (6) along said North line, South 89° 23' 51" East, 245.30 feet to the point of beginning.

ALSO EXCEPTING THEREFROM all oil, gas and minerals as heretofore reserved of record.

APN: 078-090-22S

PARCEL 6:

That portion of Fractional Section 7, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying Westerly of the Westerly boundary line of that certain tract or parcel of land described as Parcel 2 (Unit 178) as conveyed unto the United States of America in Deed recorded May 17, 1966 in Book 5314, Page 66 of Official Records, Document No. 37725.

**EXHIBIT 45**
**Page 423**

Excepting therefrom that portion conveyed to Westlands Water District in Deed recorded February 18, 1977 in Book 6743, Page 213 of Official Records, Document No. 16643, described as follows:

Beginning at the South Quarter corner of said Section 7; thence (1) along the South line of the Southeast Quarter of said Section 7, South 89° 23' 49" East, 96.50 feet to the Southwest corner of the 59.13 acre parcel of land described as Parcel Two (Unit 178) in the Deed to the United States of America recorded May 17, 1966 in Book 5314, Page 66   as Document No. 37725, Fresno County Official Records; thence (2) along the West boundary of said 59.13 acre parcel of land, North 0° 52' 58" East, 120.00 feet; thence (3) South 52° 33' 14" West, 129.80 feet; thence (4) south 83° 00' 14" west, 242.00 feet; thence (5) South 0° 36' 09" West, 8.00 feet to a point on the South line of the Southwest Quarter of said Section 7; thence (6) along last said South line, South 89° 23' 51" East, 245.00 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965 in Book 5257, Page 25, Document No. 104217, Official Records.

This legal description is made pursuant to that certain Certificate of Waiver of Parcel Map No. 17-13, recorded October 23, 2018, as Instrument No. 2018-0128928 of Official Records.

APN: 078-080-57S

PARCEL 6A:

A non-exclusive easement for ingress and egress and incidental purposes over, across and through the Westerly 20 feet of the following described property:

The fractional Northeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; and

The Southeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; except that portion lying Easterly of the West boundary of land granted to the United States of America by Deed recorded November 1, 1965 in Book 5235, Page 243, Official Records, Document No. 88214; also excepting all oil, gas, minerals and other hydrocarbon substances an heretofore reserved of record.

PARCEL 7:

The Southwest Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Plat thereof.

Except all oil, gas and other minerals in, or under said premises.

APN: 078-090-02S

EXHIBIT 45
Page 424

PARCEL 8:

Intentionally Deleted

PARCEL 9:

Intentionally Deleted

Real property in the City of Avenal, County of Kings, State of California, described as follows:

PARCEL 10:

All that portion of the Northwest Quarter of Section 19, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying within the bounds of Fresno County, California.

Except all oil, gas and other minerals in, or under said premises.

Assessed under Kings County APN 036-170-038-000

PARCEL 11:

All that portion of Section 18, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded May 18, 1936 in Book 151 at Page 8 of Official Records, and Westerly of the California Aqueduct. Said property is situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Being described as Parcel 1, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-042-000

PARCEL 12:

All that portion of the Northwest one-quarter of Section 19, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded August 18, 1936 in Book 154, Page 153 as Document No. 4437 of Official Records. Situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

EXHIBIT 45
Page 425

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinafter described property, as granted to Bravo Oil Company, a corporation, by Indenture recorded December 29, 1965 in Book 883, at Page 116 as Instrument No. 16704 of Official Records.

Being described as Parcel 3, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-037-000 and 036-170-039-000

PARCEL 13:

Intentially Deleted

Page 7 of 7

**EXHIBIT 45**
**Page 426**

# EXHIBIT 46

**EXHIBIT 46**
**Page 427**



DOC NBR:  2205595        03/24/2022 09:44:53 AM
OFFICIAL RECORDS OF Kings County
Kristine Lee, Clerk-Recorder,
RECORDING FEE: $40.00
COUNTY TAX: $0.00
CITY TAX: $0.00

Recorded at Request of
Old Republic Title Company

142100053S-DB

DOC TYPE: 04
9 PGS
R048

ERECORDING PARTNERS NETWORK

This instrument prepared by:
**PeirsonPatterson, LLP.**
**2310 Interstate 20 West, Suite 100**
**Arlington, TX  76017-1668**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

## ASSIGNMENT OF DEED OF TRUST
## (Simultaneous)

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

Loan ## AG1076

     For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA  50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company**, whose address is **6000 Westown Parkway, West Des Moines, IA 50266**, all beneficial interest under a certain Deed of Trust dated **March 10, 2022**, made and executed by **FFGT Farms, LLC, a California limited liability company**, to **Old Republic Title Company**, Trustee, upon the following described property situated in **Kings County, State of California**:

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of a single-advance term loan in the original principal amount of **$10,098,930.00**, which Deed of Trust is being filed of record simultaneously in the official records of **Kings County, State of California**, together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

     TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

     IN WITNESS WHEREOF, the undersigned Assignor has executed and made to be effective this Assignment of Deed of Trust on March 10 , 2022 .

---

Multistate Deed of Trust Assignment (Simultaneous) - Single Family

1

211631000322 [Doc Id 8448 MI 1182020]

**EXHIBIT 46**
**Page 428**

Conterra Agricultural Capital, LLC

_Signature_                              3-10-2022
Signature                          Date
**Mark A. Smith, COO & General Counsel**

_Jenna Koppen_
Witness     Jenna Koppen

STATE OF IOWA
COUNTY OF _____Polk_____

Before me, the undersigned authority, on this day personally appeared
_____Mark A. Smith, COO & General Counsel_____

_____, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this __10th__ day of __March__ , 20 __22__.

_Taylor Petersen_
Notary, State of __Iowa__

Printed Name: __Taylor Petersen__
My Commission Expires: __11-a-2024__

> **TAYLOR PETERSEN**
> Commission Number 813700
> My Commission Expires
> 11-a-2024

---

Multistate Deed of Trust Assignment (Simultaneous) - Single Family

2

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT A**

Legal Description for Fresno + Kings County.

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The South half of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting therefrom that portion of the North half of the Southeast Quarter lying west of Avenal Cutoff Road and West of the San Luis Canal and that portion of the Southwest Quarter of the Northeast Quarter lying West of the canal, all in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 2:

That portion of the North half of the Southeast Quarter lying West of Avenal Cutoff Road and West of the San Luis Canal in Section 18, Township 21 South, Range 18 South, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 feet; thence leaving said South boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 feet to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89°

Page 1 of 7

23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" ast 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances; South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 3:

The South 54 acres of the Northeast Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 fet1; thence leaving said South Boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 fet1 to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89° 23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances: South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for

EXHIBIT 46
Page 431

public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also except that portion described as follows:

Beginning at a point in the North boundary of the tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952 and recorded October 23, 1952, in Book 3224, Page 90 of Official Records, distant there along North 89° 23' 29" West 2277.72 feet from a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter of said Section 18; thence along said North boundary South 89° 23' 29" East 624.68 feet; thence leaving said North boundary South 43° 17' 09" East 1235.95 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 796.75 feet from the East Quarter corner of said Section 18; thence along said South boundary North 89° 23' 17" West 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 834.71 feet; thence North 33° 24' 22" West 348.78 feet to the point of beginning.

Also excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as excepted in the Deed from Barbara J. Meadows, et al, to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records, Document No. 55044.

APN: 078-090-26S (portion)

PARCEL 4:

A parcel of land in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, being a portion of that certain Parcel Two as described in the Deed from Vernon L. Thomas, Inc., a corporation to the United States of America, which was filed for record on September 14, 1965, in Book 5216, Page 283, Official Records of Fresno County, State of California, described as follows:

Beginning at a point in the South boundary of said Parcel Two (5216 OR 283) distant there along South 89° 23' 29" East 351.68 feet from the terminus of a course described as North 89° 23' 29" West 888.99 feet in said Parcel Two (5216 OR 283); thence from said point of beginning North 89° 23' 29" West 351.68 feet to a point in the West boundary of the Northeast Quarter of said Section 18; thence leaving said South boundary along said West boundary North 0° 33' 37" East 1560.00 feet; thence leaving said West boundary South 65° 49' 29" East, 76.36 feet; thence South 0° 08' 29" East 500.00 feet; thence South 7° 21' 29" East 469.85 feet; South 17° 13' 29" East 232.00 feet; thence South 21° 37' 22" East 370.92 feet to the point of beginning.

Excepting therefrom an undivided One-half interest in and to all oil, gas and other hydrocarbons and minerals in and under said land, as excepted by the Deed from B.E. Loomer, et al, to Alfred R. Brown, et ux, dated September 10, 1941, recorded October 6, 1941 as Document No. 33177, Official Records.

Page 3 of 7

Also excepting therefrom an undivided one-half interest in and to all oil, gas and other
hydrocarbons and minerals now or at any time hereafter situate therein and thereunder,
together with all easements and rights necessary or convenient for the production, storage and
transportation thereof and the exploration and testing of the said real property, and also the
right to drill for, produce and use water from the said real property in connection with drilling
and mining operation thereon, as reserved in the Deed from A.R. Brown and Blanche G. Brown,
husband and wife, to Carthyl Thomas and Gurtha Thomas, as tenants in common, dated
January 7, 1948, recorded February 25, 1948, as Document No. 9403, Official Records.

Also excepting therefrom all of grantors interest in and to all oil gas or minerals in and under
said land, without however the right to dig, drill or mine therefor through the surface of said
land or within 100 feet of the surface, as reserved in the Deed from Vernon L. Thomas, Inc., a
corporation, to the United States of America, recorded September 14, 1965, in Book 5216, Page
283 of Official Records, Document No. 73423.

APN: 078-090-27S

PARCEL 5:

The Southeast Quarter of the Northwest Quarter, and the North half of the Northwest Quarter
of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according
to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof conveyed to Westlands Water District by Deed
recorded December 7, 1973 in Book 6247, Page 483 of Official Records, Document No. 106071,
being more particularly described as follows:

A parcel of land in the Northeast Quarter of the Northwest Quarter of Section 18, Township 21
South, Range 18 East, Mount Diablo Base and Meridian, described an follows:

Beginning at the North quarter corner of said Section 18; thence (1) along the East line of the
Northwest Quarter of said Section 18, South 0° 33' 31" West, 180.00 feet; thence (2) North 89°
26' 29" West, 50.00 feet; thence (3) North 0° 33' 31" East, 105.00 feet; thence (4) North 75°
00' 35" West, 201.37 feet; thence (5) North 0° 36' 09" East, 25.00 feet to a point in the North
line of said Section 18; thence (6) along said North line, South 89° 23' 51" East, 245.30 feet to
the point of beginning.

ALSO EXCEPTING THEREFROM all oil, gas and minerals as heretofore reserved of record.

APN: 078-090-22S

PARCEL 6:

That portion of Fractional Section 7, Township 21 South, Range 18 East, Mount Diablo Base and
Meridian, according to the Official Plat thereof, lying Westerly of the Westerly boundary line of
that certain tract or parcel of land described as Parcel 2 (Unit 178) as conveyed unto the United
States of America in Deed recorded May 17, 1966 in Book 5314, Page 66 of Official Records,
Document No. 37725.

Page 4 of 7

Excepting therefrom that portion conveyed to Westlands Water District in Deed recorded February 18, 1977 in Book 6743, Page 213 of Official Records, Document No. 16643, described as follows:

Beginning at the South Quarter corner of said Section 7; thence (1) along the South line of the Southeast Quarter of said Section 7, South 89° 23' 49" East, 96.50 feet to the Southwest corner of the 59.13 acre parcel of land described as Parcel Two (Unit 178) in the Deed to the United States of America recorded May 17, 1966 in Book 5314, Page 66   as Document No. 37725, Fresno County Official Records; thence (2) along the West boundary of said 59.13 acre parcel of land, North 0° 52' 58" East, 120.00 feet; thence (3) South 52° 33' 14" West, 129.80 feet; thence (4) south 83° 00' 14" west, 242.00 feet; thence (5) South 0° 36' 09" West, 8.00 feet to a point on the South line of the Southwest Quarter of said Section 7; thence (6) along last said South line, South 89° 23' 51" East, 245.00 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965 in Book 5257, Page 25, Document No. 104217, Official Records.

This legal description is made pursuant to that certain Certificate of Waiver of Parcel Map No. 17-13, recorded October 23, 2018, as Instrument No. 2018-0128928 of Official Records.

APN: 078-080-57S

PARCEL 6A:

A non-exclusive easement for ingress and egress and incidental purposes over, across and through the Westerly 20 feet of the following described property:

The fractional Northeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; and

The Southeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; except that portion lying Easterly of the West boundary of land granted to the United States of America by Deed recorded November 1, 1965 in Book 5235, Page 243, Official Records, Document No. 88214; also excepting all oil, gas, minerals and other hydrocarbon substances an heretofore reserved of record.

PARCEL 7:

The Southwest Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Plat thereof.

Except all oil, gas and other minerals in, or under said premises.

APN: 078-090-02S

PARCEL 8:

Intentionally Deleted

PARCEL 9:

Intentionally Deleted

Real property in the City of Avenal, County of Kings, State of California, described as follows:

PARCEL 10:

All that portion of the Northwest Quarter of Section 19, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying within the bounds of Fresno County, California.

Except all oil, gas and other minerals in, or under said premises.

Assessed under Kings County APN 036-170-038-000

PARCEL 11:

All that portion of Section 18, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded May 18, 1936 in Book 151 at Page 8 of Official Records, and Westerly of the California Aqueduct. Said property is situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Being described as Parcel 1, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-042-000

PARCEL 12:

All that portion of the Northwest one-quarter of Section 19, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded August 18, 1936 in Book 154, Page 153 as Document No. 4437 of Official Records. Situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

EXHIBIT 46
Page 435

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinafter described property, as granted to Bravo Oil Company, a corporation, by Indenture recorded December 29, 1965 in Book 883, at Page 116 as Instrument No. 16704 of Official Records.

Being described as Parcel 3, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-037-000 and 036-170-039-000

PARCEL 13:

Intentially Deleted

Page 7 of 7

# EXHIBIT 47

EXHIBIT 47
Page 437

# NOTE

Loan #AG1115

| February 3, 2023 | Fresno, | CA |
|---|---|---|
| [Date] | [City] | [State] |

**12,862 +/- Acres, Fresno, Kern, and Kings Counties, California**
[Property Address]

**1.      BORROWERS' PROMISE TO PAY**

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, **Copper Avenue Investments, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **ACAP Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, **104 Investments, LLC**, a California limited liability company, **Lincoln Grantor Farms, LLC**, a California limited liability company, **Grantor Real Estate Investments, LLC**, a California limited liability company, **Gradon Farms, LLC**, a California limited liability company, **FFGT Farms, LLC**, a California limited liability company, **Cantua Orchards, LLC**, a California limited liability company, and **Locans Investments, LLC**, a California limited liability company (collectively, the "Borrowers"), have received, Borrowers promise to pay U.S. **$11,300,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC**. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note".

**2.      INTEREST**

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **9.8800%**. The interest rate Borrowers will pay will change in accordance with this Section 2.

**INITIAL ADJUSTMENT DATE**          **March 1, 2023**

**ADJUSTMENT FREQUENCY PERIOD** **monthly**

**SOFR RATE MARGIN**          **5.4500%**

**ADJUSTABLE RATE PROVISION.** The interest rate stated in this Note is subject to adjustment by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current Principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan during any Event of Default. Notice of the adjusted rate will be sent to the Borrowers after each interest rate adjustment. This is a CME SOFR[1] Rate Based Loan, and the applicable interest rate shall be equal

---

1 The market data is the property of Chicago Mercantile Exchange Inc. ("CME") or its licensors as applicable. All rights reserved, or otherwise licensed by CME.

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

1

**EXHIBIT 47**
**Page 438**

to the sum of the (1) SOFR Base Rate, and (2) SOFR Rate Margin, determined and adjusted monthly as follows:

CME 1-Month Term SOFR Based Rate: The "SOFR Base Rate" is an interest rate per annum equal to the CME 1- Month Term SOFR. The interest rate shall be adjusted monthly on the first day of the month. The index for adjustments is the CME 1-Month Term SOFR Index published by CME at https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html?redirect=/termsofr two (2) business days before the applicable interest rate change date.  In the event that CME 1-Month Term SOFR Index is less than zero percent per annum the index shall be deemed to be zero percent (0.0000%) per annum. If the CME 1-Month Term SOFR Index is not reported on the tenth day of a month, the CME 1-Month Term SOFR Index reported on the first business day preceding such day will be used. If this index is no longer available for any reason, is no longer posted through electronic transmission or through a source providing such information, or the Lender determines that the index is unreliable or no longer adequately covers Lender's costs of making loans using this index, Lender will select a replacement index in its sole discretion which index may be based upon comparable information and may include an interest rate spread or other price adjustment to compensate Lender for costs incurred in making or maintaining the loan.

SOFR Rate Margin: The initial annual rate of margin to be added on the SOFR Base Rate (the "SOFR Rate Margin") is equal to 5.4500% per annum. Lender, in its sole and absolute discretion, may modify and change the SOFR Rate Margin annually, with the first adjustment occurring on the first anniversary of the Closing Date, effective as of the first day of the anniversary month and each subsequent adjustment occurring annually thereafter. Lender may however modify the Rate Margin more frequently than annually in the event that an Event of Default has occurred.

After and during the continuance of an Event of Default, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

3.    **SCHEDULED PAYMENTS**
      **(A)    Time and Amount of Payments**
      **1 interest only payment on July 1, 2023, with interest calculated from the date of closing on the unpaid Principal balance at the applicable interest rate under this Note; 9 consecutive semi-annual interest only payments, beginning January 1, 2024, and the final payment of all remaining Principal, accrued and unpaid interest, and any applicable fees and costs on February 3, 2028, which is called the "Maturity Date."**
      **(B)    Place of Payments**
      Borrowers will make payments at 5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266 or at a different place if required by Lender.

If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any installment payment (whether because of a miscalculation of the interest rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the installment payment (and the corrected interest rate, if applicable) and: (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and an Event of Default does not exist under this Note, the Security Instrument, as defined below, or any other loan document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

EXHIBIT 47
Page 439

**4.     INTEREST CALCULATION**

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days.  The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

**5.     PREPAYMENTS**

     **1 year lockout:**  Borrowers shall have no right to make, and Lender shall have no obligation to accept, any voluntary prepayment, whether in whole or in part, of the Loan or any other amount under this Note at any time during the first twelve 12 months of this Note, as calculated from the date of this month.  Upon completion of payment of 12 months' interest, as calculated from the date of this Note, Borrower may prepay all or any portion of the Principal of this Note. Concurrently with any permitted prepayment of the unpaid Principal balance of this Note, Borrower shall pay any unpaid interest accrued on such Principal amount from the date to which interest was last paid to the next installment payment date.

**6.     INTEREST AFTER DEFAULT**

     Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).  From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.     ANNUAL FINANCIAL STATEMENTS**

     Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.  The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.     DISSEMINATION OF INFORMATION**

     If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

**EXHIBIT 47**
**Page 440**

9.    **LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

10.    **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **5260 N. Palm Ave., Ste. 421, Mail Stop M, Fresno, CA 93704**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

11.    **WAIVERS**

Borrowers and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

12.    **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes or which occur as a result of the administration of trusts following the death of a grantor of such trusts) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

13.    **USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**EXHIBIT 47**
**Page 441**

of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**14.  DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

      **(A)  Event of Default**

      The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

            **(1)**  If Borrowers fail to repay any interest or Principal under the Note when due;

            **(2)**  If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

            **(3)**  If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within sixty (60) days after written notice thereof from Lender, provided however if the default is one which is not susceptible to cure within sixty (60) days and Borrower commences to cure and diligently pursues the cure to completion, then there shall be no Event of Default so long as the cure process continues and is timely completed;

            **(4)**  If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

            **(5)**  If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within sixty (60) days after filing);

            **(6)**  If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

            **(7)**  If Borrowers or any grantor or any other obligated party under the Security Instrument transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

      **(B)  Late Charge for Overdue Payments**

      If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment equal to 5% of such defaulted payment then due.

      **(C)  Notice of Default**

      Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

      **(D)  No Waiver By Lender**

      Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

      **(E)  Payment of Lender's Costs and Expenses**

      Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

**EXHIBIT 47**
**Page 442**

15. **CHOICE OF LAW**

This Note shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California.

16. **CROSS-DEFAULT PROVISION**

Borrowers' default or breach under any note or agreement in which Lender has an interest shall be a breach under this Note, the Security Instrument, and any other agreements or documents securing this loan from Lender to Borrowers, and Lender may invoke any of the remedies permitted by the Security Instrument.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

*[remainder intentionally left blank – signature page follows]*

**BORROWERS:**

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

6

**EXHIBIT 47**
**Page 443**

**BORROWERS:**

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

_____
By:  Farshid Assemi
Its:  General Manager

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

_____
By:  Farshid Assemi
Its:  Manager

**C & A FARMS, LLC,**
a California limited liability company

_____
By:  Farshid Assemi
Its:  Manager

**ACAP FARMS, LLC,**
a California limited liability company

_____
By:  Farshid Assemi
Its:  Manager

**WILLOW AVENUE INVESTMENTS, LLC,**
a California limited liability company

_____
By:  Neema Assemi
Its:  Manager

**104 INVESTMENTS, LLC,**
a California limited liability company

_____
By:  Farshid Assemi
Its:  Manager

**A & H INVESTMENTS, LLC,**
a California limited liability company

_____
By:  Farshid Assemi
Its:  General Manager

**FUTURE LAND INVESTMENTS, LLC,**
a California limited liability company

_____
By:  Farid Assemi
Its:  Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

_____
By:  Neema Assemi
Its:  Manager

**GRANTOR REAL ESTATE INVESTMENTS, LLC**
a California limited liability company

_____
By:  Neema Assemi
Its:  Manager

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**EXHIBIT 47**
**Page 444**

**GRADON FARMS, LLC,**
a California limited liability company

_____

By:  Neema Assemi
Its:  Manager

**FFGT FARMS, LLC,**
a California limited liability company

_____

By:  Neema Assemi
Its:  Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager

**SHAVER FOREST DEVELOPMENT, INC.,**
a California corporation

_____

By:  Neema Assemi
Its:  CEO

**LOCANS INVESTMENTS, LLC,**
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager

**EXHIBIT 47**
**Page 445**

**GRADON FARMS, LLC**,
a California limited liability company

_____

By:  Neema Assemi
Its:  Manager


**FFGT FARMS, LLC**,
a California limited liability company

_____

By:  Neema Assemi
Its:  Manager


**CANTUA ORCHARDS, LLC**,
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager


**LOCANS INVESTMENTS, LLC**,
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager


MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**EXHIBIT 47**
**Page 446**

# EXHIBIT 48

EXHIBIT 48
Page 447

# NOTE

**Loan #AG1116**

February 3, 2023        **Fresno,**        **CA**
[Date]        [City]        [State]

**12,862 +/- Acres, Fresno, Kern, and Kings Counties, California**
[Property Address]

## 1. BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC,** a California limited liability company, **Copper Avenue Investments, LLC,** a California limited liability company, **C & A Farms, LLC,** a California limited liability company, **ACAP Farms, LLC,** a California limited liability company, **Willow Avenue Investments, LLC,** a California limited liability company, **104 Investments, LLC,** a California limited liability company, **Lincoln Grantor Farms, LLC,** a California limited liability company, **Grantor Real Estate Investments, LLC,** a California limited liability company, **Gradon Farms, LLC,** a California limited liability company, **FFGT Farms, LLC,** a California limited liability company, **Cantua Orchards, LLC,** a California limited liability company, and **Locans Investments, LLC,** a California limited liability company (collectively, the "Borrowers"), have received, Borrowers promise to pay U.S. **$11,300,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC.** Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note".

## 2. LINE OF CREDIT

Prior to the expiration of the Draw Period ("Draw Period") as calculated in accordance with this Section 2, this Promissory Note ("Note") evidences a revolving line of credit loan ("Loan") under which advances may from time to time be extended to Borrowers. Advances shall be in the minimum amount of $2,500 and shall be in amounts which are multiples of $100. Upon receipt of a verified funds request by Borrowers to a telephone number provided from time to time by Lender, **or by such other funds request method as the Lender may establish,** and provided all conditions for an advance have been met, Lender shall promptly deliver the requested funds directly to Borrowers' account at Borrowers' bank ("Bank Account") as designated in the original Loan application or by separate written notice on forms to be provided by Lender. In most cases, if a valid funds request is received by Lender at its designated telephone number at or before 12:00 noon (all times in this Note refer to the time in Louisville, Kentucky (Eastern Standard Time EST), the requested funds will be delivered on the business day following receipt of the funds request (e.g., if the funds request is received at 11:00 a.m. on Monday, the funds will usually be delivered on Tuesday; if the funds request is received at 2:00 p.m. on Tuesday, the funds will usually be delivered on Thursday). A valid funds request shall be verified by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note in a manner to be designated by the Lender. A valid designation of the Bank Account to which funds are to be advanced shall be signed by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note. Lender shall be entitled to rely on the statements in any (i) verified funds request and/or (ii) signed designation of Bank Account, to the effect that the person who signed such instrument was fully authorized to do so by all of the persons obligated to pay this Note and all persons who are obligated to pay this Note hereby release any and all claims against Lender based on Lender's reliance on such statements.

Advances may be made without payment of a transaction fee.

The Draw Period referenced above shall terminate and expire upon the earlier of the date set forth in Section 8(A)(6) or at such date as determined by the Lender, in its sole discretion.

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**EXHIBIT 48**
**Page 448**

3.    **REVOLVING FEATURE**

During the Draw Period, Borrowers may borrow, repay and reborrow under this Note at any time, up to the Principal amount of this Note, subject to the terms and conditions of this Note (the "Revolving Loan provisions"), so long as no Event of Default exists under this Note or any other documents executed in connection with this Loan (collectively, the "Loan Documents"). The unpaid Principal balance owing on this Note at any time during the Draw Period will be evidenced by Lender's internal records and the amount advanced and outstanding may not exceed at any one time the face amount of this Note. Lender shall not be obligated to make any advance to Borrowers following occurrence of an Event of Default.

4.    **PAYMENTS**

During the term of this Note, so long as no Event of Default exists or is continuing, Borrowers will be billed in arrears twice a year for interest accrued. Notwithstanding any provision in this Note to the contrary, during the Draw Period Borrowers may make, free of penalty or minimum interest charge, any number of Principal payments on any business day. Required interest payments may be made from a funds advance, provided the verified funds request for such advance specifies such a purpose in whole or in part for the requested funds. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.

Notwithstanding the foregoing, all amounts other than interest accruing over the period from the last date through which interest was last billed due under the terms of this Note, including but not limited to Principal and all other interest, shall be due and payable in full upon the earlier of Lender's billing or the Maturity Date. Interest accruing over the period from the last date through which interest was billed until the later of (a) the actual date of payment of all other amounts or (b) the Maturity Date shall be billed promptly after all such other amounts have been received by Lender.

Concurrently with any permitted prepayment of the unpaid Principal balance of this Note, Borrower shall pay any unpaid interest accrued on such Principal amount from the date to which interest was last paid to the date of the remitted prepayment.

5.    **APPLICATION OF PAYMENTS**

Notwithstanding any provision in this Note to the contrary, all payments, other than a regularly scheduled payments of interest, will be applied first to:

| | | |
|---|---|---|
| (1) | collection expenses and protective advances, if any; and then to | |
| (2) | Interest due; and then to | |
| (3) | Principal; and then to | |
| (4) | Late charges | |

6.    **ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

7.    **GENERAL PROVISIONS**

A.    Notwithstanding any provision of this Note to the contrary, interest will be calculated in any reasonable manner determined solely by the holder of this Note based on an assumed 30 day month, and a 360-day year.

B.    Notwithstanding any provision of this Note to the contrary, the whole of the Principal sum and any accrued interest and any other sums advanced to protect and/or enforce the Note holder's interest in this Note and the

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

2

**EXHIBIT 48**
**Page 449**

Security Instrument (including reasonable costs of recovery and attorney's fees and expenses) shall bear interest from and after maturity, whether or not resulting from acceleration, at a rate equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of any defaulted payment.

      C.    During the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of Principal or interest shall not be received by the fifteenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

          After the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of Principal or interest shall not be received by the tenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

      D.    Borrowers shall, as required by Section 6, provide current financial statements to the holder of this Note. If Borrowers obtain financial statements which are audited or reviewed by an independent certified public accountant for the relevant period, such financial statements provided hereunder shall be such reviewed or audited statements. Borrowers authorize Note holder to make or have made any credit inquiries Note holder feels are necessary. Borrowers also authorize the person or agencies to whom Note holder makes these inquiries to supply Note holder with the information Note holder requests.

      E.    If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument and any other security instruments, and/or any or all servicing rights with respect thereto, or to grant participations therein ("Participations"), or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each prospective purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating related to such Securities and  all documents and information which Lender now has or may hereafter acquire relating to the indebtedness under this Note and to Borrowers, any guarantor, any indemnitors and the Property, as Lender determines necessary or desirable. All information furnished by Borrowers, any guarantor, or any indemnitor that shall be shared with any prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

      F.    Upon the occurrence of any Event of Default under the Note, or in the event any action is brought to enforce the terms of this Note or any document related thereto, or in the event of the bankruptcy of any of the Borrowers, then the holder of this Note shall be entitled to recover all attorneys' fees and costs incurred as a result of such Event of Default and/or enforcing the terms of this Note and related documents.

      G.    The Borrowers represent and agree that at the time of making any and all requests for funds hereunder that none of the Borrowers, guarantors and owners of the real and personal property security will be delinquent on any taxes (federal, state, or local) of any kind. This representation is material to the making of each advance.

      H.    The Borrowers represent and agree that any and all requests for funds hereunder will be used only for agricultural or other business purposes and not for personal, family, or household purposes.

      I.    The making of any false or misleading representation will constitute an Event of Default, entitling Lender to exercise remedies for default, including but not limited to acceleration of the indebtedness.

      J.    Borrowers will make payments at **5465 Mills Civic Pkwy, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender.

      K.    Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender may send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount by a certain date Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

      L.    Even if after and during the continuance of any Event of Default under this Note, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

**EXHIBIT 48**
**Page 450**

M.       Upon the occurrence of any default or Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law those expenses include, for example, reasonable attorneys' fees.

**8.       REVOLVING LINE OF CREDIT VARIABLE RATE PROVISIONS**
      **A.       Payment of Principal and Interest.**
             (1)       So long as no Event of Default exists under this Note, interest shall accrue on the unpaid balance of this Note until the Loan is repaid in full.
             (2)       The Initial Variable Rate (defined below) will be established at closing of the Loan. Thereafter, the Variable Rate shall change according to the Rate Change Date at a rate equal to the sum of (i) the CME 1-Month Term SOFR Base Rate (defined below) and (ii) the SOFR Rate Margin (defined below) (the "Variable Rate").
             (3)       A payment of interest calculated at the Variable Rate on the outstanding Principal balance represented under this Note from the date of the first advance hereunder shall be due on the First Interest Payment Date. Thereafter, consecutive monthly installments of interest, each in the amount required to pay the unpaid interest accruing through the applicable period, shall be due on the first day of each month at the Variable Rate until the Maturity Date (as defined below). Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date (as defined below).
             (4)       If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any interest payment (whether because of a miscalculation of the Variable Rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the interest payment (and the corrected Variable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrowers are not otherwise in breach or default under any of the terms and provisions of this Note, the security instrument or any other Loan Document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.
             (5)       Borrowers may make payments of Principal in any amount on any business day of Lender during such time as the Principal is accruing interest at the Variable Rate.
             (6)       The following definitions shall apply to this Note:

      **CME 1-Month Term SOFR Base Rate**: The "SOFR Base Rate" is an interest rate per annum equal to the CME 1- Month Term SOFR. The interest rate shall be adjusted monthly on the first day of the month. The index for adjustments is the CME 1-Month Term SOFR Index published by CME at https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html?redirect=/termsofr two (2) business days before the applicable interest rate change date. In the event that CME 1-Month Term SOFR Index is less than zero percent per annum the index shall be deemed to be zero percent (0.00000%) per annum. If the CME 1-Month Term SOFR Index is not reported on the tenth day of a month, the CME 1-Month Term SOFR Index reported on the first business day preceding such day will be used. If this index is no longer available for any reason, is no longer posted through electronic transmission or through a source providing such information, or the Lender determines that the index is unreliable or no longer adequately covers Lender's costs of making loans using this index, Lender will select a replacement index in its sole discretion which index may be based upon comparable information and may include an interest rate spread or other price adjustment to compensate Lender for costs incurred in making or maintaining the loan.

      **SOFR Rate Margin**: The initial annual rate of margin to be added on the SOFR Base Rate (the

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**EXHIBIT 48**
**Page 451**

"SOFR Rate Margin") is equal to 5.4500% per annum. Lender, in its sole and absolute discretion, may modify and change the SOFR Rate Margin annually, with the first adjustment occurring on the first anniversary of the Closing Date, effective as of the first day of the anniversary month and each subsequent adjustment occurring annually thereafter. Lender may however modify the Rate Margin more frequently than annually in the event that an Event of Default has occurred.

**First Interest Payment Date**: March 1, 2023

**Revolving Loan Provisions Termination Date**: February 3, 2028

**Maturity Date**: February 3, 2028

**Rate Change Date:** March 1, 2023, and on the 1st of every month thereafter

**Initial Variable Rate: 9.88000%**

**B.      Prepayment.**

Borrowers may prepay all or part of the unpaid Principal balance of this Note on any business day.

**9.      LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.      GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **5260 N. Palm Ave., Ste. 421, Mail Stop M, Fresno, CA 93704**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.
Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.      WAIVERS**

Borrowers and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.      UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

5

**EXHIBIT 48**
**Page 452**

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes or which occur as a result of the administration of trusts following the death of a grantor of such trusts) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**13.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**14.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**
    **(A)    Event of Default**
The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:
    **(1)**    If Borrowers fail to repay any interest or Principal under the Note when due;
    **(2)**    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;
    **(3)**    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within sixty (60) days after written notice thereof from Lender, provided however if the default is one which is not susceptible to cure within sixty (60) days and Borrower commences to cure and diligently pursues the cure to completion, then there shall be no Event of Default so long as the cure process continues and is timely completed;
    **(4)**    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;
    **(5)**    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within sixty (60) days after filing);
    **(6)**    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;
    **(7)**    If Borrowers or any grantor or any other obligated party under the Security Instrument transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

6

**EXHIBIT 48**
**Page 453**

**(B)     Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment equal to 5% of such defaulted payment then due.

**(A)     Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

**(B)     No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(C)     Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**15.     CHOICE OF LAW**

This Note shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California.

**16.     CROSS-DEFAULT PROVISION**

Borrowers' default or breach under any note or agreement in which Lender has an interest shall be a breach under this Note, the Security Instrument, and any other agreements or documents securing this loan from Lender to Borrowers, and Lender may invoke any of the remedies permitted by the Security Instrument.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

*[remainder intentionally left blank – signature page follows]*

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

**EXHIBIT 48**
**Page 454**

**BORROWERS:**

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  General Manager


**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager


**C & A FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager


**ACAP FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager


**WILLOW AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager


**104 INVESTMENTS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager


**A & H INVESTMENTS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  General Manager


**FUTURE LAND INVESTMENTS, LLC,**
a California limited liability company

By:  Farid Assemi
Its:  Manager


**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager


**GRANTOR REAL ESTATE INVESTMENTS, LLC**
a California limited liability company

By:  Neema Assemi
Its:  Manager

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

8

**EXHIBIT 48**
**Page 455**

**GRADON FARMS, LLC,**
a California limited liability company

_____

By:  Neema Assemi
Its:  Manager

**FFGT FARMS, LLC,**
a California limited liability company

_____

By:  Neema Assemi
Its:  Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager

**SHAVER FOREST DEVELOPMENT, INC.,**
a California corporation

_____

By:  Neema Assemi
Its:  CEO

**LOCANS INVESTMENTS, LLC**
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

9

**EXHIBIT 48**
**Page 456**

# EXHIBIT 49

**EXHIBIT 49**
**Page 457**

Recorded at Request of
Old Republic Title Company ~~ePN~~

1421 00 25 62/ 1421 002561 / 1421002600 -DB

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2023-0011566

Recorded at the request of:
ERECORDING PARTNERS NETWORK

02/09/2023 09:23 51
Titles: 3      Pages: 52
Fees: $210.00
CA SB2 Fees:$225.00
Taxes: $0.00
Total: $435.00

_____ [Space Above This Line For Recording Data] _____

# OPEN-END DEED OF TRUST
## (With Future Advance Clause)
## Security Agreement, Assignment of Rents and Fixture Filing

Loan #AG1115 &
Loan #AG1116

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 3, 2023,** together with all Riders to this document whether recorded or unrecorded.

**(B) "Lender"** is Conterra Agricultural Capital, LLC, an Iowa limited liability company. Lender's address is 5465 Mills Civic Parkway, Suite 201, West Des Moines, Iowa 50266. Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are Lincoln Grantor Farms, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company; FFGT Farms, LLC , a California limited liability company, 104 Investments, LLC, a California limited liability company, Locans Investments, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, C & A Farms, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California Limited Liability Company. Borrowers' address is 5260 N. Palm Avenue, Suite 421, Mail Stop M, Fresno, California 93704. Borrowers are the trustors under this Security Instrument. **"Borrower Parties"** are Borrowers and Maricopa Orchards, LLC, Grantor Real Estate Investments, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC.

**(D) "Trustee"** is Old Republic Title Company. Trustee's address is 7451 N. Remington Avenue, Suite 102, Fresno, California 93711.Trustee is the trustee under this Security Instrument.

**(E) "Notes"** means (i) Borrower Parties' single disbursement promissory note dated February 3, 2023, in the principal amount of $11,300,000.00, plus interest ("Note A"), and (ii) Borrower Parties' multiple disbursement revolving line of

CALIFORNIA-- UNIFORM INSTRUMENT

I

**EXHIBIT 49**
**Page 458**

credit promissory note dated February 3, 2023, in a principal amount not to exceed $11,300,000.00, plus interest ("Note B"). Borrower Parties have promised to pay the debt evidenced by Note A according to the terms of Note A and to pay the debt in full not later than **February 3, 2028**. Borrower Parties have promised to pay the debt evidenced by Note B according to the terms of the Note B and to pay the debt in full not later than **February 3, 2028**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loans"** means the debt evidenced by the Notes, plus, in each case, interest, any prepayment charges, expenses, and late charges due under the Notes, and all sums due under this Security Instrument.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed Borrowers or Borrower Parties, whether recorded or whether unrecorded. The following Riders are to be executed by Borrowers or Borrower Parties:

☐ Irrigation Equipment Rider  ☐ Water Rights Rider

☐ Financial Information and Covenants Rider  ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider  ☐ Adjustable Rate Rider

☐ Other(s): **Cross Default Rider**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Notes.

**(M) "Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

———————

**Open-End Deed of Trust: Note B.** As it relates to Note B, this Security Instrument is given to secure the payment of the initial disbursement, with interest thereon, with additional disbursements as hereinafter specified. Upon request of Borrower Parties, Lender may hereafter at any time after the Security Instrument is recorded and before the release and cancellation of this Security Instrument, make further disbursements to Borrower Parties pursuant to the terms and provisions of Note B to the extent that the total unpaid indebtedness under Note B, exclusive of interest thereon, does not

**CALIFORNIA-- UNIFORM INSTRUMENT**

**EXHIBIT 49
Page 459**

exceed the principal amount of $11,300,000.00. As it relates to Note B, nothing herein stipulated shall limit the amounts that shall be secured hereby when advanced to protect the Property or in accordance with covenants contained in this Security Instrument. As it relates to Note B, Borrower covenants with Lender to repay all such advances aforesaid, with interest, and to apply all other covenants and conditions of this Security Instrument to such future advances. For the avoidance of doubt, none of the provisions contained in this paragraph shall apply to Note A.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes.  For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, State of California**:

**See Exhibit "A" attached hereto and made a part hereof.**

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the  real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the

CALIFORNIA-- UNIFORM INSTRUMENT

3

**EXHIBIT 49**
**Page 460**

proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in

CALIFORNIA-- UNIFORM INSTRUMENT

4

EXHIBIT 49
Page 461

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the terms of the Loans. The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrowers' expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

CALIFORNIA-- UNIFORM INSTRUMENT

**EXHIBIT 49**
**Page 462**

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice

CALIFORNIA-- UNIFORM INSTRUMENT

EXHIBIT 49
Page 463

pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the

CALIFORNIA-- UNIFORM INSTRUMENT

EXHIBIT 49
Page 464

Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the

CALIFORNIA– UNIFORM INSTRUMENT

EXHIBIT 49
Page 465

interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' address set forth in Section (C) of the Definitions above unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal

CALIFORNIA– UNIFORM INSTRUMENT

9

EXHIBIT 49
Page 466

written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing,  upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing").  Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.**  If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Notes; Change of Loan Servicer; Notice of Grievance.**  Either or both Notes or a partial interest in either or both Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.**  As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise

CALIFORNIA-- UNIFORM INSTRUMENT

EXHIBIT 49
Page 467

trigger an Environmental Cleanup.

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security

CALIFORNIA– UNIFORM INSTRUMENT

11

**EXHIBIT 49**
**Page 468**

Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrowers further covenant and agree as follows:

**25. Acceleration; Remedies. Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to**

CALIFORNIA-- UNIFORM INSTRUMENT

12

EXHIBIT 49
Page 469

Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay.  Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay.  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law.  Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law.  After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

26. **Reconveyance.**  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

27. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

28. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

---

**CALIFORNIA-- UNIFORM INSTRUMENT**

EXHIBIT 49
Page 470

**29. Other California State Specific Provisions.**

(a)       In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)       Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)       Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

(1)       at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)       the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

(d)       Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA-- UNIFORM INSTRUMENT**

14

**EXHIBIT 49**
**Page 471**

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**C & A FARMS, LLC**,
a California limited liability company

By: Farshid Assemi
Its: Manager

**ACAP FARMS, LLC**,
a California limited liability company        N/A

By: Farshid Assemi
Its: Manager

**LINCOLN GRANTOR FARMS, LLC**,
a California limited liability company        N/A

By: Neema Assemi
Its: Manager

LINCOLN GRANTOR FARMS, LLC
a California limited liability*
** **GRADON FARMS, LLC**,        *company and**
a California limited liability company

By: Neema Assemi
Their/ Its: Manager

**LOCANS INVESTMENTS, LLC**
a California limited liability company

By: Farshid Assemi
Its: Manager

**CANTUA ORCHARDS, LLC**,
a California limited liability company

By: Farshid Assemi
Its: Manager

WILLOW AVENUE INVESTMENTS, LLC,
a California limited liability
** **FFGT FARMS, LLC**,        *company and**
a California limited liability company

By: Neema Assemi
Their/ Its: Manager

**104 Investments LLC**
a California limited liability company

By: Farshid Assemi
Its: Manager

**EXHIBIT 49**
**Page 472**

Fresno

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___FRESNO___

On __Jan. 25, 2023__ before me, __L. Diaz, Notary Public__, personally appeared
**Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: __L. Diaz__
My commission expires: __April 20, 2026__

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___FRESNO___

On __Jan. 25, 2023__ before me, __L. Diaz, Notary Public__, personally appeared
**Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: __L. Diaz__
My commission expires: __April 20, 2026__

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

**CALIFORNIA— UNIFORM INSTRUMENT**

16

**EXHIBIT 49**
**Page 473**

Exhibit A

1421002561 – Fresno

**The land referred to below is situated in an unincorporated area of the County of Fresno, State of California:**

PARCEL 9:

The North half of the Northeast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78  of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69  of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN:  040-020-18-S

**EXHIBIT 49**
**Page 474**

**The land referred to below is situated in the City of Fresno, County of Fresno, State of California:**

PARCEL 11:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

**EXHIBIT 49**
**Page 475**

APN:   464-20-07

PARCEL 12:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the
Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East,
Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-08

PARCEL 13:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast
quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount
Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from
the East line of said Northwest quarter of said section.

APN:   464-020-09

PARCEL 14:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of
Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to
the Official Plat thereof.

APN:   464-020-12

PARCEL 15:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of
Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to
the Official Plat thereof.

APN:   464-020-13

PARCEL 16:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7,
Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official
Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the
Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-15

PARCEL 17:

EXHIBIT 49
Page 476

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-16

PARCEL 18:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-19

PARCEL 19:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN:   464-020-25

PARCEL 20:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-26

PARCEL 20-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL 21:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN:   464-020-28

PARCEL 22:

EXHIBIT 49
Page 477

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-29

PARCEL 23:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-30

PARCEL 24:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-31

PARCEL 25:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-34

PARCEL 26:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-35

PARCEL 27:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

**EXHIBIT 49**
**Page 478**

APN:   464-020-36

PARCEL 28:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN:   464-020-37

PARCEL 29:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN:   464-060-17

PARCEL 30:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN:   477-021-09

PARCEL 31:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL 31-A:

EXHIBIT 49
Page 479

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest ¼ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South ½ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN:   477-021-11

PARCEL 32:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-18

PARCEL 32-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL 32-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21' 45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL 33:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

EXHIBIT 49
Page 480

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN:   477-021-19

PARCEL 34:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-20

PARCEL 35:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North

EXHIBIT 49
Page 481

half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN:   477-021-25

PARCEL 36:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and 464-070-11

PARCEL 37:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

EXHIBIT 49
Page 482

Exhibit A

1421002562 Fresno

**The land referred to in below is situated in the County of Fresno, State of California, and is described as follows:**

**Tract II:** [Gragnani Ranch]

**TRACT A:**

The Northeast quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in an unincorporated area of the County of Fresno, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided 50% interest in and to all oil, minerals and other hydrocarbon substances therein and thereunder, as reserved by A. J. Yates and Joyce E. Yates, husband and wife in Deed recorded May 3, 1985, Document No. 85043693, Official Records.

Also excepting therefrom an undivided 50% interest in and to all oil, gas and other hydrocarbons and minerals on, in or under said land, as reserved by Anderson, Clayton and Co., its successors and assigns, in Deed recorded September 28, 1971 in Book 5941 Page 200 of Official Records.

APN: 040-060-24-S

**TRACT B**

PARCEL ONE:

The West half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to James L. Marshall, a married man as his separate property, dated May 30, 1974, recorded in June 25, 1974, as Document No. 47797.

APN: 040-020-24-S

**EXHIBIT 49**
**Page 483**

PARCEL TWO:

The East half and the East half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to John Alan Silveira, a single man, dated May 30, 1974, recorded June 25, 1974, as Document No. 47797.

APN: 040-020-25-S

TRACT C:

Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian,

EXCEPTING THEREFROM the West 1811.4 feet;

ALSO EXCEPTING the East 1731.7 feet;

ALSO EXCEPTING that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721, Pages 929, 931 & 933, Official Records of Fresno County;

ALSO EXCEPTING THEREFROM that portion deeded to Westlands Water District recorded in Book 5681, Page 67, Official Records of Fresno County.

FURTHER EXCEPTING THEREFROM, all right, title and interest in and to oil, minerals and hydrocarbon substances within and underlying said property by Grant Deed recorded June 3, 1960 in Book 4396, Page 525 and by Grant Deed recorded June 3, 1960 in Book 4396, Page 527, both of Official Records.

Being the land pursuant to a Certificate of Compliance, recorded February 11, 1999 as Document 1999-0021855 of Official Records.

APN: 027-171-81-S

EXHIBIT 49
Page 484

**TRACT III:** [Samarin]

PARCEL ONE:

All of Section 32, the Southwest Quarter of the Northwest Quarter of Section 33 and all of the North half of the North half of said Section 33 lying West of the centerline of the county road running in a Northwesterly and Southeasterly direction through Sections 28, 29 and 33 being more particularly described in that certain Grant of Right of Way from Miller and Lux Incorporated to the County of Fresno recorded April 4, 1932, in Book 1210, Page 151 of Official Records, all in Township 14 South, Range 15 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on January 31, 1855.

Excepting therefrom that portion of land described as F-35 of Schedule "A" taken by the United States of America by that certain Declaration of Taking recorded March 13, 1968, in Book 5546, Page 453 of Official Records.

Also excepting therefrom all oil, gas and other hydrocarbon substances in or under the lands hereby conveyed, together with the right to enter upon the said lands for the purpose of exploring and drilling for, developing, producing and exploiting the same, and to erect, maintain, operate and remove all such derricks, machinery building, well coverings and other equipment as may be appropriate for such purposes, and the right to erect, maintain, operate, and remove power lines for the conduct of electricity, telephone and telegraph lines and to lay, maintain, operate and remove pipe lines for oil, gas and water, and to construct, maintain,

operate and remove tanks and other facilities for the storage of oil, gas and water, as reserved in the Deed from Frederick W. McNear, also known as Fred W. McNear, and also known as F. W. McNear, to L.R. Van Burgh, dated July 22, 1946, recorded September 17, 1946, in Book 2455, Page 46 of Official Records, as Document No. 65654.

APN: 019-180-09 and 019-180-27

PARCEL TWO:

That portion of Section 28 lying West of the centerline of the county road running in a Northwesterly and Southeasterly direction through Sections 28, 29 and 33 being more particularly described in that certain Grant of Right of Way from Miller and Lux Incorporated to the County of Fresno recorded April 4, 1932 in Book 1210, Page 151 of Official Records, all of Section 29, except that portion thereof lying East of the centerline of said county road, all in Township 14 South, Range 15 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on January 31, 1855.

Excepting therefrom that portion of land described as F-35 of Schedule "A" taken by the United States of America by that certain Declaration of Taking recorded March 13, 1968 in Book 5546, Page 453 of Official Records.

**EXHIBIT 49**
**Page 485**

Also excepting therefrom all oil, gas and other hydrocarbon substances in or under the lands hereby conveyed, together with the right to enter upon the said lands for the purpose of exploring and drilling for, developing, producing and exploiting the same, and to erect, maintain, operate and remove all such derricks, machinery building, well coverings and other equipment as may be appropriate for such purposes, and the right to erect, maintain, operate, and remove power lines for the conduct of electricity, telephone and telegraph lines and to lay, maintain, operate and remove pipe lines for oil, gas and water, and to construct, maintain, operate and remove tanks and other facilities for the storage of oil, gas and water, as reserved in the Deed from Frederick W. McNear, also known as Fred W. McNear, and also known as F. W. McNear, to L.R. Van Burgh, dated July 22, 1946, recorded September 17, 1946, in Book 2455, Page 46 of Official Records, as Document No. 65654.

APN: 019-180-23 and 019-180-25

**TRACT IV:**

PARCEL 1:

The South half of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting therefrom that portion of the North half of the Southeast Quarter lying west of Avenal Cutoff Road and West of the San Luis Canal and that portion of the Southwest Quarter of the Northeast Quarter lying West of the canal, all in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 2:

That portion of the North half of the Southeast Quarter lying West of Avenal Cutoff Road and West of the San Luis Canal in Section 18, Township 21 South, Range 18 South, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

**EXHIBIT 49**
**Page 486**

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 feet; thence leaving said South boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 feet to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89° 23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" ast 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances; South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 3:

The South 54 acres of the Northeast Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

EXHIBIT 49
Page 487

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 fet1; thence leaving said South Boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 fet1 to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89° 23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances: South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also except that portion described as follows:

Beginning at a point in the North boundary of the tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952 and recorded October 23, 1952, in Book 3224, Page 90 of Official Records, distant there along North 89° 23' 29" West 2277.72 feet from a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter of said Section 18; thence along said North boundary South 89° 23' 29" East 624.68 feet; thence leaving said North boundary South 43° 17' 09" East 1235.95 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 796.75 feet from the East Quarter corner of said Section 18; thence along said South boundary North 89° 23' 17" West 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 834.71 feet; thence North 33° 24' 22" West 348.78 feet to the point of beginning.

Also excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as excepted in the Deed from Barbara J. Meadows, et al, to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records, Document No. 55044.

APN: 078-090-26S (portion)

EXHIBIT 49
Page 488

PARCEL 4:

A parcel of land in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, being a portion of that certain Parcel Two as described in the Deed from Vernon L. Thomas, Inc., a corporation to the United States of America, which was filed for record on September 14, 1965, in Book 5216, Page 283, Official Records of Fresno County, State of California, described as follows:

Beginning at a point in the South boundary of said Parcel Two (5216 OR 283) distant there along South 89° 23' 29" East 351.68 feet from the terminus of a course described as North 89° 23' 29" West 888.99 feet in said Parcel Two (5216 OR 283); thence from said point of beginning North 89° 23' 29" West 351.68 feet to a point in the West boundary of the Northeast Quarter of said Section 18; thence leaving said South boundary along said West boundary North 0° 33' 37" East 1560.00 feet; thence leaving said West boundary South 65° 49' 29" East, 76.36 feet; thence South 0° 08' 29" East 500.00 feet; thence South 7° 21' 29" East 469.85 feet; South 17° 13' 29" East 232.00 feet; thence South 21° 37' 22" East 370.92 feet to the point of beginning.

Excepting therefrom an undivided One-half interest in and to all oil, gas and other hydrocarbons and minerals in and under said land, as excepted by the Deed from B.E. Loomer, et al, to Alfred R. Brown, et ux, dated September 10, 1941, recorded October 6, 1941 as Document No. 33177, Official Records.

Also excepting therefrom an undivided one-half interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling and mining operation thereon, as reserved in the Deed from A.R. Brown and Blanche G. Brown, husband and wife, to Carthyl Thomas and Gurtha Thomas, as tenants in common, dated January 7, 1948, recorded February 25, 1948, as Document No. 9403, Official Records.

Also excepting therefrom all of grantors interest in and to all oil gas or minerals in and under said land, without however the right to dig, drill or mine therefor through the surface of said land or within 100 feet of the surface, as reserved in the Deed from Vernon L. Thomas, Inc., a corporation, to the United States of America, recorded September 14, 1965, in Book 5216, Page 283 of Official Records, Document No. 73423.

APN: 078-090-27S

PARCEL 5:

**EXHIBIT 49**
**Page 489**

The Southeast Quarter of the Northwest Quarter, and the North half of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof conveyed to Westlands Water District by Deed recorded December 7, 1973 in Book 6247, Page 483 of Official Records, Document No. 106071, being more particularly described as follows:

A parcel of land in the Northeast Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, described an follows:

Beginning at the North quarter corner of said Section 18; thence (1) along the East line of the Northwest Quarter of said Section 18, South 0° 33' 31" West, 180.00 feet; thence (2) North 89° 26' 29" West, 50.00 feet; thence (3) North 0° 33' 31" East, 105.00 feet; thence (4) North 75° 00' 35" West, 201.37 feet; thence (5) North 0° 36' 09" East, 25.00 feet to a point in the North line of said Section 18; thence (6) along said North line, South 89° 23' 51" East, 245.30 feet to the point of beginning.

ALSO EXCEPTING THEREFROM all oil, gas and minerals as heretofore reserved of record.

APN: 078-090-22S

PARCEL 6:

That portion of Fractional Section 7, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying Westerly of the Westerly boundary line of that certain tract or parcel of land described as Parcel 2 (Unit 178) as conveyed unto the United States of America in Deed recorded May 17, 1966 in Book 5314, Page 66 of Official Records, Document No. 37725.

Excepting therefrom that portion conveyed to Westlands Water District in Deed recorded February 18, 1977 in Book 6743, Page 213 of Official Records, Document No. 16643, described as follows:

Beginning at the South Quarter corner of said Section 7; thence (1) along the South line of the Southeast Quarter of said Section 7, South 89° 23' 49" East, 96.50 feet to the Southwest corner of the 59.13 acre parcel of land described as Parcel Two (Unit 178) in the Deed to the United States of America recorded May 17, 1966 in Book 5314, Page 66  as Document No. 37725, Fresno County Official Records; thence (2) along the West boundary of said 59.13 acre parcel of land, North 0° 52' 58" East, 120.00 feet; thence (3) South 52° 33' 14" West, 129.80 feet; thence (4) south 83° 00' 14" west, 242.00 feet; thence (5) South 0° 36' 09" West, 8.00 feet to a point on the South line of the Southwest Quarter of said Section 7; thence (6) along last said South line, South 89° 23' 51" East, 245.00 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as

EXHIBIT 49
Page 490

granted to Bravo Oil Company in Deed recorded December 29, 1965 in Book 5257, Page 25, Document No. 104217, Official Records.

This legal description is made pursuant to that certain Certificate of Waiver of Parcel Map No. 17-13, recorded October 23, 2018, as Instrument No. 2018-0128928 of Official Records.

APN: 078-080-57S

PARCEL 6A:

A non-exclusive easement for ingress and egress and incidental purposes over, across and through the Westerly 20 feet of the following described property:

The fractional Northeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; and

The Southeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; except that portion lying Easterly of the West boundary of land granted to the United States of America by Deed recorded November 1, 1965 in Book 5235, Page 243, Official Records, Document No. 88214; also excepting all oil, gas, minerals and other hydrocarbon substances an heretofore reserved of record.

PARCEL 7:

The Southwest Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Plat thereof.

Except all oil, gas and other minerals in, or under said premises.

APN: 078-090-02S

PARCEL 8:

Intentionally Deleted

PARCEL 9:

Intentionally Deleted

**The following parcel is located in the County of Fresno, State of California and Assessed with Kings County:**

PARCEL 10:

All that portion of the Northwest Quarter of Section 19, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying within the bounds of Fresno County, California.

Except all oil, gas and other minerals in, or under said premises.

Assessed under Kings County APN 036-170-038-000

EXHIBIT 49
Page 491

The land referred to in below is situated in the County of Fresno, State of California, and is described as follows:

TRACT V: [Le Moore]

PARCEL 1:

That portion of the North Half of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, lying Northerly of the right of way of the Southern Pacific Railroad, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-81

PARCEL 2:

That portion of the West half of the Northwest quarter AND the West 30.00 feet of the East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, lying Sourtherly of the right of way of the Southern Pacific Railroad, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

**EXHIBIT 49**
**Page 492**

APN: 068-130-82

PARCEL 3:

The East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof. Lying Southerly of the right of way of the Southern Pacific Railroad.

Excepting therefrom the West 30.00 feet thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-83

PARCEL 4:

The West half of the Northeast quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, lying Southerly of the right of way of the Southern Pacific Railroad,  pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-84

PARCEL 5:

The East half of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of

**EXHIBIT 49**
**Page 493**

California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-88

PARCEL 6:

The Northwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-89

PARCEL 7:

The Southwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-90

PARCEL 8:

The Northwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

EXHIBIT 49
Page 494

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-74

PARCEL 9:

The Southwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-75

PARCEL 10:

The East half of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-79

PARCEL 11:

The Northwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

EXHIBIT 49
Page 495

APN: 068-130-80

Parcel 12:

The Southwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 Ease, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to th Official Plat thereof.

APN: 068-130-63

**TRACT VI:**  [Diener Five Points]

PARCEL 1:

The Northeast Quarter of Section 16, Township 18 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Together with the Easterly 660.03 feet of the Northwest Quarter of said Section 16.

Excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Section 16, said Northeast corner being at Coordinates Y=380, 340.97 feet and X=1,606, 371.10 feet; thence (1) along the East line of said Section 16, South 1° 26' 28" West, a distance of 13.28 feet to the Northeasterly boundary of the existing State Highway, Road 06-FRE-33; thence (2)along said Northeasterly boundary North 43° 44' 00" West, a distance of 18.60 feet to the North line of said Section 16; thence (3), along said North line South 89° 16' 39" East, a distance of 13.19 feet to the point of beginning.

Excepting therefrom 75% of all oil, gas, minerals and other hydrocarbons in, on or underlying said real property, with the right of ingress and egress to and from said real property for the purpose of exploring for, producing, removing and storing all oil, gas, hydrocarbons and other minerals and such other rights as may be necessary or convenient in the full and free exercise of the rights herein expressly reserved, as reserved in the Deed from Lyle J. Christie, an unmarried man, to Five Points Ranch, Inc., a corporation, dated July 8, 1965, recorded August 20, 1965, in Book 5207, Page 332 of Official Records, Document No. 67349.

APN: 058-080-23S and 058-080-30S

PARCEL 2:

The Southeast Quarter of Section 32, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Plats.

Excepting therefrom all oil, gas and other hydrocarbon substances, as reserved in various Deeds of record.

APN: 050-100-09S

**EXHIBIT 49**
**Page 496**

PARCEL 3:

The East-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom that portion as conveyed to The United States of America in that certain Grant Deed Recorded August 24, 1965 in Book 5208, Page 554 of Fresno County Official Records, described as follows:

Beginning at a point in the North boundary of said Section 7, distant therealong North 89° 40' West 1940.5 feet from the Northeast corner of said Section 7; thence along said North boundary South 89° 40' East 697.0 feet; thence leaving said North boundary South 27° 32' East 2491.6 feet; thence South 89° 22' East 67.9 feet to a point in the East boundary of said Section 7; thence along said East boundary the following courses and distances:

South 0° 28' West 442.1 feet to the East Quarter corner of said Section 7; thence continuing South 0° 38' West 744.5 feet; thence leaving said East boundary and running North 27° 32' West 3173.2 feet; thence North 33° 40' West 374.4 feet; thence North 39° 48' West 358.2 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document Nos. 104217 and 104218, Official Records.

APN: 060-020-38S and 060-020-39S

TRACT VII: [Floral North]

PARCEL 1:

The Southwest Quarter of the Southwest Quarter of Section 35, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, in an unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, and as per Certificate of Waiver Parcel Map No. 00-16 recorded August 6, 2001 as Document No. 2001-0110902 of Official Records.

Excepting therefrom a Life Estate in and to the interest in all mineral rights in, on or under said land, as reserved by Wallace E Barron and Daisy E. Barron, husband and wife, in Deed recorded September 30, 1952 in Book 3215, Page 550 of Official Records.

APN: 027-180-93

PARCEL 2:

The Northwest Quarter of the Southwest Quarter of Section 35, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, in an unincorporated area, County of Fresno, State of

EXHIBIT 49
Page 497

California, according to the Official Plat thereof, and as per Certificate of Waiver Parcel Map No. 00-16 recorded August 6, 2001 as Document No. 2001-0110902 of Official Records.

Excepting therefrom a Life Estate in and to the interest in all mineral rights in, on or under said land, as reserved by Wallace E Barron and Daisy E. Barron, husband and wife, in Deed recorded September 30, 1952 in Book 3215, Page 550 of Official Records.

APN: 027-180-94

PARCEL 3: (Intentionally Deleted)

APN: 027-180-95

PARCEL 4:

The Southeast Quarter of the Southwest Quarter of Section 35, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, and as per Certificate of Waiver Parcel Map No. 00-16 recorded August 6, 2001 as Document No. 2001-0110902 of Official Records.

Excepting therefrom a life estate in and to 1/2 interest in all mineral rights in, on or under said property, as reserved in the deed from Wallace E. Barron and Daisy E. Barron, husband and wife, recorded September 30, 1952 in Book 3215, Page 550 of Official Records.

APN: 027-180-96

PARCEL 5: (Intentionally Deleted)

APN: 038-050-05S

PARCEL 6:

The South-half of the Northwest Quarter of the Northwest Quarter of Section 2, Township 16, South, Range 13 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on June 4, 1881.

Excepting therefrom and all oil, gas, minerals and hydrocarbon substances in, on or under said land together with the right to drill and explore for same at two locations to be determined by grantor's. grantors shall reimburse grantee, their successors and assigns, for any damages to the surface of said land as a result of said drilling and exploration together with a rental in an amount that is customary at the time, , as reserved by Joy Elizabeth Smith, a married woman as her sole and separate property, et al, in the Grant Deed recorded June 5, 2006 under Recorder's Serial Number 2006-0117287, Official Records.

APN: 038-050-06S

PARCEL 7:

EXHIBIT 49
Page 498

The Southeast Quarter of the Northwest Quarter of Section 2, Township 16, South, Range 13 East, Mount Diablo Base and Meridian, in an unincorporated area, County of Fresno, State of California, according to the Official Plat thereof.

Excepting therefrom all oil, gas, minerals and any other Hydrocarbon substances in, on and under the herein above described land, not heretofore reserved of record, as reserved by Wells Fargo Bank, N.A., as successor in interest to Bank of America, NT&SA, as Trustee under the Will of C. Ray Robinson, deceased, in the Grant deed recorded March 22, 2006 under Recorder's Serial Number 2006-0058554, Official Records.

APN: 038-050-08

PARCEL 8:

The Northwest Quarter of the Northwest Quarter of Section 1, Township 16, South, Range 13 East, Mount Diablo Base and Meridian, in an unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, and as per Certificate of Waiver of Parcel Map No. 99-39, recorded January 18, 2001 as Instrument No. 2001-0006327 of Official Records.

APN: 038-050-52

PARCEL 9: (Intentionaly Deleted)

APN:  038-050-53

PARCEL 10:

The Southwest Quarter of the Northwest Quarter of Section 1, Township 16 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, and as per Certificate of Waiver of Parcel Map No. 99-39, recorded January 18, 2001 as Instrument No. 2001-0006327 of Official Records.

APN:  038-050-54

PARCEL 11:

The Southeast Quarter of the Northwest Quarter of Section 1, Township 16 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, and as per Certificate of Waiver of Parcel Map No. 99-39, recorded January 18, 2001 as Instrument No. 2001-0006327 of Official Records.

APN:  038-050-55


**TRACT VIIIA: [Gragnani]**

**TRACT I of TRACT VIIIA:**

PARCEL ONE:

EXHIBIT 49
Page 499

The Northwest quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom an undivided 1/2 interest in and to all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved in the Deed recorded September 28, 1971, in Book 5941, Page 200 of Official Records, as Document No. 78378.

And also excepting an undivided 1/2 interest in and to all oil, gas, minerals and other hydrocarbon substances, as reserved in Deed recorded May 3, 1985 as Document No. 85043689, Official Records.

APN: 040-060-23S

PARCEL ONE-A:

An easement for rights of way for passage over, upon and across, and ingress and egress to and from the Westerly 20 feet of the Southwest Quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Said easement is for the benefit of and is appurtenant to Grantee's property described as the Northwest Quarter of Section 18, Township 16 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, as granted to Donald Jerry Gragnani, a married man as his sole and separate property, in the Grant Deed dated December 27, 1994 and recorded on February 7, 1995 as Instrument No. 95-016598 of Official Records.

PARCEL TWO:

The East One-half of Section 24, Township 16 South, Range 15 East, Mount Diablo Base and Meridian, according to the United States Government Township Plats thereof.

Excepting therefrom all oil, gas. other hydrocarbons. minerals and metals, in. on or underlying said property together with the right to explore for, drill for, produce, store and remove any and all said substances and all other rights convenient or incidental to the full use and enjoyment of the rights herein expressly reserved, as reserved by Elizabeth Zerlang in Deed recorded June 5, 1969 in Book 5693 of Official Records, Page 552.

APN: 038-160-16S

**TRACT II of TRACT VIIIA:**

PARCEL ONE:

The West half of Section 24, Township 16 South, Range 15 East, M.D.B. & M., according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-fourth of all minerals, ore, gas and other hydrocarbon substances lying in, upon, under or which may be produced, saved and sold from said real property.

APN: 038-160-17-S

**EXHIBIT 49**
**Page 500**

PARCEL TWO:

The North half of Section 10, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM all that portion of said property conveyed to the United States of America in that certain Deed dated March 2, 1972 and recorded April 26, 1972 in Book 6016, Page 474 of Official Records, as Document No. 37493.

ALSO EXCEPTING THEREFROM that portion described as follows:

Beginning at a point which is on the West line of said Section 10 and 100 feet North of the Southwest corner of the North one-half of said Section 10, which point shall be the true point of beginning; thence North along the West line of said Section 10, a distance of 325 feet; thence East at a right angle and parallel with the South line of said section, a distance of 325 feet; thence South at a right angle and parallel with the West line of said section, a distance of 325 feet; thence West at a right angle and parallel with the South line of said section, a distance of 325 feet to the true point of beginning on the West line of said Section 10.

ALSO EXCEPTING THEREFROM one-half of all oil, gas and other hydrocarbon substances and one-half of all minerals, whether metallic or non-metallic, in, under or on said real property as reserved by the San Francisco Bank, a corporation, in Deed recorded June 10, 1948 in Book 2644, Page 420 of Official Records, Document No. 28130.

ALSO EXCEPTING THEREFROM 5% of all oil, gas and other hydrocarbon substances and 5% of all minerals, whether metallic or non-metallic in and under said land, as excepted in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, recorded December 27, 1950 in Book 2944, Page 550 of Official Records, Document No. 69757.

ALSO EXCEPTING THEREFROM 25% of all oil, gas and other hydrocarbon substances and 25% of all minerals, whether metallic or non-metallic in and under said land, as reserved in the Deed dated April 23, 1962, from Miles O. Humphreys, Jr. and Zona Humphreys, his wife and T.M. Robinson and Myrtle E. Robinson, his wife, to Ernest E. Sullivan and Gracie Sullivan, his wife, recorded May 4, 1962, as Document No. 36478.

ALSO EXCEPTING THEREFROM 10% of all oil, gas and other hydrocarbon substances and 10% of all minerals, whether metallic or non-metallic in and under said land, together with the right to explore and develop oil, gas and other hydrocarbon substances on, in and under said land above described and in the event of the exercise of said right so reserved, the Grantee shall be compensated for any and all damages done to the surface of said land or crops growing thereon, as reserved in the Deed from Ernest E. Sullivan and Gracie Sullivan, husband and wife to Sullivan & Gragnani, Inc., a corporation, recorded May 4, 1962, as Document No. 36479.

APN:  040-030-44-S

PARCEL THREE:

The North half of Section 17, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXHIBIT 49
Page 501

EXCEPTING THEREFROM all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document No. 104217 in Book 5257, Page 25, Official Records.

APN:  040-060-26-S

**TRACT III of TRACT VIIIA:**

PARCEL ONE:

The West half of Section 14, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in the unincorporated area of the County of Fresno, State of California.

Excepting therefrom the following:

A strip of parcel of land in the Southwest quarter of Section 14, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, described as follows:

Beginning at the Southwest corner of said Section 14; thence along the West line of said Section 14 North 00° 20' 36" East 34.84 feet; thence leaving said West line South 34° 41' 08" East 42.36 feet to a point in the South line of said Section 14; thence along said South 89° 57' 55" West 24.31 feet to the point of beginning.

Also excepting therefrom all the coal, lignite, coal oil, petroleum, naptha, asphalt, maltha, brea, natural gas and all kindred or similar substances which now exist or any time hereafter may exist upon, in or under the property, with the full, free, exclusive and perpetual right below one hundred feet from the surface contours of the property to explore, dig, mine and bore for and otherwise to extract said substances from the above described land and to sever and remove the same therefrom, as well as the right to dispose of, inject and/or below said one hundred foot level store any substance or substances for the enjoyment of these rights and for other business activities of grantor, reserving all rights of location in and under the above described land for mines, tunnels, shafts, wells, pumps, and all other machinery, equipment and/or structures deemed necessary by grantor to enjoy the rights excepted and reserved hereby, also reserving the right to take and use and develop for use any and all subterranean waters under the above described land as all such waters may now or hereafter exist in, on or under the above described land as so far as any of the said waters may be necessary or convenient for carrying on of any or all of the above mentioned works and the full enjoyment of the rights set forth above as excepted and reserved in the deed recorded October 19, 1993 as Instrument No. 93-161681.

PARCEL ONE-A:

**EXHIBIT 49**
**Page 502**

A non-exclusive easement for ingress, egress and maintenance of a ditch over the North 40 feet of the following described real property for water transfer:

The East half of Section 14, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in the unincorporated area of the County of Fresno, State of California.

APN: 040-070-41

TRACT IV of TRACT VIIIA:

PARCEL 1:

The West half of the East half of Section 7, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting an undivided 50% of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved in that certain Deed dated April 20, 1985, and recorded May 3, 1985, as Document No. 85-043685, Official Records.

APN 040-020-16S

PARCEL 2:

The East half of the East half of Section 7, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Plat thereof.

APN 040-020-15

PARCEL 3:

The Southwest Quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R. T. Hughes and Bess L. Hughes, husband and wife to John H. Hughes and Ruby Dale Hughes, husband and wife, as joint tenants, dated January 10, 1950, recorded January 24, 1950 in Book 2829, Page 69 of Official Records, Document No. 4385.

Excepting and reserving unto the Grantors herein an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon.

APN 040-020-19S

EXHIBIT 49
Page 503

PARCEL 4:

The Southeast Quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R. T. Hughes and Bess L. Hughes, husband and wife to John H. Hughes and Ruby Dale Hughes, husband and wife, as joint tenants, dated January 10, 1950, recorded January 24, 1950 in Book 2829, Page 69 of Official Records, Document No. 4385.

Also excepting therefrom an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Harold A. Johnson to Dale Gene Graham, a married man, as his separate property, dated May 30, 1974, recorded June 25, 1974 as Document No. 47794.

APN 040-020-21S

PARCEL 5:

All of Section 1, Township 16 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

Excepting therefrom the title and exclusive right to all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of said grantee, its successors and assigns, of ingress and egress in, upon or over said property to explore and prospect for, extract;, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts, or tunnels, excavations, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities, as conveyed by Southern Pacific Company, a corporation, to Bravo Oil Company, a corporation, by Deed dated December 27, 1965, recorded December 29, 1965, in Book 5257 Page 25 of Official Records, Document No. 104217.

APN: 038-090-30s

EXHIBIT 49
Page 504

# EXHIBIT A

**ORDER NO. : 1421002600**

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

## TRACT I:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN: 027-171-15-S

PARCEL 3:

EXHIBIT 49
Page 505

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN:  027-171-84-S

**TRACT II:**

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

**EXHIBIT 49**
**Page 506**

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

EXHIBIT 49
Page 507

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

**EXHIBIT 49**
**Page 508**

**TRACT III:**

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**EXHIBIT 49**
**Page 509**

# EXHIBIT 50

**EXHIBIT 50**
**Page 510**

Recorded at Request of 
Old Republic Title Company

1421002595 / 1421002583-D8

**Laura Avila, Assessor-Recorder**
Kern County Official Records

SA
2/09/2023
09:16 AM

Recorded Electronically by:
451 Old Republic Title Company

**DOC#: 223015311**

| Stat Types: 3 | Pages: 25 |
| --- | --- |
| FEES | 138.00 |
| TAXES | .00 |
| OTHER | 225.00 |
| PAID | 363.00 |

223015311

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

_____ [Space Above This Line For Recording Data] _____

# OPEN-END DEED OF TRUST
## (With Future Advance Clause)
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1115 &**
**Loan #AG1116**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document.  Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)  "Security Instrument"** means this document, which is dated **February 3, 2023**, together with all Riders to this document whether recorded or unrecorded.

**(B)  "Lender"** is Conterra Agricultural Capital, LLC, an Iowa limited liability company.  Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, Iowa 50266.**  Lender is the beneficiary under this Security Instrument.

**(C)  "Borrowers"** are C & A Farms, LLC, a California limited liability company, **Lincoln Grantor Farms, LLC,** a California limited liability company, **Maricopa Orchards, LLC,** a California limited liability company, **Willow Avenue Investments, LLC,** a California limited liability company,  and **Grantor Real Estate Investments, LLC,** a California limited liability company. Borrowers' address is **5260 N. Palm Avenue, Suite 421, Mail Stop M, Fresno, California 93704.** Borrowers are the trustors under this Security Instrument. **"Borrower Parties"** are Borrowers and, Gradon Farms, LLC, FFGT Farms, LLC, 104 Investments, LLC, Locans Investments, LLC, ACAP Farms, LLC, Cantua Orchards, Copper Avenue Investments, LLC.

**(D)  "Trustee"** is Old Republic Title Company. Trustee's address is **7451 N. Remington Avenue, Suite 102, Fresno, California 93711.**Trustee is the trustee under this Security Instrument.

**(E)  "Notes"** means (i) Borrower Parties' single disbursement promissory note dated February 3, 2023, in the principal amount of $11,300,000.00, plus interest (**"Note A"**), and (ii) Borrower Parties' multiple disbursement revolving line of credit promissory note dated February 3, 2023, in a principal amount not to exceed $11,300,000.00, plus interest (**"Note

**CALIFORNIA-- UNIFORM INSTRUMENT**

1

**EXHIBIT 50**
**Page 511**

B"). Borrower Parties have promised to pay the debt evidenced by Note A according to the terms of Note A and to pay the debt in full not later than **February 3, 2028**. Borrower Parties have promised to pay the debt evidenced by Note B according to the terms of the Note B and to pay the debt in full not later than **February 3, 2028**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loans"** means the debt evidenced by the Notes, plus, in each case, interest, any prepayment charges, expenses, and late charges due under the Notes, and all sums due under this Security Instrument.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed Borrowers or Borrower Parties, whether recorded or whether unrecorded.  The following Riders are to be executed by Borrowers or Borrower Parties:

☐ Irrigation Equipment Rider      ☐ Water Rights Rider

☐ Other (s): Cross Default Rider

     ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider      ☐ Adjustable Rate Rider

     ☐ Financial Information and Covenants Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Notes.

**(M) "Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

---

**Open-End Deed of Trust: Note B.** As it relates to Note B, this Security Instrument is given to secure the payment of the initial disbursement, with interest thereon, with additional disbursements as hereinafter specified. Upon request of Borrower Parties, Lender may hereafter at any time after the Security Instrument is recorded and before the release and cancellation of this Security Instrument, make further disbursements to Borrower Parties pursuant to the terms and

**CALIFORNIA-- UNIFORM INSTRUMENT**

**EXHIBIT 50**
**Page 512**

provisions of Note B to the extent that the total unpaid indebtedness under Note B, exclusive of interest thereon, does not exceed the principal amount of $11,300,000.00. As it relates to Note B, nothing herein stipulated shall limit the amounts that shall be secured hereby when advanced to protect the Property or in accordance with covenants contained in this Security Instrument. As it relates to Note B, Borrower covenants with Lender to repay all such advances aforesaid, with interest, and to apply all other covenants and conditions of this Security Instrument to such future advances. For the avoidance of doubt, none of the provisions contained in this paragraph shall apply to Note A.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes.  For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kern, State of California**:

      **See Exhibit "A" attached hereto and made a part hereof.**

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

      **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

      **TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

      **TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the  real property in **Kern County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

      **TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

      **TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real

---

**CALIFORNIA-- UNIFORM INSTRUMENT**

**EXHIBIT 50**
**Page 513**

property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers

**CALIFORNIA-- UNIFORM INSTRUMENT**

4

**EXHIBIT 50**
**Page 514**

and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the terms of the Loans.  The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably.  Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans.  Lender may obtain insurance coverage, at Lender's option and Borrowers' expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained.  Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument.  These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy

**CALIFORNIA-- UNIFORM INSTRUMENT**

5

EXHIBIT 50
Page 515

shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers.  Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.**  Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.**  Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to

CALIFORNIA-- UNIFORM INSTRUMENT

6

**EXHIBIT 50**
**Page 516**

any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7.  Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage.  Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument.  These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease.  If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

**CALIFORNIA-- UNIFORM INSTRUMENT**

7

**EXHIBIT 50**
**Page 517**

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

**CALIFORNIA-- UNIFORM INSTRUMENT**

8

**EXHIBIT 50**
**Page 518**

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' address set forth in Section (C) of the Definitions above, unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its

CALIFORNIA-- UNIFORM INSTRUMENT

9

**EXHIBIT 50**
**Page 519**

consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Notes; Change of Loan Servicer; Notice of Grievance.** Either or both Notes or a partial interest in either or both Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in

**CALIFORNIA-- UNIFORM INSTRUMENT**

10

**EXHIBIT 50**
**Page 520**

Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the

CALIFORNIA-- UNIFORM INSTRUMENT

11

EXHIBIT 50
Page 521

Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrowers further covenant and agree as follows:

**25. Acceleration; Remedies. Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior**

CALIFORNIA-- UNIFORM INSTRUMENT

12

**EXHIBIT 50**
**Page 522**

to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.**  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

---

CALIFORNIA-- UNIFORM INSTRUMENT

13

EXHIBIT 50
Page 523

**29.  Other California State Specific Provisions.**

(a)      In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)      Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)      Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

(1)      at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)      the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

(d)      Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

CALIFORNIA-- UNIFORM INSTRUMENT

14

**EXHIBIT 50**
**Page 524**

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**C & A FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By:  ~~Neema Assemi~~  *Farshid Assemi*
Its:  Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**WILLOW AVENUE INVESTMENTS, LLC**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**GRANTOR REAL ESTATE INVESTMENTS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

CALIFORNIA– UNIFORM INSTRUMENT

15

**EXHIBIT 50**
**Page 525**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF ___FRESNO___

On __Jan. 25, 2023__ before me, __L. Diaz, Notary Public__, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: __L. Diaz__
My commission expires: __April 20, 2026__

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF ___Fresno___

On __Jan. 25, 2023__ before me, __L. Diaz, Notary Public__, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: __L. Diaz__
My commission expires: __April 20, 2026__

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

---

**CALIFORNIA– UNIFORM INSTRUMENT**

16

**EXHIBIT 50**
**Page 526**

Exhibit A

Solar/Mitigation

The land referred to in this Report is situated in the County of Kern, City of , State of California, and is described as follows:

PARCEL 1:

THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN AN UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL AND GAS WITHIN OR UNDERLYING SAID LAND, AS PREVIOUSLY RESERVED OF RECORD.

APN: 220-170-01

PARCEL 2:        [PARCEL 3:]

THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.&M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH

**EXHIBIT 50**
**Page 527**

THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-170-02

PARCEL 3:      [PARCEL 4:]

THE WEST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED ARE OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING OF THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

ALSO EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON- HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING, THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND

**EXHIBIT 50**
**Page 528**

APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED JUNE 6, 2004 AS DOCUMENT NO. 0204130494, OFFICIAL RECORDS.

APN: 220-170-07

PARCEL 4:      [PARCEL 6:]

Parcel B of Parcel Map No. 12196, according to the map thereof, filed for record on October 13, 2020, in Book 62 of Parcel Maps, at Pages 1 through 3, Kern County Records.


EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-87

PARCEL 5:         [PARCEL 7:]

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED

**EXHIBIT 50**
**Page 529**

WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-10

PARCEL 6:         [PARCEL 8: ]

THE NORTH HALF OF THE NORTH HALF OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE INTEREST OF THE SUNSET RAILROAD AS SAID RAILROAD IS NOW LOCATED.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY;

AND ALSO EXCEPTING THEREFROM ALL GEOTHERMAL RESOURCES, EMBRACING; INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

TOGETHER WITH ALL RIGHTS ASSOCIATED WITH OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS AS CONTAINED THEREIN, ALL AS RESERVED BY CHEVRON U.S.A., INC., IN DEED RECORDED DECEMBER 22, 2004 AS INSTRUMENT NO. 0204317445 OF OFFICIAL RECORDS.

**EXHIBIT 50**
**Page 530**

APN: 220-130-02

PARCEL 7:        [PARCEL 10:]

THE SURFACE AND 500 FEET OF THE SUBSURFACE VERTICALLY IN DEPTH BELOW THE SURFACE OF THE EAST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR THAT MAY BE PRODUCED FROM SAID PARCEL, 500 FEET IN DEPTH, TOGETHER WITH THE EXCLUSIVE RIGHT TO ENTER UPON SAID PREMISES FOR THE PURPOSE OF MINING FOR AND REMOVING THE SAME THEREFROM, AS EXCEPTED AND RESERVED IN THE DEED FROM STANDARD OIL COMPANY OF CALIFORNIA, A DELAWARE CORPORATION, TO CALIFORNIA LAND AND CATTLE COMPANY, A CORPORATION, RECORDED SEPTEMBER 18, 1963, IN BOOK 3644, PAGE 951  OF OFFICIAL RECORDS.

APN: 220-170-08 and 220-170-09 and 220-170-10

PARCEL 8:        [PARCEL 11:]

THE NORTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA, AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED IN A DECREE OF DECLARATION OF TAKING DATED DECEMBER 31, 1942, A CERTIFIED COPY OF WHICH WAS RECORDED JANUARY 13, 1943 IN BOOK 1090, PAGE 341 OF OFFICIAL RECORDS, AND AS EXCEPTED IN DEED FROM UNITED STATES OF AMERICA, DATED JANUARY 24, 1949 RECORDED MARCH 17, 1949 IN BOOK 1602, PAGE 105 OF OFFICIAL RECORDS.

ALSO EXCEPT REMAINING $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, TOGETHER WITH RIGHT OF ENTRY.

APN: 220-170-11

PARCEL 9:        [PARCEL 13:]

ALL OF THE SOUTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL MINERALS OF WHATSOEVER NATURE (INCLUDING BUT NOT LIMITED TO OIL, GAS, OTHER HYDROCARBONS AND ASSOCIATED SUBSTANCES) IN, UNDER OR WHICH MAY BE PRODUCED THEREFROM,

**EXHIBIT 50**
**Page 531**

TOGETHER WITH ALL RIGHTS AND PRIVILEGES OF INGRESS, EGRESS, USE AND OCCUPANCY OF, UPON AND WITHIN THE SURFACE AND SUBSURFACE THEREOF AS THE OWNER OF THE AFORESAID MINERALS MAY FROM TIME TO TIME DEEM NECESSARY OR CONVENIENT IN CONNECTION WITH THE EXPLORATION, DEVELOPMENT AND OPERATION OF SAID LANDS FOR THE AFORESAID MINERALS AND THE STORING, HANDLING, TREATING AND TRANSPORTATION THEREOF, ALL WITHOUT LIABILITY WHATSOEVER TO GRANTEE AND ALL AS CONVEYED BY GRANTORS TO SONICO, INC., A DELAWARE CORPORATION, BY MINERAL DEED DATED FEBRUARY 28, 1967, AND RECORDED IN BOOK 4030, PAGE 208 OF OFFICIAL RECORDS OF KERN COUNTY.

APN: 220-170-31 and 32

PARCEL 10:          [PARCEL 14:]

ALL OF SECTION 19, TOWNSHIP 32 SOUTH, RANGE 26 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS RESERVED IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

**EXHIBIT 50**
**Page 532**

ALSO EXCEPTING THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED DECEMBER 31, 2003 AS DOCUMENT NO. 0203281471, OFFICIAL RECORDS.

APN: 295-040-30 and 31

PARCEL 11:      [PARCEL 24:]


All of Section 13, Township 11 North, Range 23 West, San Bernardino Base and Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all right, title and interest in and to the mineral rights in the properties described herein (expressly excluding, however, the right to use the surface for open pit mining, quarrying and strip mining), and all right , title and interest in any other contract agreements or rights, tangible or intangible that are owned by the grantor, in whole or part, and that are related to the ownership and use of the mineral rights conveyed hereby, from the lands.

Specifically excepting and reserving therefrom all surface rights (except for the rights of surface access for the purpose of grantee and its assigns exploring for, developing, producing, transporting and selling minerals from the property and which are recognized by California law, rules, order and regulation), personal property for fixtures associated with affixed to or located upon the surface, well bores (if any), water or water rights or entitlements (except such water as may be associated and incidentally produced with the minerals from the property) or any existing oil, gas or mineral production (if any) from the property, as granted to California Minerals, L.P., a Texas limited partnership, in Deed recorded December 30, 1998 as Document No. 0198184684 of Official Records.

APN: 239-150-11

**EXHIBIT 50**
**Page 533**

Exhibit A
ORDER NO. 1421002595-DB

The land referred to in this Report is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

**TRACT I:**  [Gravity]

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

**EXHIBIT 50**
**Page 534**

**TRACT II:**  [Steinhauer]

PARCEL 1:

The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN:  521-160-06

PARCEL 2:

The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN:  521-160-07

PARCEL 3:

The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section 4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.

APN:  060-050-15

**EXHIBIT 50**
**Page 535**

# EXHIBIT 51

**EXHIBIT 51**
**Page 536**

Recorded at Request of
Old Republic Title Company   RPN

1421002562 | 1421002561-08



DOC NBR: 2301976      02/09/2023 09:15:38 AM
OFFICIAL RECORDS OF Kings County
Kristine Lee, Clerk-Recorder,
RECORDING FEE: $346.00
COUNTY TAX: $0.00
CITY TAX: $0.00

TITLE: 3
DOC TYPE: 08
22 PGS
R065

ERECORDING PARTNERS NETWORK

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

_____ [Space Above This Line For Recording Data] _____

# OPEN-END DEED OF TRUST
## (With Future Advance Clause)
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1115 &**
**Loan #AG1116**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 3, 2023**, together with all Riders to this document whether recorded or unrecorded.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**, an Iowa limited liability company.  Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, Iowa 50266.**  Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are **Copper Avenue Investments, LLC**, a California limited liability company, **Lincoln Grantor Farms, LLC**, a California limited liability company, **ACAP Farms, LLC**, a California limited liability company, **FFGT Farms, LLC**, a California limited liability, and **Willow Avenue Investments, LLC**, a California limited liability company. Borrowers are the trustors under this Security Instrument. Borrowers' address is **5260 N. Palm Avenue, Suite 421, Mail Stop M, Fresno, California 93704.**

**"Borrower Parties"** are Copper Avenue Investments, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, FFGT Farms, LLC, a California limited liability, and Willow Avenue Investments, LLC, a California limited liability company and Maricopa Orchards, LLC, Gradon Farms, LLC, 104 Investments, LLC, Locans Investments, LLC, Cantua Orchards, LLC, C & A Farms, LLC, , Grantor Real Estate Investments, LLC. Borrower Parties' address is **5260 N. Palm Avenue, Suite 421, Mail Stop M, Fresno, California 93704**

**(D) "Trustee"** is **Old Republic Title Company**. Trustee's address is **7451 N. Remington Avenue, Suite 102, Fresno,**

**CALIFORNIA-- UNIFORM INSTRUMENT**

1

**EXHIBIT 51**
**Page 537**

**California 93711.**Trustee is the trustee under this Security Instrument.

**(E) "Notes"** means (i) Borrower Parties' single disbursement promissory note dated February 3 2023, in the principal amount of $11,300,000.00, plus interest (**"Note A"**), and (ii) Borrower Parties' multiple disbursement revolving line of credit promissory note dated February 3, 2023, in a principal amount not to exceed $11,300,000.00, plus interest (**"Note B"**). Borrower Parties have promised to pay the debt evidenced by Note A according to the terms of Note A and to pay the debt in full not later than **February 3, 2028**. Borrower Parties have promised to pay the debt evidenced by Note B according to the terms of the Note B and to pay the debt in full not later than **February 3, 2028**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loans"** means the debt evidenced by the Notes, plus, in each case, interest, any prepayment charges, expenses, and late charges due under the Notes, and all sums due under this Security Instrument.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed Borrowers or Borrower Parties, whether recorded or whether unrecorded. The following Riders are to be executed by Borrowers or Borrower Parties:

☐ Irrigation Equipment Rider ☐ Water Rights Rider

☐ Financial Information and Covenants Rider ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider ☐ Adjustable Rate Rider

☐ Other(s): **Cross Default Rider**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Notes.

**(M) "Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

CALIFORNIA-- UNIFORM INSTRUMENT

2

**EXHIBIT 51**
**Page 538**

**Open-End Deed of Trust: Note B.** As it relates to Note B, this Security Instrument is given to secure the payment of the initial disbursement, with interest thereon, with additional disbursements as hereinafter specified. Upon request of Borrower Parties, Lender may hereafter at any time after the Security Instrument is recorded and before the release and cancellation of this Security Instrument, make further disbursements to Borrower Parties pursuant to the terms and provisions of Note B to the extent that the total unpaid indebtedness under Note B, exclusive of interest thereon, does not exceed the principal amount of $11,300,000.00. As it relates to Note B, nothing herein stipulated shall limit the amounts that shall be secured hereby when advanced to protect the Property or in accordance with covenants contained in this Security Instrument. As it relates to Note B, Borrower covenants with Lender to repay all such advances aforesaid, with interest, and to apply all other covenants and conditions of this Security Instrument to such future advances. For the avoidance of doubt, none of the provisions contained in this paragraph shall apply to Note A.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes.  For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kings, State of California:**

      **See Exhibit "A" attached hereto and made a part hereof.**

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

      **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

      **TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

      **TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the  real property in **Kings County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

      **TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrowers do hereby covenant and agree that Borrowers will not give such

CALIFORNIA-- UNIFORM INSTRUMENT

3

**EXHIBIT 51**
**Page 539**

consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

TOGETHER WITH all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

TOGETHER WITH all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

TOGETHER WITH all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

TOGETHER WITH any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:
**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.**
Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be

CALIFORNIA-- UNIFORM INSTRUMENT

4

**EXHIBIT 51
Page 540**

applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Charges; Liens.**  Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

4.  **Property Insurance.**  Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the terms of the Loans.  The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably.  Lender may require Borrowers to pay, in connection with the Loans, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans.  Lender may obtain insurance coverage, at Lender's option and Borrowers' expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained.  Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument.  These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to

EXHIBIT 51
Page 541

disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrowers shall be in default if, during the Loan application process, Borrowers or

CALIFORNIA– UNIFORM INSTRUMENT

**EXHIBIT 51**
**Page 542**

Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous

CALIFORNIA-- UNIFORM INSTRUMENT

7

EXHIBIT 51
Page 543

Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument,

CALIFORNIA-- UNIFORM INSTRUMENT

**EXHIBIT 51**
**Page 544**

including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' address set forth in Section (C) of the Definitions above, unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this

CALIFORNIA-- UNIFORM INSTRUMENT

9

**EXHIBIT 51
Page 545**

period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Notes; Change of Loan Servicer; Notice of Grievance.** Either or both Notes or a partial interest in either or both Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:

**CALIFORNIA-- UNIFORM INSTRUMENT**

10

**EXHIBIT 51**
**Page 546**

gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of

CALIFORNIA-- UNIFORM INSTRUMENT

EXHIBIT 51
Page 547

the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

CALIFORNIA-- UNIFORM INSTRUMENT

12

**EXHIBIT 51**
**Page 548**

NON-UNIFORM COVENANTS. Borrowers further covenant and agree as follows:

**25. Acceleration; Remedies.** Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by

CALIFORNIA-- UNIFORM INSTRUMENT

13

EXHIBIT 51
Page 549

Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.
## 29. Other California State Specific Provisions.

(a)     In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

(d)     Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

---

**CALIFORNIA-- UNIFORM INSTRUMENT**

**EXHIBIT 51**
**Page 550**

**2301976  Page 15 of 22**

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

FFGT FARMS, LLC, a California limited liability company and
WILLOW AVENUE INVESTMENTS, LLC, a California limited liability*
** LINCOLN GRANTOR FARMS, LLC,                 *company and**
a California limited liability company

Their /
By: Neema Assemi
Its: Manager

ACAP FARMS, LLC
a California limited liability company

By: Farshid Assemi
Its: Manager

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same.

CALIFORNIA-- UNIFORM INSTRUMENT

15

EXHIBIT 51
Page 551

**2301976  Page 16 of 22**

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same.

By: Farshid Assemi
Its: Manager
FFGT FARMS, LLC, a California limited liability company and
WILLOW AVENUE INVESTMENTS, LLC, a California limited liability*
** LINCOLN GRANTOR FARMS, LLC,   *company and**
a California limited liability company

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same

Their / By: Neema Assemi
Its: Manager

**ACAP FARMS, LLC**
a California limited liability company

By: Farshid Assemi
Its: Manager

CALIFORNIA– UNIFORM INSTRUMENT

15

EXHIBIT 51
Page 552

**2301976  Page 17 of 22**

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF _FRESNO_

On _Jan. 25, 2023_ before me, _L. Diaz, Notary Public_, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _L. Diaz_ (Seal)

Notary Public
Printed Name:_ L. Diaz_
My commission expires: _April 20, 2026_

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF _FRESNO_

On _Jan 25, 2023_ before me, _L. Diaz, Notary Public_, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _L. Diaz_ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2026_

CALIFORNIA– UNIFORM INSTRUMENT

16

**EXHIBIT 51**
**Page 553**

**2301976  Page 18 of 22**

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate
> is attached, and not the truthfulness, accuracy, or
> validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___Fresno___

On ___Feb. 1, 2023___ before me, ___L. Diaz, Notary Public___, personally appeared
**Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: ___L. Diaz___
My commission expires: ___April 20, 2026___

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20. 2026

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate
> is attached, and not the truthfulness, accuracy, or
> validity of that document.

STATE OF CALIFORNIA
COUNTY OF _____

On _____ before me, _____, personally appeared
**Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _____
My commission expires: _____

CALIFORNIA– UNIFORM INSTRUMENT

16

**EXHIBIT 51
Page 554**

2301976  Page 19 of 22

Exhibit A

1421002561 – Kings

The land referred to is situated in the unincorporated area of the County of Kings, State of
California, and is described as follows:

**The land referred to below is situated in an unincorporated area of the County of
Kings, State of California:**

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11,
12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in
the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof
recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record
of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue
(abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of
the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old
Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal
Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51
at Page 78 of Deeds, Kings County Records.

APN:  004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section
15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De
Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3
at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on
that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN:  004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well
reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15,
Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of
San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats,
Kings County Records.

**EXHIBIT 51**
**Page 555**

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN:  004-140-012 (Portion)

PARCEL 3A:

One acre in the Northwest corner North and West of Kings River Bypass Canal, in Lot 7 in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as shown on Map of Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map Book Page 70.

APN: 004-140-005

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN:  004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

EXHIBIT 51
Page 556

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN:  004-230-026 (Portion)
      004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN:  004-230-013

**EXHIBIT 51**
**Page 557**

**2301976  Page 22 of 22**

Exhibit A

1421002562 – Kings

**Tract I:**

The land referred to in below is situated in the City of Lemoore of the County of Kings, State of California, and is described as follows:

The Northwest quarter of Section 35, Township 18 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Government Township Plat approved October 28, 1869.

EXCEPTING THEREFROM that portion conveyed to the City of Lemoore, a municipal corporation, as described in Grant Deed recorded January 09, 1998 as Instrument No. 98-420 of Official Records.

APN: 021-030-057

**Tract IV:**

PARCEL 11:

All that portion of Section 18, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded May 18, 1936 in Book 151 at Page 8 of Official Records, and Westerly of the California Aqueduct. Said property is situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Being described as Parcel 1, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-042-000

PARCEL 12:

All that portion of the Northwest one-quarter of Section 19, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded August 18, 1936 in Book 154, Page 153 as Document No. 4437 of Official Records. Situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinafter described property, as granted to Bravo Oil Company, a corporation, by Indenture recorded December 29, 1965 in Book 883, at Page 116 as Instrument No. 16704 of Official Records.

Being described as Parcel 3, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-037-000 and 036-170-039-000

**EXHIBIT 51**
**Page 558**

# EXHIBIT 52

EXHIBIT 52
Page 559

## ALLONGE TO PROMISSORY NOTE

For purposes of endorsement of the promissory note dated February 3, 2023, executed by **Maricopa Orchards, LLC**, a California limited liability company, **Copper Avenue Investments, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **ACAP Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, **104 Investments, LLC**, a California limited liability company, **Lincoln Grantor Farms, LLC**, a California limited liability company, **Grantor Real Estate Investments, LLC**, a California limited liability company, **Gradon Farms, LLC**, a California limited liability company, **FFGT Farms, LLC**, a California limited liability company, **Cantua Orchards, LLC**, a California limited liability company, and **Locans Investments, LLC**, a California limited liability company in favor of Conterra Agricultural Capital, LLC, an Iowa limited liability company, in the original principal amount of $11,300,000.00 plus interest (the "**Note**"), this Allonge to Promissory Note is affixed and becomes a permanent part of the Note.

**PAY TO THE ORDER OF**
**American Equity Investment Life Insurance Company**
**WITHOUT RECOURSE**

Dated: February 3, 2023

<div style="margin-left:40%">

**CONTERRA AGRICULTURAL CAPITAL, LLC,**
**an Iowa limited liability company**

By: _____
    Mark A. Smith
Its:  COO & General Counsel

</div>

**EXHIBIT 52**
**Page 560**

# EXHIBIT 53

EXHIBIT 53
Page 561

**ALLONGE TO PROMISSORY NOTE**

For purposes of endorsement of the promissory note dated February 3, 2023, executed by **Maricopa Orchards, LLC**, a California limited liability company, **Copper Avenue Investments, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **ACAP Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, **104 Investments, LLC**, a California limited liability company, **Lincoln Grantor Farms, LLC**, a California limited liability company, **Grantor Real Estate Investments, LLC**, a California limited liability company, **Gradon Farms, LLC**, a California limited liability company, **FFGT Farms, LLC**, a California limited liability company, **Cantua Orchards, LLC**, a California limited liability company, and **Locans Investments, LLC**, a California limited liability company in favor of Conterra Agricultural Capital, LLC, an Iowa limited liability company, in the original principal amount of $11,300,000.00 plus interest (the "**Note**"), this Allonge to Promissory Note is affixed and becomes a permanent part of the Note.

**PAY TO THE ORDER OF**
**American Equity Investment Life Insurance Company**
**WITHOUT RECOURSE**

Dated: February 3, 2023

                                    **CONTERRA AGRICULTURAL CAPITAL, LLC,**
                                    **an Iowa limited liability company**

By: _____
                    Mark A. Smith
Its:  COO & General Counsel

**EXHIBIT 53**
**Page 562**

# EXHIBIT 54

**EXHIBIT 54**
**Page 563**

Fresno County Recorder
Paul Dictos, CPA

**2023-0023044**

Recorded at the request of:
CSC, LOGAN

03/14/2023 11:52 58
Titles: 1     Pages: 38
Fees: $130.00
CA SB2 Fees:$75.00
Taxes:  $0.00
Total:  $205.00

This instrument prepared by:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

# ASSIGNMENT OF DEED OF TRUST

**Loan # AG1115 &**
**Loan # AG1116**

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA  50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company**, whose address is **6000 Westown Parkway, West Des Moines, IA 50266**, all beneficial interest under a certain Deed of Trust dated **February 3, 2023**, made and executed by **Lincoln Grantor Farms, a California limited liability company, Gradon Farms, LLC, a California limited liability company, FFGT Farms, LLC, a California limited liability company, 104 Investments, LLC, a California limited liability company, Locans Investments, LLC, a California limited liability company, Cantua Orchards, LLC a California limited liability company, C & A Farms, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California limited liability company**, to **Old Republic Title Company**, Trustee, upon the following described property situated in **Fresno County**, State of **California:**

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of two promissory notes in the principal amount of $11,300,000.00 and $11,300,000.00, respectively, which Deed of Trust is of record in the official records of **Fresno County, State of California**, as Document Number: 2023-0011566 together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

Dated effective this 3rd day of February, 2023.

---

**Multistate Deed of Trust Assignment**

1

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT 54**
**Page 564**

**Conterra Agricultural Capital, LLC**

_____     2/28/2023
Signature                                                    Date

**Mark A. Smith, COO & General Counsel**

_____
Witness      Madyson Riebhoff

STATE OF IOWA
COUNTY OF _____POLK_____

Before me, the undersigned authority, on this day personally appeared
_____Mark A. Smith, COO & General counsel of Conterra_____
_____Agricultural Capital, LLC_____
, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this _28th_ day of _February_, 20 _23_

_____
Notary, State of Iowa

Printed Name: Taylor Petersen
My Commission Expires: 11/9/2024

> **TAYLOR PETERSEN**
> Commission Number 813700
> My Commission Expires
> 11-9-2024

---

Multistate Deed of Trust Assignment – AG1115 Fresno

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT 54**
**Page 565**

Exhibit A

1421002561 – Fresno

**The land referred to below is situated in an unincorporated area of the County of Fresno, State of California:**

PARCEL 9:

The North half of the Northeast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78  of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69  of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN:  040-020-18-S

**EXHIBIT 54**
**Page 566**

**The land referred to below is situated in the City of Fresno, County of Fresno, State of California:**

PARCEL 11:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

**EXHIBIT 54**
**Page 567**

APN:   464-20-07

PARCEL 12:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-08

PARCEL 13:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN:   464-020-09

PARCEL 14:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-12

PARCEL 15:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-13

PARCEL 16:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-15

PARCEL 17:

EXHIBIT 54
Page 568

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-16

PARCEL 18:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-19

PARCEL 19:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN: 464-020-25

PARCEL 20:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-26

PARCEL 20-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL 21:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN: 464-020-28

PARCEL 22:

EXHIBIT 54
Page 569

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-29

PARCEL 23:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-30

PARCEL 24:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-31

PARCEL 25:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-34

PARCEL 26:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-35

PARCEL 27:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

EXHIBIT 54
Page 570

APN:  464-020-36

PARCEL 28:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN:  464-020-37

PARCEL 29:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN:  464-060-17

PARCEL 30:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN:  477-021-09

PARCEL 31:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL 31-A:

EXHIBIT 54
Page 571

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest ¼ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South ½ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN:   477-021-11

PARCEL 32:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-18

PARCEL 32-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL 32-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21' 45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL 33:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

EXHIBIT 54
Page 572

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN:   477-021-19

PARCEL 34:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-20

PARCEL 35:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North

EXHIBIT 54
Page 573

half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN:   477-021-25

PARCEL 36:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and 464-070-11

PARCEL 37:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

EXHIBIT 54
Page 574

Exhibit A
1421002562 Fresno

**The land referred to in below is situated in the County of Fresno, State of California, and is described as follows:**

Tract II:  [Gragnani Ranch]

TRACT A:

The Northeast quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in an unincorporated area of the County of Fresno, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided 50% interest in and to all oil, minerals and other hydrocarbon substances therein and thereunder, as reserved by A. J. Yates and Joyce E. Yates, husband and wife in Deed recorded May 3, 1985, Document No. 85043693, Official Records.

Also excepting therefrom an undivided 50% interest in and to all oil, gas and other hydrocarbons and minerals on, in or under said land, as reserved by Anderson, Clayton and Co., its successors and assigns, in Deed recorded September 28, 1971 in Book 5941 Page 200 of Official Records.

APN: 040-060-24-S

TRACT B

PARCEL ONE:

The West half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to James L. Marshall, a married man as his separate property, dated May 30, 1974, recorded in June 25, 1974, as Document No. 47797.

APN:  040-020-24-S

**EXHIBIT 54**
**Page 575**

PARCEL TWO:

The East half and the East half of the West half of the Northeast quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife as joint tenants, dated January 10, 1950, recorded January 24, 1950, in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder together with all easements and rights necessary or convenient for the production, storage, and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Patricia Johnson Schreiner to John Alan Silveira, a single man, dated May 30, 1974, recorded June 25, 1974, as Document No. 47797.

APN: 040-020-25-S

TRACT C:

Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian,

EXCEPTING THEREFROM the West 1811.4 feet;

ALSO EXCEPTING the East 1731.7 feet;

ALSO EXCEPTING that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721, Pages 929, 931 & 933, Official Records of Fresno County;

ALSO EXCEPTING THEREFROM that portion deeded to Westlands Water District recorded in Book 5681, Page 67, Official Records of Fresno County.

FURTHER EXCEPTING THEREFROM, all right, title and interest in and to oil, minerals and hydrocarbon substances within and underlying said property by Grant Deed recorded June 3, 1960 in Book 4396, Page 525 and by Grant Deed recorded June 3, 1960 in Book 4396, Page 527, both of Official Records.

Being the land pursuant to a Certificate of Compliance, recorded February 11, 1999 as Document 1999-0021855 of Official Records.

APN: 027-171-81-S

EXHIBIT 54
Page 576

**TRACT III:** [Samarin]

**PARCEL ONE:**

All of Section 32, the Southwest Quarter of the Northwest Quarter of Section 33 and all of the North half of the North half of said Section 33 lying West of the centerline of the county road running in a Northwesterly and Southeasterly direction through Sections 28, 29 and 33 being more particularly described in that certain Grant of Right of Way from Miller and Lux Incorporated to the County of Fresno recorded April 4, 1932, in Book 1210, Page 151 of Official Records, all in Township 14 South, Range 15 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on January 31, 1855.

Excepting therefrom that portion of land described as F-35 of Schedule "A" taken by the United States of America by that certain Declaration of Taking recorded March 13, 1968, in Book 5546, Page 453 of Official Records.

Also excepting therefrom all oil, gas and other hydrocarbon substances in or under the lands hereby conveyed, together with the right to enter upon the said lands for the purpose of exploring and drilling for, developing, producing and exploiting the same, and to erect, maintain, operate and remove all such derricks, machinery building, well coverings and other equipment as may be appropriate for such purposes, and the right to erect, maintain, operate, and remove power lines for the conduct of electricity, telephone and telegraph lines and to lay, maintain, operate and remove pipe lines for oil, gas and water, and to construct, maintain,

operate and remove tanks and other facilities for the storage of oil, gas and water, as reserved in the Deed from Frederick W. McNear, also known as Fred W. McNear, and also known as F. W. McNear, to L.R. Van Burgh, dated July 22, 1946, recorded September 17, 1946, in Book 2455, Page 46 of Official Records, as Document No. 65654.

APN: 019-180-09 and 019-180-27

**PARCEL TWO:**

That portion of Section 28 lying West of the centerline of the county road running in a Northwesterly and Southeasterly direction through Sections 28, 29 and 33 being more particularly described in that certain Grant of Right of Way from Miller and Lux Incorporated to the County of Fresno recorded April 4, 1932 in Book 1210, Page 151 of Official Records, all of Section 29, except that portion thereof lying East of the centerline of said county road, all in Township 14 South, Range 15 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on January 31, 1855.

Excepting therefrom that portion of land described as F-35 of Schedule "A" taken by the United States of America by that certain Declaration of Taking recorded March 13, 1968 in Book 5546, Page 453 of Official Records.

**EXHIBIT 54**
**Page 577**

Also excepting therefrom all oil, gas and other hydrocarbon substances in or under the lands hereby conveyed, together with the right to enter upon the said lands for the purpose of exploring and drilling for, developing, producing and exploiting the same, and to erect, maintain, operate and remove all such derricks, machinery building, well coverings and other equipment as may be appropriate for such purposes, and the right to erect, maintain, operate, and remove power lines for the conduct of electricity, telephone and telegraph lines and to lay, maintain, operate and remove pipe lines for oil, gas and water, and to construct, maintain, operate and remove tanks and other facilities for the storage of oil, gas and water, as reserved in the Deed from Frederick W. McNear, also known as Fred W. McNear, and also known as F. W. McNear, to L.R. Van Burgh, dated July 22, 1946, recorded September 17, 1946, in Book 2455, Page 46 of Official Records, as Document No. 65654.

APN: 019-180-23 and 019-180-25

**TRACT IV:**

**PARCEL 1:**

The South half of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting therefrom that portion of the North half of the Southeast Quarter lying west of Avenal Cutoff Road and West of the San Luis Canal and that portion of the Southwest Quarter of the Northeast Quarter lying West of the canal, all in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

**PARCEL 2:**

That portion of the North half of the Southeast Quarter lying West of Avenal Cutoff Road and West of the San Luis Canal in Section 18, Township 21 South, Range 18 South, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

**EXHIBIT 54**
**Page 578**

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 feet; thence leaving said South boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 feet to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89° 23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" ast 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances; South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Also excepting therefrom an undivided 16.665% interest in and to the oil, gas, hydrocarbons and other minerals, as granted to Albert L. Britz and Helen Britz, husband and wife, as joint tenants, in that certain Mineral Deed dated November 29, 1974, recorded December 26, 1974, in Book 6381, Page 573, Document No. 95778.

APN: 078-090-26S (portion)

PARCEL 3:

The South 54 acres of the Northeast Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom any portion lying within Kings County.

Also excepting the following described property:

EXHIBIT 54
Page 579

Beginning at the Southeast corner of said Section 18, thence along the South boundary of said Section 18, North 89° 22' 41" West, 494.84 fet1; thence leaving said South Boundary North 0° 38' 22" East 1356.52 feet; thence North 12° 26' 44" West 314.19 feet; thence North 42° 58' 46" West 248.69 feet; thence South 47° 41' 53" West 1760.35 feet to a point in the Southeasterly boundary of that certain 80 foot wide strip of land now existing and being used for public road right of way; thence North 43° 26' 29" West 80.00 fet1 to a point in the Northwesterly boundary of said 80 foot wide strip of land; thence North 45° 15' 24" East 1760.68 feet; thence North 43° 17' 09" West 100.00 feet to a point hereinafter referred to as point "A"; thence continuing North 43° 17' 09" West 854.87 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 1504.50 feet from the East Quarter corner of said Section 18; thence along said South boundary, South 89° 23' 17" East 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 1235.95 feet to a point in the North boundary of that certain tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records; thence along said North boundary South 89° 23' 29" East 1653.04 feet to a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter corner of said Section 18; thence along said East boundary line the following courses and distances: South 0° 34' 07" West 819.44 feet to a point in the Northwesterly boundary of aforesaid 80 foot wide strip of land now existing and being used for public road right of way; thence continuing South 0° 34' 07" West 71.26 feet to the East Quarter corner of said Section 18; thence South 0° 34' 19" West 39.97 feet to a point in the Southeasterly boundary of said 80 foot wide strip of land; thence continuing South 0° 34' 19" West 2602.43 feet to the point of beginning.

Also except that portion described as follows:

Beginning at a point in the North boundary of the tract of land described in Deed to John A. Kochergen, et al, dated September 2, 1952 and recorded October 23, 1952, in Book 3224, Page 90 of Official Records, distant there along North 89° 23' 29" West 2277.72 feet from a point in the East boundary of said Section 18, distant there along North 0° 34' 07" East 890.70 feet from the East Quarter of said Section 18; thence along said North boundary South 89° 23' 29" East 624.68 feet; thence leaving said North boundary South 43° 17' 09" East 1235.95 feet to a point in the South boundary of the Northeast Quarter of said Section 18, distant there along North 89° 23' 17" West 796.75 feet from the East Quarter corner of said Section 18; thence along said South boundary North 89° 23' 17" West 707.75 feet; thence leaving said South boundary North 43° 17' 09" West 834.71 feet; thence North 33° 24' 22" West 348.78 feet to the point of beginning.

Also excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as excepted in the Deed from Barbara J. Meadows, et al, to John A. Kochergen, et al, dated September 2, 1952, recorded October 23, 1952, in Book 3224, Page 90 of Official Records, Document No. 55044.

APN: 078-090-26S (portion)

EXHIBIT 54
Page 580

PARCEL 4:

A parcel of land in Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, being a portion of that certain Parcel Two as described in the Deed from Vernon L. Thomas, Inc., a corporation to the United States of America, which was filed for record on September 14, 1965, in Book 5216, Page 283, Official Records of Fresno County, State of California, described as follows:

Beginning at a point in the South boundary of said Parcel Two (5216 OR 283) distant there along South 89° 23' 29" East 351.68 feet from the terminus of a course described as North 89° 23' 29" West 888.99 feet in said Parcel Two (5216 OR 283); thence from said point of beginning North 89° 23' 29" West 351.68 feet to a point in the West boundary of the Northeast Quarter of said Section 18; thence leaving said South boundary along said West boundary North 0° 33' 37" East 1560.00 feet; thence leaving said West boundary South 65° 49' 29" East, 76.36 feet; thence South 0° 08' 29" East 500.00 feet; thence South 7° 21' 29" East 469.85 feet; South 17° 13' 29" East 232.00 feet; thence South 21° 37' 22" East 370.92 feet to the point of beginning.

Excepting therefrom an undivided One-half interest in and to all oil, gas and other hydrocarbons and minerals in and under said land, as excepted by the Deed from B.E. Loomer, et al, to Alfred R. Brown, et ux, dated September 10, 1941, recorded October 6, 1941 as Document No. 33177, Official Records.

Also excepting therefrom an undivided one-half interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling and mining operation thereon, as reserved in the Deed from A.R. Brown and Blanche G. Brown, husband and wife, to Carthyl Thomas and Gurtha Thomas, as tenants in common, dated January 7, 1948, recorded February 25, 1948, as Document No. 9403, Official Records.

Also excepting therefrom all of grantors interest in and to all oil gas or minerals in and under said land, without however the right to dig, drill or mine therefor through the surface of said land or within 100 feet of the surface, as reserved in the Deed from Vernon L. Thomas, Inc., a corporation, to the United States of America, recorded September 14, 1965, in Book 5216, Page 283 of Official Records, Document No. 73423.

APN: 078-090-27S

PARCEL 5:

EXHIBIT 54
Page 581

The Southeast Quarter of the Northwest Quarter, and the North half of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof conveyed to Westlands Water District by Deed recorded December 7, 1973 in Book 6247, Page 483 of Official Records, Document No. 106071, being more particularly described as follows:

A parcel of land in the Northeast Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, described as follows:

Beginning at the North quarter corner of said Section 18; thence (1) along the East line of the Northwest Quarter of said Section 18, South 0° 33' 31" West, 180.00 feet; thence (2) North 89° 26' 29" West, 50.00 feet; thence (3) North 0° 33' 31" East, 105.00 feet; thence (4) North 75° 00' 35" West, 201.37 feet; thence (5) North 0° 36' 09" East, 25.00 feet to a point in the North line of said Section 18; thence (6) along said North line, South 89° 23' 51" East, 245.30 feet to the point of beginning.

ALSO EXCEPTING THEREFROM all oil, gas and minerals as heretofore reserved of record.

APN: 078-090-22S

PARCEL 6:

That portion of Fractional Section 7, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying Westerly of the Westerly boundary line of that certain tract or parcel of land described as Parcel 2 (Unit 178) as conveyed unto the United States of America in Deed recorded May 17, 1966 in Book 5314, Page 66 of Official Records, Document No. 37725.

Excepting therefrom that portion conveyed to Westlands Water District in Deed recorded February 18, 1977 in Book 6743, Page 213 of Official Records, Document No. 16643, described as follows:

Beginning at the South Quarter corner of said Section 7; thence (1) along the South line of the Southeast Quarter of said Section 7, South 89° 23' 49" East, 96.50 feet to the Southwest corner of the 59.13 acre parcel of land described as Parcel Two (Unit 178) in the Deed to the United States of America recorded May 17, 1966 in Book 5314, Page 66 as Document No. 37725, Fresno County Official Records; thence (2) along the West boundary of said 59.13 acre parcel of land, North 0° 52' 58" East, 120.00 feet; thence (3) South 52° 33' 14" West, 129.80 feet; thence (4) south 83° 00' 14" west, 242.00 feet; thence (5) South 0° 36' 09" West, 8.00 feet to a point on the South line of the Southwest Quarter of said Section 7; thence (6) along last said South line, South 89° 23' 51" East, 245.00 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as

EXHIBIT 54
Page 582

granted to Bravo Oil Company in Deed recorded December 29, 1965 in Book 5257, Page 25, Document No. 104217, Official Records.

This legal description is made pursuant to that certain Certificate of Waiver of Parcel Map No. 17-13, recorded October 23, 2018, as Instrument No. 2018-0128928 of Official Records.

APN: 078-080-57S

PARCEL 6A:

A non-exclusive easement for ingress and egress and incidental purposes over, across and through the Westerly 20 feet of the following described property:

The fractional Northeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; and

The Southeast Quarter of Section 6, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; except that portion lying Easterly of the West boundary of land granted to the United States of America by Deed recorded November 1, 1965 in Book 5235, Page 243, Official Records, Document No. 88214; also excepting all oil, gas, minerals and other hydrocarbon substances an heretofore reserved of record.

PARCEL 7:

The Southwest Quarter of the Northwest Quarter of Section 18, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Plat thereof.

Except all oil, gas and other minerals in, or under said premises.

APN: 078-090-02S

PARCEL 8:

Intentionally Deleted

PARCEL 9:

Intentionally Deleted

**The following parcel is located in the County of Fresno, State of California and Assessed with Kings County:**

PARCEL 10:

All that portion of the Northwest Quarter of Section 19, Township 21 South, Range 18 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying within the bounds of Fresno County, California.

Except all oil, gas and other minerals in, or under said premises.

Assessed under Kings County APN 036-170-038-000

**EXHIBIT 54**
**Page 583**

The land referred to in below is situated in the County of Fresno, State of California, and is described as follows:

TRACT V:  [Le Moore]

PARCEL 1:

That portion of the North Half of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, lying Northerly of the right of way of the Southern Pacific Railroad, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-81

PARCEL 2:

That portion of the West half of the Northwest quarter AND the West 30.00 feet of the East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, lying Southerly of the right of way of the Southern Pacific Railroad, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517  and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company, for its railroad right of way, station ground, yards and incidental purposes in Deed recorded March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

EXHIBIT 54
Page 584

APN: 068-130-82

PARCEL 3:

The East half of the Northwest quarter of Section 25, Township 19 South, Range 18 East,
Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of
California, according to the Official Plat thereof. Lying Southerly of the right of way of the
Southern Pacific Railroad.

Excepting therefrom the West 30.00 feet thereof, pursuant to Certificate of Waiver of Parcel
Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant
Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company,
for its railroad right of way, station ground, yards and incidental purposes in Deed recorded
March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and
under or which may be produced or saved in, on or under said land as reserved by the Boston
Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records,
as to the Northwest quarter and the Southeast quarter.

APN: 068-130-83

PARCEL 4:

The West half of the Northeast quarter of Section 25, Township 19 South, Range 18 East,
Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of
California, according to the Official Plat thereof, lying Southerly of the right of way of the
Southern Pacific Railroad, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded
September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August
12, 2021 as Instrument Number 2021-0130939

Excepting therefrom that portion of the Northeast quarter as described in the Declaration of
Taking No. 1, in favor of the United States of America, recorded January 28, 1958 as
Instrument No. 6428, in Book 4021, Page 1 of Official Records.

Also excepting therefrom that portion thereof reserved by Southern Pacific Railroad Company,
for its railroad right of way, station ground, yards and incidental purposes in Deed recorded
March 22, 1912 in Book 492, Page 413 of Deeds, Fresno County records.

Also excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and
under or which may be produced or saved in, on or under said land as reserved by the Boston
Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records,
as to the Northwest quarter and the Southeast quarter.

APN: 068-130-84

PARCEL 5:

The East half of the Southwest quarter of Section 25, Township 19 South, Range 18 East,
Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of

EXHIBIT 54
Page 585

California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-88

PARCEL 6:

The Northwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-89

PARCEL 7:

The Southwest quarter of the Southwest quarter of Section 25, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130939

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-90

PARCEL 8:

The Northwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

EXHIBIT 54
Page 586

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-74

PARCEL 9:

The Southwest quarter of the Northwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-75

PARCEL 10:

The East half of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

APN: 068-130-79

PARCEL 11:

The Northwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, pursuant to Certificate of Waiver of Parcel Map No. 20-05 Recorded September 1, 2020 as Instrument Number 2020-0115517 and Grant Deed Recorded August 12, 2021 as Instrument Number 2021-0130938

Excepting therefrom all the oil, gas and other hydrocarbon substances and minerals in and under or which may be produced or saved in, on or under said land as reserved by the Boston Land Company in the Deed recorded April 4, 1955 in Book 3584, Page 226 of Official Records, as to the Northwest quarter and the Southeast quarter.

EXHIBIT 54
Page 587

APN: 068-130-80

Parcel 12:

The Southwest quarter of the Southwest quarter of Section 36, Township 19 South, Range 18 Ease, Mount Diablo Base and Meridian, in the unincorporated area, County of Fresno, State of California, according to th Official Plat thereof.

APN: 068-130-63

**TRACT VI:  [Diener Five Points]**

**PARCEL 1:**

The Northeast Quarter of Section 16, Township 18 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Together with the Easterly 660.03 feet of the Northwest Quarter of said Section 16.

Excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Section 16, said Northeast corner being at Coordinates Y=380, 340.97 feet and X=1,606, 371.10 feet; thence (1) along the East line of said Section 16, South 1° 26' 28" West, a distance of 13.28 feet to the Northeasterly boundary of the existing State Highway, Road 06-FRE-33; thence (2)along said Northeasterly boundary North 43° 44' 00" West, a distance of 18.60 feet to the North line of said Section 16; thence (3), along said North line South 89° 16' 39" East, a distance of 13.19 feet to the point of beginning.

Excepting therefrom 75% of all oil, gas, minerals and other hydrocarbons in, on or underlying said real property, with the right of ingress and egress to and from said real property for the purpose of exploring for, producing, removing and storing all oil, gas, hydrocarbons and other minerals and such other rights as may be necessary or convenient in the full and free exercise of the rights herein expressly reserved, as reserved in the Deed from Lyle J. Christie, an unmarried man, to Five Points Ranch, Inc., a corporation, dated July 8, 1965, recorded August 20, 1965, in Book 5207, Page 332 of Official Records, Document No. 67349.

APN: 058-080-23S and 058-080-30S

**PARCEL 2:**

The Southeast Quarter of Section 32, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Plats.

Excepting therefrom all oil, gas and other hydrocarbon substances, as reserved in various Deeds of record.

APN: 050-100-09S

**EXHIBIT 54**
**Page 588**

PARCEL 3:

The East-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and
Meridian, according to the Official Plat thereof.

Excepting therefrom that portion as conveyed to The United States of America in that certain
Grant Deed Recorded August 24, 1965 in Book 5208, Page 554 of Fresno County Official
Records, described as follows:

Beginning at a point in the North boundary of said Section 7, distant therealong North 89° 40'
West 1940.5 feet from the Northeast corner of said Section 7; thence along said North
boundary South 89° 40' East 697.0 feet; thence leaving said North boundary South 27° 32' East
2491.6 feet; thence South 89° 22' East 67.9 feet to a point in the East boundary of said Section
7; thence along said East boundary the following courses and distances:

South 0° 28' West 442.1 feet to the East Quarter corner of said Section 7; thence continuing
South 0° 38' West 744.5 feet; thence leaving said East boundary and running North 27° 32'
West 3173.2 feet; thence North 33° 40' West 374.4 feet; thence North 39° 48' West 358.2 feet
to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now
known to exist or hereafter discovered upon, within or underlying the hereinabove described
property or that may be produced therefrom, including, without the generality of the foregoing,
all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in
solution, and sand, gravel and aggregates and products derived therefrom, as granted to Bravo
Oil Company in Deeds recorded December 29, 1965, as Document Nos. 104217 and 104218,
Official Records.

APN: 060-020-38S and 060-020-39S

TRACT VII: [Floral North]

PARCEL 1:

The Southwest Quarter of the Southwest Quarter of Section 35, Township 15 South, Range 13
East, Mount Diablo Base and Meridian, in an unincorporated area, County of Fresno, State of
California, according to the Official Plat thereof, and as per Certificate of Waiver Parcel Map No.
00-16 recorded August 6, 2001 as Document No. 2001-0110902 of Official Records.

Excepting therefrom a Life Estate in and to the interest in all mineral rights in, on or under said
land, as reserved by Wallace E Barron and Daisy E. Barron, husband and wife, in Deed recorded
September 30, 1952 in Book 3215, Page 550 of Official Records.

APN: 027-180-93

PARCEL 2:

The Northwest Quarter of the Southwest Quarter of Section 35, Township 15 South, Range 13
East, Mount Diablo Base and Meridian, in an unincorporated area, County of Fresno, State of

EXHIBIT 54
Page 589

California, according to the Official Plat thereof, and as per Certificate of Waiver Parcel Map No. 00-16 recorded August 6, 2001 as Document No. 2001-0110902 of Official Records.

Excepting therefrom a Life Estate in and to the interest in all mineral rights in, on or under said land, as reserved by Wallace E Barron and Daisy E. Barron, husband and wife, in Deed recorded September 30, 1952 in Book 3215, Page 550 of Official Records.

APN: 027-180-94

PARCEL 3: (Intentionally Deleted)

APN: 027-180-95

PARCEL 4:

The Southeast Quarter of the Southwest Quarter of Section 35, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, and as per Certificate of Waiver Parcel Map No. 00-16 recorded August 6, 2001 as Document No. 2001-0110902 of Official Records.

Excepting therefrom a life estate in and to 1/2 interest in all mineral rights in, on or under said property, as reserved in the deed from Wallace E. Barron and Daisy E. Barron, husband and wife, recorded September 30, 1952 in Book 3215, Page 550 of Official Records.

APN: 027-180-96

PARCEL 5: (Intentionally Deleted)

APN: 038-050-05S

PARCEL 6:

The South-half of the Northwest Quarter of the Northwest Quarter of Section 2, Township 16, South, Range 13 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on June 4, 1881.

Excepting therefrom and all oil, gas, minerals and hydrocarbon substances in, on or under said land together with the right to drill and explore for same at two locations to be determined by grantor's. grantors shall reimburse grantee, their successors and assigns, for any damages to the surface of said land as a result of said drilling and exploration together with a rental in an amount that is customary at the time, , as reserved by Joy Elizabeth Smith, a married woman as her sole and separate property, et al, in the Grant Deed recorded June 5, 2006 under Recorder's Serial Number 2006-0117287, Official Records.

APN: 038-050-06S

PARCEL 7:

EXHIBIT 54
Page 590

The Southeast Quarter of the Northwest Quarter of Section 2, Township 16, South, Range 13 East, Mount Diablo Base and Meridian, in an unincorporated area, County of Fresno, State of California, according to the Official Plat thereof.

Excepting therefrom all oil, gas, minerals and any other Hydrocarbon substances in, on and under the herein above described land, not heretofore reserved of record, as reserved by Wells Fargo Bank, N.A., as successor in interest to Bank of America, NT&SA, as Trustee under the Will of C. Ray Robinson, deceased, in the Grant deed recorded March 22, 2006 under Recorder's Serial Number 2006-0058554, Official Records.

APN: 038-050-08

PARCEL 8:

The Northwest Quarter of the Northwest Quarter of Section 1, Township 16, South, Range 13 East, Mount Diablo Base and Meridian, in an unincorporated area, County of Fresno, State of California, according to the Official Plat thereof, and as per Certificate of Waiver of Parcel Map No. 99-39, recorded January 18, 2001 as Instrument No. 2001-0006327 of Official Records.

APN: 038-050-52

PARCEL 9: (Intentionaly Deleted)

APN: 038-050-53

PARCEL 10:

The Southwest Quarter of the Northwest Quarter of Section 1, Township 16 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, and as per Certificate of Waiver of Parcel Map No. 99-39, recorded January 18, 2001 as Instrument No. 2001-0006327 of Official Records.

APN: 038-050-54

PARCEL 11:

The Southeast Quarter of the Northwest Quarter of Section 1, Township 16 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, and as per Certificate of Waiver of Parcel Map No. 99-39, recorded January 18, 2001 as Instrument No. 2001-0006327 of Official Records.

APN: 038-050-55

TRACT VIIIA: [Gragnani]

TRACT I of TRACT VIIIA:

PARCEL ONE:

EXHIBIT 54
Page 591

The Northwest quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom an undivided 1/2 interest in and to all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved in the Deed recorded September 28, 1971, in Book 5941, Page 200 of Official Records, as Document No. 78378.

And also excepting an undivided 1/2 interest in and to all oil, gas, minerals and other hydrocarbon substances, as reserved in Deed recorded May 3, 1985 as Document No. 85043689, Official Records.

APN: 040-060-23S

PARCEL ONE-A:

An easement for rights of way for passage over, upon and across, and ingress and egress to and from the Westerly 20 feet of the Southwest Quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Said easement is for the benefit of and is appurtenant to Grantee's property described as the Northwest Quarter of Section 18, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, as granted to Donald Jerry Gragnani, a married man as his sole and separate property, in the Grant Deed dated December 27, 1994 and recorded on February 7, 1995 as Instrument No. 95-016598 of Official Records.

PARCEL TWO:

The East One-half of Section 24, Township 16 South, Range 15 East, Mount Diablo Base and Meridian, according to the United States Government Township Plats thereof.

Excepting therefrom all oil, gas, other hydrocarbons, minerals and metals, in, on or underlying said property together with the right to explore for, drill for, produce, store and remove any and all said substances and all other rights convenient or incidental to the full use and enjoyment of the rights herein expressly reserved, as reserved by Elizabeth Zerlang in Deed recorded June 5, 1969 in Book 5693 of Official Records, Page 552.

APN: 038-160-16S

TRACT II of TRACT VIIIA:

PARCEL ONE:

The West half of Section 24, Township 16 South, Range 15 East, M.D.B. & M., according to the Official Plat thereof.

EXCEPTING THEREFROM an undivided one-fourth of all minerals, ore, gas and other hydrocarbon substances lying in, upon, under or which may be produced, saved and sold from said real property.

APN:  038-160-17-S

EXHIBIT 54
Page 592

PARCEL TWO:

The North half of Section 10, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM all that portion of said property conveyed to the United States of America in that certain Deed dated March 2, 1972 and recorded April 26, 1972 in Book 6016, Page 474 of Official Records, as Document No. 37493.

ALSO EXCEPTING THEREFROM that portion described as follows:

Beginning at a point which is on the West line of said Section 10 and 100 feet North of the Southwest corner of the North one-half of said Section 10, which point shall be the true point of beginning; thence North along the West line of said Section 10, a distance of 325 feet; thence East at a right angle and parallel with the South line of said section, a distance of 325 feet; thence South at a right angle and parallel with the West line of said section, a distance of 325 feet; thence West at a right angle and parallel with the South line of said section, a distance of 325 feet to the true point of beginning on the West line of said Section 10.

ALSO EXCEPTING THEREFROM one-half of all oil, gas and other hydrocarbon substances and one-half of all minerals, whether metallic or non-metallic, in, under or on said real property as reserved by the San Francisco Bank, a corporation, in Deed recorded June 10, 1948 in Book 2644, Page 420 of Official Records, Document No. 28130.

ALSO EXCEPTING THEREFROM 5% of all oil, gas and other hydrocarbon substances and 5% of all minerals, whether metallic or non-metallic in and under said land, as excepted in the Deed from R.T. Hughes and Bess L. Hughes, husband and wife, recorded December 27, 1950 in Book 2944, Page 550 of Official Records, Document No. 69757.

ALSO EXCEPTING THEREFROM 25% of all oil, gas and other hydrocarbon substances and 25% of all minerals, whether metallic or non-metallic in and under said land, as reserved in the Deed dated April 23, 1962, from Miles O. Humphreys, Jr. and Zona Humphreys, his wife and T.M. Robinson and Myrtle E. Robinson, his wife, to Ernest E. Sullivan and Gracie Sullivan, his wife, recorded May 4, 1962, as Document No. 36478.

ALSO EXCEPTING THEREFROM 10% of all oil, gas and other hydrocarbon substances and 10% of all minerals, whether metallic or non-metallic in and under said land, together with the right to explore and develop oil, gas and other hydrocarbon substances on, in and under said land above described and in the event of the exercise of said right so reserved, the Grantee shall be compensated for any and all damages done to the surface of said land or crops growing thereon, as reserved in the Deed from Ernest E. Sullivan and Gracie Sullivan, husband and wife to Sullivan & Gragnani, Inc., a corporation, recorded May 4, 1962, as Document No. 36479.

APN: 040-030-44-S

PARCEL THREE:

The North half of Section 17, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXHIBIT 54
Page 593

EXCEPTING THEREFROM all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document No. 104217 in Book 5257, Page 25, Official Records.

APN:  040-060-26-S

TRACT III of TRACT VIIIA:


PARCEL ONE:

The West half of Section 14, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in the unincorporated area of the County of Fresno, State of California.

Excepting therefrom the following:

A strip of parcel of land in the Southwest quarter of Section 14, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, described as follows:

Beginning at the Southwest corner of said Section 14; thence along the West line of said Section 14 North 00° 20' 36" East 34.84 feet; thence leaving said West line South 34° 41' 08" East 42.36 feet to a point in the South line of said Section 14; thence along said South 89° 57' 55" West 24.31 feet to the point of beginning.

Also excepting therefrom all the coal, lignite, coal oil, petroleum, naptha, asphalt, maltha, brea, natural gas and all kindred or similar substances which now exist or any time hereafter may exist upon, in or under the property, with the full, free, exclusive and perpetual right below one hundred feet from the surface contours of the property to explore, dig, mine and bore for and otherwise to extract said substances from the above described land and to sever and remove the same therefrom, as well as the right to dispose of, inject and/or below said one hundred foot level store any substance or substances for the enjoyment of these rights and for other business activities of grantor, reserving all rights of location in and under the above described land for mines, tunnels, shafts, wells, pumps, and all other machinery, equipment and/or structures deemed necessary by grantor to enjoy the rights excepted and reserved hereby, also reserving the right to take and use and develop for use any and all subterranean waters under the above described land as all such waters may now or hereafter exist in, on or under the above described land as so far as any of the said waters may be necessary or convenient for carrying on of any or all of the above mentioned works and the full enjoyment of the rights set forth above as excepted and reserved in the deed recorded October 19, 1993 as Instrument No. 93-161681.

PARCEL ONE-A:

EXHIBIT 54
Page 594

A non-exclusive easement for ingress, egress and maintenance of a ditch over the North 40 feet of the following described real property for water transfer:

The East half of Section 14, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in the unincorporated area of the County of Fresno, State of California.

APN: 040-070-41

**TRACT IV of TRACT VIIIA:**

PARCEL 1:

The West half of the East half of Section 7, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting an undivided 50% of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved in that certain Deed dated April 20, 1985, and recorded May 3, 1985, as Document No. 85-043685, Official Records.

APN 040-020-16S

PARCEL 2:

The East half of the East half of Section 7, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Plat thereof.

APN 040-020-15

PARCEL 3:

The Southwest Quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R. T. Hughes and Bess L. Hughes, husband and wife to John H. Hughes and Ruby Dale Hughes, husband and wife, as joint tenants, dated January 10, 1950, recorded January 24, 1950 in Book 2829, Page 69 of Official Records, Document No. 4385.

Excepting and reserving unto the Grantors herein an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon.

APN 040-020-19S

**EXHIBIT 54**
**Page 595**

PARCEL 4:

The Southeast Quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the Deed from R. T. Hughes and Bess L. Hughes, husband and wife to John H. Hughes and Ruby Dale Hughes, husband and wife, as joint tenants, dated January 10, 1950, recorded January 24, 1950 in Book 2829, Page 69 of Official Records, Document No. 4385.

Also excepting therefrom an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the Deed from Harold A. Johnson to Dale Gene Graham, a married man, as his separate property, dated May 30, 1974, recorded June 25, 1974 as Document No. 47794.

APN 040-020-21S

PARCEL 5:

All of Section 1, Township 16 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

Excepting therefrom the title and exclusive right to all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of said grantee, its successors and assigns, of ingress and egress in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts, or tunnels, excavations, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities, as conveyed by Southern Pacific Company, a corporation, to Bravo Oil Company, a corporation, by Deed dated December 27, 1965, recorded December 29, 1965, in Book 5257 Page 25 of Official Records, Document No. 104217.

APN: 038-090-30s

EXHIBIT 54
Page 596

## EXHIBIT A

**ORDER NO. : 1421002600**

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

**TRACT I:**

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN:  027-171-15-S

PARCEL 3:

**EXHIBIT 54**
**Page 597**

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN:  027-171-84-S

**TRACT II:**

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

**EXHIBIT 54**
**Page 598**

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

EXHIBIT 54
Page 599

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

EXHIBIT 54
Page 600

**TRACT III:**

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**EXHIBIT 54**
**Page 601**

# EXHIBIT 55

EXHIBIT 55
Page 602

Laura Avila, Assessor-Recorder
Kern County Official Records

RC
3/14/2023
11:18 AM

Recorded Electronically by:
39N  Contera Holdings

DOC #: **223029410**


223029410

| Stat Types: 1 | Pages: 11 |
|---|---|
| FEES | 54.00 |
| TAXES | .00 |
| OTHER | 225.00 |
| PAID | 279.00 |

This instrument prepared by:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

# ASSIGNMENT OF DEED OF TRUST

**Loan # AG1115 &**
**Loan # AG1116**

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA  50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company**, whose address is **6000 Westown Parkway, West Des Moines, IA 50266**, all beneficial interest under a certain Deed of Trust dated February 3, 2023, made and executed by **Lincoln Grantor Farms, LLC, a California limited liability company, C & A Farms, LLC, a California limited liability company, Maricopa Orchards, LLC, a California limited liability company, Willow Avenue Investments, LLC, a California limited liability company, and Grantor Real Estate Investments, LLC, a California limited liability company, to Old Republic Title Company**, Trustee, upon the following described property situated in **Kern County**, State of **California**:

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of two promissory notes in the principal amount of $11,300,000.00 and $11,300,000.00, respectively, which Deed of Trust is of record in the official records of **Kern County, State of California**, as Document Number: 223015311 together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

Dated effective this 3rd day of February, 2023.

---

Multistate Deed of Trust Assignment

1

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT 55**
**Page 603**

**Conterra Agricultural Capital, LLC**

_____ 2/28/2023
Signature                                                Date
**Mark A. Smith, COO & General Counsel**

_____
Witness    Madyson Rielhoff

STATE OF IOWA
COUNTY OF Polk

Before me, the undersigned authority, on this day personally appeared Mark A. Smith, COO & General Counsel of Conterra Agricultural Capital, LLC, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 28ᵗʰ day of February , 20 23 .

_____
Notary, State of Iowa

Printed Name: Taylor Petersen
My Commission Expires: 11/9/2024



TAYLOR PETERSEN
Commission Number 813700
My Commission Expires
11-9-2024

Multistate Deed of Trust Assignment

2

**EXHIBIT 55**
**Page 604**

**Exhibit A**
Solar/Mitigation

The land referred to in this Report is situated in the County of Kern, City of , State of California, and is described as follows:

PARCEL 1:

THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN AN UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL AND GAS WITHIN OR UNDERLYING SAID LAND, AS PREVIOUSLY RESERVED OF RECORD.

APN: 220-170-01

PARCEL 2:      [PARCEL 3:]

THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.&M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH

EXHIBIT 55
Page 605

THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-170-02

PARCEL 3:     [PARCEL 4:]

THE WEST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED ARE OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING OF THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

ALSO EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON- HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING, THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND

EXHIBIT 55
Page 606

APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED JUNE 6, 2004 AS DOCUMENT NO. 0204130494, OFFICIAL RECORDS.

APN: 220-170-07

PARCEL 4:      [PARCEL 6:]

Parcel B of Parcel Map No. 12196, according to the map thereof, filed for record on October 13, 2020, in Book 62 of Parcel Maps, at Pages 1 through 3, Kern County Records.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-87

PARCEL 5:      [PARCEL 7:]

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED

EXHIBIT 55
Page 607

WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-10

PARCEL 6:        [PARCEL 8: ]

THE NORTH HALF OF THE NORTH HALF OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE INTEREST OF THE SUNSET RAILROAD AS SAID RAILROAD IS NOW LOCATED.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY;

AND ALSO EXCEPTING THEREFROM ALL GEOTHERMAL RESOURCES, EMBRACING; INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

TOGETHER WITH ALL RIGHTS ASSOCIATED WITH OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS AS CONTAINED THEREIN, ALL AS RESERVED BY CHEVRON U.S.A., INC., IN DEED RECORDED DECEMBER 22, 2004 AS INSTRUMENT NO. 0204317445 OF OFFICIAL RECORDS.

EXHIBIT 55
Page 608

APN: 220-130-02

PARCEL 7:        [PARCEL 10:]

THE SURFACE AND 500 FEET OF THE SUBSURFACE VERTICALLY IN DEPTH BELOW THE SURFACE OF THE
EAST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN,
IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE
OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER
SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR THAT MAY BE PRODUCED FROM SAID PARCEL,
500 FEET IN DEPTH, TOGETHER WITH THE EXCLUSIVE RIGHT TO ENTER UPON SAID PREMISES FOR THE
PURPOSE OF MINING FOR AND REMOVING THE SAME THEREFROM, AS EXCEPTED AND RESERVED IN THE
DEED FROM STANDARD OIL COMPANY OF CALIFORNIA, A DELAWARE CORPORATION, TO CALIFORNIA LAND
AND CATTLE COMPANY, A CORPORATION, RECORDED SEPTEMBER 18, 1963, IN BOOK 3644, PAGE 951  OF
OFFICIAL RECORDS.

APN: 220-170-08 and 220-170-09 and 220-170-10

PARCEL 8:        [PARCEL 11:]

THE NORTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO
MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA,
ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA, AND OTHER
HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED IN A DECREE OF
DECLARATION OF TAKING DATED DECEMBER 31, 1942, A CERTIFIED COPY OF WHICH WAS RECORDED
JANUARY 13, 1943 IN BOOK 1090, PAGE 341 OF OFFICIAL RECORDS, AND AS EXCEPTED IN DEED FROM
UNITED STATES OF AMERICA, DATED JANUARY 24, 1949 RECORDED MARCH 17, 1949 IN BOOK 1602, PAGE
105 OF OFFICIAL RECORDS.

ALSO EXCEPT REMAINING $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA
AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, TOGETHER WITH RIGHT
OF ENTRY.

APN: 220-170-11

PARCEL 9:        [PARCEL 13:]

ALL OF THE SOUTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT
DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF
CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL MINERALS OF WHATSOEVER NATURE (INCLUDING BUT NOT LIMITED TO OIL, GAS, OTHER
HYDROCARBONS AND ASSOCIATED SUBSTANCES) IN, UNDER OR WHICH MAY BE PRODUCED THEREFROM,

EXHIBIT 55
Page 609

TOGETHER WITH ALL RIGHTS AND PRIVILEGES OF INGRESS, EGRESS, USE AND OCCUPANCY OF, UPON AND WITHIN THE SURFACE AND SUBSURFACE THEREOF AS THE OWNER OF THE AFORESAID MINERALS MAY FROM TIME TO TIME DEEM NECESSARY OR CONVENIENT IN CONNECTION WITH THE EXPLORATION, DEVELOPMENT AND OPERATION OF SAID LANDS FOR THE AFORESAID MINERALS AND THE STORING, HANDLING, TREATING AND TRANSPORTATION THEREOF, ALL WITHOUT LIABILITY WHATSOEVER TO GRANTEE AND ALL AS CONVEYED BY GRANTORS TO SONICO, INC., A DELAWARE CORPORATION, BY MINERAL DEED DATED FEBRUARY 28, 1967, AND RECORDED IN BOOK 4030, PAGE 208 OF OFFICIAL RECORDS OF KERN COUNTY.

APN: 220-170-31 and 32

PARCEL 10:          [PARCEL 14:]

ALL OF SECTION 19, TOWNSHIP 32 SOUTH, RANGE 26 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS RESERVED IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

**EXHIBIT 55**
**Page 610**

ALSO EXCEPTING THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED DECEMBER 31, 2003 AS DOCUMENT NO. 0203281471, OFFICIAL RECORDS.

APN: 295-040-30 and 31

PARCEL 11:      [PARCEL 24:]

All of Section 13, Township 11 North, Range 23 West, San Bernardino Base and Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all right, title and interest in and to the mineral rights in the properties described herein (expressly excluding, however, the right to use the surface for open pit mining, quarrying and strip mining), and all right , title and interest in any other contract agreements or rights, tangible or intangible that are owned by the grantor, in whole or part, and that are related to the ownership and use of the mineral rights conveyed hereby, from the lands.

Specifically excepting and reserving therefrom all surface rights (except for the rights of surface access for the purpose of grantee and its assigns exploring for, developing, producing, transporting and selling minerals from the property and which are recognized by California law, rules, order and regulation), personal property for fixtures associated with affixed to or located upon the surface, well bores (if any), water or water rights or entitlements (except such water as may be associated and incidentally produced with the minerals from the property) or any existing oil, gas or mineral production (if any) from the property, as granted to California Minerals, L.P., a Texas limited partnership, in Deed recorded December 30, 1998 as Document No. 0198184684 of Official Records.

APN: 239-150-11

EXHIBIT 55
Page 611

**Exhibit A**
**ORDER NO. 1421002595-DB**

The land referred to in this Report is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

**TRACT I:  [Gravity]**

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

**EXHIBIT 55**
**Page 612**

**TRACT II:** [Steinhauer]

PARCEL 1:

The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN: 521-160-06

PARCEL 2:

The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN: 521-160-07

PARCEL 3:

The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section 4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.

APN: 060-050-15

**EXHIBIT 55**
**Page 613**

# EXHIBIT 56

**EXHIBIT 56**
**Page 614**



DOC NBR:  2304389       03/23/2023 02:21:12 PM
OFFICIAL RECORDS OF Kings County
Kristine Lee, Clerk-Recorder,
RECORDING FEE: $106.00
COUNTY TAX: $0.00
CITY TAX: $0.00



DOC TYPE: 04
6 PGS
R065

CONTERRA AGRICULTURAL CAPITAL LLC

This instrument prepared by:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

# ASSIGNMENT OF DEED OF TRUST

Loan # AG1115 &
Loan # AG1116

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA  50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company,** whose address is **6000 Westown Parkway, West Des Moines, IA 50266**, all beneficial interest under a certain Deed of Trust dated **February 3, 2023**, made and executed by **Copper Avenue Investments, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, FFGT Farms, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California limited liability company** to **Old Republic Title Company,** Trustee, upon the following described property situated in **Kings County, State of California:**

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of two promissory notes in the principal amount of $11,300,000.00 and $11,300,000.00, respectively, which Deed of Trust is of record in the official records of **Kings County, State of California,** as Document Number: 2301976 together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

Dated effective this 3rd day of February, 2023.

---

**Multistate Deed of Trust Assignment**

1

211631000322 [Doc Id 8448 M11182020]

**EXHIBIT 56**
**Page 615**

**2304389  Page 2 of 6**

**Conterra Agricultural Capital, LLC**

_____   2/28/2023
Signature                  Date
**Mark A. Smith, COO & General Counsel**

_____
Witness   Madyson Riebhoff

STATE OF IOWA
COUNTY OF Polk

Before me, the undersigned authority, on this day personally appeared Mark A. Smith, COO & General Counsel of Conterra Agricultural Capital, LLC, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 28ᵀᴴ day of February , 20 23 .

_____
Notary, State of Iowa

Printed Name: Taylor Petersen
My Commission Expires: 11/9/2024


TAYLOR PETERSEN
Commission Number 813700
My Commission Expires.
11-9-2024

Multistate Deed of Trust Assignment

2

211631000322 [Doc Id 8448 M11182020]

EXHIBIT 56
Page 616

2304389  Page 3 of 6

**Exhibit A**

The land referred to is situated in the unincorporated area of the County of Kings, State of California, and is described as follows:

The land referred to below is situated in an unincorporated area of the County of Kings, State of California:

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

*3*

EXHIBIT 56
Page 617

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 3A:

One acre in the Northwest corner North and West of Kings River Bypass Canal, in Lot 7 in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as shown on Map of Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map Book Page 70.

APN: 004-140-005

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

EXHIBIT 56
Page 618

2304389  Page 5 of 6

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN:  004-230-026 (Portion)
        004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN:  004-230-013

5

EXHIBIT 56
Page 619

2304389  Page 6 of 6

**Tract I:**

The land referred to in below is situated in the City of Lemoore of the County of Kings, State of California, and is described as follows:

The Northwest quarter of Section 35, Township 18 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Government Township Plat approved October 28, 1869.

EXCEPTING THEREFROM that portion conveyed to the City of Lemoore, a municipal corporation, as described in Grant Deed recorded January 09, 1998 as Instrument No. 98-420 of Official Records.

APN: 021-030-057

**Tract IV:**

PARCEL 11:

All that portion of Section 18, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded May 18, 1936 in Book 151 at Page 8 of Official Records, and Westerly of the California Aqueduct. Said property is situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Also excepting therefrom Two-thirds of all mineral and oil rights and all minerals, oil and gas.

Being described as Parcel 1, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-042-000

PARCEL 12:

All that portion of the Northwest one-quarter of Section 19, Township 21 South, Range 18 East, according to the Official Plat thereof, lying Northwesterly of the Avenal Cutoff Road, said road being granted to the County of Kings by Deed recorded August 18, 1936 in Book 154, Page 153 as Document No. 4437 of Official Records. Situated in the City of Avenal, County of Kings, California.

Excepting therefrom any portion lying within Fresno County.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinafter described property, as granted to Bravo Oil Company, a corporation, by Indenture recorded December 29, 1965 in Book 883, at Page 116 as Instrument No. 16704 of Official Records.

Being described as Parcel 3, pursuant to that certain Parcel Map Waiver for City of Avenal, Parcel Map Waiver No. 08-01, recorded April 06, 2009 as Instrument No. 0905510 of Official Records.

APN: 036-170-037-000 and 036-170-039-000

6

EXHIBIT 56
Page 620