**EXHIBIT 1**

# NOTE

**Loan #AG1021**

**July 23, 2020**
[Date]

**Fresno**
[City]

**CA**
[State]

**473 +/- Acres**
**Kern County, California**
[Property Address]

**1.    BORROWERS' PROMISE TO PAY**

In return for a loan that **Maricopa Orchards, LLC,** a California limited liability company, and **Willow Avenue Investments, LLC,** a California limited liability company (Maricopa Orchards, LLC and Willow Avenue Investments, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$5,550,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company.** Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

**2.    INTEREST**

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **3.750%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

**3.    SCHEDULED PAYMENTS**

**(A)   Time and Amount of Payments**

**1 payment on January 1, 2021, in the Principal amount of $94,400.66 plus all accrued interest, with interest calculated from the date of closing on the unpaid Principal balance at 3.750%% per annum; 19 consecutive semi-annual Principal and interest payments of $198,463.16 each, beginning July 1, 2021 with the final payment of all remaining Principal and interest, plus any costs and expenses, due on July 23, 2030, which is called the "Maturity Date."**

**(B)   Place of Payments**

Borrowers will make payments at 7755 Office Plaza Drive North, Suite 195, West Des Moines, IA 50266 or at a different place if required by Lender

**4.    INTEREST CALCULATION**

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to Principal, and finally to late charges.

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**5.    PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.    INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).  From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.    ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.  The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.    DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.      LENDER ADVANCES**
Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.     GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.
Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.     WAIVERS**
Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.     UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**13.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**14.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

    **(A)    Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

        **(1)**      If Borrowers fail to repay any interest or Principal under the Note when due;

        **(2)**      If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

        **(3)**      If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument and any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

        **(4)**      If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

        **(5)**      If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

        **(6)**      If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

        **(7)**      If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

    **(B)    Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

    **(C)    Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

    **(D)    No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(E)      Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Willow Avenue Investments, LLC**
a California limited liability company

_____

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

_____

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

5

**EXHIBIT 2**

# NOTE

Loan # AG1024
Kern County, CA

**July 23, 2020**

## 1.    BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Willow Avenue Investments, LLC**, a California limited liability company (Maricopa Orchards, LLC and Willow Avenue Investments, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$4,696,367.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company.** Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

## 2.    MULTIPLE ADVANCE LINE OF CREDIT

Prior to the expiration of the Draw Period ("Draw Period") as calculated in accordance with this paragraph "2", this Promissory Note ("Note") evidences a multiple advance line of credit loan ("Loan") under which Loan advances may from time to time be extended to Borrowers in accordance with the terms hereof. Advances are subject to the amounts available to Borrowers pursuant to Section 3 of this Note, and shall be in the minimum amount of $50,000.00 and shall be in amounts which are multiples of $100.00. Upon receipt of a verified funds request by Borrowers to a telephone number provided from time to time by Lender, **or by such other funds request method as the Lender may establish,** and provided all conditions for an advance have been met, Lender shall promptly deliver the requested funds directly to Borrowers' account at Borrowers' bank ("Bank Account") as designated in the original Loan application or by separate written notice on forms to be provided by Lender. In most cases, if a valid funds request is received by Lender at its designated telephone number at or before 12:00 noon (all times in this paragraph refer to the time in Des Moines, Iowa (Central Standard Time CST), the requested funds will be delivered two (2) business days following receipt of the funds request (e.g., if the funds request is received at 11:00 a.m. on Monday, the funds will usually be delivered on Wednesday; if the funds request is received at 2:00 p.m. on Tuesday, the funds will usually be delivered on Friday). A valid funds request shall be verified by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note in a manner to be designated by the Lender. A valid designation of the Bank Account to which funds are to be advanced shall be signed by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note. Lender shall be entitled to rely on the statements in any (i) verified funds request and/or (ii) signed designation of Bank Account, to the effect that the person who signed such instrument was fully authorized to do so by all of the persons obligated to pay this Note and all persons who are obligated to pay this Note hereby release any and all claims against Lender based on Lender's reliance on such statements.

Advances may be made without payment of a transaction fee.

The Draw Period referenced above shall terminate and expire upon the earlier of the date set forth in paragraph 9(A)(7) or at such date as determined by the Lender, in its sole discretion.

## 3.    DRAW FEATURE

During the Draw Period, Borrowers may borrow under this Note at any time, subject to the terms and conditions of this Note (the "Draw Provisions"), provided that no Event of Default exists under this Note or the Security Instrument, as defined below, and subject to the following Advance Schedule: (a) monthly draws shall be permitted in accordance with an annual development budget approved by Lender; (b) advances shall be based on the approved annual budget with an advance rate of 60% of development costs, as supported by evidence of the development costs. The unpaid principal balance owing on this Note at any time during the Draw Period will be evidenced by Lender's internal records and the amount advanced and outstanding may not exceed at any one time the face amount of this Note. Lender shall not be obligated to make any Loan advance to Borrowers following occurrence

1

of an Event of Default.

## 4.    PAYMENTS

During the Draw Period of the Note, Borrowers will be billed in arrears twice a year for interest accrued. Notwithstanding any provision in this Note to the contrary and subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the principal balance of this Note. Any prepayment over 10% of the principal balance of this Note made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of the principal balance of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the Security Instrument.

Notwithstanding the foregoing, all amounts other than interest accruing over the period from the last date through which interest was last billed due under the terms of this Note, including but not limited to principal and all other interest, shall be due and payable in full upon the Maturity Date, unless otherwise permitted to be earlier pursuant to the terms of this Note. Interest accruing over the period from the last date through which interest was billed until the later of (a) the actual date of payment of all other amounts or (b) the Maturity Date shall be billed promptly after all such other amounts have been received by Lender.

## 5.    APPLICATION OF PAYMENTS

A.    During the Draw Period

Notwithstanding any provision in this Note to the contrary, all payments during the Draw Period, other than a regularly scheduled payment of interest, will be applied first to:

(1)    All other amounts owed other than late charges; and then to
(2)    Late charges; and then to
(3)    Accrued interest; and then to
(4)    Principal.

B.    After the Draw Period

All payments received after termination of the Draw Period will be applied first to:
(1)    All other amounts owed other than late charges; and then to

(2)    Late charges; and then to
(3)    Accrued interest; and then to
(4)    Principal.

The term "late charges" is intended to include both flat fees associated with late payments, if any, and any incremental increase in interest rate as a result of maturity or default.

**6.    EARLY TERMINATION**

During the Draw Period, Borrowers may terminate the multiple advance line of credit Loan represented by this Note by (i) providing written notice to Lender of the intent to do so, (ii) paying the outstanding principal balance in full, plus any applicable Yield Maintenance Premium, and by (iii) agreeing to pay accrued but unbilled interest promptly upon being billed. Borrowers will be billed for the amount of accrued interest and all other amounts owed, if any, other than interest within fifteen (15) days after the later of Lender's receipt of the notice terminating the Loan and the payment in full of the principal. The collateral securing this Note will then be released of record upon receipt of the final payment of all amounts owed under this Note. Amounts that might be owed other than interest include, but are not limited to, late charges, standby fees, taxes and other amounts advanced by Lender and attorney fees and costs. So long as Borrowers are not in default, the Loan will not terminate simply because the outstanding principal balance may be zero at any given time.

**7.    GENERAL PROVISIONS**

A.    Notwithstanding any provision of this Note to the contrary, interest on this Note is computed on a 30/360 simple interest basis; monthly interest is calculated by applying the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days.

B.    Upon the occurrence and during the continuance of an Event of Default, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum or, if less, the maximum rate allowed by applicable state law. In addition, upon the occurrence and during the continuance of an Event of Default, the Lender may add any unpaid interest to principal then due under this Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).

C.    Neither the imposition nor payment of any additional interest, compounded interest or the late fee hereunder shall be deemed a waiver of any Event of Default.

D.    Borrowers will make payments at **7755 Office Plaza Dr. North, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender.

**8.    MULTIPLE ADVANCE LINE OF CREDIT VARIABLE RATE PROVISIONS**

A.    **Payment of Principal and Interest.**

(1)    Interest shall accrue on the unpaid balance of this Note until the Loan is repaid in full.

(2)    The Initial Variable Rate is as stated in Section 9(A)(7) below. Thereafter, the Variable Rate shall change according to the Rate Change Date at a rate equal to the sum of (i) the Current Index (defined below) and (ii) the Margin (defined below) (the "Variable Rate").

(3)    A payment of interest calculated at the Variable Rate on the outstanding principal balance represented under this Note from the date of the first advance hereunder shall be due on the First Interest Payment Date. Thereafter, consecutive semi-annual installments of interest, each in the amount required to pay the unpaid interest accruing through the applicable period, shall be due on each January 1 and July 1 at the Variable Rate until the Maturity Date (as defined below) or the Conversion Date (as defined below) as the case may be. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date (as defined below).

(4)    If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any interest payment (whether because of a miscalculation of the Variable Rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the interest payment (and the corrected Variable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have

3

otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrowers are not otherwise in breach or default under any of the terms and provisions of this Note, the Security Instrument or any other loan document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

        (5)     Borrowers may make payments of principal in any amount on any business day of Lender during such time as the principal is accruing interest at the Variable Rate.

        (6)     the Multiple Advance Line of Credit Provisions will expire on **July 23, 2027**.

        (7)     The following definitions shall apply to this Note:

**Current Index**: The Index that is published in <u>The Wall Street Journal</u> on the applicable Rate Change Date.

**Index**. Beginning with the initial Rate Change Date, the variable rate will be based on an Index. The "Index" is the U.S. 7-Year Treasury Note, subject to a floor of 3.75%. The variable interest rate shall change to a rate that shall be determined 2 business days prior to the applicable Rate Change Date. If the Index is no longer available, the Note Holder will choose a new Index that is based on comparable information.

**Margin: 3.220%**

**First Interest Payment Date: January 1, 2021**

**Draw Provisions Termination Date: July 23, 2027**.

**First Principal Payment Date: July 23, 2027**

**Maturity Date: July 23, 2027**

**Rate Change Date: 8/1/2020 and on the 1ˢᵗ of every month thereafter**

**Initial Variable Rate: 3.750%**

**Variable Rate Floor: 3.750%**

**9.     GIVING OF NOTICES**

     Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

     Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**10.    WAIVERS**

     Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**11.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**12.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**13.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

**(A)    Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

**(1)**    If Borrowers fail to repay any interest or Principal under the Note when due;

**(2)**    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

**(3)**    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

**(4)**    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

**(5)**    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

**(6)**    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

**(7)**    If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**(B)    Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

**(A)    Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

**(B)    No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(C)    Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

6

**EXHIBIT 3**

B0339-4712 10/12/2020 5:00 PM Received by California Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**For Office Use Only**

**-FILED-**

File #: U200029038629

Date Filed: 10/12/2020

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGEMENT TO: (Name and Address)**   32548 - CONTERRA

Lien Solutions                77133829
P.O. Box 29071
Glendale, CA  91209-9071      CALI

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Willow Avenue Investments, LLC | | | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1396 W Herndon Ave Suite 101 | Fresno | CA | 93711 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | | | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6000 Westown Parkway | West Des Moines | IA | 50266 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:
See Rider A to UCC and Exhibit A legal description attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
77133829            AG1021 & AG1024            Maricopa Orchards, LLC

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

B0339-4713 10/12/2020 5:00 PM Received by California Secretary of State

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
**Willow Avenue Investments, LLC**

OR

18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

22. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☒ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **CONTERRA AGRICULTURAL CAPITAL, LLC** | | | | |
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7755 Office Plaza Dr N, Suite 195 | West Des Moines | IA | 50266 | USA |

23. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

24. MISCELLANEOUS: 77133829-CA-0   32548 - CONTERRA ASSET MANAG    CONTERRA AGRICULTURAL    File with: Secretary of State, CA    AG1021 & AG1024   Maricopa Orchards, LLC

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDITIONAL PARTY (Form UCC1AP) (Rev. 08/22/11)

**EXHIBIT 4**



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210036237933 |
| Date Filed: 4/7/2021 |

| Submitter Information: | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 GLENDALE, CA 912099071 |

| Amendment Action Information: | |
| --- | --- |
| Initial Financing Statement File Number | U200029038629 |
| Date Filed | 10/12/2020 |
| Amendment Action | Collateral Amendment |
| Collateral Change | Add Collateral |

| Indicate how documentation of Collateral is provided: | Attached in a File |
| --- | --- |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY |
| --- | --- |

Optional Filer Reference Information:
79836016

See Rider A to UCC and Exhibit A legal description attached hereto and made a part hereof.

B0381-5521 04/07/2021 8:55 AM Received by California Secretary of State

This page and any following pages include and merge any text received for the collateral description with any attachments.

B0381-5522 04/07/2021 8:55 AM Received by California Secretary of State

# RIDER A TO UCC

Debtor:                              **Willow Avenue Investments, LLC**

Secured Party:                  **American Equity Investment Life Insurance Company**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

---

**RIDER A TO UCC**

1

B0381-5523 04/07/2021 8:55 AM Received by California Secretary of State

**ORDER NO. :** 1411018744C

# EXHIBIT A

The land referred to is situated in the County of Kern, City of Bakersfield, State of California, and is described as follows:

PARCEL 1:

Lots 1, 2 and 3 and the North half of the Northeast Quarter of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas, hydrocarbon substances and other minerals contained within the property hereinabove referred to, whether now known to exist or hereafter discovered, all oil, gas, hydrocarbon substances and other mineral rights belonging to or appertaining to said property, the exclusive right to prospect for, drill for, produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals upon and from said property, the exclusive right to drill upon, to drill through and otherwise to use said property to produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals from adjacent or neighboring lands, and the exclusive right to inject in, store under and thereafter withdraw from said property oil, gas, hydrocarbon substances and other minerals and products thereof, whether produced from said property or elsewhere, together with the right to drill and operate whatever wells, construct, install, operate, maintain and remove whatever other facilities and do whatever else may be reasonably necessary on and in said property for the full enjoyment and exercise of the rights to excepted and reserved, and the unrestricted right of ingress and egress to and from said property for all such purposes; but grantor and its successors and assigns shall compensate grantee and its successors and assigns upon demand for any and all damage they cause to improvements and growing crops upon said property by the enjoyment or exercise of the rights so excepted and reserved by Tenneco West, Inc., a Delaware corporation in Deed recorded December 28, 1971 in Book 4614, Page 672 of Official Records.

APN: 295-070-04 and 295-070-06

PARCEL 2:

Lots 1 and 2 in the Northeast Quarter of Section 3, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas, hydrocarbon substances and other minerals contained within the property hereinabove referred to, whether now known to exist or hereafter discovered, all oil, gas, hydrocarbon substances and other mineral rights belonging to or appertaining to said property, the exclusive right to prospect for, drill for, produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals upon and from said property, the exclusive right to drill upon, to drill through and otherwise to use said property to produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals from

B0381-5524 04/07/2021 8:55 AM Received by California Secretary of State

adjacent or neighboring lands, and the exclusive right to inject in, store under and thereafter withdraw from said property oil, gas, hydrocarbon substances and other minerals and products thereof, whether produced from said property or elsewhere, together with the right to drill and operate whatever wells, construct, install, operate, maintain and remove whatever other facilities and do whatever else may be reasonably necessary on and in said property for the full enjoyment and exercise of the rights to excepted and reserved, and the unrestricted right of ingress and egress to and from said property for all such purposes; but grantor and its successors and assigns shall compensate grantee and its successors and assigns upon demand for any and all damage they cause to improvements and growing crops upon said property by the enjoyment or exercise of the rights so excepted and reserved by Tenneco West, Inc., a Delaware corporation in Deed recorded December 28, 1971 in Book 4614, Page 672 of Official Records.

APN: 295-070-23

PARCEL 3:

Lots 4, 5 and 6 of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM an undivided 1/6th interest in and to the oil, gas and other hydrocarbon substances and all other minerals and mineral rights conveyed to Ernest L. Antongiovanni, an unmarried man, as to an undivided one-third (1/3) interest, Claudia Lee Heinle, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest and Martha Jean Ball, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest, by Deed recorded November 16, 1984 in Book 5711, Page 487 of Official Records.

ALSO EXCEPTING THEREFROM all minerals including all gas and other hydrocarbons within or underlying said property, owned by Lucy Antongiovanni, a widow and Ernest Antongiovanni, as Trustee, as Trustee of the Testamentary Trust of the Ugo Antongiovanni Trust (Ernest Antongiovanni, aka Ernest L. Antongiovanni, aka Ernst L. Antongiovanni and Lucy Antongiovanni, aka Lucy Angela Antongiovanni, aka Lucille Angela Antongiovanni), as reserved in Deed recorded September 1, 1988 in Book 6159, Page 78 of Official Records.

By an Agreement for surface entry waiver and for drill sites dated May 26, 1988 executed by and between David Antongiovanni; Helen Antongiovanni individually and on behalf of the Estate of Eugene Antongiovanni, deceased; Lucy A. Antongiovanni, and Ernest L. Antongiovanni as Trustee of The Ugo Antongiovanni, Trust recorded September 1, 1988 in Book 6159, Page 146 of Official Records,  it was agreed that none of the surface thereof to a depth of 500 feet below the surface thereof, ever shall be used for the purpose of drilling for, producing, extracting, or taking the oil, gas or other hydrocarbon substances and the other minerals, therein or thereunder, EXCEPTING THEREFROM a drill site together with unrestricted rights for ingress and egress to and from the drill site, and for pipelines to and from the drill site, the location of the drill site, roadway and pipeline easements being described as a portion of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, and as Section is shown on County Surveyor's Map 7-1, filed in Book 7 at Page 22 of Filed Maps, in the Office of the County Surveyor of said County and described as:

B0381-5525 04/07/2021 8:55 AM Received by California Secretary of State

The Easterly 300 feet of the Northerly 300 feet of the Southerly 815 feet of the Northwest Quarter of said Section 2, together with the right of access across the Northerly 15 feet of the Northeast Quarter and also across the Easterly 15 feet of the Northerly 1805 feet of the Northwest Quarter of last named Section 2.

APN: 295-070-03

PARCEL 4:

Lots 5 and 7 of Section 3, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM an undivided 1/6th interest in and to the oil, gas and other hydrocarbon substances and all other minerals and mineral rights conveyed to Ernest L. Antongiovanni, an unmarried man, as to an undivided one-third (1/3) interest, Claudia Lee Heinle, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest and Martha Jean Ball, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest, by Deed recorded November 16, 1984 in Book 5711, Page 487 of Official Records.

ALSO EXCEPTING THEREFROM all minerals including all gas and other hydrocarbons within or underlying said property, owned by Lucy Antongiovanni, a widow and Ernest Antongiovanni, as Trustee, as Trustee of the Testamentary Trust of the Ugo Antongiovanni Trust (Ernest Antongiovanni, aka Ernest L. Antongiovanni, aka Ernst L. Antongiovanni and Lucy Antongiovanni, aka Lucy Angela Antongiovanni, aka Lucille Angela Antongiovanni) as reserved in Deed recorded September 1, 1988 in Book 6159, Page 78 of Official Records.

By an Agreement for surface entry waiver and for drill sites dated May 26, 1988 executed by and between David Antongiovanni; Helen Antongiovanni individually and on behalf of the Estate of Eugene Antongiovanni, deceased; Lucy A. Antongiovanni, and Ernest L. Antongiovanni as Trustee of The Ugo Antongiovanni, Trust recorded September 1, 1988 in Book 6159, Page 146 of Official Records, it was agreed that none of the surface thereof to a depth of 500 feet below the surface thereof, ever shall be used for the purpose of drilling for, producing, extracting, or taking the oil, gas or other hydrocarbon substances and the other minerals, therein or thereunder, EXCEPTING THEREFROM therefrom a drill site together with unrestricted rights for ingress and egress to and from the drill site, and for pipelines to and from the drill site, the location of the drill site, roadway and pipeline easements being described as a portion of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, and as Section is shown on County Surveyor's Map 7-1, filed in Book 7 at page 22 of Filed Maps, in the Office of the County Surveyor of said County and described as:

The Easterly 300 feet of the Northerly 300 feet of the Southerly 960 feet of the Northeast Quarter of said Section 3, together with the right of access across the Northerly 15 feet of Section 2 of said township and range, and also across the Easterly 15 feet of the Northerly 1635 feet of said Section 3.

APN: 295-070-02

**EXHIBIT 5**

# Guaranty

| | |
|---|---|
| **Guarantor**<br>(give name and address)<br>Darius Assemi<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | |
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Willow Avenue Investments, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Darius Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

[X]  **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

[ ]  **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

---

Guaranty

> (Note Description)
> **Note Dates: July 23, 2020**
> **Note Amount: $5,550,000.00**
> **Lender: Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

☐    **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020**, in the original principal amount of **$5,550,000.00**, respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

      1.    This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

      2.    Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

2

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.      If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.      If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.      If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.      Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7. Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8. If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9. Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10. Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11. Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12. Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13. Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.     It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.     Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums  as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.     To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.     The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.     Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.     This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

---

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this ____ day of July, 2020.

**Guarantor:**

_____    _____
Signature                                        Date

**Darius Assemi**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _Fresno_

On _July 20, 2020_ before me, _L. Diaz, Notary Public_, personally appeared **Darius Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

Guaranty

7

**EXHIBIT 6**

# Guaranty

| | |
|---|---|
| **Guarantor**<br>(give name and address)<br>Farid Assemi<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | |
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Willow Avenue Investments, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒ **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐ **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

---

Guaranty

1

---

(Note Description)
**Note Dates: July 23, 2020**
**Note Amount: $5,550,000.00**
**Lender: Conterra Agricultural Capital, LLC**
**Borrowers: Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

---

☐     **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐     **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020,** in the original principal amount of **$5,550,000.00,** respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.      This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.      Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

2

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.     If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.     If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.     If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.     Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.    Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.    If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.    Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.    Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.    Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.    Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.    Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14. It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15. Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums  as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16. To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17. The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18. Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19. This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

**Guaranty**

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

---

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED this _____ day of July, 2020.

**Guarantor:**

_____    7/17/2020
Signature                Date
**Farid Assemi**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF Fresno

On July 17, 2020 before me, C. Diaz, Notary Public , personally appeared Farid Assemi, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

Notary Public L. Diaz
Printed Name:_____
My commission expires: April 20, 2022

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

Guaranty

**EXHIBIT 7**

# Guaranty

| Guarantor<br>(give name and address)<br>Farshid Assemi<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | |
|---|---|
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Willow Avenue Investments, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farshid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

[X] **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

[ ] **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

Guaranty

1

> (Note Description)
> **Note Dates: July 23, 2020**
> **Note Amount: $5,550,000.00**
> **Lender: Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

☐    **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020,** in the original principal amount of **$5,550,000.00,** respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

    1.    This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

    2.    Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

**Guaranty**

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.     If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.     If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.     If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.     Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.    Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.    If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.    Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.    Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.    Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.    Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.    Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.     It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.     Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.     To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.     The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.     Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.     This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

**Guaranty**

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.     Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.     The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.     This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

> **IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

> **PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**
>
> By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this _____ day of July, 2020.

**Guarantor:**

_Farshid Assemi_ _7/17/2020_
Signature                                    Date
**Farshid Assemi**

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF CALIFORNIA
COUNTY OF _Fresno_

On _July 17, 2020_ before me, _L. Diaz, Notary Public_, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _S. Diaz_ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

Guaranty

**EXHIBIT 8**

# Guaranty

| Guarantor (give name and address) Darius Assemi 1306 W Herndon Ave #101 Fresno, CA 93711 | |
|---|---|
| Borrowers (give name and address) Maricopa Orchards, LLC 1306 W Herndon Ave #101 Fresno, CA 93711<br><br>Willow Avenue Investments, LLC 1306 W Herndon Ave #101 Fresno, CA 93711 | Lender (give name and address) Conterra Agricultural Capital, LLC 7755 Office Plaza Dr. North, Suite 195 West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Darius Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒ **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐ **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

Guaranty

1

> (Note Description)
> **Note Dates: July 23, 2020**
> **Note Amount: $4,696,367.00**
> **Lender:  Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

☐    **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.**  If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph.  In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020,** in the original principal amount of **$4,696,367.00,** respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero**  percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.    This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation.  In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed.  If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.    Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.     If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.     If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.     If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.     Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.      Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.      If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.      Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.     Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.     Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.     Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.     Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.    It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.    Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.    To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.    The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.    Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.    This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

5

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

---

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this ____ day of July, 2020.

**Guarantor:**

_____  7/20/2020
Signature                                          Date
**Darius Assemi**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _FRESNO_

On _July 20, 2020_ before me, _L. DIAZ, Notary Public_, personally appeared **Darius Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. DIAZ_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

Guaranty

7

**EXHIBIT 9**

# Guaranty

| Guarantor<br>(give name and address)<br>Farid Assemi<br>1306 W Herndon Ave<br>#101 Fresno, CA 93711 | |
|---|---|
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Willow Avenue Investments,<br>LLC 1306 W Herndon Ave #101<br>Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

[X]  **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

[ ]  **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

Guaranty

1

---

(Note Description)
**Note Dates: July 23, 2020**
**Note Amount: $4,696,367.00**
**Lender: Conterra Agricultural Capital, LLC**
**Borrowers: Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

---

☐    **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020**, in the original principal amount of **$4,696,367.00**, respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.    This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.    Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.    If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.    If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.    If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.    Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7. Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8. If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9. Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10. Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11. Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12. Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13. Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect.  Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.    It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers.  Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.    Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums  as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.    To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.    The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California.  The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California.  Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.    Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.    This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others.  No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

**Guaranty**

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.     Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.     The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.     This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

---

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED this _____ day of July, 2020.

**Guarantor:**

7/17/2020

Signature                                    Date
Farid Assemi

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF   FRESNO

On   July 17, 2020   before me,   L. Diaz, Notary Public   , personally appeared Farid Assemi, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name:   L. Diaz
My commission expires:   April 20, 2022

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

Guaranty

7

**EXHIBIT 10**

# Guaranty

| Guarantor (give name and address) Farshid Assemi 1306 W Herndon Ave #101 Fresno, CA 93711 | |
|---|---|
| **Borrowers** (give name and address) Maricopa Orchards, LLC 1306 W Herndon Ave #101 Fresno, CA 93711<br><br>Willow Avenue Investments, LLC 1306 W Herndon Ave #101 Fresno, CA 93711 | **Lender** (give name and address) Conterra Agricultural Capital, LLC 7755 Office Plaza Dr. North, Suite 195 West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farshid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒ **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐ **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

---

Guaranty

1

> (Note Description)
> **Note Dates: July 23, 2020**
> **Note Amount: $4,696,367.00**
> **Lender:  Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

☐   **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐   **Percentage Limitation.**  If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph.  In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020,** in the original principal amount of **$4,696,367.00**, respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero**  percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.    This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation.  In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed.  If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.    Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

2

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full.  Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.    If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof.  Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.    If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.    If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.    Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.      Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.      If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument.  As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.      Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.     Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.     Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.     Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.     Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.    It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.    Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.    To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.    The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.    Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.    This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

**Guaranty**

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this _____ day of July, 2020.

**Guarantor:**

Signature _____  7/17/2020
Date

**Farshid Assemi**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___FRESNO___

On __July 17, 2020__ before me, __L. Diaz, Notary Public__, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: __L. Diaz__
My commission expires: __April 20, 2022__

> L. DIAZ
> NOTARY PUBLIC - CALIFORNIA
> COMMISSION # 2235602
> FRESNO COUNTY
> My Comm. Exp. April 20, 2022

Guaranty

7

# EXHIBIT 11

# Allonge to Promissory Note

Loan # AG1021

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **July 23, 2020**

Original Amount: **$5,550,000.00**

Borrower Name(s): **Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

Property Address: **473 +/- Acres, Kern County, California**

PAY TO THE ORDER OF

**American Equity Investment Life Insurance Company**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature

**Mark A. Smith, COO & General Counsel**

**EXHIBIT 12**

# Allonge to Promissory Note

**Loan # AG1024**

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **July 23, 2020**

Original Amount: **$4,696,367.00**

Borrower Name(s): **Maricopa Orchards, LLC and Willow Avenue Investments, LLC**

Property Address: **473 +/- Acres, Kern County, California**

PAY TO THE ORDER OF

**American Equity Investment Life Insurance Company**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature

**Mark A. Smith, COO & General Counsel**

**EXHIBIT 13**

## COLLATERAL SUBSTITUTION AGREEMENT

**AG1021**
**AG1024**

THIS COLLATERAL SUBSTITUTION AGREEMENT (this "Agreement") is dated as of December 16, 2021, and is made by and between **Maricopa Orchards, LLC**, a California limited liability company, and **Willow Avenue Investments, LLC, a California limited liability company** (collectively, the "Borrowers"), and **American Equity Investment Life Insurance Company** (the "Lender").

### Recitals

A.    On or around July 23, 2020, Conterra Agricultural Capital, LLC, an Iowa limited liability company ("**Originator**"), made a loan to Borrowers in the original principal amount of $5,550,000.00 (the "**AG1021 Loan**"), which is evidenced by Borrowers' promissory note dated July 23, 2020 (as amended or otherwise modified from time to time, the "**AG1021 Note**"), payable to Originator in the amount of the Loan plus interest, and subsequently endorsed by Originator to Lender.

B.    The AG1021 Note was secured by, among other documents, a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated July 23, 2020 (as amended or otherwise modified from time to time, the "**AG 1021 Security Instrument**"), granted by Willow Avenue Investments, LLC, as trustor, for the benefit of Originator, encumbering the real property described therein (the "**Kern Properties**"), and recorded in the Official Records of Kern County, California, on July 23, 2020, as Document No. 220096750. The Security Instrument was subsequently assigned by Originator to Lender pursuant to an Assignment of Deed of Trust dated July 23, 2020, and recorded in the Official Records of Kern County, California.

C.    On or around July 23, 2020, Originator made a second loan to Borrowers in the original principal amount up to $4,696,367.00 (the "**AG1024 Loan**"), which is evidenced by Borrowers' promissory note dated July 23, 2020 (as amended or otherwise modified from time to time, the "**AG1024 Note**"), payable to Originator in the amount of the Loan plus interest, and subsequently endorsed by Originator to Lender.

D.    The AG1024 Note was secured by, among other documents, an Open-End Deed of Trust (With Future Advance Clause), Security Agreement, Assignment of Rents and Fixture Filing dated July 23, 2020 (as amended or otherwise modified from time to time, the "**AG 1024 Security Instrument**"), granted by Willow Avenue Investments, LLC, as trustor, for the benefit of Originator, also encumbering the Kern Properties, and recorded in the Official Records of Kern County, California, on July 23, 2020, as Document No. 220096752. The Security Instrument was subsequently assigned by Originator to Lender pursuant to an Assignment of Deed of Trust dated July 23, 2020, and recorded in the Official Records of Kern County, California.

E.    The Kern Properties are also referred to herein as the "Release Properties."

F.    Lender and Borrowers desire to set forth certain agreements between them concerning the release of the Release Properties from the liens of the AG1021 Security Instrument and the AG1024 Security Instrument (collectively, the "Lien Instruments"), and the simultaneous pledge by Borrowers of certain replacement real property located in Fresno County (the "Fresno Properties" or "Replacement Properties") and more particularly described in **Exhibit A** hereto.

NOW, THEREFORE, in consideration of the premises, mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrowers and Lender agree as follows:

## Agreement

1.    Collateral Substitution. Provided that no Event of Default, as defined in the AG1021 Note and AG1024 Note has occurred and is continuing, Borrowers shall be permitted to substitute (referred herein as the "Substitution") the Replacement Properties for the Release Properties, upon satisfaction of the following conditions:

(a)    Lender's Approval. The proposed Substitution shall be, in all respects, acceptable to Lender in its reasonable discretion.

(b)    No Defaults. At the time of the Substitution, there shall be no Events of Default under either the AG1021 Loan or the AG1024 Loan.

(c)    Title to Replacement Properties. Borrowers shall have or obtain, at or before the time of the Substitution, good, marketable and indefeasible fee title to the Replacement Properties.

(d)    Collateral Substitution Fee. Borrowers shall pay to Lender a collateral substitution fee equal to $1,500.00 at the time of Substitution.

(e)    Security Instruments. Borrowers shall have executed, acknowledged and delivered to Lender (i) one or more security instruments and UCC financing statements with respect to the Replacement Properties as may be necessary or desirable in Lender's determination with respect to any applicable jurisdiction so as to effectively create upon such recording and filing a valid and enforceable first priority lien upon the Replacement Properties in favor of Lender, (ii) amendments to all of the documents evidencing and/or executed in connection with the Loan (the "Loan Documents"), whereby the Loan Documents shall be modified to address those issues raised by the terms of the Substitution, and (iii) such other documents as Lender may reasonably require in connection with the Substitution. The security instruments and UCC financing statements shall be substantially the same in form and substance as the counterparts of such documents executed and delivered with respect to the Release Properties, subject to modifications reflecting the Replacement Properties as the property that is the subject of such replacement documents. The security instruments encumbering the Replacement Properties shall secure all amounts evidenced by the AG1021 Note or AG1024 Note, as applicable.

(f)    Title Insurance. Lender shall have received an ALTA extended coverage mortgagee's title insurance policy issued by an approved title insurance company and meeting Lender's requirements for title insurance policies and otherwise acceptable to Lender (a "Qualified Title Policy") insuring the lien of the security instruments encumbering the Replacement Properties and dated as of the date of the Substitution. The Qualified Title Policy issued with respect to the Replacement Properties shall (1) provide coverage to Lender in the amount of the Loans affected by the substitution, (2) insure Lender that such security instrument(s) creates a valid first lien on the Replacement Properties encumbered thereby, free and clear of all exceptions from coverage other than those exceptions acceptable to Lender, and (3) contain such endorsements and affirmative coverages as are contained in the Qualified Title Policies insuring the liens of the existing AG1021 Security Instrument and AG1024 Security Instrument (to the extent such endorsements and affirmative coverages are applicable and available in the jurisdiction in which the Replacement Properties is located) and such other endorsements and affirmative coverages as Lender may reasonably require.

(g)     Payment of Costs. Borrowers shall have paid or reimbursed Lender for all costs and expenses incurred by Lender (including, without limitation, all disbursements and reasonable attorneys' fees) in connection with the Substitution, whether or not such Substitution in fact occurs, and Borrowers shall have paid all title premiums, escrow charges, recording charges, filing fees, taxes or other expenses (including, without limitation, mortgage and intangibles taxes and documentary stamp taxes) payable in connection with the Substitution. If Borrowers fail to pay any such amount within ten (10) days after demand from Lender, such failure shall constitute an Event of Default under the security instruments encumbering the Replacement Properties, or under the existing AG1021 Security Instrument and AG1024 Security Instrument if the Substitution does not occur, and the amount due shall bear interest at the Default Rate (as defined in the AG1021 Note and AG1024 Note) from the date such amounts are incurred by Lender until paid.

2.     Release of Lien. Upon the satisfaction of the conditions precedent set forth in **Section 1** hereof, Lender will release (i) the liens of the existing AG1021 Security Instrument and AG1024 Security Instrument from the Release Properties.

3.     Request for Collateral Substitution. Any request by Borrowers for the Substitution shall be accompanied by all documentation necessary for Lender to determine whether the conditions set forth in **Section 1** hereof have been or will be satisfied.

4.     Payment of Fees and Expenses. Borrowers shall pay upon demand all fees and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender in performing its obligations under this Agreement or in responding to any request or notice received from Borrowers pursuant to this Agreement. If Borrowers fail to pay any such amount within ten (10) days after demand from Lender, such failure shall constitute an Event of Default under the security instruments encumbering the Replacement Properties, or under the existing AG1021 Security Instrument and AG1024 Security Instrument if the Substitution does not occur, and the amount due shall bear interest at the Default Rate (as defined in the AG1021 Note and AG1024 Note) from the date such amounts are incurred by Lender until paid.

5.     Notices. All notices or instructions required or permitted to be given under this Agreement shall be in writing and shall be delivered to Borrowers and Lender in accordance with the provisions of the security instruments.

6.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

7.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute the same agreement.

*[remainder of page intentionally left blank – signature page follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**BORROWERS:**

**WILLOW AVENUE INVESTMENTS, LLC**
a California limited liability company

By: _____

Darius Assemi

Its: Manager

**MARICOPA ORCHARDS, LLC**
a California limited liability company

By: _____

Farshid Assemi

Its: General Manager

**LENDER:**

**AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY**

By: Conterra Holdings, LLC, an Iowa limited liability company d/b/a Conterra Ag Capital
Its: Attorney-in-Fact under Limited Power of Attorney dated June 29, 2020

By: _____

Mark A. Smith

Its: COO & General Counsel

**EXHIBIT A**

**Legal Description**

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN: 027-171-15-S

PARCEL 3:

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN:  027-171-84-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S
PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S
PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**EXHIBIT 14**

**AGREEMENT TO CONVERT**
**AND**
**AMENDED AND RESTATED NOTE**

**Loan # AG1024**

This Agreement to Convert and Amended and Restated Note (this "Agreement") is made effective this 16th day of December, 2021 (the "Effective Date"), by and among **American Equity Investment Life Insurance Company** (the "Lender") and **Maricopa Orchards, LLC,** a California limited liability company, and **Willow Avenue Investments, LLC,** a California limited liability company (collectively, the "Borrowers"), and modifies and amends certain terms of Borrower's indebtedness evidenced by a Promissory Note (the "Note") to Lender dated July 23, 2020, which is secured by a Deed of Trust Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date and covering the property described in the Security Instrument (the "Property").

In consideration of Borrower's exercise of Borrower's option to convert Borrower's variable interest rate multiple advance line of credit loan to another interest rate loan, pursuant to the provisions of the Note and the Security Instrument, the Note is hereby modified, amended, and restated as follows:

I.    The provisions of the Note are deleted in full and amended and restated with the following:

**1.  BORROWER'S PROMISE TO PAY**
    In return for a loan that Maricopa Orchards, LLC, a California limited liability company and Willow Avenue Investments, LLC, a California limited liability company ("Borrowers") has received, Borrower promises to pay U.S. **$1,614,797.00,** (this amount is called "Principal"), plus interest, to the order of American Equity Investment Life Insurance Company ("Lender"). Borrower will make all payments under this Note in the form of cash, check or money order.
    Borrower understands that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

**2.  INTEREST**
    So long as no Event of Default exists, interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of **3.75%.**
    After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 7 of this Note.

**3.  SCHEDULED PAYMENTS**
    **(A)  Time and Amount of Payments**
    **Borrower will make one interest only payment on January 1, 2022, with interest calculated from the Effective Date at 3.75% per annum; 17 consecutive semi-annual Principal and interest payments of $59,796.99 beginning July 1, 2022, with interest calculated at 3.75% per annum, and the final payment of all outstanding Principal and accrued interest, plus any incurred costs and expenses, on July 23, 2030, which is called the "Maturity Date."**
    **(B)  Place of Payments**
    Borrower will make payments at **5465 Mills Civic Pkwy, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender

**4.  INTEREST CALCULATION**
    Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for

1

the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to Principal, and finally to late charges.

## 5.  PREPAYMENTS.

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

## 6.  INTEREST AFTER DEFAULT

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

## 7.  ANNUAL FINANCIAL STATEMENTS

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

## 8.  DISSEMINATION OF INFORMATION

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis

and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

## 9. LENDER ADVANCES

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

## 10. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at 1306 W Herndon Ave #101, Fresno, CA 93711, or at a different address if Borrowers give Lender a notice of Borrowers' different address. Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

## 11. WAIVERS

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

## 12. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

## 13. USURY

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

## 14. DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED

(A) Event of Default

3

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

     **(1)**     If Borrower fails to repay any interest or Principal under the Note when due;

     **(2)**     If Borrower defaults in any material respect in the performance of any of the other covenants, agreements and obligations of any of the Borrower or any other obligated party under the Security Instrument or any related loan documents involving the payment of money and fails to cure such default within ten (10) days;

     **(3)**     If Borrower defaults in any material respect in the performance of any of such Borrower's non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan documents and fails to cure such default within thirty (30) days after written notice thereof from Lender;

     **(4)**     If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

     **(5)**     If any bankruptcy or insolvency petition is filed by or against Borrower under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

     **(6)**     If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

     **(7)**     If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

     **(B)**     **Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

     **(C)**     **Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

     **(D)**     **No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

     **(E)**     **Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

*[remainder of page intentionally left blank – signature page follows]*

**BORROWERS:**

**WILLOW AVENUE INVESTMENTS, LLC**
a California limited liability company

By: _____
   Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC**
a California limited liability company

By: _____
   Farshid Assemi
Its: General Manager

**LENDER:**

**AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY**

By: Conterra Holdings, LLC, an Iowa limited liability company d/b/a Conterra Ag Capital
Its: Attorney-in-Fact under Limited Power of Attorney dated June 29, 2020

By: _____
   Mark A. Smith
Its: COO & General Counsel

# EXHIBIT 15

Fresno County Recorder
Paul Dictos, CPA

# 2021-0206984

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/17/2021 04:07 25
Titles: 3    Pages: 23
Fees: $99.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $99.00

RECORDING REQUESTED BY
**OLD REPUBLIC TITLE COMPANY**

Escrow No.:  1411012312-DB
APN:    See Exhibit A attached

WHEN RECORDED MAIL TO

Conterra Ag Capital
5465 Mills Civic Pkwy Suite 201
West Des Moines, IA 50266

Loan # AG1021

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

## Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing

1  ☒  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2  ☐  Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4  ☐  Exempt from fee per GC 27388.1(a)(1); fee cap of $225 reached

-------------------------------------------- For Use in Select Counties --------------------------------------------

5  ☐  Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

6  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____(date) as document number _____

7  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ _____ (date) as document number(s)_____

8  ☐  Exempt from fee per GC27388.1(a)(1); maximum fees having been paid on documents in the transaction(s) recorded previously on _____ (date) as document _____ number(s)

9  ☐  Exempt from fee under GC27388.1 for the following reasons:
_____

10  ☐  Exempt from fee per GC 27388.1(a)(1); not related to real property

11  ☐  Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12  ☐  Exempt from fee per GC 27388.1(a)(1); document is executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) Part 4 of the Code of Civil Procedure).

Recorded at Request of
Old Republic Title Company

Ⓐ 141012312-D²

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Shelby Peters**

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
# Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1021**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **December 16, 2021**, together with all Riders to this document.

**(B) "Lender"** is **American Equity Investment Life Insurance Company.**   Lender's address is **6000 Westown Parkway, West Des Moines, Iowa 50266.**  Lender is the beneficiary under this Security Instrument.

**(C) "Borrower"** is **Willow Avenue Investments, LLC, a California limited liability company**.  Borrower is the trustor under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company.**  Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711**.

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Note"** means the promissory note signed by Borrower Parties and dated **July 23, 2020.** The **"Note"** states that Borrower Parties owe Lender **Five Million Five Hundred Fifty Thousand and No/100 ($5,550,000.00)**, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 23, 2030.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether recorded or not recorded.  The following Riders are to be executed by Borrower and/or Borrower Parties:

**CALIFORNIA--UNIFORM INSTRUMENT**

1

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 2 of 23
Order: a Comment:

☐ Irrigation Equipment Rider                    ☐ Water Rights Rider

☒ Financial Information and Covenants Rider      ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider                       ☐ Adjustable Rate Rider

☐ Other(s):

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)** **"Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note. For this purpose, Borrower irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

**Please see Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

**1,614.18 +/- Acres**
**Fresno County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

   **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made

---

**CALIFORNIA--UNIFORM INSTRUMENT**

2

thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

TOGETHER WITH all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

TOGETHER WITH all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

TOGETHER WITH all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

TOGETHER WITH all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

TOGETHER WITH all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

TOGETHER WITH all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

TOGETHER WITH any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider

**CALIFORNIA--UNIFORM INSTRUMENT**

3

is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require

**CALIFORNIA—UNIFORM INSTRUMENT**

4

Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

   **4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

   If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

   All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

   In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

   If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any

CALIFORNIA—UNIFORM INSTRUMENT

5

refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    **5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

    Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    **6. Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

    **7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due

**CALIFORNIA—UNIFORM INSTRUMENT**

and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights

**CALIFORNIA–UNIFORM INSTRUMENT**

7

under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this

**CALIFORNIA--UNIFORM INSTRUMENT**

8

Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably

**CALIFORNIA—UNIFORM INSTRUMENT**

9

require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and

**CALIFORNIA--UNIFORM INSTRUMENT**

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 11 of 23
Order: a Comment:

expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower

**CALIFORNIA–UNIFORM INSTRUMENT**

11

agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies.** Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or

CALIFORNIA--UNIFORM INSTRUMENT

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 13 of 23
Order: a Comment:

any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

26. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

27. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

28. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

29. **Other California State Specific Provisions.**

(a)    In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)    Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)    at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)    the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

CALIFORNIA--UNIFORM INSTRUMENT

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 14 of 23
Order: a Comment:

(d)    Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

*[remainder of page intentionally left blank – signature page follows]*

---

**CALIFORNIA–UNIFORM INSTRUMENT**

14

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**"BORROWER"**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Darius Assemi
Its: Manager

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _FRESNO_

On _Dec. 15, 2021_ before me, _L. Diaz, Notary Public_, personally appeared **Darius Assemi,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

> L. DIAZ
> NOTARY PUBLIC - CALIFORNIA
> COMMISSION # 2235802
> FRESNO COUNTY
> My Comm. Exp. April 20, 2022

**CALIFORNIA--UNIFORM INSTRUMENT**

15

**EXHIBIT A**

**Legal Description**

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN: 027-171-15-S

PARCEL 3:

B-1

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN: 027-171-84-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

B-1

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

B-1

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

B-1

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

Description: CA Fresno Document - Year.DocID 2021.0206984 Page 21 of 23
Order: a Comment:

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1021**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this **16th day of December, 2021**, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by Willow Avenue Investments, LLC (the "Borrower") to secure a promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to Conterra Agricultural Capital dated July 23, 2020, and subsequently assigned to **American Equity Investment Life Insurance Company** (the "Lender") and covering the property described in the Security Instrument and located at:

**1,614.18 +/- Acres**
**Fresno County, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument by Borrower, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain Borrower Parties' financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

[X]  **Frequency.** Annually, Borrower Parties will provide to Lender Borrower Parties' internally prepared financial statements and tax returns within **150** days after the close of each fiscal year.

[X]  **Water Sources.** At all times, the property must have sufficient water sources, producing enough water to sustain normal production.

[X]  **Current Ratio.** Borrower Parties shall always maintain a current ratio, as determined in Lender's sole discretion, of not less than 1.25:1, when measured with the December 31 cost basis financial statements for The Assemi Group, as defined below, annually thereafter during the term of the Loan. Current ratio is computed, as of any date of determination, by dividing current assets by current liabilities.

[X]  **Debt Service Coverage Ratio.** Borrower Parties shall maintain at all times a debt service coverage ratio, as determined in Lender's sole discretion, great than or equal to 1.25:1 when measured with the December 31 financial statements for The Assemi Group, as defined below, annually thereafter during the term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income minus withdrawals, plus depreciation (except for livestock related depreciation), plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

[X]  **Transfer of Ownership.** Borrower Parties shall not, without Lender's prior written consent, convey, transfer, or pledge any ownership to other third-parties, excepting transfers to entities within The Assemi Group, as defined

below.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means all entities identified and consolidated within the annual accountant-audited financial statements title "The Assemi Group".

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

**BORROWER PARTIES:**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Darius Assemi
Its: Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

*[Sign Originals Only]*

# EXHIBIT 16

RECORDING REQUESTED BY
**OLD REPUBLIC TITLE COMPANY**

Escrow No.:  1411012312-DB
APN:    See Exhibit A attached

WHEN RECORDED MAIL TO

Conterra Ag Capital
5465 Mills Civic Pkwy Suite 201
West Des Moines, IA 50266

LN # H61024

Fresno County Recorder
Paul Dictos, CPA

**2021-0206985**

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/17/2021 04:07 25
Titles: 3    Pages: 23
Fees: $99.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $99.00

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

# Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing

1  ☒  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2  ☐  Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4  ☐  Exempt from fee per GC 27388.1(a)(1); fee cap of $225 reached

-------------------------------------------------- For Use in Select Counties --------------------------------------------------

5  ☐  Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

6  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____(date) as document number _____

7  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ _____ (date) as document number(s)_____

8  ☐  Exempt from fee per GC27388.1(a)(1); maximum fees having been paid on documents in the transaction(s) recorded previously on _____ (date) as document _____ number(s)

9  ☐  Exempt from fee under GC27388.1 for the following reasons:
   _____

10  ☐  Exempt from fee per GC 27388.1(a)(1); not related to real property

11  ☐  Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12  ☐  Exempt from fee per GC 27388.1(a)(1); document is executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) Part 4 of the Code of Civil Procedure).

Recorded at Request of
Old Republic Title Company

1411012312-08

③

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Shelby Peters**

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
# Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1024**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **December 16, 2021**, together with all Riders to this document.

**(B) "Lender"** is **American Equity Investment Life Insurance Company.** Lender's address is **6000 Westown Parkway, West Des Moines, Iowa 50266.** Lender is the beneficiary under this Security Instrument.

**(C) "Borrower"** is **Willow Avenue Investments, LLC, a California limited liability company.** Borrower is the trustor under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company.** Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Note"** means the promissory note signed by Borrower Parties and dated **July 23, 2020**, as amended and restated pursuant to an Agreement to Convert and Amended and Restated Note signed by Borrower Parties dated December 15, 2021. The **"Note"** states that Borrower Parties owe Lender **One Million Six Hundred Fourteen Thousand Seven Hundred Ninety Seven and No/100 ($1,614,797.00,)**, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 23, 2030.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether
**CALIFORNIA--UNIFORM INSTRUMENT**

1

recorded or not recorded.  The following Riders are to be executed by Borrower and/or Borrower Parties:

☐ Irrigation Equipment Rider                    ☐ Water Rights Rider
☒ Financial Information and Covenants Rider     ☐ Permitted Prior Encumbrance Rider
☐ Mortgage Insurance Rider                      ☐ Adjustable Rate Rider
☐ Other(s):

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)** **"Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Borrower irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

**Please see Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

**1,614.18 +/- Acres**
**Fresno County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

      **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed,

---

**CALIFORNIA–UNIFORM INSTRUMENT**

2

attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and

**CALIFORNIA--UNIFORM INSTRUMENT**

3

specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in

CALIFORNIA--UNIFORM INSTRUMENT

4

accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

    **4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

    If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

    All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

    In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

    If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts

**CALIFORNIA--UNIFORM INSTRUMENT**

5

unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable

**CALIFORNIA--UNIFORM INSTRUMENT**

6

costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's

**CALIFORNIA–UNIFORM INSTRUMENT**

judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by

CALIFORNIA–UNIFORM INSTRUMENT

8

federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's

CALIFORNIA--UNIFORM INSTRUMENT

9

interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless

CALIFORNIA—UNIFORM INSTRUMENT

10

from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures or added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of  Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change.  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23.  Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents.  However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the

**CALIFORNIA--UNIFORM INSTRUMENT**

11

Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the**

CALIFORNIA—UNIFORM INSTRUMENT

12

notice of sale in one or more parcels and in any order Trustee determines. **Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**26.  Reconveyance.**  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.**  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.  Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.**  Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29.  Other California State Specific Provisions.**

(a)       In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)       Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)       Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)       at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)       the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

CALIFORNIA—UNIFORM INSTRUMENT

13

(d)     Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA—UNIFORM INSTRUMENT**

14

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**"BORROWER"**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Darius Assemi
Its:  Manager

---

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

---

STATE OF CALIFORNIA
COUNTY OF _____FRESNO_____

On _Dec. 15, 20-1_____ before me, _L. Diaz, Notary Public_____, personally appeared **Darius Assemi,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name:_____L. Diaz_____
My commission expires:_____April 20, 2022_____

L. DIAZ
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

---

**CALIFORNIA--UNIFORM INSTRUMENT**

15

**EXHIBIT A**

**Legal Description**

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-85-S
PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN: 027-171-15-S

PARCEL 3:

B-1

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN: 027-171-84-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

Description: CA Fresno Document - Year.DocID 2021.206985 Page 18 of 23
Order: a Comment:

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

B-1

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

B-1

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

B-1

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1024**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this **16th day of December, 2021,** and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by Willow Avenue Investments, LLC (the "Borrower") to secure a promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to Conterra Agricultural Capital, LLC dated July 23, 2020, and subsequently assigned to **American Equity Investment Life Insurance Company** (the "Lender"), and as amended and restated on December 15, 2021, and covering the property described in the Security Instrument and located at:

**1,614.18 +/- Acres**
**Fresno County, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument by Borrower, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain Borrower Parties' financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

☒      **Frequency.** Annually, Borrower Parties will provide to Lender Borrower Parties' internally prepared financial statements and tax returns within **150** days after the close of each fiscal year.

☒      **Water Sources.** At all times, the property must have sufficient water sources, producing enough water to sustain normal production.

☒      **Current Ratio.** Borrower Parties shall always maintain a current ratio, as determined in Lender's sole discretion, of not less than 1.25:1, when measured with the December 31 cost basis financial statements for The Assemi Group, as defined below, annually thereafter during the term of the Loan. Current ratio is computed, as of any date of determination, by dividing current assets by current liabilities.

☒      **Debt Service Coverage Ratio.** Borrower Parties shall maintain at all times a debt service coverage ratio, as determined in Lender's sole discretion, great than or equal to 1.25:1 when measured with the December 31 financial statements for The Assemi Group, as defined below, annually thereafter during the term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income minus withdrawals, plus depreciation (except for livestock related depreciation), plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

☒      **Transfer of Ownership.** Borrower Parties shall not, without Lender's prior written consent, convey, transfer, or pledge any ownership to other third-parties, excepting transfers to entities within The Assemi Group, as defined

below.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means all entities identified and consolidated within the annual accountant-audited financial statements title "The Assemi Group".

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

**BORROWER PARTIES:**

**Willow Avenue Investments, LLC**
a California limited liability company

By: Darius Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

**EXHIBIT 17**

Fresno County Recorder
Paul Dictos, CPA

## 2021-0206986

Recorded at the request of:
ERECORDING PARTNERS NETWORK

12/17/2021 04:07 25
Titles: 1   Pages: 9
Fees: $35.00
CA SB2 Fees:$0.00
Taxes: $0.00
Total: $35.00

RECORDING REQUESTED BY
**OLD REPUBLIC TITLE COMPANY**

Escrow No.:   1411012312-DB
APN:   See Exhibit A attached.

WHEN RECORDED MAIL TO

Conterra Ag Capital
5465 Mills Civic Pkwy Suite 201
West Des Moines, IA 50266

Attn: Shelby Peters

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

## UCC Financing Statement

1  ☒  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2  ☐  Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4  ☐  Exempt from fee per GC 27388.1(a)(1); fee cap of $225 reached

-------------------------------------------------- For Use in Select Counties --------------------------------------------------

5  ☐  Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

6  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____(date) as document number _____

7  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ _____ (date) as document number(s)_____

8  ☐  Exempt from fee per GC27388.1(a)(1); maximum fees having been paid on documents in the transaction(s) recorded previously on _____ (date) as document                                                                                    number(s)

9  ☐  Exempt from fee under GC27388.1 for the following reasons:
_____

10  ☐  Exempt from fee per GC 27388.1(a)(1); not related to real property

11  ☐  Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12  ☐  Exempt from fee per GC 27388.1(a)(1); document is executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) Part 4 of the Code of Civil Procedure).

Recorded at Request of
Old Republic Title Company

141012312-DB

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| **Shelby Peters 515.348.6409** |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| **shelby.peters@ConterraAg.com** |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

**Attn: Shelby Peters**
**Conterra Ag Capital**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Willow Avenue Investments, LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1396 W Herndon Ave Suite 101** | **Fresno** | **CA** | **93711** | **USA** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **American Equity Investment Life Insurance Company** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **6000 Westown Parkway** | **West Des Moines** | **IA** | **50266** | **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:

**See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A legal description attached hereto and made a part hereof.**

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|

| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**AG1021 & AG1024**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**Willow Avenue Investments, LLC**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only *one* additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  <u>or</u>  ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only *one* name (11a or 11b)

11a. ORGANIZATION'S NAME

**Conterra Agricultural Capital, LLC**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **5465 Mills Civic Pkwy, Ste. 201** | **West Des Moines** | **IA** | **50266** | **USA** |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the
REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16
(if Debtor does not have a record interest):

16. Description of real estate:

**See Exhibit A attached hereto and made a part hereof.**

17. MISCELLANEOUS:

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# RIDER A TO UCC

Debtor:                        **Willow Avenue Investments, LLC**

Secured Party:                 **American Equity Investment Life Insurance Company**

Assignor Secured Party:    **Conterra Agricultural Capital, LLC**


In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

---

RIDER A TO UCC

1

## EXHIBIT A

### Legal Description

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN:  027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN:  027-171-15-S

PARCEL 3:

B-1

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN: 027-171-84-S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

B-1

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

B-1

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

Description: CA Fresno Document - Year.DocID 2021.206986 Page 8 of 9
Order: a Comment:

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:
The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

Description: CA Fresno Document - Year.DocID 2021.206986 Page 9 of 9
Order: a Comment:

# EXHIBIT 18

 



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File #: U210111410316

Date Filed: 12/19/2021

| Submitter Information: | |
|---|---|
| Contact Name | Kirk Stanfield |
| Organization Name | SOS Corporate & Court Services |
| Phone Number | (916) 442-4901 |
| Email Address | order@sosccs.com |
| Address | 520 9TH STREET #103 SACRAMENTO, CA 95814 |

| Amendment Action Information: | |
|---|---|
| Initial Financing Statement File Number | U200029038629 |
| Date Filed | 10/12/2020 |
| Amendment Action | Collateral Amendment |
| Collateral Change | Delete Collateral |

| Indicate how documentation of Collateral is provided: | Attached in a File |
|---|---|

Upload PDF as Collateral:
1421001288 1 of 4.pdf

☐ Check this box to see additional UCC Collateral options.

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

Authorizing Secured Party Name      AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY

Optional Filer Reference Information:
AG1021 & AG1024

Miscellaneous Information:
COLLATERAL CHANGE DELETE: SEE EXHIBIT A

B0456-1691 12/19/2021 2:15 PM Received by California Secretary of State

B0456-1692 12/19/2021 2:15 PM Received by California Secretary of State

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Shelby Peters 515-348-6409

**B. E-MAIL CONTACT AT FILER (optional)**
Shelby.peters@conterraag.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Attn: Shelby Peters
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☑ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|
| U200029038629 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                                    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☑ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☑ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:
See attached Exhibit A

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| American Equity Investment Life Insurance Company | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
AG1021 & AG1024

UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

B0456-1693 12/19/2021 2:15 PM Received by California Secretary of State

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM
FOLLOW INSTRUCTIONS

| 11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form |
|---|
| U200029038629 |

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as Item 9 on Amendment form

12a. ORGANIZATION'S NAME
American Equity Investment Life Insurance Company

OR

12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME
Willow Avenue Investments, LLC

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

15. This FINANCING STATEMENT AMENDMENT:
  ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17
(if Debtor does not have a record interest):

17. Description of real estate:
See Attached Exhibit A

18. MISCELLANEOUS:

UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

B0456-1694 12/19/2021 2:15 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the County of Kern, City of Bakersfield, State of California, and is described as follows:

PARCEL 1:

Lots 1, 2 and 3 and the North half of the Northeast Quarter of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas, hydrocarbon substances and other minerals contained within the property hereinabove referred to, whether now known to exist or hereafter discovered, all oil, gas, hydrocarbon substances and other mineral rights belonging to or appertaining to said property, the exclusive right to prospect for, drill for, produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals upon and from said property, the exclusive right to drill upon, to drill through and otherwise to use said property to produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals from adjacent or neighboring lands, and the exclusive right to inject in, store under and thereafter withdraw from said property oil, gas, hydrocarbon substances and other minerals and products thereof, whether produced from said property or elsewhere, together with the right to drill and operate whatever wells, construct, install, operate, maintain and remove whatever other facilities and do whatever else may be reasonably necessary on and in said property for the full enjoyment and exercise of the rights to excepted and reserved, and the unrestricted right of ingress and egress to and from said property for all such purposes; but grantor and its successors and assigns shall compensate grantee and its successors and assigns upon demand for any and all damage they cause to improvements and growing crops upon said property by the enjoyment or exercise of the rights so excepted and reserved by Tenneco West, Inc., a Delaware corporation in Deed recorded December 28, 1971 in Book 4614, Page 672 of Official Records.

APN: 295-070-04 and 295-070-06

PARCEL 2:

Lots 1 and 2 in the Northeast Quarter of Section 3, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM all oil, gas, hydrocarbon substances and other minerals contained within the property hereinabove referred to, whether now known to exist or hereafter discovered, all oil, gas, hydrocarbon substances and other mineral rights belonging to or appertaining to said property, the exclusive right to prospect for, drill for, produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals upon and from said property, the exclusive right to drill upon, to drill through and otherwise to use said property to produce, mine, extract and remove oil, gas, hydrocarbon substances and other minerals from

B0456-1695 12/19/2021 2:15 PM Received by California Secretary of State

adjacent or neighboring lands, and the exclusive right to inject in, store under and thereafter withdraw from said property oil, gas, hydrocarbon substances and other minerals and products thereof, whether produced from said property or elsewhere, together with the right to drill and operate whatever wells, construct, install, operate, maintain and remove whatever other facilities and do whatever else may be reasonably necessary on and in said property for the full enjoyment and exercise of the rights to excepted and reserved, and the unrestricted right of ingress and egress to and from said property for all such purposes; but grantor and its successors and assigns shall compensate grantee and its successors and assigns upon demand for any and all damage they cause to improvements and growing crops upon said property by the enjoyment or exercise of the rights so excepted and reserved by Tenneco West, Inc., a Delaware corporation in Deed recorded December 28, 1971 in Book 4614, Page 672 of Official Records.

APN: 295-070-23

PARCEL 3:

Lots 4, 5 and 6 of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM an undivided 1/6th interest in and to the oil, gas and other hydrocarbon substances and all other minerals and mineral rights conveyed to Ernest L. Antongiovanni, an unmarried man, as to an undivided one-third (1/3) interest, Claudia Lee Heinle, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest and Martha Jean Ball, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest, by Deed recorded November 16, 1984 in Book 5711, Page 487 of Official Records.

ALSO EXCEPTING THEREFROM all minerals including all gas and other hydrocarbons within or underlying said property, owned by Lucy Antongiovanni, a widow and Ernest Antongiovanni, as Trustee, as Trustee of the Testamentary Trust of the Ugo Antongiovanni Trust (Ernest Antongiovanni, aka Ernest L. Antongiovanni, aka Ernst L. Antongiovanni and Lucy Antongiovanni, aka Lucy Angela Antongiovanni, aka Lucille Angela Antongiovanni), as reserved in Deed recorded September 1, 1988 in Book 6159, Page 78 of Official Records.

By an Agreement for surface entry waiver and for drill sites dated May 26, 1988 executed by and between David Antongiovanni; Helen Antongiovanni individually and on behalf of the Estate of Eugene Antongiovanni, deceased; Lucy A. Antongiovanni, and Ernest L. Antongiovanni as Trustee of The Ugo Antongiovanni, Trust recorded September 1, 1988 in Book 6159, Page 146 of Official Records, it was agreed that none of the surface thereof to a depth of 500 feet below the surface thereof, ever shall be used for the purpose of drilling for, producing, extracting, or taking the oil, gas or other hydrocarbon substances and the other minerals, therein or thereunder, EXCEPTING THEREFROM a drill site together with unrestricted rights for ingress and egress to and from the drill site, and for pipelines to and from the drill site, the location of the drill site, roadway and pipeline easements being described as a portion of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, and as Section is shown on County Surveyor's Map 7-1, filed in Book 7 at Page 22 of Filed Maps, in the Office of the County Surveyor of said County and described as:

B0456-1696 12/19/2021 2:15 PM Received by California Secretary of State

The Easterly 300 feet of the Northerly 300 feet of the Southerly 815 feet of the Northwest Quarter of said Section 2, together with the right of access across the Northerly 15 feet of the Northeast Quarter and also across the Easterly 15 feet of the Northerly 1805 feet of the Northwest Quarter of last named Section 2.

APN: 295-070-03

PARCEL 4:

Lots 5 and 7 of Section 3, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, as shown on the Record of Survey filed November 19, 1895 in Book 1, Page 128 of Record of Surveys, in the Office of the County Recorder of said County.

EXCEPTING THEREFROM an undivided 1/6th interest in and to the oil, gas and other hydrocarbon substances and all other minerals and mineral rights conveyed to Ernest L. Antongiovanni, an unmarried man, as to an undivided one-third (1/3) interest, Claudia Lee Heinle, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest and Martha Jean Ball, a married woman as her sole and separate property, as to an undivided one-third (1/3) interest, by Deed recorded November 16, 1984 in Book 5711, Page 487 of Official Records.

ALSO EXCEPTING THEREFROM all minerals including all gas and other hydrocarbons within or underlying said property, owned by Lucy Antongiovanni, a widow and Ernest Antongiovanni, as Trustee, as Trustee of the Testamentary Trust of the Ugo Antongiovanni Trust (Ernest Antongiovanni, aka Ernest L. Antongiovanni, aka Ernst L. Antongiovanni and Lucy Antongiovanni, aka Lucy Angela Antongiovanni, aka Lucille Angela Antongiovanni) as reserved in Deed recorded September 1, 1988 in Book 6159, Page 78 of Official Records.

By an Agreement for surface entry waiver and for drill sites dated May 26, 1988 executed by and between David Antongiovanni; Helen Antongiovanni individually and on behalf of the Estate of Eugene Antongiovanni, deceased; Lucy A. Antongiovanni, and Ernest L. Antongiovanni as Trustee of The Ugo Antongiovanni, Trust recorded September 1, 1988 in Book 6159, Page 146 of Official Records, it was agreed that none of the surface thereof to a depth of 500 feet below the surface thereof, ever shall be used for the purpose of drilling for, producing, extracting, or taking the oil, gas or other hydrocarbon substances and the other minerals, therein or thereunder, EXCEPTING THEREFROM therefrom a drill site together with unrestricted rights for ingress and egress to and from the drill site, and for pipelines to and from the drill site, the location of the drill site, roadway and pipeline easements being described as a portion of Section 2, Township 32 South, Range 27 East, Mount Diablo Base and Meridian, and as Section is shown on County Surveyor's Map 7-1, filed in Book 7 at page 22 of Filed Maps, in the Office of the County Surveyor of said County and described as:

The Easterly 300 feet of the Northerly 300 feet of the Southerly 960 feet of the Northeast Quarter of said Section 3, together with the right of access across the Northerly 15 feet of Section 2 of said township and range, and also across the Easterly 15 feet of the Northerly 1635 feet of said Section 3.

APN: 295-070-02

**EXHIBIT 19**






**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210111411217 |
| Date Filed: 12/19/2021 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | Kirk Stanfield |
| Organization Name | SOS Corporate & Court Services |
| Phone Number | (916) 442-4901 |
| Email Address | order@sosccs.com |
| Address | 520 9TH STREET #103 SACRAMENTO, CA 95814 |

Amendment Action Information:

| | |
| --- | --- |
| Initial Financing Statement File Number | U200029038629 |
| Date Filed | 10/12/2020 |
| Amendment Action | Collateral Amendment |
| Collateral Change | Add Collateral |

| Indicate how documentation of Collateral is provided: | Attached in a File |
| --- | --- |

Upload PDF as Collateral:
1421001228 2 of 4.pdf

☐ Check this box to see additional UCC Collateral options.

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY |
| --- | --- |

Optional Filer Reference Information:
AG1021 & AG1024

Miscellaneous Information:
COLLATERAL CHANGE ADD: SEE ATTACHED EXHIBIT A

B0456-1705 12/19/2021 2:22 PM Received by California Secretary of State

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Shelby Peters 515-348-6409

**B. E-MAIL CONTACT AT FILER (optional)**
Shelby.peters@conterraag.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Attn: Shelby Peters
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| U200029038629 | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:       **AND** Check one of these three boxes to:

☐ This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☑ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☑ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:
See attached Exhibit A

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | American Equity Investment Life Insurance Company | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
AG1021 & AG1024

B0456-1706 12/19/2021 2:22 PM Received by California Secretary of State

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM
FOLLOW INSTRUCTIONS

| 11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as Item 1a on Amendment form |
|---|
| U200029038629 |

**12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as Item 9 on Amendment form**

| 12a. ORGANIZATION'S NAME |
|---|
| American Equity Investment Life Insurance Company |

OR

| 12b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction Item 13); Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| 13a. ORGANIZATION'S NAME |
|---|
| Willow Avenue Investments, LLC |

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

| 15. This FINANCING STATEMENT AMENDMENT: | 17. Description of real estate: |
|---|---|
| ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing | See Attached Exhibit A |
| 16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest): | |

18. MISCELLANEOUS:

UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

B0456-1707 12/19/2021 2:22 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The North 771.60 feet (measured along the West line of the Northeast one quarter) of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian; EXCEPTING THEREFROM the North 50 feet and ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded October 20, 1964 in Book 5082, Page 1 as Document No. 82320, Official Records.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya an Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-85-S

PARCEL 2:

The Northwest quarter of Section 29, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion thereof lying Northeasterly of the Southwesterly boundary line of that property conveyed to the State of California in the Deed recorded August 12, 1996 in Book 5346 Page 477 as Document No. 59482, Official Records.

ALSO EXCEPTING THEREFROM 50% of oil, gas and minerals rights in and under said land as reserved in the Deed from Frank G. Everts, et al, to Elynor Falk and David Falk, wife and husband, dated November 29, 1963, recorded February 13, 1964 in Book 4964 Page 236 as Document No. 12039, Official Records.

ALSO EXCEPTING AND RESERVING unto the grantors, as their interests appear, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157913, Official Records.

APN: 027-171-15-S

PARCEL 3:

The East one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast quarter, pursuant to Lot Line Adjustment No. 05-12.

EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals, which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 20020157911, Official Records.

APN: 027-171-60-S

PARCEL 4:

The West one half of that portion of the Northeast one quarter of Section 30, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, lying South of the North 771.60 feet (measured along the West line of the Northeast one quarter) of said Northeast one quarter.

ALSO EXCEPTING THEREFROM AND RESERVING unto James S. Anderson, all the grantor's right, title and interest in and to all oil, gas, other hydrocarbon substances and minerals which may be located in and under said land, as conveyed in the Deed from Robert Montoya and Juanita Montoya, husband and wife to James S. Anderson, a married man as his sole and separate property, dated March 19, 2001, recorded June 19, 2001 as Document No. 2001-0084954, Official Records, as reserved in the Grant Deed recorded September 12, 2002 as Document No. 2002-157911, Official Records.

APN: 027-171-84-S

B0456-1708 12/19/2021 2:22 PM Received by California Secretary of State

B0456-1709 12/19/2021 2:22 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Southwest Quarter of Section 20, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855.

Excepting therefrom that portion granted to CMA, a California general partnership in the Corporation of Grant Deed dated July 1, 1988 and recorded on September 19, 1988 as Instrument No. 88-103835, Official Records.

Also excepting therefrom all oil, gas, minerals, and other hydrocarbon substances in and under said land.

APN: 050-060-42S

PARCEL 2:

The Westerly 90 feet of the Northwest Quarter of Section 29, Township 17 South, Range 16 East, Mount Diablo Same and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying said land, or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, together with the exclusive and perpetual right of Bravo Oil Company, it successors and assigns, of ingress and across in, upon or over said property to explore and prospect for, extract, develop, save, convey, store, refine, process and remove the same and to make such use of said property and the surface thereof as is necessary or useful in connection therewith, which use may include the sinking, boring, digging or drilling of wells, shafts or tunnels, excavating, open pit mining and constructing, maintaining and removing roads, ways, pipe lines, pole lines, tanks, buildings, structures and facilities.

APN: 050-100-40S

PARCEL 3:

That portion of the Northeast Quarter of Section 30, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Township Plat approved by the Surveyor General on August 6, 1855, described as follows:

B0456-1710 12/19/2021 2:22 PM Received by California Secretary of State

Beginning at a point on the North line of said Section 30, 530 feet West of the Northeast corner of said Section; thence South parallel with the East line of said Section, 540 feet; thence East parallel with the North line of said Section, 500 feet; thence South parallel with said East line 950 feet; thence West parallel with said North line 150 feet; thence South parallel with said East line 220 feet; thence East parallel with said North line 180 feet to said East line; thence North along said East line to the Northeast corner of said Section 30; thence West along the North line of said Section to the point of beginning.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land, as previously reserved of record.

APN: 050-100-27S

PARCEL 4:

The Northeast quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 393422, Official Records.

APN: 050-070-25S

PARCEL 5:

The Southwest Quarter of Section 23, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom the Southwest Quarter of the Southwest Quarter of said Section 23.

Also excepting therefrom all oil, gas and minerals in and under said land, as reserved in the Deed from Kings County Development Company to Carl L. Mauldin, dated May 15, 1947, recorded July 25, 1947, in Book 2561, Page 220 as Document No. 39422, Official Records.

APN: 050-070-39S

PARCEL 6:

Section 3, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all of the minerals and mineral ores of ever kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without limiting the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates, and products derived therefrom, as granted to Bravo Oil Company in Deed recorded December 29, 1965, as Document No. 104217, Official Records.

APN: 060-030-14S

B0456-1711 12/19/2021 2:22 PM Received by California Secretary of State

PARCEL 7:

The Southeast Quarter of the Southeast Quarter of Section 6, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plats thereof.

Excepting therefrom all oil, gas, and other hydrocarbons and minerals in and under said land as previously reserved of record.

APN: 060-020-20S

PARCEL 8:

The North 160 acres thereof of the Fractional West One-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the Official Government Plat thereof.

Excepting therefrom all iron, coal, lignite, asphaltum, petroleum, and other mineral oils, gypsum, gold, silver, cinnabar, lead, tin, copper, limestone, marble and all other deposits and substances, as reserved by Southern Pacific Railroad Company in Deed recorded January 16, 1904 in Book 308, Page 453 of Deeds, Fresno County Records.

APN: 060-020-50S

B0456-1712 12/19/2021 2:22 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**EXHIBIT 20**

Fresno County Recorder
Paul Dictos, CPA

**2023-0053791**

Recorded at the request of:
ERECORDING PARTNERS NETWORK

06/09/2023 01:28 24
Titles: 2        Pages: 3
Fees: $44.00
CA SB2 Fees:$150.00
Taxes: $0.00
Total: $194.00

Recorded at the Request of
Old Republic Title Company

· 1421002604-DB

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

Conterra Ag Capital
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266
Attn: Alison Werts 515-564-5147

_____ [Above Space for Recorder's Use Only] _____

### SUBSTITUTION OF TRUSTEE AND PARTIAL RECONVEYANCE

      **American Equity Investment Life Insurance Company** ("**Beneficiary**"), the present beneficiary and owner and holder of the Deed of Trust Security Agreement, Assignment of Rents and Fixture Filing dated December 16, 2021, made by **Willow Avenue Investments, LLC,** a California limited liability company to Old Republic Title Company, as original trustee, for **Conterra Agricultural Capital, LLC, an Iowa limited liability company**, as original beneficiary, and recorded as **Instrument Number 2021-0206984** on December 17, 2021, of Official Records in the office of the County Recorder of Fresno County, California (the "**Deed of Trust**"), HEREBY APPOINTS AND SUBSTITUTES **Conterra Agricultural Capital, LLC,** an Iowa limited liability company ("**Successor Trustee**"), as the new and successor trustee thereunder in accordance with the terms and provisions contained therein.

      Pursuant to Beneficiary's written request and in accordance with the provisions of the Deed of Trust, Successor Trustee DOES HEREBY RECONVEY to the person or persons legally entitled thereto, without warranty, all the estate, title, and interest acquired and now held by Successor Trustee as trustee under the Deed of Trust in and to that certain property described on **Exhibit A** attached hereto and by this reference incorporated herein ("**Released Portion**") while retaining the lien of the Deed of Trust unimpaired and of full force and effect with respect to all other property and collateral described in the Deed of Trust and not previously released by any trustee.

*[remainder of page intentionally blank – signature page follows]*

IN WITNESS WHEREOF, Beneficiary and Successor Trustee have caused this instrument to be executed as of _May 18_____, 2023.

**BENEFICIARY:**

AMERICAN EQUITY INVESTMENT LIFE
INSURANCE COMPANY

By: Conterra Holdings, LLC, an Iowa limited liability
    company d/b/a Conterra Ag Capital
Its: Attorney-in-Fact under Limited Power of
    Attorney dated June 29, 2020

By: _____
    Mark A. Smith
Its:  COO & General Counsel

**SUCCESSOR TRUSTEE:**

CONTERRA AGRICULTURAL CAPITAL, LLC,
an Iowa limited liability company

By: _____
    Mark A. Smith
Its:  COO & General Counsel

STATE OF IOWA, COUNTY OF POLK, ss.

    This instrument was acknowledged before me on _May 18_____, 2023, by Mark A. Smith, as COO & General Counsel of Conterra Holdings, LLC, as Attorney-in-Fact, pursuant to Limited Power of Attorney dated June 29, 2020, for American Equity Investment Life Insurance Company.

ALISON WERTS
Commission Number 796850
My Commission Expires
June 22, 2025

_____
Notary Public in and for the State of Iowa

STATE OF IOWA, COUNTY OF POLK, ss.

    This instrument was acknowledged before me on _May 18_____, 2023, by Mark A. Smith, as COO & General Counsel of Conterra Agricultural Capital, LLC, an Iowa limited liability company.

ALISON WERTS
Commission Number 796850
My Commission Expires
June 22, 2025

_____
Notary Public in and for the State of Iowa

Re: AG1021

Description: CA Fresno Document - Year.DocID 2023.0053791 Page 2 of 3
Order: a Comment:

## EXHIBIT A

### LEGAL DESCRIPTION OF RELEASED PORTION

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

Description: CA Fresno Document - Year.DocID 2023.0053791 Page 3 of 3
Order: a Comment:

**EXHIBIT 21**

Fresno County Recorder
Paul Dictos, CPA

## 2023-0053792

Recorded at the request of:
ERECORDING PARTNERS NETWORK

06/09/2023 01:28 24
Titles: 2      Pages: 3
Fees: $44.00
CA SB2 Fees:$75.00
Taxes: $0.00
Total: $119.00

Recorded at the Request of
Old Republic Title Company

1421002604-DB

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

Conterra Ag Capital
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266
Attn: Alison Werts 515-564-5147

_____ [Above Space for Recorder's Use Only] _____

### SUBSTITUTION OF TRUSTEE AND PARTIAL RECONVEYANCE

**American Equity Investment Life Insurance Company** ("**Beneficiary**"), the present beneficiary and owner and holder of the End Deed of Trust Security Agreement, Assignment of Rents and Fixture Filing dated December 16, 2021, made by **Willow Avenue Investments, LLC,** a California limited liability company to Old Republic Title Company, as original trustee, for **Conterra Agricultural Capital, LLC, an Iowa limited liability company**, as original beneficiary, and recorded as **Instrument Number 2021-0206985** on December 17, 2021, of Official Records in the office of the County Recorder of Fresno County, California (the "**Deed of Trust**"), HEREBY APPOINTS AND SUBSTITUTES **Conterra Agricultural Capital, LLC**, an Iowa limited liability company ("**Successor Trustee**"), as the new and successor trustee thereunder in accordance with the terms and provisions contained therein.

Pursuant to Beneficiary's written request and in accordance with the provisions of the Deed of Trust, Successor Trustee DOES HEREBY RECONVEY to the person or persons legally entitled thereto, without warranty, all the estate, title, and interest acquired and now held by Successor Trustee as trustee under the Deed of Trust in and to that certain property described on **Exhibit A** attached hereto and by this reference incorporated herein ("**Released Portion**") while retaining the lien of the Deed of Trust unimpaired and of full force and effect with respect to all other property and collateral described in the Deed of Trust and not previously released by any trustee.

*[remainder of page intentionally blank – signature page follows]*

IN WITNESS WHEREOF, Beneficiary and Successor Trustee have caused this instrument to be executed as of _May 18_____, 2023.

**BENEFICIARY:**

AMERICAN EQUITY INVESTMENT LIFE
INSURANCE COMPANY

By: Conterra Holdings, LLC, an Iowa limited liability
    company d/b/a Conterra Ag Capital
Its: Attorney-in-Fact under Limited Power of
    Attorney dated June 29, 2020

By: _____
    Mark A. Smith
Its:  COO & General Counsel


**SUCCESSOR TRUSTEE:**

CONTERRA AGRICULTURAL CAPITAL, LLC,
an Iowa limited liability company

By: _____
    Mark A. Smith
Its:  COO & General Counsel

STATE OF IOWA, COUNTY OF POLK, ss.

    This instrument was acknowledged before me on _May 18____, 2023, by Mark A. Smith, as COO & General Counsel of Conterra Holdings, LLC, as Attorney-in-Fact, pursuant to Limited Power of Attorney dated June 29, 2020, for American Equity Investment Life Insurance Company.

ALISON WERTS
Commission Number 796850
My Commission Expires
June 22, 2025

_____
Notary Public in and for the State of Iowa


STATE OF IOWA, COUNTY OF POLK, ss.

    This instrument was acknowledged before me on _May 18____, 2023, by Mark A. Smith, as COO & General Counsel of Conterra Agricultural Capital, LLC, an Iowa limited liability company.

ALISON WERTS
Commission Number 796850
My Commission Expires
June 22, 2025

_____
Notary Public in and for the State of Iowa

Re: AG1024

2

## EXHIBIT A

### LEGAL DESCRIPTION OF RELEASED PORTION

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**EXHIBIT 22**

Old Republic Title Company

1421002604-DB

**Fresno County Recorder**
**Paul Dictos, CPA**

**2023-0053793**

Recorded at the request of:
ERECORDING PARTNERS NETWORK

06/09/2023 01:28 24
Titles: 1     Pages: 3
Fees: $25.00
CA SB2 Fees:$0.00
Taxes: $0.00
Total: $25.00

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
A. Werts 515-564-5147

B. E-MAIL CONTACT AT FILER (optional)
alison.werts@conterraag.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

American Equity Investment Life Ins. Co.
c/o Conterra
5465 Mills Civic Parkway, Ste. 201
West Des Moines, IA 50266
Recorded Requested by and return to

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☑ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| #2021-0206986 recorded 12/17/21  *Fresno County records* | (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                    AND Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☑ COLLATERAL CHANGE:  Also check one of these four boxes:  ☐ ADD collateral  ☑ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:
See attached Exhibit A

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | American Equity Investment Life Insurance Company | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
AG1021

UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM
FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER:  Same as item 1a on Amendment form

#2021-0206986 recorded 12/17/21

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT:  Same as item 9 on Amendment form

| | |
|---|---|
| 12a. ORGANIZATION'S NAME | American Equity Investment Life Insurance Company |
| OR 12b. INDIVIDUAL'S SURNAME | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13):  Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| | | | |
|---|---|---|---|
| 13a. ORGANIZATION'S NAME  *Willow Avenue Investments LLC* | | | |
| OR 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

15. This FINANCING STATEMENT AMENDMENT:

☐ covers timber to be cut   ☐ covers as-extracted collateral   ☑ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17
(if Debtor does not have a record interest):

17. Description of real estate:

Released property is listed on Exhibit A

18. MISCELLANEOUS:

UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

## EXHIBIT A

### LEGAL DESCRIPTION OF RELEASED PORTION

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

# EXHIBIT 23






**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U230040617926 |
| Date Filed: 6/9/2023 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | Kirk Stanfield |
| Organization Name | |
| Phone Number | (916) 205-9441 |
| Email Address | order@sosccs.com |
| Address | 9580 Oak Ave Parkway #7-266 Folsom, CA 95630 |

Amendment Action Information:

| | |
| --- | --- |
| Initial Financing Statement File Number | U200029038629 |
| Date Filed | 10/12/2020 |
| Amendment Action | Collateral Amendment |
| Collateral Change | Delete Collateral |

| | |
| --- | --- |
| Indicate how documentation of Collateral is provided: | Attached in a File |

Upload PDF as Collateral:
U200029038629.pdf

☐ Check this box to see additional UCC Collateral options.

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| | |
| --- | --- |
| Authorizing Secured Party Name | AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY |

Optional Filer Reference Information:
AG1024

Miscellaneous Information:

B1846-6115 06/09/2023 12:17 PM Received by California Secretary of State

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>A. Werts 515-564-5147 | |
| B. E-MAIL CONTACT AT FILER (optional)<br>alison.werts@conterraag.com | |
| C. SEND ACKNOWLEDGMENT TO:  (Name and Address)<br><br>⌐ American Equity Investment Life Ins. Co.<br>c/o Conterra<br>5465 Mills Civic Parkway, Ste. 201<br>West Des Moines, IA 50266<br><br>⌐ | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER<br>File #: U200029038629 filed 10/12/20 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]<br>(or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | | | | |
|---|---|---|---|---|
| 6a. ORGANIZATION'S NAME | | | | |
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | | |
|---|---|---|---|---|
| 7a. ORGANIZATION'S NAME | | | | |
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☑ **COLLATERAL CHANGE:**  Also check one of these four boxes:  ☐ ADD collateral   ☑ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral

Indicate collateral:
See attached Exhibit A

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | | | | |
|---|---|---|---|---|
| 9a. ORGANIZATION'S NAME<br>American Equity Investment Life Insurance Company | | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
AG1024

UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

B1846-6116  06/09/2023  12:17 PM  Received by California Secretary of State

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM
FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER:  Same as item 1a on Amendment form
**File #: U200029038629 filed 10/12/20**

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME
American Equity Investment Life Insurance Company

OR

12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13):  Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME

OR

13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

15. This FINANCING STATEMENT AMENDMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17
(if Debtor does not have a record interest):

17. Description of real estate:
Released property is listed on Exhibit A

18. MISCELLANEOUS:

UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

B1846-6117 06/09/2023 12:17 PM Received by California Secretary of State

## EXHIBIT A

### LEGAL DESCRIPTION OF RELEASED PORTION

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

The East 1731.7 feet of Section 28, Township 15 South, Range 13 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in deeds of record.

Excepting therefrom that portion deeded to Fresno County for Manning Avenue, recorded in Book 5721 Page 929, Official Records.

APN: 027-171-82-S

**EXHIBIT 24**

# NOTE

**Loan #AG1022**

| **July 23, 2020** | **Fresno** | **CA** |
|---|---|---|
| [Date] | [City] | [State] |

**20 +/- Acres**
**Kern County, California**
[Property Address]

### 1.    BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Lincoln Grantor Farms, LLC**, a California limited liability company (Maricopa Orchards, LLC and Willow Avenue Investments, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$288,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company**. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

### 2.    INTEREST

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **3.750%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

### 3.    SCHEDULED PAYMENTS

**(A)   Time and Amount of Payments**
**1 payment on January 1, 2021, in the Principal amount of $4,898.63 plus all accrued interest, with interest calculated from the date of closing on the unpaid Principal balance at 3.750%% per annum; 19 consecutive semi-annual Principal and interest payments of $10,298.63 each, beginning July 1, 2021 with the final payment of all remaining Principal and interest, plus any costs and expenses, due on July 23, 2030, which is called the "Maturity Date."**
**(B)   Place of Payments**
Borrowers will make payments at 7755 Office Plaza Drive North, Suite 195, West Des Moines, IA 50266 or at a different place if required by Lender

### 4.    INTEREST CALCULATION

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to Principal, and finally to late charges.

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

1

5. **PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

6. **INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

7. **ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31ˢᵗ of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

8. **DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities

("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

## 9.    LENDER ADVANCES

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

## 10.    GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

## 11.    WAIVERS

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

## 12.    UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

13.    **USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

14.    **DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

(A)    **Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

(1)    If Borrowers fail to repay any interest or Principal under the Note when due;

(2)    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

(3)    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

(4)    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

(5)    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

(6)    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

(7)    If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

(B)    **Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

(C)    **Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

(D)    **No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

(E)     **Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Lincoln Grantor Farms, LLC**
a California limited liability company

_____

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

_____

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

**EXHIBIT 25**

Recorded at Request of
Old Republic Title Company

141018745

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC
7755 Office Plaza Dr. North, Suite 195
West Des Moines, IA 50266
Attn: Taylor Petersen**

Jon Lifquist, Assessor-Recorder
Kern County Official Records

LB
7/23/2020
11:57 AM

Recorded Electronically by:
451 Old Republic Title Company

DOC #: **220096754**



220096754

| Stat Types: 3 | Pages: 16 |
|---|---|
| FEES | 111.00 |
| TAXES | .00 |
| OTHER | 225.00 |
| PAID | 336.00 |

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1022**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)** "**Security Instrument**" means this document, which is dated **July 23, 2020,** together with all Riders to this document.

**(B)** "**Lender**" is **Conterra Agricultural Capital, LLC.** Lender is a **limited liability company** organized and existing under the laws of **Iowa.** Lender's address is **7755 Office Plaza Dr. North, Suite 195 West Des Moines, IA 50266.** Lender is the beneficiary under this Security Instrument.

**(C)** "**Borrower**" is **Lincoln Grantor Farms, LLC, a California limited liability company.** Borrower is the trustor under this Security Instrument. "**Borrower Parties**" are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company.** Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

**(D)** "**Trustee**" is Old Republic Title Company.

**(E)** "**Note**" means the promissory note signed by Borrower Parties and dated **July 23, 2020.** The "**Note**" states that Borrower Parties owe Lender **Two Hundred Eighty-Eight Thousand and No/100 Dollars ($288,000.00),** plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 23, 2030.**

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether
**CALIFORNIA–UNIFORM INSTRUMENT**

1

recorded or not recorded.  The following Riders are to be executed by Borrower and/or Borrower Parties:

☐ Irrigation Equipment Rider                    ☐ Water Rights Rider

☐ Financial Information and Covenants Rider     ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider                      ☐ Adjustable Rate Rider

☐ Other(s):

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Borrower irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kern, California**:

**Please see Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

**20 +/- Acres**
**Kern County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

    **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed,

---

**CALIFORNIA—UNIFORM INSTRUMENT**

attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Kern, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and

**CALIFORNIA--UNIFORM INSTRUMENT**

specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in

**CALIFORNIA--UNIFORM INSTRUMENT**

4

accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts

**CALIFORNIA–UNIFORM INSTRUMENT**

5

unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    **5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

    Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    **6. Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

    **7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable

**CALIFORNIA--UNIFORM INSTRUMENT**

costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's

CALIFORNIA--UNIFORM INSTRUMENT

judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by

CALIFORNIA--UNIFORM INSTRUMENT

8

federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's

CALIFORNIA--UNIFORM INSTRUMENT

interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless

CALIFORNIA--UNIFORM INSTRUMENT

from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the

CALIFORNIA—UNIFORM INSTRUMENT

11

Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies.** Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the

CALIFORNIA--UNIFORM INSTRUMENT

notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)     In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

CALIFORNIA–UNIFORM INSTRUMENT

(d)    Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA--UNIFORM INSTRUMENT**

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

**"BORROWER"**

**Lincoln Grantor Farms, LLC**
a California limited liability company

By: Neema Assemi
Its: Manager

Lincoln Grantor Farms, LLC

a California limited liability company

Neema Assemi

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF CALIFORNIA
COUNTY OF _Fresno_

On _July 20, 2020_ before me, _L. Diaz, Notary Public_, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

---

**CALIFORNIA--UNIFORM INSTRUMENT**

15

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

**EXHIBIT 26**

 

**STATE OF CALIFORNIA**
*Office of the Secretary of State, Alex Padilla*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U200024956631 |
| Date Filed: 10/12/2020 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| LINCOLN GRANTOR FARMS, LLC | 1306 W. HERNDON AVE. STE 101 FRESNO, CA 93711 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 6000 WESTOWN PARKWAY WEST DES MOINES, IA 50266 |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 7755 OFFICE PLAZA DR N SUITE 195 WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Attached in a File

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
77141935

See Rider A to UCC and Exhibit A legal description, attached hereto and made a part hereof.

B0335-8995 10/12/2020 7:12 AM Received by California Secretary of State

This page and any following pages include and merge any text received for the collateral description with any attachments.

B0035-8996 10/12/2020 7:12 AM Received by California Secretary of State

# RIDER A TO UCC

Debtor:                          **Lincoln Grantor Farms, LLC**

Secured Party:                   **American Equity Investment Life Insurance Company**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

---

**RIDER A TO UCC**

B0335-8997 10/12/2020 7:12 AM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

**EXHIBIT 27**

**Jon Lifquist, Assessor—Recorder**
Kern County Official Records

DUARTED
10/13/2020
10:32 AM

Recorded at the request of
**Public**

Recording Requested By:

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

Return To:

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

D O C # :  **220148455**

| Stat Types: 1 | Pages: | **5** |
|---|---|---|
| Fees | | 30.00 |
| Taxes | | 0.00 |
| Others | | 75.00 |
| PAID | | $105.00 |

THIS SPACE IS FOR RECORDER'S USE ONLY

**DOCUMENT TITLE(S)**

**UCC FINANCING STATEMENT  Original(UCC-1) Filing**

THIS  Original(UCC-1) Filing      FIXTURE FILING IS BEING RECORDED WITH   KERN          COUNTY

Order No: 77141732

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

49931 - Conterra Ag -

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

77141732

CALI
FIXTURE

File with: Kern, CA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name): if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** Lincoln Grantor Farms, LLC | | | | | |
| **1b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **1c. MAILING ADDRESS** 1306 W. Herndon Ave. Ste 101 | CITY Fresno | STATE CA | POSTAL CODE 93711 | | COUNTRY USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name): if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | | |
| **2b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **2c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | | COUNTRY |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME** AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | | | | | |
| **3b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **3c. MAILING ADDRESS** 6000 Westown Parkway | CITY West Des Moines | STATE IA | POSTAL CODE 50266 | | COUNTRY USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A legal description, attached hereto and made a part hereof.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
77141732                    AG1022                                              Maricopa Orchards, LLC

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

| 9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐ | |
|---|---|
| 9a. ORGANIZATION'S NAME  Lincoln Grantor Farms, LLC | |
| OR 9b. INDIVIDUAL'S SURNAME | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 10b. INDIVIDUAL'S SURNAME | | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☒ ASSIGNOR SECURED PARTY'S NAME:  Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME  CONTERRA AGRICULTURAL CAPITAL, LLC | | | | |
|---|---|---|---|---|
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 11c. MAILING ADDRESS  7755 Office Plaza Dr N, Suite 195 | CITY  West Des Moines | STATE  IA | POSTAL CODE  50266 | COUNTRY  USA |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| 13. ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable) | 14. This FINANCING STATEMENT:  ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☒ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate:  See Exhibit A attached hereto and made a part hereof. |

17. MISCELLANEOUS: 77141732-CA-29   49931 - Conterra Ag - County        CONTERRA AGRICULTURAL        File with: Kern, CA        AG1022   Maricopa Orchards, LLC

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# RIDER A TO UCC

Debtor:                          **Lincoln Grantor Farms, LLC**

Secured Party:                   **American Equity Investment Life Insurance Company**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

---

**RIDER A TO UCC**

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

**EXHIBIT 28**

# Guaranty

| Guarantor (give name and address) Darius Assemi 1306 W Herndon Ave #101 Fresno, CA 93711 | |
|---|---|
| **Borrowers** (give name and address) Maricopa Orchards, LLC 1306 W Herndon Ave #101 Fresno, CA 93711  Lincoln Grantor Farms, LLC 1306 W Herndon Ave #101 Fresno, CA 93711 | **Lender** (give name and address) Conterra Agricultural Capital, LLC 7755 Office Plaza Dr. North, Suite 195 West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Darius Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

[X]    **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

[ ]    **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

---

Guaranty

1

> (Note Description)
> **Note Dates: July 23, 2020**
> **Note Amount: $288,000.00**
> **Lender: Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Lincoln Grantor Farms, LLC**

☐    **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale**, together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020**, in the original principal amount of **$288,000.00**, respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

     1.    This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

     2.    Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

**Guaranty**

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.    If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.    If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.    If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.    Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.    Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.    If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.    Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.    Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.    Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.    Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.    Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

**Guaranty**

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.    It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.    Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums  as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.    To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.    The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.    Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.    This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

**Guaranty**

5

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

---

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT.** Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this _____ day of July, 2020.

**Guarantor:**


_____  7/20/2020
Signature                         Date
**Darius Assemi**


> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _FRESNO_

On _July 20, 2020_ before me, _L. Diaz, Notary Public_, personally appeared **Darius Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____
Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

> L. DIAZ
> NOTARY PUBLIC . CALIFORNIA
> COMMISSION # 2235602
> FRESNO COUNTY
> My Comm. Exp. April 20, 2022

Guaranty

7

**EXHIBIT 29**

# Guaranty

| | |
|---|---|
| **Guarantor**<br>(give name and address)<br>Farid Assemi<br>1306 W Herndon Ave<br>#101 Fresno, CA 93711 | |
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Lincoln Grantor Farms,<br>LLC 1306 W Herndon Ave<br>#101 Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒   **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐   **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

Guaranty

1

> (Note Description)
> **Note Dates: July 23, 2020**
> **Note Amount: $288,000.00**
> **Lender: Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Lincoln Grantor Farms, LLC**

☐  **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐  **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020**, in the original principal amount of **$288,000.00**, respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.    This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.    Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

**Guaranty**

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.      If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.      If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.      If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.      Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.    Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law.  Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.    If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument.  As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.    Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.    Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.    Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.    Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.    Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.    It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.    Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.    To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.    The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.    Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.    This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

5

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.     Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.     The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.     This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

6

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED this _____ day of July, 2020.

**Guarantor:**

7/17/2020

_Signature_
**Farid Assemi**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF Fresno

On July 17, 2020 before me, L. Diaz, Notary Public , personally appeared Farid Assemi, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: L. Diaz
My commission expires: April 20, 2022

> L. DIAZ
> NOTARY PUBLIC - CALIFORNIA
> COMMISSION # 2235602
> FRESNO COUNTY
> My Comm. Exp. April 20, 2022

**Guaranty**

7

# EXHIBIT 30

# Guaranty

| Guarantor<br>(give name and address)<br>Farshid Assemi<br>1306 W Herndon Ave<br>#101 Fresno, CA 93711 | |
|---|---|
| Borrowers<br>(give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Lincoln Grantor Farms,<br>LLC 1306 W Herndon Ave<br>#101 Fresno, CA 93711 | Lender<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farshid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

[X] **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

[ ] **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

---

Guaranty

> (Note Description)
> **Note Dates: July 23, 2020**
> **Note Amount: $288,000.00**
> **Lender: Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Lincoln Grantor Farms, LLC**

☐     **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale, together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.**

☐     **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020**, in the original principal amount of **$288,000.00**, respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

      1.      This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

      2.      Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

2

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.    If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.    If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.    If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.    Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.      Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.      If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.      Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.     Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.     Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.     Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.     Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

**Guaranty**

compliance with Lender's requirements in such respect.  Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.      It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty.  It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers.  Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.      Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums  as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.      To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.      The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California.  The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California.  Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California.  Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.      Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.      This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others.  No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

**Guaranty**

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this _____ day of July, 2020.

**Guarantor:**

_Signature_ _____    7/17/2020
                                                _Date_

**Farshid Assemi**

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF CALIFORNIA
COUNTY OF _____Fresno_____

On _____July 17, 2020_____ before me, _L. Diaz, Notary Public_____, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _____L. Diaz_____
My commission expires: _____April 20, 2022_____

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

Guaranty

7

# EXHIBIT 31

# Allonge to Promissory Note

Loan # AG1022

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **July 23, 2020**

Original Amount: **$288,000.00**

Borrower Name(s): **Maricopa Orchards, LLC and Lincoln Grantor Farms, LLC**

Property Address: **20 +/- Acres, Kern County, California**

PAY TO THE ORDER OF

**American Equity Investment Life Insurance Company**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature

**Mark A. Smith, COO & General Counsel**

Allonge to Promissory Note

1

**EXHIBIT 32**

Jon Lifquist, Assessor-Recorder
Kern County Official Records

LB
7/23/2020
11:57 AM

RECORDING REQUESTED BY

OLD REPUBLIC TITLE COMPANY

Escrow No.:   1411018745
APN:   see legal

WHEN RECORDED MAIL TO

Conterra Agricultural Capital, LLC
Taylor Petersen
7755 Ofice Plaza Drive North, Suite 195,
West Des Moines, IA 50266

Recorded Electronically by:
451  Old Republic Title Company

DOC #:  220096755

220096755

| Stat Types: | 1 | Pages: 4 |
|---|---|---|
| FEES | | 33.00 |
| TAXES | | .00 |
| OTHER | | .00 |
| PAID | | 33.00 |

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

## Assignment of Deed of Trust

1  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2  ☐  Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4  ☒  Exempt from fee per GC27388.1(a)(1); fee cap of $225 reached

5  ☐  Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

6  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____ (date) as document number _____

7  ☐  Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ (date) as document number(s) _____

8  ☐  Exempt from fee per GC27388.1(a)(1); maximum fees have been paid on documents in the transaction(s) recorded previously on _____ (date) as document number(s) _____

11 ☐  Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12 ☐  Exempt from fee per GC27388.1(a)(2); executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) of Part 4 of the Code of Civil Procedure)

DB/db

Recorded at Request of
Old Republic Title Company

*1411018745*

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**7755 Office Plaza Drive North, Suite 195, Suite 195**
**West Des Moines, IA 50266**

-------------------------------------------------- [Space Above This Line For Recording] --------------------------------------------------

# ASSIGNMENT OF DEED OF TRUST

**Loan # AG1022**

For Value Received, Conterra Agricultural Capital, LLC, an Iowa limited liability company ("Assignor") whose address is **7755 Office Plaza Drive North, Suite 195, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company, whose address is 6000 Westown Parkway, West Des Moines, Iowa 50266 ("Assignee")** all beneficial interest under a certain Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filings date July 23, 2020 (collectively, the "Deed of Trust" made and executed by **Lincoln Grantor Farms, LLC, a California limited liability company**, as Trustor to Old Republic Title Company, as Trustee, upon the following described property situated in **Kern County**, State of **California**:

**See Exhibit "A" attached hereto and made a part hereof.**

such Deed of Trust having been given to secure payment of **$288,000.00** _____, which Deed of Trust **is recording concurrently herewith.** (Original Amount of Principal) is of record in Book ////////// Page ////// in the Real Property Records of **Kern** County, State of **California**, together with the note(s) and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever without recourse, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Deed of Trust on
July 23 _____, 2020 _____.

---

Conterra Agricultural Capital, LLC

Signature                               7-23-2020
                                        Date
Mark A. Smith, COO & General Counsel

Witness

STATE OF IOWA
COUNTY OF Dallas

Before me, the undersigned authority, on this day personally appeared
Mark A. Smith, COO General Counsel

, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 23rd day of July, 20 2 0.

Notary, State of Iowa
Printed Name: Taylor Petersen
My Commission Expires: 11-9-2021



TAYLOR PETERSEN
Commission Number 813700
My Commission Expires
11-9-2021

This Instrument Prepared By:
PeirsonPatterson, LLP

---

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

Lot 12 of Parcel Map No. 11595 in an unincorporated area of the County of Kern, State of California and as shown on Parcel Map filed on October 28, 2011 in Book 58, Pages 144 to 147 of Parcel Maps, Kern County Records.

Except from all that portion of Lot 4 (as shown on governmental plat) lying in the Southwest corner of Northeast quarter of the Northeast quarter and those parts of Lot 5 lying within the Southeast quarter of the Northeast quarter of said section 33, an undivided 1/16th interest of all coal, oil, gas and other minerals within or underlying said land, as reserved by the State of California in the Patent recorded July 2, 1928 in Book 252 Page 222 of Official Records.

Also except from all that portion of Lot 4 (as shown on Governmental Plat) lying in the Southwest corner of Northeast Quarter of the Northeast Quarter and those parts of Lot 5 lying within the Southeast Quarter of the Northeast Quarter of said Section 33, an undivided 7/16ths of all oil, gas and other minerals within or underlying, or which may be produced, saved and sold from said land, as reserved in the Deed from Bloomfield Land Association, a corporation, dated May 11, 1939, recorded May 29, 1939 in Book 871, Page 162 of Official Records.

Also except from the remainder, 1/2 of all coal, oil, gas and other minerals within or underlying said land, as reserved by Bloomfield Land Association, in Deed recorded May 29, 1939 in Book 871, Page162 of Official Records.

Also except all minerals, oil, gas and other hydrocarbon substances in and upon the East half of the Southeast Quarter of said Section, as reserved in Deed from Mary G. Olin, a married woman, et al, to Rose Gray, a widow, dated May 29, 1939, recorded July 8, 1939 in Book 876, Page 178 of Official Records.

Also except one half of any remaining oil, gas and other minerals in and under said land as excepted by Johnston & Washer, Inc., also known as Johnston & Washer, a corporation, in Deed recorded November 23, 1977 in Book 5071, Page 594, Official Records..

Also all remaining minerals, oil, gas and other hydrocarbon substances, if any, lying in, upon and under said land were reserved by S & J Alfalfa, Inc., a California Corporation.

APN: 185-342-42

**EXHIBIT 33**

# NOTE

**Loan #AG1023**

**July 23, 2020**
[Date]

**Fresno**
[City]

**CA**
[State]

**273 +/- Acres**
**Kern County, California**
[Property Address]

**1.      BORROWERS' PROMISE TO PAY**

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Grantor Real Estate Investments, LLC**, a California limited liability company (Maricopa Orchards, LLC and Grantor Real Estate Investments, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$3,312,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company.**  Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

**2.      INTEREST**

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Borrowers will pay interest at a yearly rate of **3.750%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

**3.      SCHEDULED PAYMENTS**

**(A)    Time and Amount of Payments**

**1 payment on January 1, 2021, in the Principal amount of $56,334.23 plus all accrued interest, with interest calculated from the date of closing on the unpaid Principal balance at 3.750%% per annum; 19 consecutive semi-annual principal and interest payments of $118,434.23 each beginning July 1, 2021, with the final payment of all remaining Principal and interest, plus any costs and expenses, due on July 23, 2030, which is called the "Maturity Date."**

**(B)    Place of Payments**

Borrowers will make payments at 7755 Office Plaza Drive North, Suite 195, West Des Moines, IA  50266 or at a different place if required by Lender

**4.      INTEREST CALCULATION**

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days.   The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to Principal, and finally to late charges.

---

MULTISTATE FIXED RATE NOTE

1

5. **PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

6. **INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

7. **ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

8. **DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities

MULTISTATE FIXED RATE NOTE

("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.      LENDER ADVANCES**
        Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.     GIVING OF NOTICES**
        Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.
        Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.     WAIVERS**
        Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.     UNIFORM SECURED NOTE**
        This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

                If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

---

MULTISTATE FIXED RATE NOTE

13. **USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

14. **DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

(A)    **Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

(1)    If Borrowers fail to repay any interest or Principal under the Note when due;

(2)    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

(3)    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

(4)    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

(5)    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

(6)    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

(7)    If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

(B)    **Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

(C)    **Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

(D)    **No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay

---

MULTISTATE FIXED RATE NOTE

4

immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

(E)    **Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Grantor Real Estate Investments, LLC**
a California limited liability company

_____

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

_____

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

---

**MULTISTATE FIXED RATE NOTE**

5

# EXHIBIT 34

Jon Lifquist, Assessor-Recorder
Kern County Official Records

DD
7/23/2020
11:55 AM

Recorded at Request of
Old Republic Title Company

141101874 6

Recorded Electronically by:
451  Old Republic Title Company

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**7755 Office Plaza Dr. North, Suite 195**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

**DOC#:** 220096746



220096746

| Stat Types: 3 | Pages: 15 |
|---|---|
| FEES | 108.00 |
| TAXES | .00 |
| OTHER | 225.00 |
| PAID | 333.00 |



_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST

# Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1023**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document.  Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)  "Security Instrument"** means this document, which is dated **July 23, 2020,** together with all Riders to this document.

**(B)  "Lender"** is **Conterra Agricultural Capital, LLC.** Lender is a **limited liability company** organized and existing under the laws of **Iowa.** Lender's address is **7755 Office Plaza Dr. North, Suite 195 West Des Moines, IA 50266.** Lender is the beneficiary under this Security Instrument.

**(C)  "Borrower"** is **Grantor Real Estate Investments, LLC, a California limited liability company.** Borrower is the trustor under this Security Instrument.  **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liabilty company.** Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

**(D)  "Trustee"** is Old Republic Title Company.

**(E)  "Note"** means the promissory note signed by Borrower Parties and dated **July 23, 2020.** The **"Note"** states that Borrower Parties owe Lender **Three Million Three Hundred Twelve Thousand and No/100 ($3,312,000.00),** plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 23, 2030.**

**(F)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)  "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)  "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties,

**CALIFORNIA–UNIFORM INSTRUMENT**

1

recorded or not recorded. The following Riders are to be executed by Borrower and/or Borrower Parties:

☐ Irrigation Equipment Rider                    ☐ Water Rights Rider

☐ Financial Information and Covenants Rider     ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider                      ☐ Adjustable Rate Rider

☐ Other(s):

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note. For this purpose, Borrower irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kern, California**:

**PARCEL 1:**
**The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.**
**APN: 521-160-06**

**PARCEL 2:**
**The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.**
**APN: 521-160-07**

**PARCEL 3:**
**The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section 4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.**
**APN: 060-050-15**

**CALIFORNIA—UNIFORM INSTRUMENT**

which currently has the address of:

**273 +/- Acres of Agricultural Land**
**Kern County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Kern, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**CALIFORNIA--UNIFORM INSTRUMENT**

3

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so

---

**CALIFORNIA--UNIFORM INSTRUMENT**

4

long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties.

CALIFORNIA--UNIFORM INSTRUMENT

If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrower shall be in default if, during the loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate

CALIFORNIA–UNIFORM INSTRUMENT

6

building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument,

CALIFORNIA–UNIFORM INSTRUMENT

7

whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless

CALIFORNIA--UNIFORM INSTRUMENT

Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing

**CALIFORNIA--UNIFORM INSTRUMENT**

9

this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that

CALIFORNIA--UNIFORM INSTRUMENT

any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

CALIFORNIA--UNIFORM INSTRUMENT

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the**

CALIFORNIA--UNIFORM INSTRUMENT

Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)  In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)  Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)  Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)  at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)  the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

CALIFORNIA--UNIFORM INSTRUMENT

13

(d)    Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA–UNIFORM INSTRUMENT**

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower.

**"BORROWER"**  Grantor Real Estate

**Grantor Real Estate Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager          Assemi

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF  Fresno

On  July 20, 2020  before me,  L. Diaz, Notary Public  , personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: L. Diaz
My commission expires: April 20, 2022

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

**CALIFORNIA--UNIFORM INSTRUMENT**

15

**EXHIBIT 35**






**STATE OF CALIFORNIA**
*Office of the Secretary of State, Alex Padilla*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U200025028422 |
| Date Filed: 10/12/2020 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| GRANTOR REAL ESTATE INVESTMENTS, LLC | 1306 W HERNDON AVE. STE 101 FRESNO, CA 93711 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 6000 WESTOWN PARKWAY WEST DES MOINES, IA 50266 |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 7755 OFFICE PLAZA DR N SUITE 195 WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Attached in a File

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
77152200

B0335-9681 10/12/2020 2:15 PM Received by California Secretary of State

See Rider A to UCC and Exhibit A legal description, attached hereto and made a part hereof.

B0335-9682 10/12/2020 2:15 PM Received by California Secretary of State

This page and any following pages include and merge any text received for the collateral description with any attachments.

# RIDER A TO UCC

Debtor:                        **Grantor Real Estate Investments, LLC**

Secured Party:                 **American Equity Investment Life Insurance Company**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

---

**RIDER A TO UCC**

1

B0035-9683 10/12/2020 2:15 PM Received by California Secretary of State

B0335-9684 10/12/2020 2:15 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

PARCEL 1:

The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN:  521-160-06

PARCEL 2:

The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN:  521-160-07

PARCEL 3:

The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section 4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.

APN:  060-050-15

**EXHIBIT 36**

Jon Lifquist, Assessor—Recorder
Kern County Official Records

DUARTED
10/23/2020
12:19 PM

Recorded at the request of
**Public**

Recording Requested By:

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

Return To:

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

| DOC#: | 220156768 | Stat Types: 1 | Pages: 5 |
|---|---|---|---|

| | |
|---|---|
| Fees | 30.00 |
| Taxes | 0.00 |
| Others | 225.00 |
| PAID | $255.00 |

THIS SPACE IS FOR RECORDER'S USE ONLY

DOCUMENT TITLE(S)

UCC FINANCING STATEMENT  Original(UCC-1) Filing

THIS  Original(UCC-1) Filing    FIXTURE FILING IS BEING RECORDED WITH    KERN        COUNTY

Order No: 77151394

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)** 49931 - Conterra Ag -

Lien Solutions                     77151394
P.O. Box 29071
Glendale, CA  91209-9071           CALI
                                   FIXTURE

File with: Kern, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Grantor Real Estate Investments, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave. Ste 101 | Fresno | CA | 93711 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6000 Westown Parkway | West Des Moines | IA | 50266 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A legal description, attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
77151394         AG1023                                    Maricopa Orchards, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| Grantor Real Estate Investments, LLC |

OR

| 9b. INDIVIDUAL'S SURNAME | |
| --- | --- |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |

OR

| 10b. INDIVIDUAL'S SURNAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☒ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
| --- |
| CONTERRA AGRICULTURAL CAPITAL, LLC |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| 7755 Office Plaza Dr N, Suite 195 | West Des Moines | IA | 50266 | USA |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| 13. ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☒ is filed as a fixture filing |
| --- | --- |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: See Exhibit A attached hereto and made a part hereof. |

17. MISCELLANEOUS: 77151394-CA-29   49931 - Conterra Ag - County      CONTERRA AGRICULTURAL      File with: Kern, CA      AG1023   Maricopa Orchards, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# RIDER A TO UCC

Debtor:                        **Grantor Real Estate Investments, LLC**

Secured Party:                 **American Equity Investment Life Insurance Company**

Assignor Secured Party:    **Conterra Agricultural Capital, LLC**

In addition to the real property described on Exhibit A attached hereto (the "Property"), all items now or hereafter attached to the Property to the extent they are fixtures are added to the collateral described in this financing statement, together the following collateral:

All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing.

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the collateral covered by this financing statement.

RIDER A TO UCC

1

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

PARCEL 1:

The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN:  521-160-06

PARCEL 2:

The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.

APN:  521-160-07

PARCEL 3:

The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section 4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.

APN:  060-050-15

**EXHIBIT 37**

# Guaranty

| Guarantor | |
|---|---|
| (give name and address)<br>Darius Assemi<br>1306 W Herndon Ave<br>#101 Fresno, CA 93711 | |
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Grantor Real Estate Investments,<br>LLC 1306 W Herndon Ave #101<br>Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Darius Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒ **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐ **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

(Note Description)
**Note Dates: July 23, 2020**
**Note Amount: $3,312,000.00**
**Lender:  Conterra Agricultural Capital, LLC**
**Borrowers: Maricopa Orchards, LLC and Grantor Real Estate Investments, LLC**

☐    **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph.  In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020,** in the original principal amount of **$3,312,000.00,** respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.      This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.      Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

2

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.     If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.     If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.     If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.     Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.     Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.     If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.     Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.     Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.     Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.     Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.     Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

**Guaranty**

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.     It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.     Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.     To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.     The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.     Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.     This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

5

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.     Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.     The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.     This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this ____ day of July, 2020.

**Guarantor:**

_____  _____   7/20/20
Signature                                                          Date
**Darius Assemi**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _____FRESNO_____

On _July 20, 2020_ before me, _L. Diaz, Notary Public_, personally appeared **Darius Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

---

Guaranty

7

# EXHIBIT 38

# Guaranty

| Guarantor | |
|---|---|
| (give name and address)<br>Farid Assemi<br>1306 W Herndon Ave<br>#101 Fresno, CA 93711 | |
| **Borrowers** | **Lender** |
| (give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Grantor Real Estate Investments,<br>LLC 1306 W Herndon Ave #101<br>Fresno, CA 93711 | (give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒    **Continuing Guaranty.**  If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph.  In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐    **Specific Guaranty.**  If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph.  The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

Guaranty

(Note Description)
**Note Dates: July 23, 2020**
**Note Amount: $3,312,000.00**
**Lender:  Conterra Agricultural Capital, LLC**
**Borrowers: Maricopa Orchards, LLC and Grantor Real Estate Investments, LLC**

☐    **Monetary Limitation.**  If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.**  If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph.  In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020**, in the original principal amount of **$3,312,000.00**, respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero**  percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.      This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation.  In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed.  If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.      Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

2

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.    If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.    If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.    If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.    Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.    Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.    If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.    Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.    Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.    Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.    Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.    Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.     It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.     Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.     To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.     The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.     Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.     This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED this _____ day of July, 2020.

**Guarantor:**

7/17/2020

Signature _____ Date
Farid Assemi

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF FRESNO

On July 17, 2020 before me, L. Diaz, Notary Public, personally appeared Farid Assemi, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: L. Diaz
My commission expires: April 20, 2022

> L. DIAZ
> NOTARY PUBLIC · CALIFORNIA
> COMMISSION # 2235602
> FRESNO COUNTY
> My Comm. Exp. April 20, 2022

Guaranty

7

**EXHIBIT 39**

# Guaranty

| | |
|---|---|
| **Guarantor**<br>(give name and address)<br>Farshid Assemi<br>1306 W Herndon Ave<br>#101 Fresno, CA 93711 | |
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711<br><br>Grantor Real Estate Investments,<br>LLC 1306 W Herndon Ave #101<br>Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>7755 Office Plaza Dr. North, Suite 195<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farshid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

[X]    **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

[ ]    **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

---

Guaranty

1

> (Note Description)
> **Note Dates: July 23, 2020**
> **Note Amount: $3,312,000.00**
> **Lender:  Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Grantor Real Estate Investments, LLC**

☐    **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale,** together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.**  If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph.  In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the two certain promissory notes dated **July 23, 2020,** in the original principal amount of **$3,312,000.00,** respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero**  percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.    This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation.  In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed.  If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.    Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

**Guaranty**

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3. If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4. If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5. If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6. Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

Guaranty

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.      Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law.  Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.      If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument.  As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.      Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.      Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.      Lender need not notify any of the Guarantors that Lender has sued Borrowers, but if Lender gives written notice to the Guarantors that it has sued Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.      Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.      Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.   It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.   Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.   To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.   The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.   Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.   This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.     Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.     The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.     This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this _____ day of July, 2020.

**Guarantor:**

_Farshid_ _____  7/17/2020
Signature                          Date
**Farshid Assemi**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _Fresno_

On _July 17, 2020_ before me, _L. Diaz, Notary Public_, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2236602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

---

Guaranty

7

**EXHIBIT 40**

# Allonge to Promissory Note

Loan # AG1023

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **July 23, 2020**

Original Amount: **$3,312,000.00**

Borrower Name(s): **Maricopa Orchards, LLC and Grantor Real Estate Investments, LLC**

Property Address: **273 +/- Acres, Kern County, California**

PAY TO THE ORDER OF

**American Equity Investment Life Insurance Company**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

_____
Signature

**Mark A. Smith, COO & General Counsel**

**EXHIBIT 41**

RECORDING REQUESTED BY

OLD REPUBLIC TITLE COMPANY

Escrow No.:   1411018746
APN:   see legal

WHEN RECORDED MAIL TO

Conterra Agriculotural Capital, LLC
Taylor Petersen
7755 Ofice Plaza Drive North, Suite 195,
West Des Moines, IA 50266

Jon Lifquist, Assessor-Recorder
Kern County Official Records

DD
7/23/2020
11:55 AM

Recorded Electronically by:
451 Old Republic Title Company

DOC#: 220096747



220096747

| Stat Types: 1 | | Pages: 3 |
|---|---|---|
| FEES | | 30.00 |
| TAXES | | .00 |
| OTHER | | .00 |
| PAID | | 30.00 |

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## Assignment of Deed of Trust

1 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2 ☐ Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4 ☒ Exempt from fee per GC27388.1(a)(1); fee cap of $225 reached

5 ☐ Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

6 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____ (date) as document number _____

7 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded on _____ (date) as document number(s) _____

8 ☐ Exempt from fee per GC27388.1(a)(1); maximum fees have been paid on documents in the transaction(s) recorded previously on _____ (date) as document number(s) _____

11 ☐ Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12 ☐ Exempt from fee per GC27388.1(a)(2); executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) of Part 4 of the Code of Civil Procedure)

DB/db

Recorded at Request of
Old Republic Title Company

1411018746

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**7755 Office Plaza Drive North, Suite 195, Suite 195**
**West Des Moines, IA 50266**

--------------------------------------------------- [Space Above This Line For Recording] ---------------------------------------------------

# ASSIGNMENT OF DEED OF TRUST

**Loan # AG1023**

For Value Received, Conterra Agricultural Capital, LLC, an Iowa limited liability company ("Assignor") whose address is **7755 Office Plaza Drive North, Suite 195, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company, whose address is 6000 Westown Parkway, West Des Moines, Iowa 50266 ("Assignee")** all beneficial interest under a certain Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filings dated July 23, 2020, (collectively, the "Deed of Trust" made and executed by **Grantor Real Estate Investments, LLC, a California limited liability company**, as Trustor, to Old Republic Title Company, as Trustee, upon the following described property situated in **Kern** County, State of **California**:

PARCEL 1:
**The West half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.**
**APN: 521-160-06**

PARCEL 2:
**The East half (1/2) of the Southeast Quarter (1/4) of Section 33, Township 25 South, Range 25 East, M.D.B. & M., in the County of Kern, State of California.**
**APN: 521-160-07**

PARCEL 3:
**The West half of the Northwest Quarter and the West half of the East half of the Northwest Quarter of Section**
**4, Township 26 South, Range 25 East, M.D.B. & M, in the County of Kern, State of California.**
**APN: 060-050-15**

such Deed of Trust having been given to secure payment of **$3,312,000.00**            , which Deed of Trust
**is recorded concurrently herewith.**        (Original Amount of Principal)
is of record in Book //////// Page ////// in the Real Property Records of **Kern** County, State of **California**, together with the note(s) and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

California Deed of Trust Assignment - Single Family                                                                11/02

1

200909410425 [Doc Id 8457 M10032017]

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever without recourse, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Deed of Trust on ___JULY 23___, 2020____.

Conterra Agricultural Capital, LLC

_____ 7-23-2020
Signature                                    Date
Mark A. Smith, COO & General Counsel

_____
Witness

STATE OF IOWA
COUNTY OF ____Dallas____

Before me, the undersigned authority, on this day personally appeared
___Mark A. Smith, COO & General Counsel_____

, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 23rd day of July_____, 20 20.

___Taylor Petersen_____
Notary, State of Iowa
Printed Name: Taylor Petersen
My Commission Expires: 11-9-2021

TAYLOR PETERSEN
Commission Number 813700
My Commission Expires
11-9-2021

This Instrument Prepared By:
PeirsonPatterson, LLP

**EXHIBIT 42**

# NOTE

Loan #AG1069

October 15, 2021
[Date]

Fresno,
[City]

**CA**
[State]

**642 +/- Acres**
**Fresno County, California**
[Property Address]

### 1.    BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Gradon Farms, LLC**, a California limited liability company (Maricopa Orchards, LLC and Gradon Farms, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$3,852,300.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC**, an Iowa limited liability company.  Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

### 2.    INTEREST

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Borrowers will pay interest at a yearly rate of **3.500%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

### 3.    SCHEDULED PAYMENTS

**(A) Time and Amount of Payments**
**Borrower will make (i) 1 principal payment in the amount of $67,307.74 on January 1, 2022, accompanied with interest calculated from the date of closing on the unpaid principal balance at 3.500% per annum; (ii) 19 consecutive semi-annual Principal and interest payments of $134,722.99 each, due and payable on the first day of each July and January, beginning July 1, 2022, and (iii) the final payment of all remaining Principal and interest, plus any costs and expenses incurred, due on October 15, 2031, which is called the "Maturity Date."**

**(B) Place of Payments**
Borrowers will make payments at **5465 Mills Civic Parkway, Suite 195, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender.

### 4.    INTEREST CALCULATION

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days.  The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

---

MULTISTATE FIXED RATE NOTE

**5.    PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.    INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.    ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.    DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any

---

MULTISTATE FIXED RATE NOTE

guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.    LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.    WAIVERS**

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**13.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or

MULTISTATE FIXED RATE NOTE

criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

14.     **DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**
   **(A)     Event of Default**
      The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:
         **(1)**     If Borrowers fail to repay any interest or Principal under the Note when due;
         **(2)**     If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;
         **(3)**     If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;
         **(4)**     If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;
         **(5)**     If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);
         **(6)**     If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;
         **(7)**     If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.
   **(B)     Late Charge for Overdue Payments**
      If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.
   **(C)     Notice of Default**
      Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.
   **(D)     No Waiver By Lender**
      Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.
   **(E)     Payment of Lender's Costs and Expenses**
      Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those

MULTISTATE FIXED RATE NOTE

4

expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Gradon Farms, LLC**
a California limited liability company

By: Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**,
a California limited liability company

By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

---

**MULTISTATE FIXED RATE NOTE**

**EXHIBIT 43**

Recorded at Request of
Old Republic Title Company

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

**Fresno County Recorder**
**Paul Dictos, CPA**

**2021-0172474**

Recorded at the request of:
ERECORDING PARTNERS NETWORK

10/15/2021 11:49 19
Titles: 3      Pages: 18
Fees: $84.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $84.00

bove This Line For Recording Data] _____

# DEED OF TRUST
# Security Agreement, Assignment of Rents and Fixture Filing

**Loan #AG1069**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)  "Security Instrument"** means this document, which is dated **October 15, 2021,** together with all Riders to this document.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC.**  Lender is a **limited liability company** organized and existing under the laws of **Iowa.**  Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266.** Lender is the beneficiary under this Security Instrument.

**(C) "Borrower"** is **Gradon Farms, LLC, a California limited liability company.**  Grantor is the trustor under this Security Instrument.  **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liability company.**  Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

**(D)  "Trustee"** is **Old Republic Title Company.**

**(E) "Note"** means the promissory note signed by Borrower Parties and dated **October 15, 2021.** The Note states that Borrower Parties owe Lender **Three Million Eight Hundred Fifty Two Thousand Three Hundred and 00/100 ($3,852,300.00),** plus interest.  Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **October 15, 2031.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Notes, plus interest, any prepayment charges and late charges due under the Notes, and all sums due under this Security Instrument, plus interest.

**(H)  "Riders"** mean all Riders to this Security Instrument that are executed by Borrower or Borrower Parties, whether

CALIFORNIA—UNIFORM INSTRUMENT

1

recorded or whether unrecorded.  The following Riders are to be executed by Borrower or Borrower Parties:

☐  Irrigation Equipment Rider      ☐  Water Rights Rider

☒  Financial Information and Covenants Rider      ☐  Permitted Prior Encumbrance Rider

☐  Mortgage Insurance Rider      ☐  Adjustable Rate Rider

☐  Other(s): Cross Default Rider; Cross Collateralization Rider

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)  "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrower under this Security Instrument or of Borrower Parties' under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

       **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

**642 +/- Acres of Agricultural Land**
**Fresno County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

       **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made

**CALIFORNIA–UNIFORM INSTRUMENT**

thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the  real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument.  Borrower warrants and will defend generally the title to the Property against all

**CALIFORNIA--UNIFORM INSTRUMENT**

3

claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS.  Borrower covenants and agrees as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12.  Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower or Borrower Parties from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.**  Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Borrower or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.**  Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Borrower and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

CALIFORNIA--UNIFORM INSTRUMENT

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then

CALIFORNIA--UNIFORM INSTRUMENT

5

due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or Borrower Parties or any persons or entities acting at the direction of Borrower or Borrower Parties or with Borrower's or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the Security Instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Note from the date

CALIFORNIA–UNIFORM INSTRUMENT

6

of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or

**CALIFORNIA–UNIFORM INSTRUMENT**

7

modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11.  Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower or Borrower Parties.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's or Borrower Parties' acceptance of any such refund made by direct payment to Borrower or Borrower Parties will constitute a waiver of any right of action Borrower or Borrower Parties might have arising out of such overcharge.

**12.  Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  The notice address shall be Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13.  Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding

**CALIFORNIA--UNIFORM INSTRUMENT**

8

neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing,  upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrower or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of

**CALIFORNIA–UNIFORM INSTRUMENT**

acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower or Borrower Parties.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's and Borrower Parties' normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached

**CALIFORNIA–UNIFORM INSTRUMENT**

10

to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrower or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrower's and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

    **20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

    **21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

    **22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

    **23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower or Borrower Parties shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

    If Lender gives notices of default to Borrower: (i) all Rents received by Borrower or Borrower Parties shall be held by Borrower or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

CALIFORNIA–UNIFORM INSTRUMENT

11

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrower's or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower further covenants and agrees as follows:

**25. Acceleration; Remedies.** Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons

CALIFORNIA—UNIFORM INSTRUMENT

legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.  Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)     In addition to the provisions of any Loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(d)     Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower or Borrower Parties.

---

**CALIFORNIA−UNIFORM INSTRUMENT**

13

DOC #2021-0172474  Page 14 of 18

**"BORROWER"**

**Gradon Farms LLC**
a California limited liability company

_____

By: Neema Assemi
Its:  Manager

---

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate
> is attached, and not the truthfulness, accuracy, or
> validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___FRESNO___

On _October 14, 2021_ before me, _L. Diaz, Notary Public_, personally appeared
**Neema Assemi,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name:__L. Diaz_____
My commission expires:__April 20, 2022__



L. DIAZ
NOTARY PUBLIC   CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm  Exp  April 20, 2022

---

**CALIFORNIA—UNIFORM INSTRUMENT**

14

# FINANCIAL INFORMATION AND COVENANTS RIDER

**Loan # AG1069**

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this **15th day of October, 2021,** and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date given by Gradon Farms, LLC (the "Borrower") to secure promissory note (the "Note") made by Borrower and Maricopa Orchards, LLC (collectively, the "Borrower Parties") to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**642 +/- Acres**
**Fresno County, California**

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

[X] **Financials.** Annually, Lender will be provided Borrower Parties' internally prepared financial statements and tax returns within **150** days after the close of each fiscal year. Financial statements provided to Lender must include market value balance sheets and an entity-by-entity breakdown of any and all related party accounts/notes, both payable and receivable.

[X] **Debt Service Coverage Ratio.** Annually, the Assemi Group, as defined below, shall maintain at all times a debt service coverage ratio greater than or equal to 1.25:1 when measured with the December 31 financial statements.

Debt Service Coverage Ratio shall be as determined in Lender's sole discretion and based on the December 31 financial statements for The Assemi Group, as defined below, during the applicable term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income minus withdrawals, plus depreciation (except for livestock related depreciation), plus interest expense. Annual Debt Service Requirements means of all principal and interest payment due within one year on any loans or leases outstanding to Lender or any third-party lender.

[X] **Total Liabilities/Total Assets.** Annually, Borrower Parties and all guarantors of the Notes on a consolidated

MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER

1

basis shall maintain Total Liabilities to Total Assets of no more than 60%, as measured as of December 31 each year using market basis financial statements.

☒       **Transfer of Ownership.** Borrower Parties shall not, without Lender's prior written consent, convey, transfer, or pledge any ownership of the membership interests in the entities to other third-parties, excepting transfers to entities within The Assemi Group, as defined below.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means all entities identified and consolidated within the annual accountant-audited financial statements title "The Assemi Group".

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

DATED effective this l5 day of October, 2021.

**"BORROWER PARTIES"**

**Gradon Farms, LLC**
a California limited liability company

_____
By: ~~Farshid Assemi~~ Neema Assemi
Its:  Manager

**Maricopa Orchards, LLC**
a California limited liability company

_____
By: Farshid Assemi
Its:  General Manager

*[Sign Originals Only]*

_____
**MULTISTATE FINANCIAL INFORMATION AND COVENANTS RIDER**

2

**ORDER NO. :** 1421000876

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Northeast Quarter of Section 16, Township 18 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Together with the Easterly 660.03 feet of the Northwest Quarter of said Section 16.

Excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Section 16, said Northeast corner being at Coordinates Y=380, 340.97 feet and X=1,606, 371.10 feet; thence (1) along the East line of said Section 16, South 1° 26' 28" West, a distance of 13.28 feet to the Northeasterly boundary of the existing State Highway, Road 06-FRE-33; thence (2)along said Northeasterly boundary North 43° 44' 00" West, a distance of 18.60 feet to the North line of said Section 16; thence (3), along said North line South 89° 16' 39" East, a distance of 13.19 feet to the point of beginning.

Excepting therefrom 75% of all oil, gas, minerals and other hydrocarbons in, on or underlying said real property, with the right of ingress and egress to and from said real property for the purpose of exploring for, producing, removing and storing all oil, gas, hydrocarbons and other minerals and such other rights as may be necessary or convenient in the full and free exercise of the rights herein expressly reserved, as reserved in the Deed from Lyle J. Christie, an unmarried man, to Five Points Ranch, Inc., a corporation, dated July 8, 1965, recorded August 20, 1965, in Book 5207, Page 332 of Official Records, Document No. 67349.

APN: 058-080-23S and 058-080-30S

PARCEL 2:

The Southeast Quarter of Section 32, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Plats.

Excepting therefrom 75% all oil, gas and other hydrocarbon substances, as reserved in various Deeds of record.

APN: 050-100-09S

PARCEL 3:

The East-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

DOC #2021-0172474  Page 18 of 18

Excepting therefrom that portion as conveyed to The United States of America  in that certain Grant Deed Recorded August 24, 1965 in Book 5208, Page 554 of Fresno County Official Records, described as follows:

Beginning at a point in the North boundary of said Section 7, distant therealong North 89° 40' West 1940.5 feet from the Northeast corner of said Section 7; thence along said North boundary South 89° 40' East 697.0 feet; thence leaving said North boundary South 27° 32' East 2491.6 feet; thence South 89° 22' East 67.9 feet to a point in the East boundary of said Section 7; thence along said East boundary the following courses and distances:

South 0° 28' West 442.1 feet to the East Quarter corner of said Section 7; thence continuing South 0° 38' West 744.5 feet; thence leaving said East boundary and running North 27° 32' West 3173.2 feet; thence North 33° 40' West 374.4 feet; thence North 39° 48' West 358.2 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document Nos. 104217 and 104218, Official Records.

APN: 060-020-38S and 060-020-39S

**EXHIBIT 44**




B0439-8380 10/20/2021 12:11 PM Received by California Secretary of State



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210094921531 |
| Date Filed: 10/20/2021 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| GRADON FARMS, LLC | 1306 W. HERNDON AVE<br>STE 101<br>FRESNO, CA 93711 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 6000 WESTOWN PARKWAY<br>WEST DES MOINES, IA 50266 |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY<br>STE 201<br>WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Attached in a File

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
83035569

See Rider A to UCC and Exhibit A Legal Description attached hereto and made a part hereof.

B0439-8381 10/20/2021 12:11 PM Received by California Secretary of State

This page and any following pages include and merge any text received for the collateral description with any attachments.

B0439-8382 10/20/2021 12:11 PM Received by California Secretary of State

# RIDER A TO UCC

**Debtor:**                          **Gradon Farms, LLC**

**Secured Party:**                   **American Equity Investment Life Insurance Company**

**Assignors Secured Party:**         **Conterra Agricultural Capital, LLC**

    All building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property described on Exhibit A, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins;

    All of Debtor's right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired: all irrigation equipment (including but not limited to center irrigation pivots, pumps, PVC pipe, sprinklers, motors, well equipment, pumps and power units situated on the Property);

    And all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

---

RIDER A TO UCC

©PeirsonPatterson, LLP. 2021

211025000516 [Doc Id 9696 M10292018]

B0439-8383 10/20/2021 12:11 PM Received by California Secretary of State

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Northeast Quarter of Section 16, Township 18 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Together with the Easterly 660.03 feet of the Northwest Quarter of said Section 16.

Excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Section 16, said Northeast corner being at Coordinates Y=380, 340.97 feet and X=1,606, 371.10 feet; thence (1) along the East line of said Section 16, South 1° 26' 28" West, a distance of 13.28 feet to the Northeasterly boundary of the existing State Highway, Road 06-FRE-33; thence (2) along said Northeasterly boundary North 43° 44' 00" West, a distance of 18.60 feet to the North line of said Section 16; thence (3), along said North line South 89° 16' 39" East, a distance of 13.19 feet to the point of beginning.

Excepting therefrom 75% of all oil, gas, minerals and other hydrocarbons in, on or underlying said real property, with the right of ingress and egress to and from said real property for the purpose of exploring for, producing, removing and storing all oil, gas, hydrocarbons and other minerals and such other rights as may be necessary or convenient in the full and free exercise of the rights herein expressly reserved, as reserved in the Deed from Lyle J. Christie, an unmarried man, to Five Points Ranch, Inc., a corporation, dated July 8, 1965, recorded August 20, 1965, in Book 5207, Page 332 of Official Records, Document No. 67349.

APN: 058-080-23S and 058-080-30S

PARCEL 2:

The Southeast Quarter of Section 32, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Plats.

Excepting therefrom all oil, gas and other hydrocarbon substances, as reserved in various Deeds of record.

APN: 050-100-09S

PARCEL 3:

The East-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom that portion as conveyed to The United States of America  in that certain Grant Deed Recorded August 24, 1965 in Book 5208, Page 554 of Fresno County Official Records, described as follows:

Beginning at a point in the North boundary of said Section 7, distant therealong North 89° 40' West 1940.5 feet from the Northeast corner of said Section 7; thence along said North boundary South 89° 40' East 697.0 feet; thence leaving said North boundary South 27° 32' East 2491.6 feet; thence South 89° 22' East 67.9 feet to a point in the East boundary of said Section 7; thence along said East boundary the following courses and distances:

South 0° 28' West 442.1 feet to the East Quarter corner of said Section 7; thence continuing South 0° 38' West 744.5 feet; thence leaving said East boundary and running North 27° 32' West 3173.2 feet; thence North 33° 40' West 374.4 feet; thence North 39° 48' West 358.2 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document Nos. 104217 and 104218, Official Records.

APN: 060-020-38S and 060-020-39S

B0439-8384 10/20/2021 12:11 PM Received by California Secretary of State

**EXHIBIT 45**

# Guaranty

| **Guarantor**<br>(give name and address)<br>Darius Assemi<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | |
|---|---|
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>Gradon Farms, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>5465 Mills Civic Pkwy, Suite 201<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Darius Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒ **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐ **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

> (Note Description)
> **Note Date: October 15, 2021**
> **Note Amount: $3,852,300.00**
> **Lender: Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Gradon Farms, LLC**

☐     **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale**, together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐     **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the promissory note dated **October 15, 2021,** in the original principal amount of **$3,852,300.00** respectively, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

1.      This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

2.      Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.    If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.    If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.    If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.    Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of any of the Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

**Guaranty**

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.      Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law. Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.      If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument. As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.      Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.     Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.     Lender need not notify any of the Guarantors that Lender has sued any of the Borrowers, but if Lender gives written notice to the Guarantors that it has sued any of the Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.     Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.     Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

compliance with Lender's requirements in such respect.  Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.    It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers.  Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.    Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums  as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.    To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.    The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California.  The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California.  Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.    Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.    This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others.  No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT**. If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

6

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this _____ day of October, 2021.

**Guarantor:**

_____
Signature                              Date
**Darius Assemi**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _____*FRESNO*_____

On _*October 14, 2021*_ before me, _*L. Diaz, Notary Public*_, personally appeared **Darius Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _*L. Diaz*_
My commission expires: _*April 20, 2022*_

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

**Guaranty**

7

**EXHIBIT 46**

# Guaranty

| Guarantor |  |
|---|---|
| (give name and address)<br>Farid Assemi<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | |
| **Borrowers** | **Lender** |
| (give name and address)<br>Maricopa Orchards, LLC<br>Gradon Farms, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | (give name and address)<br>Conterra Agricultural Capital, LLC<br>5465 Mills Civic Pkwy, Suite 201<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒    **Continuing Guaranty.**  If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph.  In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐    **Specific Guaranty.**  If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph.   The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

---

Guaranty

1

> (Note Description)
> **Note Dates: October 15, 2021**
> **Note Amount: $3,852,300**
> **Lender: Conterra Agricultural Capital, LLC**
> **Borrowers: Maricopa Orchards, LLC and Gradon Farms, LLC**

☐    **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale**, together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐    **Percentage Limitation.** If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by the certain promissory note dated **October 15, 2021**, in the original principal amount of **$3,852,300.00**, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

     1.     This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed. If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

     2.     Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.      If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.      If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.      If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.      Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of any of the Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

**Guaranty**

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.       Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law.  Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.       If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument.  As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.       Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.      Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.      Lender need not notify any of the Guarantors that Lender has sued any of the Borrowers, but if Lender gives written notice to the Guarantors that it has sued any of the Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.      Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.      Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

Guaranty

4

compliance with Lender's requirements in such respect.  Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.     It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers.  Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.     Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums  as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.     To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.     The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California.  The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California.  Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.     Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.     This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others.  No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

5

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.     Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.     The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.     This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

**IL AND MD Only - CONFESSION OF JUDGMENT**. If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this _____ day of October, 2021.

**Guarantor:**

_____
Signature                                    Date
**Farid Assemi**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _____FRESNO_____

On _October 13, 2021_ before me, _L. Diaz, Notary Public_, personally appeared **Farid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

_____
Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2022_

L. DIAZ
NOTARY PUBLIC  CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm Exp  April 20, 2022

# EXHIBIT 47

# Guaranty

| | |
|---|---|
| **Guarantor**<br>(give name and address)<br>Farshid Assemi<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | |
| **Borrowers**<br>(give name and address)<br>Maricopa Orchards, LLC<br>Gradon Farms, LLC<br>1306 W Herndon Ave #101<br>Fresno, CA 93711 | **Lender**<br>(give name and address)<br>Conterra Agricultural Capital, LLC<br>5465 Mills Civic Pkwy, Suite 201<br>West Des Moines, IA 50266 |

FOR VALUE RECEIVED, in consideration of any and all loans or other financial accommodations heretofore or hereafter at any time made or granted to "Borrowers" by the "Lender" and as an inducement to the Lender to advance monies or continue current obligations with Borrowers or extend credit to the Borrowers, which loans, other financial accommodations, monies advanced and/or extensions of credit will or may benefit the undersigned, and which would not have been and/or will not be made without this Guaranty, the undersigned, being **Farshid Assemi** (hereinafter called "Guarantors" whether one or more, or a "Guarantor", when referring to one specifically), do hereby guarantee to the Lender the immediate payment in full of any and all of the Guaranteed Indebtedness (as hereinafter defined) when due, whether by acceleration or otherwise, and at all times thereafter.

☒ **Continuing Guaranty.** If the box adjacent to this paragraph is checked, this is a continuing guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph. In connection with a continuing guaranty hereunder, the term "Guaranteed Indebtedness" shall include (1) any and all indebtedness of every kind and character, without limit as to amount, whether now existing or hereafter arising, of Borrowers to Lender, regardless of whether evidenced by notes, drafts, acceptances, discounts, overdrafts, deeds of trust, security agreements, loan agreements, or otherwise, and regardless whether such indebtedness be fixed, contingent, primary, secondary, joint, several or joint and several, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described in (1) preceding, (3) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (1) preceding or interest described in (2) preceding, or any part thereof.

☐ **Specific Guaranty.** If the box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing all Guaranteed Indebtedness as defined in this paragraph. The term "Guaranteed Indebtedness" for purposes of a specific guaranty means any and all amounts of (1) principal, (2) interest, whether accruing before or after maturity, on any and all of the indebtedness described, and (3) reasonable attorneys' fees, reasonable costs and expenses actually incurred or suffered by Lender in the collection of the foregoing indebtedness described in (1) and (2) preceding, or any part thereof, and other amounts owing or which hereafter become owing on or in connection with the certain indebtedness, obligations or liabilities of Borrowers to Lender described below, together with all renewals, modifications and extensions thereof, even though represented by new instruments, such indebtedness being described as follows:

(Note Description)
**Note Dates: October 15, 2021**
**Note Amounts: $3,852,300**
**Lender:  Conterra Agricultural Capital, LLC**
**Borrowers: Maricopa Orchards, LLC and Gradon Farms, LLC**

☐     **Monetary Limitation.** If the box adjacent to this paragraph is checked, Guarantor's liability respecting the Guaranteed Indebtedness whether pursuant to a continuing guaranty or specific guaranty, as applicable, shall not exceed an aggregate principal amount at any time of **$0.00 of the outstanding principal balance(s) owing on the Guaranteed Indebtedness at the time Lender makes written demand upon Borrowers on above referenced Note(s) for payment under this Guaranty, it being understood and agreed that Guarantor's liability hereunder shall not in any way be reduced by any payment received by the Lender from other Guarantors on the Guaranteed Indebtedness or any proceeds received or credit applied at any foreclosure sale**, together with and plus any and all interest, attorneys' fees and costs of collection owing and which may hereafter become owing on or in connection with the Guaranteed Indebtedness.

☐     **Percentage Limitation.**  If this box adjacent to this paragraph is checked, this is a specific guaranty applicable to and guaranteeing any and all Guaranteed Indebtedness as defined in this paragraph.  In connection with this Guaranty, the term "Guaranteed Indebtedness" shall include (a) the principal indebtedness owing by Borrowers to Lender now or hereafter arising under or evidenced by certain promissory note dated **October 15, 2021**, in the original principal amount of **$3,852,000.00**, executed by Borrowers and payable to the order of Lender (the "Note"), provided however, Guarantor's obligation hereunder for that portion of the Note that represents principal shall be limited to **Zero** percent **(0.000%)** of the outstanding principal balance of the Note as of the date of maturity, whether by acceleration or otherwise (and the foregoing provision applies regardless of any subsequent foreclosure); (b) accrued but unpaid interest, whether accruing before or after maturity, on any and all of the entire outstanding indebtedness described in (a) herein; (c) all obligation of Borrowers to Lender under any documents evidencing, securing, governing and/or pertaining to all or any part of the indebtedness described in (a), and (b) herein; (d) any and all attorneys' fees, costs and expenses incurred or suffered by Lender in the making of, the administration of or collection of the foregoing indebtedness described in (a), (b) and (c) herein or the protection of preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations described in (a), (b), (c) and (d) herein.

    1.     This Guaranty shall be binding upon the Guarantors, and upon the respective heirs, administrators, executors, personal representatives, successors and assigns of each of the Guarantors, and to the extent that the Borrowers or any of the Guarantors is either a partnership or a corporation, all references herein to the Borrowers and to the Guarantors, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation.  In the event of the death of any of the Guarantors, the obligation of the estate of a deceased Guarantor hereunder shall continue in full force and effect as to: (1) the Guaranteed Indebtedness, as it exists at the date of death, and any renewals, modifications or extensions thereof, and (2) loans or advances made to or for the account of Borrowers after the date of death of a deceased Guarantor pursuant to an obligation of the Lender, under a commitment made to Borrowers prior to the date of such death, subject only to the limitation, if any be herein specified, on the amount of the Guaranteed Indebtedness hereby guaranteed.  If more than one party shall execute this Guaranty, the term "Guarantors" as used herein shall mean and refer to all parties executing this Guaranty and each of them, and all such parties shall be jointly and severally obligated hereunder.

    2.     Subject to any express limitation of liability provided hereinabove, this instrument shall be an absolute and unconditional guaranty, and the fact that at any time or from time to time the Guaranteed Indebtedness

Guaranty

2

may be paid in full shall not affect the obligation of the Guarantors with respect to the Guaranteed Indebtedness; provided, however, that any of the Guarantors may discontinue his obligations hereunder only upon actual receipt by the Lender of written notice from such discontinuing Guarantors, or any person duly authorized and acting on behalf of such discontinuing Guarantors of the discontinuance hereof as to such Guarantors; provided further, however, that no such notice of discontinuance shall affect or impair any of the agreements and obligations of such discontinuing Guarantors hereunder with respect to: (1) any and all of the Guaranteed Indebtedness owing and existing prior to the time of actual receipt of such notice by the Lender which amount shall be provided to the discontinuing Guarantor by Lender upon receipt of such written notice of discontinuance by Guarantor, (2) any and all of the Guaranteed Indebtedness created or acquired thereafter pursuant to any commitment or agreement made to or with Borrowers prior to the giving of such notice, (3) any and all extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing to which Guarantor is a party, (4) any and all interest on any of the foregoing, and (5) any and all expenses paid or incurred by the Lender in endeavoring to collect any of the foregoing, and in enforcing this Guaranty against such discontinuing Guarantors; and all of the agreements and obligations of such discontinuing Guarantors under this Guaranty shall, notwithstanding any such notice of discontinuance, remain fully in effect until all of the Guaranteed Indebtedness (including any extensions, rearrangements, restructurings, modifications or renewals of any of the foregoing enumerated items to which Guarantor is a party), and all such interest and expenses shall have been paid in full. Any such notice of discontinuance by or on behalf of any of the Guarantors shall not affect or impair the obligations hereunder of any other Guarantors who have not given such notice.

3.    If this is a continuing guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by any Guarantor's payment of any amount hereunder, including payment of all amounts due as of any specified date, but shall continue in full force and effect as against each Guarantor for the full amount, except as otherwise specified herein, of all Guaranteed Indebtedness created, incurred or arising prior to the time when notice of termination is given by the respective Guarantor to the Lender as specified herein, and until payment in full thereof. Any and all extensions of credit and financial accommodations concurrently herewith or hereafter made by Lender to Borrowers shall be conclusively presumed to have been made in acceptance hereof.

4.    If this is a specific guaranty, then this guaranty shall not be wholly or partially satisfied or extinguished by Guarantor's partial payment of any amount due on the Guaranteed Indebtedness but shall continue in full force and effect as against each Guarantor for the full amount of the Guaranteed Indebtedness until payment in full thereof.

5.    If any of the Guarantors become liable for any indebtedness owing by the Borrowers to the Lender, by endorsement or otherwise, other than pursuant to this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights the Lender may ever have against Guarantors.

6.    Guarantors, without limiting their liability hereunder in any respect, hereby consent to and waive notice of, and hereby agree that the obligations under the terms of this Guaranty shall not be in any way released, diminished, impaired, reduced or affected by the occurrence of any one or more of the following events: (a) the taking or accepting of any other security or guaranty for any or all of the Guaranteed Indebtedness; (b) any release, surrender, exchange, subordination or loss of any security at any time existing in connection with any of the Guaranteed Indebtedness; (c) any partial or total release of the liability of any of the Guarantors, or the partial or total release of any other guarantor or guarantors; (d) the death, insolvency, bankruptcy, disability or lack of corporate power of any of the Borrowers, any of the Guarantors or any party at any time liable for the payment of any or all of the Guaranteed Indebtedness, whether now existing or hereafter occurring; (e) any renewal, extension, restructuring, modification or rearrangement of the payment of any or all of the Guaranteed Indebtedness to which Guarantor is a party, or any adjustment, indulgence, forbearance or compromise that may be granted or given by the Lender to Borrowers or any of the Guarantors; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Indebtedness; (g) any failure of

**Guaranty**

3

Lender to notify the Guarantors of any renewal, extension, modification or assignment of the Guaranteed Indebtedness or any part thereof, or the release of any security or of any other action taken or not taken by the Lender against Borrowers or any new agreement between Lender and Borrowers, it being understood that Lender shall not be required to give any of the Guarantors any notice of any kind under the circumstances whatsoever with respect to or in connection with the Guaranteed Indebtedness; (h) in the event any of the Borrowers is a corporation, joint stock association or partnership, or is hereafter incorporated, the lack of enforceability of all or any part of the Guaranteed Indebtedness against Borrowers by reason of the fact that the Guaranteed Indebtedness exceeds the amount permitted by law, the act of creating the Guaranteed Indebtedness or any part thereof is ultra vires, or the officers creating same acted in excess of their authority; (i) any payments by Borrowers to Lender which is held to constitute a preference under the bankruptcy laws or any payment which Lender for any other reason is required to refund or pay to someone else; or (j) the subsequent incorporation, reorganization, merger, or consolidation of the Borrowers.

7.      Guarantors hereby waive marshalling of assets and liabilities, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any indebtedness obligation or liability to which it applies or may apply. Guarantors expressly waive each and every right to which they may be entitled by virtue of any applicable suretyship law.  Guarantors waive promptness, diligence, notice of acceptance of this Guaranty, and notice of the incurring of any obligation, indebtedness, or liability to which this Guaranty applies or may apply, and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and the taking of any other action by the Lender, and giving any notice of default or any other notice to, or making any demand on the Borrowers, any other guarantor or any other party.

8.      If, at any time, there be Other Indebtedness, as defined in this paragraph, (a) Lender, without in any manner impairing its rights hereunder, may, at its option, exercise rights of offset by applying, first, to the Other Indebtedness, any deposit balances to the credit of Borrowers and (b) Lender may apply, first, to the Other Indebtedness all payments received from Borrowers and all amounts realized by Lender from collateral or security held by Lender for the payment of Borrowers' indebtedness; provided, however, if a particular security instrument expressly requires an application different from that permitted under this paragraph, proceeds realized by Lender under such security instrument shall be applied as provided in such instrument.  As used in this paragraph, the term "Other Indebtedness" means all indebtedness, if any, of Borrowers to Lender that is not Guaranteed Indebtedness as herein defined.

9.      Any amounts received by Lender from whatsoever source on account of the Guaranteed Indebtedness may be applied by it toward the payment of such of the Guaranteed Indebtedness, and in such order of application as the Lender may from time to time elect, and notwithstanding any payments made by or for the accounts of the Guarantors pursuant to their Guaranty, the Guarantors shall not be subrogated to any rights of the Lender until such time as this Guaranty shall have been discontinued as to all of the Guarantors in the manner set forth above, and the Lender shall have received payment of the full amount of the Guaranteed Indebtedness and all of the obligations of the Guarantors hereunder.

10.      Guarantors expressly waive and bar themselves from any right to setoff, recoup or counterclaim any claim or demand against the Borrowers or against any other person liable on any part of the Guaranteed Indebtedness.

11.      Lender need not notify any of the Guarantors that Lender has sued any of the Borrowers, but if Lender gives written notice to the Guarantors that it has sued any of the Borrowers, the Guarantors shall be bound by any judgement or decree therein.

12.      Nothing herein contained shall be construed as an obligation on the part of Lender to extend credit to the Borrowers, or as an obligation to continue to extend credit.

13.      Guarantors, on demand, shall secure or make such payments on their obligations hereunder as Lender shall require, but Guarantors shall remain liable in accordance with the terms hereof notwithstanding

**Guaranty**

4

compliance with Lender's requirements in such respect. Each of the Guarantors shall furnish Lender from time to time such financial statements and other financial information as Lender may reasonably request.

14.    It shall not be necessary for Lender, in order to enforce payment hereunder by the Guarantors, first to institute suit or exhaust its remedies against Borrowers or others liable on the Guaranteed Indebtedness or to enforce its rights against any security which shall have ever been given to secure the Guaranteed Indebtedness or any guaranty. It is the intention of the parties hereto that the Guarantors shall be primarily liable, jointly and severally, with the Borrowers. Specifically, and without limiting the foregoing, the Guarantors do hereby waive and relinquish any and all rights they may have to require Lender to first proceed against Borrowers and its property.

15.    Suit may be brought against the Guarantors, joint and severally, or against any one or more of them, or less than all of them, without impairing the rights of Lender against the others of the Guarantors, and Lender may compromise any indebtedness with any one or more of the Guarantors for such sum or sums as it may see fit and release any Guarantor from all further liability to Lender for its obligations hereunder without impairing the right of Lender to demand or collect amounts due hereunder from other Guarantors not so released, provided that no such compromise with, or release of, any Guarantor shall in anywise impair the rights of the Guarantors among themselves.

16.    To secure all obligations of the Guarantors hereunder, Lender shall have a lien upon and security interest in any and all balances, credits, deposits, accounts or monies in the name of any of the Guarantors now or hereafter with the Lender and any and all property of every kind or description in the name of any of the Guarantors now or hereafter for any reason or purpose whatsoever, in the possession or control of, or in transit to the Lender or in possession or control of any agent or bailee for the Lender, and Lender may, at its election, without demand or notice of any kind to Guarantors, at any time and from time to time when any amount of the Guaranteed Indebtedness shall be due and payable, appropriate, setoff and/or apply any and all balances, credits, deposits, accounts, monies or other such property above described toward the payment of such amount or amounts in such order of application as Lender may elect.

17.    The Guaranty shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California. The proper place of venue to enforce payment of performance under the Guaranty is Fresno County, California. Guarantors irrevocably agree that any legal proceeding arising out of or in connection with the Guaranty shall be brought in a state or federal court of proper jurisdiction in Fresno County, California. Guarantors agree to pay reasonable attorneys' fees and all other collection costs if this Guaranty is placed in the hands of any attorney for collection.

18.    Lender may, from time to time, whether before or after any discontinuance of his or its obligations hereunder by any of the Guarantors, without notice to the Guarantors, or any of them, assign or transfer any or all of the Guaranteed Indebtedness or any interest therein and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Guaranteed Indebtedness shall be and remain Guaranteed Indebtedness for the purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Guaranteed Indebtedness or of any interest herein shall, to the extent of the interest of such assignee or transferee in the Guaranteed Indebtedness, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were the Lender; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee to enforce this Guaranty, for the benefit of Lender, as to that portion of the Guaranteed Indebtedness which the Lender has not assigned or transferred.

19.    This guaranty agreement, whether continuing, specific and/or limited, shall be in addition to and cumulative of, and not in substitution, novation or discharge of any and all prior or contemporaneous guaranty agreements by Guarantors, or any of them, in favor of Lender or assigned to Lender by others. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by an officer of the Lender, and then shall

Guaranty

be effective only in the specific instance and for the purpose for which given. This guaranty agreement cannot be changed orally. No notice to or demand of any of the Guarantors in any case shall of itself entitle any such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Lender in exercising the powers or rights hereunder shall impair any such right or power or be construed as a waiver hereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

20.    Unless otherwise specifically provided herein, any notice required or permitted pursuant to the terms of this Guaranty shall be in writing and shall be deemed given when hand delivered to such party, or mailed to such party, at such party's address set forth herein by certified or registered mail, return receipt requested. The addresses as set forth in this Guaranty shall be the addresses to which notices shall be sent unless the Lender or Guarantors, as applicable, shall notify the other of any change of address pursuant to the foregoing notice procedure.

21.    The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders, and the singular number used herein shall include the plural number. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts, unincorporated organizations and governments and any agency or political subdivision thereof.

22.    This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument without the necessity of all Guarantors (if more than one Guarantor) signing each counterpart. Production of any counterpart other than the one to be enforced shall not be required.

---

**IL AND MD Only - CONFESSION OF JUDGMENT.** If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

**PA only - WARRANTY OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warranty of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waives.**

By signing immediately below, Guarantor agrees to the terms of the WARRANTY OF AUTHORITY TO CONFESS JUDGMENT section.

---

**By signing below, Guarantor acknowledges and agrees (1) that Guarantor has first received, read and understood (a) the Guaranty and (b) the NOTICE TO GUARANTOR set forth below, (2) that all information**

Guaranty

6

provided to the Lender is true, correct and sufficiently complete so as not to be misleading and that the Lender has relied on such information in extending financial accommodations to the Borrowers, and (3) Guarantor agrees to all terms of the Guaranty as above stated.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED this _____ day of October, 2021.

**Guarantor:**


_____    _____
Signature                                                    Date
**Farshid Assemi**


┌─────────────────────────────────────────┐
│ A notary public or other officer completing this │
│ certificate verifies only the identity of the individual │
│ who signed the document to which this certificate │
│ is attached, and not the truthfulness, accuracy, or │
│ validity of that document. │
└─────────────────────────────────────────┘

STATE OF CALIFORNIA
COUNTY OF _____ _FRESNO_____

On _October 14, 2021_ before me, _L. Diaz, Notary Public_ _____, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: ___L. Diaz_____
My commission expires: ___April 20, 2022____

```
L. DIAZ
NOTARY PUBLIC · CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022
```

**Guaranty**

**EXHIBIT 48**

**ALLONGE TO PROMISSORY NOTE**

For purposes of endorsement of the promissory note dated October 15, 2021, executed by Maricopa Orchards, LLC, and Gradon Farms, LLC, in favor of Conterra Agricultural Capital, LLC, an Iowa limited liability company, in the original principal amount of $3,852,300.00 plus interest (the "**Note**"), this Allonge to Promissory Note is affixed and becomes a permanent part of the Note.

**PAY TO THE ORDER OF**
**American Equity Investment Life Insurance Company**
**WITHOUT RECOURSE**

Dated: October 15, 2021

                         **CONTERRA AGRICULTURAL CAPITAL, LLC,**
                         **an Iowa limited liability company**

By: _____
            Mark A. Smith
    Its:  COO & General Counsel

**EXHIBIT 49**

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2021-0172475

Recorded at the request of:
ERECORDING PARTNERS NETWORK

10/15/2021 11:49 19
Titles: 1     Pages: 4
Fees: $20.00
CA SB2 Fees:$0.00
Taxes:  $0.00
Total:  $20.00

· Recorded at Request of
Old Republic Title Company

l421000891ל

This instrument prepared by:
**PeirsonPatterson, LLP.**
**2310 Interstate 20 West, Suite 100**
**Arlington, TX  76017-1668**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Taylor Petersen**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Exempt from fee per GC27388.1;
document recorded in connection with
a concurrent transfer subject to the
imposition of documentary transfer tax

## ASSIGNMENT OF DEED OF TRUST
## (Simultaneous)

Loan ## AG1069

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA  50266**, does hereby grant, sell, assign, transfer and convey, unto **American Equity Investment Life Insurance Company**, whose address is **6000 Westown Parkway, West Des Moines, IA 50266**, all beneficial interest under a certain Deed of Trust dated **October 15, 2021**, made and executed by **Gradon Farms, LLC, a California limited liability company**, to **Old Republic Title Company**, Trustee, upon the following described property situated in **Fresno County**, State of ~~Texas~~ California

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment of a single-advance term loan in the original principal amount of **$3,852,300.00**, which Deed of Trust is being filed of record simultaneously in the official records of **Fresno County, State of California**, together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed and made to be effective this Assignment of Deed of Trust on _October 15_, 20 21_____ .

---

DOC #2021-0172475  Page 2 of 4

**Conterra Agricultural Capital, LLC**

_____ 10/15/2021
Signature                                        Date
**Mark A. Smith, COO & General Counsel**

_____
Witness    Keifer Brandt
                    Witness

STATE OF IOWA
COUNTY OF ___Polk_____    Notary Public

Before me, the undersigned authority, on this day personally appeared
___Mark A. Smith, COO & General Counsel_____

_____
, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 15ᵗʰ day of _October_____, 20 21 .

_Taylor Petersen_____
Notary, State of __Iowa_____

Printed Name: _Taylor Petersen_____
My Commission Expires: __11-9-2021___

> **TAYLOR PETERSEN**
> Commission Number 813700
> My Commission Expires
> 11-9-2021

**ORDER NO. :** 1421000876

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

PARCEL 1:

The Northeast Quarter of Section 16, Township 18 South, Range 15 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Together with the Easterly 660.03 feet of the Northwest Quarter of said Section 16.

Excepting therefrom that portion described as follows:

Beginning at the Northeast corner of said Section 16, said Northeast corner being at Coordinates Y=380, 340.97 feet and X=1,606, 371.10 feet; thence (1) along the East line of said Section 16, South 1° 26' 28" West, a distance of 13.28 feet to the Northeasterly boundary of the existing State Highway, Road 06-FRE-33; thence (2) along said Northeasterly boundary North 43° 44' 00" West, a distance of 18.60 feet to the North line of said Section 16; thence (3), along said North line South 89° 16' 39" East, a distance of 13.19 feet to the point of beginning.

Excepting therefrom 75% of all oil, gas, minerals and other hydrocarbons in, on or underlying said real property, with the right of ingress and egress to and from said real property for the purpose of exploring for, producing, removing and storing all oil, gas, hydrocarbons and other minerals and such other rights as may be necessary or convenient in the full and free exercise of the rights herein expressly reserved, as reserved in the Deed from Lyle J. Christie, an unmarried man, to Five Points Ranch, Inc., a corporation, dated July 8, 1965, recorded August 20, 1965, in Book 5207, Page 332 of Official Records, Document No. 67349.

APN: 058-080-23S and 058-080-30S

PARCEL 2:

The Southeast Quarter of Section 32, Township 17 South, Range 16 East, Mount Diablo Base and Meridian, according to the United States Government Plats.

Excepting therefrom 75% all oil, gas and other hydrocarbon substances, as reserved in various Deeds of record.

APN: 050-100-09S

PARCEL 3:

The East-half of Section 7, Township 18 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

Excepting therefrom that portion as conveyed to The United States of America in that certain Grant Deed Recorded August 24, 1965 in Book 5208, Page 554 of Fresno County Official Records, described as follows:

Beginning at a point in the North boundary of said Section 7, distant therealong North 89° 40' West 1940.5 feet from the Northeast corner of said Section 7; thence along said North boundary South 89° 40' East 697.0 feet; thence leaving said North boundary South 27° 32' East 2491.6 feet; thence South 89° 22' East 67.9 feet to a point in the East boundary of said Section 7; thence along said East boundary the following courses and distances:

South 0° 28' West 442.1 feet to the East Quarter corner of said Section 7; thence continuing South 0° 38' West 744.5 feet; thence leaving said East boundary and running North 27° 32' West 3173.2 feet; thence North 33° 40' West 374.4 feet; thence North 39° 48' West 358.2 feet to the point of beginning.

Also excepting therefrom all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the hereinabove described property or that may be produced therefrom, including, without the generality of the foregoing, all oil, natural gas and hydrocarbon substances, geothermal steam, brines and minerals in solution, and sand, gravel and aggregates and products derived therefrom, as granted to Bravo Oil Company in Deeds recorded December 29, 1965, as Document Nos. 104217 and 104218, Official Records.

APN: 060-020-38S and 060-020-39S

# EXHIBIT 50

# NOTE

Loan #AG1078

December 10, 2021        Fresno,        **CA**
[Date]        [City]        [State]

**527 +/- Acres**
**Fresno County, California**
[Property Address]

**1.  BORROWERS' PROMISE TO PAY**

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, and **Lincoln Grantor Farms, LLC**, a California limited liability company (Maricopa Orchards, LLC and Lincoln Grantor Farms, LLC are collectively referred to herein as the "Borrowers"), have received, Borrowers promise to pay U.S. **$3,530,910.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC**, an Iowa limited liability company.  Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

**2.  INTEREST**

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Borrowers will pay interest at a yearly rate of **3.500%.**

After and during the continuance of any Event of Default under this Note, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

**3.  SCHEDULED PAYMENTS**

**(A)  Time and Amount of Payments**
**Borrower will make (i) 1 principal payment in the amount of $61,692.39 on July 1, 2022, accompanied with interest calculated from the date of closing on the unpaid principal balance at 3.500% per annum; (ii) 18 consecutive semi-annual Principal and interest payments of $123,483.31 each, due and payable on the first day of each January and July, beginning January 1, 2023 and (iii) the final payment of all remaining Principal and interest, plus any costs and expenses incurred, due on December 10, 2031, which is called the "Maturity Date."**

**(B)  Place of Payments**
Borrowers will make payments at **5465 Mills Civic Parkway, Suite 195, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender.

**4.  INTEREST CALCULATION**

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days.   The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

---

**MULTISTATE FIXED RATE NOTE**

**5.    PREPAYMENTS.**

Subject to the terms of this Note, upon at least ten (10) days prior notice to Lender, Borrowers annually may prepay without premium up to 10% (either once or in the aggregate) of the Principal of this Note. Any prepayment over 10% of the Principal made by Borrowers shall be subject to and include payment of a Yield Maintenance Premium (as defined below). Upon payment in full of all Principal of this Note and payment of any accrued interest thereon and any applicable Yield Maintenance Premium, this Note shall terminate.

Yield Maintenance Premium: An amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the remaining scheduled payments of principal and interest thereon being prepaid and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the interest rate on this Note and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the rate which is equivalent to the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate, which selection shall be in Lender's sole discretion. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Issuer of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

**6.    INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).  From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.    ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.  The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.    DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any

---

MULTISTATE FIXED RATE NOTE

guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.    LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage.  Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.    WAIVERS**

Each of the Borrowers and any other person who has obligations under this Note waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due.  "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note.  That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note.  Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**13.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or

---

**MULTISTATE FIXED RATE NOTE**

criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

**14.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

**(A)    Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

**(1)**    If Borrowers fail to repay any interest or Principal under the Note when due;

**(2)**    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

**(3)**    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within thirty (30) days after written notice thereof from Lender;

**(4)**    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

**(5)**    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

**(6)**    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

**(7)**    If Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**(B)    Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

**(C)    Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

**(D)    No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(E)    Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those

---

**MULTISTATE FIXED RATE NOTE**

expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

**BORROWERS:**

**Lincoln Grantor Farms, LLC**
a California limited liability company

_____
By: Neema Assemi
Its:  Manager


**Maricopa Orchards, LLC,**
a California limited liability company

_____
By: Farshid Assemi
Its:  General Manager


*[Sign Originals Only]*

**MULTISTATE FIXED RATE NOTE**

5